WR-82,754-01
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 1/14/2015 9:09:44 PM
Accepted 1/23/2015 11:28:47 AM
ABEL ACOSTA
CLERK

MANDAMUS – RE; THEODORE LEVEE

NO. C-432-009597-1239907-A

RECEIVED
COURT OF CRIMINAL APPEALS
1/23/2015
ABEL ACOSTA, CLERK

| | | |
|---|---|---|
| Theodore Floyd Levee | ) | |
| Relator, | ) | |
| v. | ) | |
| Hon. Ruben Gonzales | ) | IN THE COURT OF CRIMINAL APPEALS OF |
| Jr. | ) | THE STATE OF TEXAS |
| Respondent | ) | |
| | ) | |

TO THE HONORABLE JUDGES OF THE COURT OF CRIMINAL APPEALS:

In re: Theodore Floyd Levee

 Please accept this document in the interest of justice and to correct a wrongful prosecution

Theodore Floyd Levee

## TABLE OF CONTENTS

1. TABLE OF CONTENTS

2. INDEX OF AURTHORITIES

3. DESIGNATION OF PARTIES

4. MOTION TO PROCEED IN FORMA PAUPERIS -     TFL 001

5. AFFIDAVIT IN SUPPORT OF MOTION –          TFL 003

6. AFFIDAVIT FOR TRUTHFULNESS -               TFL 008

7. REQUEST LEAVE TO FILE WRIT                 TFL 011

8. JURISDICTION -                             TFL 017

9.  WORD COUNT –                              TFL 010

10.     STATEMENT OF THE CASE –

        TFL  018

11.     ISSUES PRESENTED –                    TFL 019

    a. Whether the trial Court abuse its discretion interfering with plea, in violation of Rule 11 prohibition of judicial involvement in plea discussions

b. Whether the trial Court abuse its discretion in the action following the relator refusals of the agreement, thereby indicating absence of fact that the waiver was knowing, voluntary, and absent coercion, and then the Court persisting after statement by relator of intention to appeal in that action

c. Whether the trial Court abuse its discretion because relator was denied opportunity to present evidence during punishment phase of the trial in conviction and as it pertained to appeal waiver of felony conviction in Cause No. 1196215 Protective Order violation separate from conviction of Aggravated Assault

d. Whether the trial Court abuse its discretion because of it's failing to meet the requirements of a valid contract in the plea agreement -appeal waiver

e. Whether the trial Court abuse its discretion in court's refusal to allow withdrawal of appeal waiver because of the ineffective assistance of counsel, and without a hearing, as

requested informally immediately post-trial by newly attained Counsel Regan Wynn

f. Whether the trial Court abuse its discretion in refusal to allow Motion for New Trial by Attorney Wynn, because of ineffective assistance of trial counsel and without a hearing?

g. Whether the trial Court abuse its discretion because of refusal of writ and because of error in the order of the court in Habeas Corpus §11.072 application based on ineffective assistance of counsel and without a hearing as presented by newly retained Counsel David Richards

h. Whether the Court abuse its discretion because it failed to notice the ineffective assistance of counsel, in trial, punishment, withdraw request, motion for new trial and §11.072 application

12.  STATEMENT OF FACTS –                                TFL 021

a. FACT ONE TRIAL COURT INTERFERED WITH THE RIGHT TO APPEAL INPLEA AGREEMENT AND CAUSED HARM

b. FACT TWO TRIAL COURT REFUSED TO ACCEPT IMMEDIATE REQUEST TO WITHDRAW APPEAL WAVER, DENIED ANYHEARING AND CAUSED HARM

c. FACT THREE TRIAL COURT REFUSED TO ACT UPON MOTION FORNEW TRIAL THAT CLAIMED INEFFECTIVE COUNSELAND WITHOUT HEARING THEREBY CAUSING HARM

d. FACT FOUR ABUSE OF DISCRETION OCCURRED IN ACTIONS OFTHE TRIAL COURT IN THE 11.072 APPLICATION BASED ON INEFFECTIVE COUNSEL AND THE COURTS FLAWED ORDER

e. FACT FIVE COURT ABUSED DISCRETION

13.   SUMMATION OF ARGUMENT –              TFL 063

14.   ARGUMENT –                           TFL 073

15.   PRAYER –                             TFL 103

16.   APPENDIX

17.   PARTIES

Williams v. Beto, 5th Cir. 1965, 354 F.2d 698, 704

# DESIGNATION OF PARTIES

Relator

Theodore Floyd Levee
925Altara Ave
Coral Gables FL 33146
Thelevee@yahoo.com
Tel. 972-835-6777
Fax 305-665-5138


Respondent

Hon. Judge Ruben Gonzalez Jr.
432nd District Court of Texas,
401 W. Belknap
Fort Worth, TX 76196-0219
817-884-2935
817-884-3361 (fax)

Party of Interest

United States Magistrate Judge
Judge Jeffrey L. Cureton
501 West 10th Street, Room 520
Fort Worth, TX 76102
(817) 850-6690
E-Mail
USDCemergencyfile@txnd.uscourts.gov

Trial Defense Counsel

Mr. Steven Scott Bell
Bar Card Number: 00785689
9400 N Central Expy Ste 416
Dallas, TX 75231-5069
(214)-739-4477
Fax (214)-234-0062

Appellant Counsel

Mr. William Reagan Wynn
Bar Card Number: 00797708
3100 W 7th St Ste 420 Fort Worth,
TX 76107-2793
 (817)-336-5600
 Fax: (817)-336-5610

Assoc. Appellant Counsel

Mr. David L. Richards
Bar Card Number: 16845500
3001 West 5th Street, Suite 800
Fort Worth, TX 76107
(817)-332-5567
Fax: 817-885-7688

Assistant Prosecutor

Mr. Timothy Scott Rodgers
Bar Card Number: 24046741
401 W. Belknap
Fort Worth, TX 76196-0001
(817)-884-1400
Fax: 817-884-3333

Assistant Prosecutor

Mr. Lloyd Edward Whelchel
Bar Card Number: 00798579
401 W. Belknap St
Fort Worth, TX 76196
(817)-884-1641
Fax: (817-)884-3333

Assistant Criminal Prosecutor

Mr. Joe Shannon Jr.
Bar Card Number: 18107000
400 W Weatherford
Fort Worth, TX 76196-0201
(817)-884-1620
Fax: 817-884-3333

Federal Habeas Corpus Respondent Counsel
Assistant Criminal Prosecutor

Steven Waller Conder
Bar Card Number: 04656510
401 W Belknap St
 Fort Worth, TX 76102-1913
 (817)-884-1687
FAX (817) 884-1672
E-Mail sconder@tarrantcounty.com


Federal Habeas Corpus Respondent

Leighton Isles,
Director, Community Supervision
& Corrections Dept.
Tarrant County Texas
200 West Belknap Street
Fort Worth, TX 76102
Phone:
(817)-884-1600
Fax: (817)-531-5639


Persons of Interest

Complainant

Cathey Edmondson 0lds Mehl Levee 0lds
217 Harrison
Hurst TX 76053
Tele. Number (817) 282-6122

Alexandra Levee- Witness
217 Harrison
Hurst TX 76053
Tele. Number (817) 282-6122


Catherine Levee- Witness
217 Harrison
Hurst TX 76053
Tele. Number (817) 282-6122

Andrea Levee-Witness
217 Harrison
Hurst TX 76053
Tele. Number (817) 282-6122 Civil

Counsel

Charles Bennett 'Charlie' Mitchell Jr.
Naman Howell Smith & Lee, PLLC 405
Fort Worth Club Building
306 W 7th St Ste 405 Fort
Worth, TX  76102 Phone:
(817)-509-2040
Fax : (817)-509-2060

# INDEX OF AUTHORITY

354 F.2nd 698,704                                                        TFL 77

Abney v. United States, 431 U.S. 651, 656, 97 S.Ct. 2034, 2038, 52

L.Ed.2d 651 (1977).                                                      APP 1

Anderson v. Johnson, 338 F.3d 382, 392 (5th Cir. 2003)      APP 1

Arnold v. State, 685 P.2d 1261, 1265, 1267 (Alaska Ct. App. 1984)

                                                                         APP 1

Beans v. Black, 757 F.2d 933 (8th Cir.) , cert. denied, 474 U.S. 979

(1985) ;                                                                 APP 1

Brecht v. Abrahamson, 507 U.S. 619, 637-38, 113 S. Ct. 1710, 123 L.

Ed. 2d 353 (1993)                                                        APP 18

Brinegar v. United States, 338 U.S. 160, 174(1959)          TFL 74

Darden v. Wainwright, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d

144 (1986)                                                               APP 18

DeMoulin v. Kissir,446 S.W.2d 162, 165 (Mo.App.1969)      TFL 82

Ex parte Hargett, 819 S.W.2d 866, 868-69 (Tex. Crim. App. 1991)

                                                          TFL 107

Ex parte Villanueva (April 30, 2008, PD-1836-06)      TFL 107

Ex parte Wilson, 724 S.W.2d 72, 74(Tex.Cr. App.1987)      TFL 105

Griggs v. A.B. Chance Company, 503 S.W.2d 697, 704 (Mo.App.1973)

                                                          TFL 82

Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995)      APP 18

Kercheval v. United States,274 U.S. 220, 224, 71 L.Ed. ,1009, 47 S.Ct.

582 (1927).                                               TFL 76

Leland v. Oregon, 343 U.S.790, 802-03 (1952)      TFL 73

McCoy v. Wainwright, 804 F.2d 1196, 1198 (11th Cir. 1986) APP 1

McIntire, 698 S.W.2d at 660.                              TFL 105

Pharo v.Chambers Cnty., 922 S.W.2d 945, 948 (Tex. 1996)   TFL 78

Randle v. State, 847 S.W.2d 576 (Tex.Cr.App.1993)        TFL 105

re Estate of Rhea, 257 S.W.3d 787, 790 (Tex. App.-Fort Worth 2008,

                                                         TFL 78

Reyes v. State, 849 S.W.2d 812 (Tex. Crim. App. 1993)        TFL 105

Rogers v. Maggio, 714 F.2d 35, 37 (5th Cir. 1983)        APP 1

Scott v. Wainwright, 698 F.2d 427, 429 (11th Cir. 1983)        APP 1

Smith v. Phillips, 455 U.S. 209, 219, 102 S. Ct. 940, 71 L. Ed. 2d 78

(1982).        APP 18

Smith v. Phillips, 455 U.S. 209, 219, 102 S. Ct. 940, 71 L. Ed. 2d 78

(1982).        APP 18

State v Guerrero (June 5, 2013, PD-1258-12)        TFL  106

State v. Osborne, 684 P.2d 683, 691 (Wash. 1984)        APP 1

State v. Williams, 666 N.W.2d 58, 60, 65 (Wis. 2003)        TFL 104

Strickland v. Washington, 466 U.S. 668        TFL 64

Strickland v. Washington, 466 U.S. 668, 690-91, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) .                           APP 1

Strickland v. Washington, supra,466 U.S. at 687(III), 104 S.Ct. 2052

                                                                TFL 72

Strickland v. Washington, supra,466 U.S. at 687(III), 104 S.Ct. 2052

                                                                TFL 101

STRICKLAND v.WASHINGTON, 466 U.S. 668 (1984)       TFL 78

Thomas v. Lockhart, 738 F.2d 304 (8th Cir. 1984)       APP 1

Thompson v. Borg, 74 F. 3d 1571 (9th Cir. 1996        APP 18

United States v. Henderson, 72 F.3d 463, 465          APP 1

United States v. Lane, 474 U.S. 438, 449, 106 S. Ct. 725, 88 L. Ed. 2d 814 (1986)                                               APP 18

United States v. Melancon, 972 F.2d 566, 567 (5th Cir.1992).APP 1

United States v. Pruitt, 32 F.3d 431, 433 (9th Cir.1994)       APP 1

United States v. Wilkes, 20 F.3d 651, 653 (5th Cir.1994)       APP 1

Walker v. Packer, 827 S.W.2d 833, 840                     TFL 72

Walker v. Packer, 827 S.W.2d 833, 8407 Id. at 840.        TFL  101

Williams v. Beto, 5th Cir. 1965                            TFL 77

Williams v. Beto, 5th Cir. 1965, 354 F.2d 698, 704        TFL 64

**MOTION SEEKING AUTHORIZATION TO PROCEED IN FORMA PAUPERIS**

NO. C-432-009597-1239907-A


| | | |
|---|---|---|
| Theodore Floyd Levee | ) | THE COURT |
| Relator, | ) | OF CRIMINAL |
| v. | ) | APPEALS OF |
| Hon. Ruben Gonzales Jr. | ) | THE STATE OF |
| Respondent | ) | TEXAS |


TO THE HONORABLE JUDGES OF THE COURT OF

CRIMINAL APPEALS:


In re: Theodore Floyd Levee


MOTION SEEKING AUTHORIZATION TO PROCEED IN
FORMA PAUPERIS

**TFL001**

Motion the Court for an Order authorizing the relator to apply to THE

COURT OF CRIMINAL APPEALS OF THE STATE OF TEXAS

this

Writ of Mandamus, in Forma Pauperis.

In support of said Motion, Petitioner submits the attached Affidavit

in support of his Motion Seeking Authorization to Proceed in

Forma Pauperis.


Signed this 10 day of December 2014


Theodore Floyd Levee

# AFFIDAVIT IN SUPPORT OF MOTION SEEKING AUTHORIZATION TO PROCEED IN FROMA PAUPERIS

## NO. C-432-009597-1239907-A

| | | |
|---|---|---|
| Theodore Floyd Levee | ) | |
| Relator, | ) | |
| v. | ) | |
| Hon. Ruben Gonzales | ) | IN THE COURT OF CRIMINAL APPEALS OF |
| Jr. | ) | THE STATE OF TEXAS |
| Respondent | ) | |
| | ) | |

TO THE HONORABLE JUDGES OF THE COURT OF CRIMINAL APPEALS:

In re: Theodore Floyd Levee

AFFIDAVIT IN SUPPORT OF MOTION SEEKING

AUTHORIZATION TO PROCEED IN FROMA PAUPERIS

**TFL003**

I, Theodore Floyd Levee, declare that I am the relator in the above

entitled case; that in support of my motion to proceed without being

required to prepay fees, costs or give security therefor, I state that

because of my poverty I am unable to pay the costs of said proceeding

or to give security therefor; that I believe I am entitled to redress; and

that the issues which I desire to present are the following: Did the trial

court abuse its discretion?

IN support of the establishment of current financial state are the

following questions and answers;

1. Are you presently employed?                    No x

    If the answer is "no," state the date of last employment and the

amount of the salary and wages per month which you received.

    December 15 2010, salary of $108,000.00 per year.

_____

2. Have you received within the past twelve months any money from

any of the following sources?

a. Business, profession or form of self-employment?  No x

b. Rent payments, interest or dividends?   No x

c. Pensions, annuities or life insurance payment?     Yes x

d.  Gifts or inheritances?                                    Yes x

e. Any other sources?                          Yes x

If "yes," describe each source and amount received during the past

twelve months.  ANSWER;

f. May 2014, $1100.00 surrender of Annuity Lincoln National Life

g. SNAP Food Stamp Assistance 1405127147 $189.00 per month

h. Gift of 250.00 Family

3. Do you own cash, or have money in checking or savings account?

   No x

4. Do you own any real estate, stocks, bonds, notes, automobiles, or

other valuable property (excluding ordinary household furnishings and

clothing)?

   Yes x

If "yes," describe the property and state its approximate value.

ANSWER; 1997 Acura CL 2.0 in poor condition with over 200,000 miles. Cash value approximately $500.00

5. List the persons who are dependent upon you for support, state your relationship to those persons, and indicate how much you contribute toward their support.

Self .

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on October 20 2104.



Signature of Petitioner

**TFL007**

**AFFIDAVIT FOR TRUTHFULNESS**

NO. C-432-009597-1239907-A

| | | |
|---|---|---|
| Theodore Floyd | ) | |
| Levee | ) | |
| Relator, | ) | |
| v. | ) | IN THE COURT OF CRIMINAL APPEALS |
| Hon. Ruben | ) | OF THE STATE OF TEXAS |
| Gonzales Jr. | ) | |
| Respondent | ) | |

TO THE HONORABLE JUDGES OF THE COURT OF CRIMINAL APPEALS:

In re: Theodore Floyd Levee

**TFL008**

AFFIDAVIT FOR TRUTHFULNESS

Signed in the State of Florida. County of Dade

My legal name is Theodore Floyd Levee. I am presently 61 years old.

My current address of residence is 925 Altara Ave. Coral Gables. Florida 33146

I hereby state that the information contained in this application for a writ of Mandamus is true, to the best of my knowledge I also confirm that the information here is both accurate and complete and relevant information has not been omitted.

I declare under penalty of perjury that the foregoing is true and correct.

Signature of Individual

Date

December 28 2014

**TFL009**

# AFFIDAVIT OF WORD COUNT

This mandamus is below the required word count limit of 15,000 words.

**Elec Sig Theodore LEvee**

**TFL010**

# REQUEST FOR LEAVE TO FILE WRIT OF MANDAMUS AND JURISDICTION

NO. C-432-009597-1239907-A

| | | |
|---|---|---|
| Theodore Floyd | ) | |
| Levee | ) | |
| Relator, | ) | |
| v. | ) | IN THE COURT OF CRIMINAL APPEALS |
| Hon. Ruben | ) | OF THE STATE OF TEXAS |
| Gonzales Jr. | ) | |
| Respondent | ) | |

TO THE HONORABLE JUDGES OF THE COURT OF CRIMINAL APPEALS:

In re: Theodore Floyd Levee

REQUEST FOR LEAVE TO FILE WRIT OF MANDAMUS.

4-1

Comes now Theodore Floyd Levee, Relator, and request permission of the Court to file this application for writ of mandamus.

1. The purpose of the writ is to correct a manifest injustice and request this Court of Criminal Appeals to intervene by granting relief from the applicable actions and rulings of the 432nd District Court of Texas, Tarrant County, Hon. Judge Gonzales.

2. Relator, is innocent, wrongfully accused, convicted and denied his rights under due process and ineffective counsel.

3. Relator has been prevented in the intention to prove innocence, from obtaining review of or appeal from the wrongful felony conviction as it pertains to the allegation of aggravated assault and protective order violation, at the actions of the parties and the Court and is made in the interest of justice.

4. Failure in the application of due process and on the part of counsel at nearly every phase of adjudication has resulted in a grave miscarriage of justice due to factual innocence, in that substantive

4-2

evidence does not support allegation.

5. The medical records have never been factually considered, never been reviewed and those records conclusively prove realtors innocence and no crime occurred.

6. The timeliness of this writ is asked waived, in the interest of justice and the factual innocence of the relator.

7.  Indigence, the complexity of the issues, ineffectiveness of retained counsel, actions on the part of the Court and its officers and the inability to gain any pro bono support, required time learning procedure in an  attempt to protect and defend the constitutional rights of the relator acting pro se.

8. Actions of the part of the parties has contributed to the delay and untimeliness of this application.

9. As the result of the failure in

    A. the due process of law and,

    B.  ineffective assistance of counsel and,

    C.  the abridgement the Constitution of the United

States,

D. Actions and the abuse of discretion have, as such, contributed to relator's inability to

     i. Obtain effective assistance,

     ii. Obtain review,

     iii. Obtain appeal,

     iv. Obtain habeas corpus,

     v. Obtain new trial

     vi. Obtain any post-conviction consideration

     vii. Obtain hearing

          1. Of abuse of discretion

          2. Of the absence of fact in substantive medical evidence

          3. Of Proof that no crime occurred in the false claim of Aggravated Assault.

10. Actions of parties resulted in an erroneous conviction and the

**TFL014**

inability to gain any hearing to consider the absolute truth reflected in the substantive evidence contained in the records before the court.

A. Fraud on the Federal Court is alleged by relator on the part of The Tarrant County District Attorney's Office in the attempt to prevent review of the trial and proceedings.

    i. Respondent Conder's misstatement of Texas Statutes Chaper 11 requirement of service in 28 in U.S.C. 2254 necessitating Mandamus.

    ii. Prosecutor Rodgers misstatement of fact in affidavit he submitted in the support of denying 28 U.S.C. 2254

11. Mandamus is appropriate in a criminal case if the relator shows that he has no other adequate legal remedy and the act sought to be compelled is purely ministerial; a "ministerial act" is one which is accomplished without the exercise of discretion or judgment.

**TFL015**

12. The mistrial act requested has been an opportunity to present evidence in the records before the court in support of innocence in the allegation and conviction of aggravate assault.

**TFL016**

## STATEMENT OF JURISDICTION

This Court has jurisdiction to hear this original proceeding under Texas Government Code section 22.221(b)

**TFL017**

# STATEMENT OF THE CASE

Underlying Procedure

In the accusation of Aggravated Assault, ineffective assistance of trial counsel and unnoticed by the court in non-jury trial finding guilt;

Dispute in that Court failed to allow respondent to present evidence in punishment phase to finding of charges not before the court

Dispute in appeal waiver and abuse of discretion on the part of the court because of interference with the sentencing plea and appeal waiver

Dispute in failure of the court to allow immediate request by new counsel to withdraw the appeal waiver because of the ineffective assistance of counsel; And without a hearing

Dispute in the failure of the Court to allow a Motion for New Trial because of Ineffective Assistance of Trial Counsel; And without a hearing

Dispute in the failure of the court to, by its order, allow habeas corpus 11.072 because of ineffective assistance of counsel; And without a hearing

Dispute in that the trial court failed to note the constitutional ineffective assistance of counsel

Respondent

The Honorable Rubin Gonzales Jr. 432nd District Court

Tarrant County Texas

# ISSUES PRESENTED

1.      Whether the trial Court abuse its discretion interfering with plea, in violation of Rule 11 prohibition of judicial involvement in plea discussions after refusal in open court dispite defense coersion

2.      Whether the trial Court abuse its discretion in the action following the relator refusals of the agreement, thereby indicating absence of fact that the waiver was knowing, voluntary, and absent coercion, and then the Court persisting after statement by relator of intention to appeal in that action

3.      Whether the trial Court abuse its discretion because relator was denied opportunity to present evidence during punishment phase of the trial in conviction and as it pertained to appeal waiver of felony conviction in Cause No. 1196215 Protective Order violation separate from conviction of Aggravated Assault and ruling an action not before Court

4.      Whether the trial Court abuse its discretion because of it's failing to meet the requirements of a valid contract in the plea agreement -  waiver -  agreement same as recomended sentencing -no gain in waiver

5.      Whether the trial Court abuse its discretion in court's refusal to allow withdrawal of appeal waiver because of the ineffective assistance of counsel, and without a hearing, as requested informally immediately post-trial by newly attained Counsel Regan Wynn

6.     Whether the trial Court abuse its discretion in refusal to allow Motion for New Trial by Attorney Wynn, because of ineffective assistance of trial counsel and without a hearing?

7.     Whether the trial Court abuse its discretion because of refusal of writ and because of error in the order of the court in Habeas Corpus § 11.072 application based on ineffective assistance of counsel and without a hearing as presented by newly retained Counsel David Richards

8.     Whether the Court abuse its discretion because it failed to notice the ineffective assistance of counsel, in trial, punishment, withdraw request, motion for new trial and §11.072 application

# STATEMENT OF FACTS

FACT ONE

TRIAL COURT INTERFERED WITH THE RIGHT TO APPEAL IN PLEA AGREEMENT AND CAUSED HARM

1. In the Punishment phase of the trial realtor rejected waiver of appeal right in plea agreement before the court following conviction of Aggravated Assault at the bench - (see endnote [i] "I can't waive my right to appeal" )see Appendix 22

   a. Agreement was based on two un-adjudicated pending allegations of protective order violations.- See endnote [ii] "Arrest Protective Order" -not before the court -finding.

2. Court's announced acceptance of the prerogative of relator rejecting plea agreement.-see end note [iii] "Trl. Rcd. 34.4 …Court will reject any form of plea bargain" see Appendix 21 Trial Record II Pg. 34.4

3. Court refused to allow relator opportunity to present evidence or reason for rejection at the hands of constitutionally deficient counsel. id App 21 Trl. Rcd  34.2 COURT; "Do not—don't say another word"

4. The Court,  following acceptance of rejection, conferring with prosecution and receiving  recommendation, addressed defense Counsel and defeated relators intention with recomendation that was no different than waiver waiver - id App 21 Tr. Rec Pg.34 Ln 15 "We make the same recommendation with regard to punishment…"

**TFL021**

5. Court then stated it would offer counsel an opportunity to "re-offer". – See also end note Trl .Rec.II 34.21" …offer opportunity to re-offer…"

6. Counsel asked for recess and coerced plea agreement –see end note [iv] id App 21 - Trl Rcd II 35.5 "May we go outside?"

    a. Deficient counsel again applied coercion to obtain agreement because of threats, lies, and malpractice

7. Relator informed court next attempt at plea was upon advice of counsel- see end note [v] Trl Rcd 37.6 "Based on advice of counsel…" id App 21

    a. Court rejected that plea attempt. - see end note Trl Rcd 37.8 "No this is an independent decision…"

8. Court then instructed reluctant relator in what court desired in the plea. – See end note Trl Rcd 37.10 "You many not simply state …."id App II 21

    a. Relator surrendered to the Courts demands because of fear.

        i. Offer in agreement by council did not reflect what was stated in the court, conditions where unclear and continually changed and counsels offer was observed by two witnesses. Punishment Phase Trl Rcd App 21

        ii. Defense counsel made no mention prior to sentencing of prosecutor's terms stated in open court in the

presence of two witnesses see App  19 Aff of Ruso 22 Aff of Levee

      iii.  Presentation of plea and terms contractually deficient,

9. Trial Court abused its discretion in failing to honor the refusal of agreement after acceptance of that refusal.

FACT TWO

TRIAL COURT REFUSED TO ACCEPT IMMEDIATE
REQUEST TO WITHDRAW APPEAL WAVER, DENIED ANY
HEARING AND CAUSED HARM.

Immediately upon sentencing and adjournment new counsel, Regan
Wynn was retained and immediately requested withdraw of appeal
waiver based on ineffective assistance of counsel and permission to
file appeal.

   a.  Court refused request to withdraw appeal waiver

   b.  Court refused appeal

   c.  Court refused hearing.

       i.  Mr. Wynn would not produce records per request – See
end note  Feb 2012 Regan Wynn

**TFL024**

FACT THREE

TRIAL COURT REFUSED TO ACT UPON MOTION FOR NEW TRIAL THAT CLAIMED INEFFECTIVE COUNSEL AND WITHOUT HEARING THEREBY CAUSING HARM.

1. Counsel Wynn filed a motion for new trial based on ineffective assistance of counsel. ( SEE APP  12 Motion for New trial)

    a. That motion, to the knowledge of realtor expired under rule of law

    b. And without a hearing.

2. Counsel Wynn failed to perform any other action

    a. Counsel Wynn did not inform relator of any other right or pro se action in profession of innocence.

    b. Civil Counsel Charles Mitchell met with Mr. Wynn and informed relator "a different strategy was needed" in that no action was planned or performed after motion for new trial. See end note- Mitchell Email – strategy App 14

FACT FOUR

ABUSE OF DISCRETION OCCURRED IN ACTIONS OF
THE TRIAL COURT IN THE 11.072 APPLICATION
BASED ON INEFFECTIVE COUNSEL AND THE
COURTS FLAWED ORDER.

ACTIONS VIOLATED RELATORS RIGHTS UNDER
DUE PROCESS. WRIT WAS UNKNOWN TO REALTOR,
FAILING APPEAL, FAILING SERVICE AND CAUSED
HARM

3. New Counsel David Richards was retained and spoke to the court and informed relator there were two judgments on the courts orders.

   a. A plea of not guilty

   b. A plea in open court.- See end note [viii](Judgment by the Court) App 11. APP ELEVEN; REPY AND ORDER 11.072

4. Unknown to relator, Mr. Richards filed a 11.072 application for habeas corpus - id APP 11 - The 11.072 was defective

   a. That writ was not verified by realtor as required by law

   b. That writ was deficient and defective in that it did not conform to instructions for filing a writ

5. Court issued defective order absent a finding of frivolous or findings of fact and points of law in a claim of ineffective

assistance of counsel- See end note ix(COURT'S DEFECTIVE ORDER 11.072) and absent a hearing. Id App 11 State reply and order

6. Counsel David Richards never informed relator of writ

7. Counsel David Richards did not inform relator a of right to appeal

8. In the pro se filing of a § 28 U.S.C.2254 habeas application relator learned of the existence of a state writ.

a. Realtor informed the United States District Court he was unaware of the writ

b. Absence of service as required by § Chapter 11.5  see APP 24 Service

e. Respondent Counsel Mr. Conder misinformed the court in the requirement of service in a state write- see   APPENDIX EIGHTEEN; CONDOR FRAUD ON FEDRAL COURT -MISTAMEMENT OF LAW

d. Prosecution issued an affidavit deficient in truth, fact and validity prejudicing The United States District Court.- See 13. APPENDIX THIRTEEN; PROSECUTOR RODGERS SWORN AFFIFDAVIT TO MAGISTRATE

 United States District Court dismissed 28 U.S.C. 2254 with prejudice for failing to exhaust states remedies

I.  See A End Note RULING IN FEDERAL COURT

ii. See also 13. APPENDIX THIRTEEN; PROSECUTOR RODGERS SWORN AFFIFDAVIT TO MAGISTRATE

f. The writ was not appealed because its existence was unknown

FACT FIVE

COURT ABUSED DISCRETION BECAUSE IT FAILED SERVICE IN 11.072, BECAUSE IT FAILED TO RESPECT SAFEGAURDS INTENDED TO PROTECT AGAINST INEFFECTIVE ASSISTENCE OF COUNSEL, BECUSAE IT FAILED TO ALLOW RELATOR TO PRESENT EVIDENCE AT SENTENCING, BECAUSE IT IN FAILED TO REMEDY PROSECTIONS MISSTATEMENTS WHICH INCLUDED COMPACT AGREEMENT AND BECAUSE IT FAILED TO PROVIDE A FAIR TRIAL

1. Actions on the part of counsel in admissions before open court, of failing to investigate, demonstration of failure to put on a meaningful defense, and obvious lack of operating in the best interest of relator leading to this application for relief and rehearing

   i. See APPENDIX ONE ;Constitutionally ineffective trial counsel

2. Courts officers knew or should have known applicable bond and COMPACT requirements yet misstated the agreement

3. Courts officers acted contrary to INNOCENT UNTIL PROVEN GUILTY

---

**i Realtor 33.22 " I can't give up my right to appeal"**

dollars that will be paid over the term of the probation, in addition to the completion of certain classes, among them the batterer intervention program, community service restitution.

Also pending in County Criminal Court No. 5 are two cause numbers, and this is in the form of a plea-bargain agreement in Cause Nos. 1196215 and 1201875, that at the time of the sentencing, the Defendant, having been found guilty, the Defendant, should he accept his responsibility in the unadjudicated offenses pursuant to Section 12.45 of the Texas Penal Code, may take into account the instant offenses and bar any further prosecution should the Defendant accept his responsibility by a plea of guilty.

Mr. Levee, in those respective cause numbers for the offenses of violation of a protective order, how do you plead in the two cause numbers pending in County Court -- County Criminal Court No. 5, guilty or not guilty?

THE DEFENDANT: Your Honor, I'm sorry. I'm guilty of one; I'm not guilty of the other. And I can't accept this, and I can't give up my right to appeal because the information just then was a lie.

THE COURT: All right. Thank you very much.

TFL029

STATE VS. THEODORE FLOYD LEVEE

THE DEFENDANT: I can't -- I can't --

THE COURT: Don't -- do not say another word.

All right. Mr. Levee, based upon what you have just stated, the Court will reject any form of a plea bargain with regard to this matter. And it was at that time, Mr. Levee, that you had indicated, through your attorney, that you were going to accept your responsibility in -- to these two causes. Now, those two causes shall remain in force and effect with all the bond conditions as well.

State, do you still have a recommendation with regard to punishment in these -- in the cause pending before the Court under Cause No. 1239907R?

MR. RODGERS: We do, Your Honor. We make the same recommendation including the batterer's intervention -- prevention program as you stated before. We ask that the Defendant -- the Court keep an open mind to days in jail as a condition of probation.

THE COURT: Thank you.

And, Mr. Bell, would you -- I'm going to give you an opportunity, based upon the circumstances -- if you would like to reoffer or request a Presentence Investigation Report, I'm going to allow you to do that for the purposes of what -- on the basis of what the

TFL030

**FIRST ALLEGATION PO VIOLATION April 11 2010**

1. Based on realtor not understanding the arrest – as he did not hurt his wife

    a. And the fact he was taking a pain medication administered by his wife and know by her  to cause him  harm

        i.  As stated in Victims Voluntary Statement

    b. And the Hurst Jail continued to administer pain medication as the incisions from surgery was causing pain

    c.  And the inability to talk to his wife

    d. And the magistrate hearing being unrepresented

2. Signing paper he could not read because eyeglasses where still at residence

3. Being told he could not live at home any more

    a. Realtor did not understand he could not have his wallet, pants, glasses or car.

4. Realtor was accosted by screaming spouse as he entered unlock residence

   a. Gathered his pants and glasses and his computer

   b. Was in car pulling out of drive way

   c. When Hurst Police ordered him out of car as he was backing out of drive way

   d. Placing him under arrest for PO violation

   e. The black coat described in police report was actually a support Velcro immobilizer that supported the operative arm post-surgery.

## Incident Report
## HURST POLICE DEPARTMENT

**10-2696**

Supplement No
ORIG

Reported Date
04/11/2010
Nature of Call
XXXX
Officer
LONGORIA, ADAM



### Administrative Information

| Agency | Report No | Supplement No | Reported Date | Reported Time | CAD Call No |
|---|---|---|---|---|---|
| HURST POLICE DEPARTMENT | 10-2696 | ORIG | 04/11/2010 | 15:08 | 100401987 |

| Status | Nature of Call | Location | | | |
|---|---|---|---|---|---|
| REPORT TO FOLLOW | UNKNOWN CHARGE | 401 PARKVIEW CT | | | |

| City | ZIP Code | Rep Dist | Area | Beat | From Date | From Time | To Date |
|---|---|---|---|---|---|---|---|
| HURST | 76053 | A / | HU | A | 04/11/2010 | 15:08 | 04/11/2010 |

| To Time | Officer | | Assignment | Entered by | Assignment |
|---|---|---|---|---|---|
| 15:44 | 662/LONGORIA, ADAM | | PATROL | 662 | PATROL |

| RMS Transfer | Approving Officer | Approval Date | Approval Time |
|---|---|---|---|
| Successful | 2110 | 04/12/2010 | 08:40:48 |

| Arrest Tab |
|---|
| Yes |

| # Offenses | Offense | Description | Complaint Type |
|---|---|---|---|
| 1 | PC25.07 | VIOLATE PROTECTIVE O | |

### Person Summary

| Invl | Invl No | Type | Name | MNI | Race | Sex | DOB |
|---|---|---|---|---|---|---|---|
| ARR | 1 | I | LEVEE, THEODORE FLOYD | 250260 | W | M | |
| VIC | 1 | I | LEVEE, CATHEY EDMUNDSON | 274857 | W | F | |
| VIC | 2 | I | LEVEE, ALEXANDRA ELIZABETH | 285305 | W | F | |

### Summary Narrative

ACTOR VIOLATED A PROTECTIVE ORDER ISSUED BY A COURT.

ACTOR VIOLATED A PROTECTIVE ORDER ISSUED BY A COURT.

| Report Officer | Printed At | |
|---|---|---|
| 662/LONGORIA, ADAM | 02/17/2012 12:46 | Page 1 of 3 |

**TFL033**

## ARRESTEE 1: LEVEE, THEODORE FLOYD

| Involvement | Invl No | Type | Name | | MNI | Race | Sex |
|---|---|---|---|---|---|---|---|
| ARRESTEE | 1 | Individual | LEVEE, THEODORE FLOYD | | 250260 | WHITE | MALE |

| DOB | Age | Juvenile? | Height | Weight | Hair Color | Eye Color |
|---|---|---|---|---|---|---|
| ▇▇▇▇ | 56 | No | 5'10" | 195# | BROWN | HAZEL |

| Type | Address | | City | State |
|---|---|---|---|---|
| HOME | 401 PARKVIEW CT | | HURST | TEXAS |

ZIP Code: 76053

| Type | ID No |
|---|---|
| FBI NUMBER | ▇▇▇▇ |

| Type | ID No | OLS |
|---|---|---|
| OPERATOR LICENSE | ▇▇▇▇ | TEXAS |

| Type | ID No | OLS |
|---|---|---|
| STATE IDENTIFICATION NUMBER | ▇▇▇▇ | TEXAS |

| Type | ID No |
|---|---|
| SOCIAL SECURITY NUMBER | ▇▇▇▇ |

| Phone Type | Phone No |
|---|---|
| CELL | (214)794-0920 |

Mark Type: NO SCARS MARKS OR TATTOOS

| Involvement | Arrest Type | Arrest Date | Arrest Time | Booking No | Book Date | Book Time | Status |
|---|---|---|---|---|---|---|---|
| ARRESTED | ARRESTED | 04/11/2010 | 15:14:00 | 10-1434 | 04/11/2010 | 15:44:00 | BOOKED |

| Arrest Location | City | Rep Dist |
|---|---|---|
| 401 PARKVIEW CT | HURST | A / |

| Other Booking No | Beat |
|---|---|
| 88013 | A |

| Charge | Level | Charge Literal |
|---|---|---|
| PC25.07 | A2 | VIOLATE PROTECTIVE O |

## VICTIM (Person) 1: LEVEE, CATHEY EDMUNDSON

| Involvement | Invl No | Type | Name | MNI |
|---|---|---|---|---|
| VICTIM (Person) | 1 | Individual | LEVEE, CATHEY EDMUNDSON | 274857 |

| Race | Sex | DOB | Age | Juvenile? | Height | Weight | Hair Color | Eye Color |
|---|---|---|---|---|---|---|---|---|
| WHITE | FEMALE | ▇▇▇▇ | 51 | No | 5'09" | 150# | BLONDE/STRAWBERRY | GREEN |

| Type | Address | | City | State |
|---|---|---|---|---|
| HOME | 401 PARKVIEW CT | | HURST | TEXAS |

ZIP Code: 76053

| Type | ID No | OLS |
|---|---|---|
| OPERATOR LICENSE | ▇▇▇▇ | TEXAS |

| Type | ID No |
|---|---|
| SOCIAL SECURITY NUMBER | ▇▇▇▇ |

| Phone Type | Phone No |
|---|---|
| CELL | (214)794-0094 |

Employer/School: FTW ISD

## VICTIM (Person) 2: LEVEE, ALEXANDRA ELIZABETH

| Involvement | Invl No | Type | Name | MNI |
|---|---|---|---|---|
| VICTIM (Person) | 2 | Individual | LEVEE, ALEXANDRA ELIZABETH | 285305 |

| Race | Sex | DOB | Age | Juvenile? | Height | Weight | Hair Color | Eye Color |
|---|---|---|---|---|---|---|---|---|
| WHITE | FEMALE | ▇▇▇▇ | 19 | No | 5'09" | 135# | BLONDE/STRAWBERRY | BLUE |

| Type | Address | | City | State |
|---|---|---|---|---|
| HOME | 1732 SUNGLOW DR | | ARLINGTON | TEXAS |

ZIP Code: 76006

| Type | ID No | OLS |
|---|---|---|
| OPERATOR LICENSE | ▇▇▇▇ | TEXAS |

| Type | ID No |
|---|---|
| SOCIAL SECURITY NUMBER | ▇▇▇▇ |

| Phone Type | Phone No |
|---|---|
| CELL | (817)266-3341 |

| Employer/School | Position/Grade |
|---|---|
| TCC SOUTH | STUDENT |

**TFL034**

**Modus Operandi**

Crime Code(s)
ALL OTHERS

**Narrative**

On Sunday April 11, 2010 at approximately 1508 hrs I, Officer A. Longoria #662, was dispatched to 401 Parkview Ct. in reference to a disturbance. Dispatch advised Theodore Floyd Levee, w/m ▓▓▓▓▓▓▓ was on scene and there was a valid protective order in place keeping Theodore from Cathey Levee and Alexandra Levee who reside at 401 Parkview Ct. Dispatch received a 911 call from Cathey stating Theodore was inside the house making threats towards her and Alexandra. Immediately prior to my arrival in the area dispatch informed me Cathey was hysterical and then the phone disconnected. I was familiar with the assault that occurred the night before and had knowledge of the seriousness of the injuries Cathey sustained from Theodore.

Based on the potential violence of the situation I approached the house prior to backup arriving on scene and observed Theodore getting out of a red Acura parked in the driveway. Theodore was holding a large coat which was concealing his hands as he emerged from the vehicle. With my duty weapon in hard guard position I ordered Levee to drop the jacket and get onto the ground into a prone handcuffing position. Levee complied and I placed him in double locked handcuffs, searched him, and seated him in my patrol unit 21. Levee stated he was just coming back to the house to get his car and clothing so he could leave to east Texas.

I contacted Cathey and Alexandra Levee inside the house. Cathey was in a cast and crutches from injuries she sustained in the disturbance last night with Theodore. Cathey appeared very upset, shaky, and was breathing heavily. Cathey said Theodore just barged into the house (unlocked the door) and began throwing items around, calling them names, and making threats of physical harm. Cathey said Theodore was gathering his clothes and other items and loading them into the car. Alexandra denied any physical contact from Theodore today but said Theodore told them they were going to Hell.

Officer Jiminez #650 arrived on scene and provided Cathey and Alexandra with victim's assistance information and case #10-2696.

I transported Theodore to the Hurst Jail and booked him for Violation of Protective Order under case #10-2696. Theodore said he did not understand the protective order and did not know Cathey and Alexandra were at the house at the time.

**TFL035**

Detailed History for Police Seq #100402161 As of 2/17/2012 12:45:24

Priority:4 Type:29 - MEET COMPL
Location:401 PARKVIEW CT,HU
LocCross:btwn PARKVIEW DR and DEAD END

| Created: | 04/12/2010 12:53:12 | DIS2 | 2101 |
|----------|---------------------|------|------|
| Entered: | 04/12/2010 12:54:16 | DIS2 | 2101 |
| Dispatch: | 04/12/2010 13:08:08 | DIS2 | 2101 |
| Enroute: | 04/12/2010 13:08:12 | M009 | 650 |
| Onscene: | 04/12/2010 13:09:36 | DIS2 | 2101 |
| Closed: | 04/12/2010 14:19:51 | M013 | 654 |

PrimeUnit:231P Dispo:B Type:29 - MEET COMPL
Name:THEODORE LEVEE Phone: RPaddr:
Agency:HP Group:PD Beat:A Grid:A2    ⌐ Detail

```
12:53:12  CREATE  Location:401 PARKVIEW CT,HU Type:29 Name:THEODORE LEVEE Group:PD RD/Zone:A2
                  TypeDesc:MEET COMPL LocCross:btwn PARKVIEW DR and DEAD END Priority:4 Response:1P
                  Agency:HP Map:53V LocType:S
12:54:16  ENTRY   Comment:RP IN LOBBY
                  THERE IS A PROTECTIVE ORDER AGAINST SUBJ
                  HE IS NEEDING TO GET HIS WALLET AND OTHER PERSONAL ITEMS
12:54:16  -PREMIS Comment:OCC; PPR
12:54:19  NOMORE
12:55:09  MISC    Comment:KATHY LEVEE WAS CONTACTED BY THE JAIL AND WANTED AN OFFICER TO COME OUT TO
                  THE HOUSE SINCE THEODORE WAS JUST RELEASED. SHE WAS AFRAID HE WOULD COME OVER.
13:08:03  SELECT
13:08:08  DISP    331P Operator:650 OperNames:JIMENEZ,MIGUEL
13:08:08  -PRIU   331P
13:08:12  *ENRTE  331P
13:08:51  PRMPT   331P
13:08:51  -HOLD   331P
13:09:00  DISP    231P Operator:654 OperNames:ARNOLD,DISRAELI
13:09:00  -PRIU   231P
13:09:36  ONSCN   231P Location:PD,HU
13:40:27  CHGLOC  231P
13:51:29  *ONSCN  231P
13:54:30  MISC    231P Plate:077GJF Comment:LP
14:07:29  CHGLOC  231P Location:PD,HU
14:16:46  *ONSCN  231P
14:19:49  *MISC   231P Comment:ITEMS TURNED OVER... REINFORMED ABOUT STAYING AWAY FROM PPN AND
                  ADDRESSES...
14:19:51  *CLEAR  231P Dispo:B
14:19:51  -CLEAR
14:19:51  *CLOSE
```

**TFL036**

**SECOND ACCUSATION OF PO VIOLATION**

FALSE CLAIM P.O. VIOL RESULTING IN ARREST APRIL 28 2010

It was impossible for Theodore Levee to be at 401 Parkview Hurst Texas at the time as sworn to by Cassie Figueroa in the PO violation arrest.
"Figueroa said that on Wednesday 04-28-2010 atabout 1330 hours…

Drive by once every ten minutes or so

Frequency increased to about once every five minutes

Drove by six or seven times before he parked

Watched for three or four minutes and called Alexandra Levee

Who called Cathey Levee

6/1/2010 police report states Cathey did not answer Alexandra's call

4/28/10

Claim Cathey returned call at 1430 (2:30 PM)

Five minutes after he left Alexandra returned from school

Cathey Levee called Officer Tooker #638 (Sequence #100405367)

Police report shows first call to HPD at 21:15 (9:15 PM)

Claim Theodore Levee drove around for 40 minutes

**TFL037**

Court confirmed Theodore Levee was scheduled to be in Magistrate's Court on April 28 2010 at 1 PM.

Attorney Bell instructed Theodore Levee to meet him at 12:45 -15 minutes prior to call to order.

Relator signed papers in probation office at 1524 (3:24 PM)

Mr. Levee was at court at 12:45 - Mr. Bell met Theodore Levee at appox 1:30 as Bell was late for court

Theodore Levee appeared before magistrate without Mr. Bell and entered pro se plea of not guilty at 1:15

Mr. Bell met and then discussed what was happening and also discussed a plea bargain with ten years' probation when he arrived. Mr. Bell then delivered a letter of representation to the Clerk of the Court Time stamped 2:09 PM

Mr. Bell further discussed the case and left at approximately 3 PM

Theodore Levee walked to probation department and signed in.

PO Vio. hearing in Judge Polous's courtroom Mr. Bell failed to confirm Mr. Levee was with him at the time he registered with court per time stamp. resulting in the divorce courts finding and increase in bond and

the additional requirement of GPS at $800.00 per month

The confirmation of times Levee:

a.     Court PM call was 1 PM and Levee was second case called

b.     Bell and Levee were together at 2:09 PM

c.     Levee was at Probation at 3:24 PM

Times in accusation;

a.     Arrived at 1:30

b.     Drove around several times

c.     Six or seven times starting at ever ten minutes and then ever five

minutes

d.     Smallest computation of time would be 35 minutes - 1x 10 minutes

and 5 X 5 minutes

2 x10 minutes and 4 x 5 minutes = 40 minutes

3X 10 and 3 x 5 =45 minutes d.  4X 10 and 2X 5 = 50

Estimated time alleged driving around house was then between 35

and 50 minutes

Waited three or four minutes = 55 minutes

Giving time for allegation of exchange

Arrived 1:30 earliest departure 2:15

Latest 2:20

Telephone records are available to show the times do not add up

Based on court appearance and time stamp on Clerks letter it is

impossible for Theodore Levee to be at the residence at 1:30

Based on allegation it is  impossible to depart residence and be in court.

a.     depart at 2:15 to 2:30

b.     Drive and park downtown Fort Worth – appox. 45  minutes (3:00

or 3:30 PM)
c.     Appear in Magistrates court at 1 PM call to order

d.     And then sign into Probation office several blocks away at 3:24
PM

# Counsel time stamped notice of representation

Mr. Bell's time stamped letter of representation made in the company of relator



Times per police report 10-3220

# Incident Report
## HURST POLICE DEPARTMENT

10-3220    Supplement No
ORIG



Reported Date
04/28/2010
Nature of Call
XXX
Officer
BATES,GARY

## Administrative Information

| Agency | | Report No | | Supplement No | Reported Date | | Reported Time | CAD Call No |
|---|---|---|---|---|---|---|---|---|
| HURST POLICE DEPARTMENT | | 10-3220 | | ORIG | 04/28/2010 | | 21:15 | 100405367 |

| Status | | Nature of Call | | Location | | | | |
|---|---|---|---|---|---|---|---|---|
| REPORT TO FOLLOW | | UNKNOWN CHARGE | | 401 PARKVIEW CT | | | | |

| City | | ZIP Code | Map Dbt | Area | Beat | From Date | From Time | |
|---|---|---|---|---|---|---|---|---|
| HURST | | 76053 | A / | HU | A | 04/28/2010 | 13:30 | |

| Officer | | | | Assignment | Entered by | Assignment | RMS Transfer |
|---|---|---|---|---|---|---|---|
| 558/BATES,GARY | | | | PATROL | 558 | PATROL | Successful |

| Approving Officer | | Approval Date | | Approved Time | | |
|---|---|---|---|---|---|---|
| 2133 | | 05/04/2010 | | 10:39:49 | | |

| # Offenses | Offense | | Description | | Complaint Type | |
|---|---|---|---|---|---|---|
| 1 | PC25.07 | | VIOLATE PROTECTIVE O | | | |

## Person Summary

| Invl | Invl No | Type | Name | MNI | Race | Sex |
|---|---|---|---|---|---|---|
| SUS | 1 | I | LEVEE,THEODORE FLOYD | 250260 | W | M |
| VIC | 1 | I | LEVEE,CATHEY EDMONDSON | 274857 | W | F |
| WIT | 1 | I | FIGUEROA,CASSANDRA JANEL | 312673 | W | F |
| WIT | 2 | I | LEVEE,ALEXANDRA ELIZABETH | 285305 | W | F |

## Vehicle Summary

| Invl | Type | License No | State | Lic Year | Year | Make | Model | Style | Color |
|---|---|---|---|---|---|---|---|---|---|
| SUS | 1 | | | | | ACUR | | | MAR |

## Summary Narrative

ACTOR VIOLATED A PROTECTIVE ORDER ISSUED BY A COURT.

| Report Officer | Printed At | |
|---|---|---|
| 558/BATES,GARY | 06/01/2010 16:18 | Page 1 of 3 |

**TFL042**

**Incident Report**     10-3220    Supplement No ORIG

**HURST POLICE DEPARTMENT**

### SUSPECT 1: LEVEE, THEODORE FLOYD

| Involvement | Invl No | Type | Name | | | | | MNI | Race | Sex |
|---|---|---|---|---|---|---|---|---|---|---|
| SUSPECT | 1 | Individual | LEVEE, THEODORE FLOYD | | | | | 250260 | WHITE | MALE |

| DOB | Age | Juvenile? | Height | Weight | Hair Color | Eye Color |
|---|---|---|---|---|---|---|
| | 56 | No | 5'10" | 195# | BROWN | HAZEL |

| Type | ID No | | OLS |
|---|---|---|---|
| OPERATOR LICENSE | 10803961 | | TEXAS |

### VICTIM (Person) 1: LEVEE, CATHEY EDMONDSON

| Involvement | Invl No | Type | Name | | | | | MNI |
|---|---|---|---|---|---|---|---|---|
| VICTIM (Person) | 1 | Individual | LEVEE, CATHEY EDMONDSON | | | | | 274857 |

| Race | Sex | DOB | Age | Juvenile? | Height | Weight | Hair Color | Eye Color |
|---|---|---|---|---|---|---|---|---|
| WHITE | FEMALE | | 51 | No | 5'09" | 150# | BLONDE/STRAWBERRY | GREEN |

| Type | Address | | City | State |
|---|---|---|---|---|
| HOME | ███ CT | | HURST | TEXAS |

| ZIP Code |
|---|
| 76053 |

### WITNESS 1: FIGUEROA, CASSANDRA JANEL

| Involvement | Invl No | Type | Name | | MNI | Race |
|---|---|---|---|---|---|---|
| WITNESS | 1 | Individual | FIGUEROA, CASSANDRA JANEL | | 312673 | WHITE |

| Sex | DOB | Age | Ethnicity | Juvenile? | Height | Weight | Hair Color | Eye Color |
|---|---|---|---|---|---|---|---|---|
| FEMALE | | 22 | NOT OF HISPANIC ORIGIN | No | 5'07" | 100# | BROWN | BROWN |

| Skin |
|---|
| MEDIUM |

| Type | Address | | City | State |
|---|---|---|---|---|
| HOME | ███ CT | | FORT WORTH | TEXAS |

| ZIP Code |
|---|
| 76053 |

| Type | | OLS |
|---|---|---|
| OPERATOR LICENSE | ███ | TEXAS |

| Phone Type | Phone No |
|---|---|
| CELL | (260)715-2887 |

| Alias Name | | Race | Sex | DOB | Height | Weight | Hair Color |
|---|---|---|---|---|---|---|---|
| FIGUEROA, CASSIE | | WHITE | FEMALE | 09/06/1987 | 5'07" | 100# | BROWN |

| Eye Color | Skin |
|---|---|
| BROWN | MEDIUM |

| Employer/School | Position/Grade |
|---|---|
| HOUSE SITTER | HOUSE SIT |

### WITNESS 2: LEVEE, ALEXANDRA ELIZABETH

| Involvement | Invl No | Type | Name | | MNI | Race |
|---|---|---|---|---|---|---|
| WITNESS | 2 | Individual | LEVEE, ALEXANDRA ELIZABETH | | 285305 | WHITE |

| Sex | DOB | Age | Juvenile? | Height | Weight | Hair Color | Eye Color |
|---|---|---|---|---|---|---|---|
| FEMALE | | 19 | No | 5'09" | 135# | BLONDE/STRAWBERRY | BLUE |

### Vehicle

| Involvement | Type | Make | Color | # Occupants |
|---|---|---|---|---|
| SUSPECT | AUTO | ACURA | MAROON OR BURGUNDY | 1 |

### Modus Operandi

Crime Code(s)
ALL OTHERS

### Narrative

On Thursday, 04-29-10, at about 1345 hours, I, Officer G. Bates #558, was dispatched to 401 Parkview Ct, where I met with house sitter Cassie Figueroa concerning a violation of protective order.

Figueroa started living in the house just after the original incident, but was not acquainted with Theodore Floyd Levee, white male, date of birth ███ She only recognized him from having seen the photographs inside the house.

Figueroa said that on Wednesday, 04-28-2010, at about 1330 hours, as she was trimming the hedges and working in the yard she saw a maroon early 90's Acura driving

| Report Officer | Printed At | |
|---|---|---|
| 558/BATES, GARY | 06/01/2010 16:18 | Page 2 of 3 |

**TFL043**

**Narrative**

slowly past on Bluebonnet, once every ten minutes or so. The frequency increased to about once every five minutes. He was driving by so slowly that she was able to see his face and recognize him from having seen the pictures inside the house. About the fifth time he drove by, he actually stopped on Bluebonnet, and stared at her. She looked right at his face. He was not wearing glasses and his hair was brown with a grayish tint. He probably drove by about six or seven times before he parked, about four or five houses down the street on Parkview Dr, and leaned against the hood, folded his arms, and watched Figueroa for about three or four minutes. She called Alex Mehl (Alexandra Levee), his step daughter (Figueroa's friend) to let her know what he had done. Alex called her mother, Kathy while she was on her way home. He pulled up in the driveway, got out, slammed the car door, and began walking aggressively toward Figueroa, who was inside garage at the time. Figueroa's pit bull alerted to what was happening and began coming out of the garage, which caused Levee to halt his advance. He asked, "Who the fuck are you?" Figueroa repeated the same phrase back to him. He answered, "This is my house, why are you here? Figueroa told him that to her knowledge the owner of the house was Cathey, that she was told that there was a protective order, and he should leave before something bad happened. He took another step toward Figueroa, and she then picked up a long metal bar and started tapping it on the ground to deter him from any violence he might intend for her. He asked something like, "What are you going to do, compared to me?" and started laughing. Figueroa told him that if he didn't leave she was going to start swinging, and she held the bar in a position to use it as a defensive weapon. Figueroa's dog started snarling and going toward Levee. The dog got about a foot away from him and started snapping at him. Levee then got in his car and left.

About five minutes after Levee left the location Alex returned from school. Figueroa had a family obligation that afternoon and had to leave. Cathey called the police and Officer R. Tooker #638 (seq #100405367) and they were told to ask Figueroa to call when she returned. The original case number was 10-2679.

**TFL044**

# [iii] COURT 34.2 Don't—Do not say another word.

STATE VS. THEODORE FLOYD LEVEE                                        34

THE DEFENDANT: I can't -- I can't --

THE COURT: Don't -- do not say another word.

All right. Mr. Levee, based upon what you have just stated, the Court will reject any form of a plea bargain with regard to this matter. And it was at that time, Mr. Levee, that you had indicated, through your attorney, that you were going to accept your responsibility in -- to these two causes. Now, those two causes shall remain in force and effect with all the bond conditions as well.

State, do you still have a recommendation with regard to punishment in these -- in the cause pending before the Court under Cause No. 1239907R?

MR. RODGERS: We do, Your Honor. We make the same recommendation including the batterer's intervention -- prevention program as you stated before. We ask that the Defendant -- the Court keep an open mind to days in jail as a condition of probation.

THE COURT: Thank you.

And, Mr. Bell, would you -- I'm going to give you an opportunity, based upon the circumstances -- if you would like to reoffer or request a Presentence Investigation Report, I'm going to allow you to do that for the purposes of what -- on the basis of what the

**TFL045**

## <sup>iv</sup> 35.5 May we go outside?

STATE VS. THEODORE FLOYD LEVEE   35

Defendant just stated.  What is your preference?

MR. BELL:  Can I have a moment to consult with him, Your Honor?

THE COURT:  You may.

MR. BELL:  Can we go outside?

THE COURT:  Yes, you may.  You have --

We'll be off the record.

(Recess from 4:29 p.m. to 4:34 p.m.)

(Open court, Defendant present)

THE COURT:  All right.  We're back on the record once again.

The parties have had an opportunity to consult with one another, and there is, once again, a plea-bargain agreement as regarding punishment.  In essence, the plea bargain is that if Mr. Levee pleads guilty pursuant to a 12.45, guilty to the offense -- unadjudicated offense of a violation of protective order and hereby waives his right of appeal in Cause No. 1239907R, that would be agreeable to both parties, the State and the Defense, based upon a sentencing including probation as previously set forth earlier on the record.

Is that correct, Mr. Bell?

MR. BELL:  That is correct.

THE COURT:  And is that correct, Mr. Rodgers?

TFL046

## <sup>v</sup> (37.6 Based on Advice of Counsel…)

STATE VS. THEODORE FLOYD LEVEE

THE COURT: No, it cannot. This will remain on your record indefinitely.

THE DEFENDANT: I have to follow my counsel's --

THE REPORTER: I can't hear you, sir.

THE DEFENDANT: I -- on the advice of counsel, I accept.

THE COURT: No. This is an independent decision on your part. You may give (sic) the advice of counsel, but you may not simply state that you are pleading guilty and in effect waiving your right of appeal by simply stating that it's his recommendation that you rely upon solely.

This is where you are admitting guilt, you're pleading guilty freely and voluntarily, you're waiving any right of appeal. Do you understand that? It's not subject to any condition whatsoever. This has to be a free and voluntary choice on your part. Do you understand that?

THE DEFENDANT: I do now, Your Honor.

THE COURT: Now, what is your decision?

THE DEFENDANT: I'll plead.

THE COURT: Okay. Now, Mr. Levee, based upon your response -- your response is being received and accepted as a knowing and intentional waiver on your

**TFL047**

## <sup>vi</sup> **Wynn refused to send all records dispite request.**

Print - Close Window - Click More at the bottom of the email to print single message

Subject:Re: Reagan Wynn
From:   Theodore Levee (thelevee@yahoo.com)
To:       rwynn@kearneywynn.com;
Date:    Tuesday, December 11, 2012 2:04 AM


**Theodore Laurenzana - Levee**
**Coral Gables Florida**
**972-835-6777**


**From:** Reagan Wynn <rwynn@kearneywynn.com>
**To:** Thelevee@yahoo.com
**Sent:** Wednesday, March 14, 2012 10:17 AM
**Subject:** Re: Reagan Wynn

Ted - i am out of state this week.  I will get thefile together and forwarded to Mr Mitchell next week.

Reagan

Sent from my iPad

On Mar 13, 2012, at 7:18 PM, "Thelevee@yahoo.com" <Thelevee@yahoo.com> wrote:

Please forward ALL attorneys work and a copy of the contract to Mr. Mitchell, as well as all notes, memos and any other material concerning my relationship with your firm as soon as possible. According to Mr. Amitchell he has only received the trust.

It was offered to assist me in obtaining what the court agreed to and was never done, that is return to Florida. I have lost the tuition for one class, with constitutional and administrative law classes not too far behind.
 I took the on line training for the compact and according to the sources I talked to Florida has never recieved the request.
 This is contrary to the agreement that was made and I am the only one that seems to follow the rules and keep agreements.
 I am curious however, because in the cites I found.
 The false accusations made in the 404 claiming I was accused of sexual assault of my daughter was found to be without merit and  the statement did not constitute the claim according to Hurst PD Det. Noone. In the cases I read that action would prejudice the court if were not presented to

**TFL048**

identify or if it was not substantiated. The negative cite I read said if but not for the prior ARREST, then the 404 action could be the grounds for a new trial.

I have had other attorneys read the transcript and the general consensus is the testimony against me contradicted itself many times.
While Mr. Bell referenced the medical statements, he presented no evidence and no witness.at the same time referring to them in closing argument. These statements - prior claims of how the accident happened on no way match the testimony. The statements were in a sworn bus.
Affidavit of HEB ER records.
The claim of 80% disability has no merit especially in light of the statement Cathey made to Dr. Kadoko's that she is in the chair on the advice of counsel and is really quite active.
In the transcript Mr. Bell stated he recieved states evidence as late as two days prior to trial. Meaning he did not excersize his discovery opportunity and he actually said the discord did not exist in Texas.

 Mr. Bell bullied my daughter and my friend to accept the offer to plea post finding. I can only say I am the process of getting a psych evaluation.

The mortgage lawsuit cathey filed against CITI was defeated in summary judgement. The car accident is coming up soon.

Perhaps the two greatest points were that Mr. Bell refused my request for expert medical testimony. You see one of the claims is I kicked her and broke her leg. The bone claimed is the small bone in the back of the leg. A kick from the front would have had to break both bones.

Mr. Bell was completely unprepared. He actually told the judge he did not do appeals when the judge asked if he advised his client concerning appeal rights. It was not in the transcript however but Risa and my daughter heard it as well . The court may have been off the record at the time.

I ask that you please excuse my bitterness.


Sent from my iPad

Begin forwarded message:

**From:** Charles Mitchell <cmitchell@namanhowell.com>
**Date:** February 28, 2012 2:39:58 PM CST
**To:** 'Theodore Levee' <thelevee@yahoo.com>
**Cc:** Patty Rien <prien@namanhowell.com>
**Subject: Reagan Wynn**

Ted:

I've spoken with Reagan. He is forwarding his contract to me and the monies you have in escrow. You owe the Probation Department or the monitoring company $845.00 I instructed

Reagan to pay that out of the escrow monies. He also said he'd be happy to assist you in trying to get you transferred to Florida. He advised that prior to deduction for the $845.00 there was $13,300.00 in escrow.

Yours truly,

**Charles B. Mitchell, Jr., Esq.**
Naman Howell Smith & Lee, PLLC
Fort Worth Club Building
306 West 7th Street, Suite 405
Fort Worth, Texas 76102-4911
(817)509-2025 (main)
(817)509-2040 (direct)
(817)509-2060 (fax)
Email: cmitchell@namanhowell.com
Licensed in Texas and Arkansas

To Learn More visit www.namanhowell.com

*******************
The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential.  If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited.  If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

Important/Confidential: This communication and any files or documents attached to it are intended only for the use of the person or entity to which it is addressed. It contains information that may be privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient of this communication, you are hereby notified that the copying, distribution or other use of this communication is strictly prohibited. If you have received this communication by mistake, please notify the sender immediately by electronic mail and destroy all forms of this communication (electronic or paper). Thank you.

=

**TFL050**

## MITCHELL EMAIL STRATEGY FOLLOWING MEETING WITH WYNN

Wynn- Mitchell meeting Feb 2012 strategy change.

Print - Close Window - Click More at the bottom of the email to print single message

Subject:Re: Meeting with Mr. Wynn, Esq.
From:    Charles Mitchell (cmitchell@namanhowell.com)
To:      thelevee@yahoo.com;
Cc:      prien@namanhowell.com;
Date:    Tuesday, January 24, 2012 6:33 AM


Contact patty to schedule.

----- Original Message -----
From: The levee@yahoo.com [mailto:Thelevee@yahoo.com]
Sent: Tuesday, January 24, 2012 02:20 AM
To: Charles Mitchell
Subject: Meeting with Mr. Wynn, Esq.

Mr. Wynn has requested a time I can meet with him and my desire mr. Mitchell be present. Mr. Wynn does not have the depth of the evidence nor the full picture of the actions of previous council.
It would serve my best interest if the two attorneys had a coordination of the information going forward.
If you agreeable, how is the best way to coordinate a meeting? I am to call Mr. Wynn and set up the time Tuesday morning, January 24.

Sent from my iPad


Important/Confidential: This communication and any files or documents attached to it are intended only for the use of the person or entity to which it is addressed. It contains information that may be privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient of this communication, you are hereby notified that the copying, distribution or other use of this communication is strictly prohibited. If you have received this communication by mistake, please notify the sender immediately by electronic mail and destroy

**TFL051**

From:Charles Mitchell (cmitchell@namanhowell.com)

To:    thelevee@yahoo.com;

Cc:    prien@namanhowell.com; cmitchell@namanhowell.com;

Date: Friday, February 10, 2012 9:57 AM


Mr. Levee:

Take your trip mEeting with Wynn went well have full understanding of where you are in criminal case. Some changes in strategy necessary will explain to you next week.

Charles Mitchell

## viii JUDGEMENT BY THE COURT showing plea of guilty and plea in open court

CASE NO. 1239907R    COUNT ONE
INCIDENT NO./TRN: 9094465345

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 432ND DISTRICT COURT |
| v. | § § § | |
| THEODORE FLOYD LEVEE | § § | TARRANT COUNTY, TEXAS |
| STATE ID NO.: TX08578043 | § § | |

### JUDGMENT OF CONVICTION BY COURT—WAIVER OF JURY TRIAL

| | | | |
|---|---|---|---|
| Judge Presiding: | HON. RUBEN GONZALEZ JR. | Date Judgment Entered: | 10/14/2011 |
| Attorney for State: | JOE SHANNON, JR. TIMOTHY RODGERS | Attorney for Defendant: | STEVEN BELL |

Offense for which Defendant Convicted:
**AGGRAVATED ASSAULT CAUSING SERIOUS BODILY INJURY**

| Charging Instrument: | Statute for Offense: |
|---|---|
| Indictment | 22.02(a)(1) PC |

Date of Offense:
**4/10/2010**

| Degree of Offense: | Plea to Offense: | Findings on Deadly Weapon: |
|---|---|---|
| 2ND DEGREE FELONY | NOT GUILTY | N/A |

Terms of Plea Bargain:
**OPEN PLEA TO THE COURT**

| Plea to 1st Enhancement Paragraph: | Plea to 2nd Enhancement/Habitual Paragraph: |
|---|---|
| N/A | N/A |
| Findings on 1st Enhancement Paragraph: | Findings on 2nd Enhancement/Habitual Paragraph: |
| N/A | N/A |

| Date Sentence Imposed: | 10/14/2011 | Date Sentence to Commence: | 10/14/2011 |
|---|---|---|---|

Punishment and Place of Confinement: **10 YEARS Institutional Division, TDCJ**

THIS SENTENCE SHALL RUN **N/A.**

☒ SENTENCE OF CONFINEMENT SUSPENDED, DEFENDANT PLACED ON COMMUNITY SUPERVISION FOR **10 Years.**

| Fine: | Court Costs: | Restitution: | Restitution Payable to: |
|---|---|---|---|
| $1,000.00 Not Suspended | $284.00 | N/A | ☐ VICTIM (see below)  ☐ AGENCY/AGENT (see below) |

Sex Offender Registration Requirements do not apply to the Defendant. TEX. CODE CRIM. PROC. chapter 62

The age of the victim at the time of the offense was **N/A** .

| Time Credited: | If Defendant is to serve sentence in TDCJ, enter incarceration periods in chronological order. |
|---|---|
| | If Defendant is to serve sentence in county jail or is given credit toward fine and costs, enter days credited below. |
| | N/A Days  Notes: N/A |

All pertinent information, names and assessments indicated above are incorporated into the language of the judgment below by reference.

This cause was called for trial in TARRANT County, Texas. The State appeared by her District Attorney.
Counsel / Waiver of Counsel (select one)
☒ Defendant appeared in person with Counsel.

004

Case No. 1239907R                                    Page __1__ of __3__

**TFL053**

# <sup>ix</sup> COURTS DEFECTIVE  11.072 ORDER

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

NO. C-432-009597-1239907-AP

JUL 05 2012

TIME _2:46_

EX PARTE                              §      IN THE 432ND JUDICIAL __ DEPUTY
                                      §
                                      §      DISTRICT COURT OF
                                      §
THEODORE FLOYD LEVEE                   §      TARRANT COUNTY, TEXAS

ORDER

The Court orders that the applicant's requested relief in this application for writ of habeas corpus be denied.

SIGNED AND ENTERED this the 2ND day of _July, 2012_.

_____
JUDGE PRESIDING

SCANNED

037

**TFL054**

# <sup>x</sup> RULING OF UNITED STATES DISTRICT COURT 28 U.S.C. 2254

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **THEODORE FLOYD LEVEE,** | § | |
| Petitioner, | § | |
| | § | |
| V. | § | Civil Action No. 4:13-CV-211-Y |
| | § | |
| **SHARI BRITTON, Chief of Probation** | § | |
| **and Parole Field Services and Interstate** | § | |
| **Compact, Florida Department of** | § | |
| **Corrections, and** | § | |
| **LEIGHTON ILES, Director of** | § | |
| **Community Supervision and Corrections** | § | |
| **Department of Tarrant County, Texas,** | § | |
| Respondents. | § | |

### FINDINGS, CONCLUSIONS, AND RECOMMENDATION
### OF THE UNITED STATES MAGISTRATE JUDGE
### AND NOTICE AND ORDER

This cause of action was referred to the United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b), as implemented by an order of the United States District Court for the Northern District of Texas. The Findings, Conclusions, and Recommendation of the United States Magistrate Judge are as follows:

### I. FINDINGS AND CONCLUSIONS

#### A. NATURE OF THE CASE

This is a petition for writ of habeas corpus by a state prisoner under 28 U.S.C. § 2254.

#### B. PARTIES

Petitioner Theodore Floyd Levee is a state court probationer currently being supervised in the State of Florida.

**TFL055**

Respondents are Shari Britton, Chief of Probation and Parole Field Services and Interstate Compact, Florida Department of Corrections, and Leighton Iles, Director of Community Supervision and Corrections Department of Tarrant County, Texas.

### C. FACTUAL AND PROCEDURAL HISTORY

In May 2011 petitioner was indicted for aggravated assault causing serious bodily injury in Tarrant County, Texas, Case No. 1239907R. (App. to Resp't Prel. Resp. at 4) On October 14, 2011, following a bench trial, petitioner was convicted and then entered into a plea bargain agreement with the state, whereby he agreed to plead guilty and waive his right to appeal in exchange for a probated 10-year sentence, a plea-in-bar in Case No. 1196215 for violating a protective order,[1] and a $1000 fine. (*Id.* at 4 & 22; App. to Resp't Reply at 261-271) Petitioner did not pursue a direct appeal. On April 11, 2012, petitioner filed a state habeas application, raising one or more of the claims raised herein, under Texas Code of Criminal Procedure article 11.072, entitled "Procedure in Community Supervision Case," which the trial court denied on July 5, 2012. (App. to Resp't Mtn to Supp. at 1-6) Tex. Code Crim. Proc. Ann. art. 11.072 (West 2005). Petitioner did not appeal the denial. *Id.* art. 11.072, § 8. Petitioner filed this federal petition on February 12, 2013, in the Southern District of Florida, Miami Division, and it was subsequently transferred to this court.

### D. ISSUES

In five grounds, petitioner claims (1) he was denied due process, (2) he received ineffective assistance of counsel, (3) the state engaged in prosecutorial misconduct, (4) the trial court abused its discretion, (5) and the evidence was insufficient. (Pet. at 6-11 & Attach. at 2-11)

---

[1] The record relfects the state also agreed to dismiss a second violation of a protective order in Case No. 1201875. (Resp't Reply, App. at 265)

2

**TFL056**

E. EXHAUSTION OF STATE COURT REMEDIES

Respondent asserts the petition should be dismissed without prejudice on exhaustion grounds because petitioner did not appeal the trial court's denial of habeas relief. (Resp't Reply at 5-7) A state prisoner must exhaust all available state court remedies before he can obtain federal habeas corpus relief, unless there is no state corrective process or circumstances exist which render the state corrective process ineffective to protect the prisoner's rights. 28 U.S.C. § 2254(b) & (c); *Fisher v. State*, 169 F.3d 295, 302 (5th Cir. 1999). Section 2254(b) and (c) provide in pertinent part:

> (b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that —
>> (A) the applicant has exhausted the remedies available in the courts of the State; or
>> (B)(i) there is an absence of available State corrective process;
> or
>> (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.
>
> . . .
>
> (c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

28 U.S.C. § 2254(b)(1), (c).

The exhaustion requirement is designed to "protect the state court's role in the enforcement of federal law and prevent the disruption of state judicial proceedings." *Rose v. Lundy,* 455 U.S. 509, 518 (1982). In order to exhaust, a petitioner must "fairly present" all of his claims to the highest state court for review. *O'Sullivan v. Boerckel,* 526 U.S. 838, 842-48 (1999); *Richardson v. Procunier,* 762 F.2d 429, 430-31 (5th Cir. 1985). In Texas, the Texas Court of Criminal Appeals is the highest criminal court in the state. *Richardson,* 762 F.2d at 431. A habeas corpus petitioner who

3

**TFL057**

has been granted community supervision may satisfy the exhaustion requirement by presenting both the factual and legal substance of his claims to the state trial court in an application for a writ of habeas corpus under article 11.072. TEX. CODE CRIM. PROC. ANN. art. 11.072, § 8. In the event the state district court denies the habeas petition, the petitioner has a right to appeal to the Texas appellate courts and to petition the Texas Court of Criminal Appeals for discretionary review. *Ex parte Villanueva*, 252 S.W.3d 391, 395-96 (Tex. Crim. App. 2008) (discussing filing, disposition and appeals of article 11.072 writs).

In the present case, to the extent petitioner raises new claims for the first time in this federal petition, the claims are clearly unexhausted. And, to the extent petitioner raises claims that were raised in his state habeas application, he failed to exhaust state court remedies available to him by not using the procedure provided in article 11.072 to appeal the trial court's order denying state habeas relief.[2] Because there has been no fair presentation of those claims to the Texas Court of Criminal Appeals, the claims are unexhausted.

Under article 11.072 § 9, petitioner would likely be barred by application of the abuse of the writ rule by any successive effort to exhaust state court remedies. Tex. Code Crim. Proc. Ann. art. 11.072, § 9. As a result, these claims are barred from consideration by this court under the procedural default doctrine. *Nobles v. Johnson*, 127 F.3d 409, 423 (5th Cir. 1997) (finding unexhausted claim, which would be barred by the Texas abuse of the writ doctrine if raised in a successive state habeas petition, to be procedurally barred).

---

[2] Petitioner was apparently under the impression that he was not allowed to appeal the trial court's denial. (Pet. at 7)

4

**TFL058**

Federal habeas corpus relief is unavailable in the face of a state procedural default unless the petitioner can show (1) cause for the default and actual prejudice, or (2) that the federal court's failure to consider the claim will result in a miscarriage of justice, *i.e.*, that the petitioner is actually innocent of the crime. 28 U.S.C. § 2254(b)(1)(B); *Sawyer v. Whitley*, 505 U.S. 333, 339-40 (1992); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Finley v. Johnson*, 243 F.3d 215, 219-20 (5th Cir. 2001). A petitioner demonstrates cause by showing that his efforts to comply with the state's procedural rules were hampered by "some objective factor external to the defense." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). On the other hand, a "fundamental miscarriage" implies that a constitutional violation probably caused the conviction of an innocent person. *McCleskey v. Zant*, 499 U.S. 467, 502 (1991).

Petitioner did not reply to respondent's answer or give any explanation to excuse his default, other than his bald assertions that he was denied due process, and he acknowledges in his petition that his grounds for relief have not been presented to the highest court of the state. (Pet. at 6-13) Nor has petitioner demonstrated that failure to consider his claims will result in a miscarriage of justice, *i.e.*, that he is innocent of the crime for which he was charged and convicted. Accordingly, petitioner's claims are procedurally barred from federal habeas review. *See Coleman*, 501 U.S. at 750-51. Under these circumstances, the proper action is to dismiss the petition with prejudice. *Horsley v. Johnson*, 197 F.3d 134, 137-38 (5th Cir. 1999); *Jones v. Jones*, 163 F.3d 285, 296 (5th Cir. 1998), *cert. denied*, 528 U.S. 895 (1999).

## II. RECOMMENDATION

It is therefore recommended that the petition be DISMISSED with prejudice for failure to exhaust state court remedies, as required by 28 U.S.C. § 2254(b)(1).

5

**TFL059**

## III. NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 10 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The court is extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions, and recommendation until __December 5__, 2013. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

## IV. ORDER

Under 28 U.S.C. § 636, it is ordered that each party is granted until ~~November~~ _December_ __5__, 2013, to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions, and recommendation. It is further ordered that if objections are filed and the opposing party chooses to file a response, a response shall be filed within seven (7) days of the filing date of the objections.

6

**TFL060**

It is further ordered that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions, and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED November _14_, 2013.

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE

7

**TFL061**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

THEODORE FLOYD LEVEE,          §
    Petitioner,            §
                §
VS.                            §   CIVIL ACTION NO.4:13-CV-211-Y
                §
SHARI BRITTON, Chief of        §
Probation and Parole Field     §
Services and Interstate Compact,§
Florida Department of          §
Corrections, and               §
LEIGHTON ILES, Director of     §
Community Supervision and      §
Corrections Department of      §
Tarrant County, Texas,         §
    Respondents            §

FINAL JUDGMENT

In accordance with an Order issued this same day and Federal Rule of Civil Procedure 58, petitioner Theodore Floyd Levee's petition for writ of habeas corpus is DISMISSED with prejudice. All costs of court are taxed against the party who incurred them.

SIGNED January 14, 2014.

TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

**TFL062**

SUMMATION OF ARGUMENT

1. The court was misled because prosecution and defense failed in their duty as officers of the court to investigate and conduct a fair trial.

2. The court abused its discretion.

    a. Because it interfered in the Rule 11 agreement in sentencing agreement / appeal waiver

    b. Because it failed to note ineffective counsels failure to present defense or evidence or contradict obvious inconsistencies.

    c. Because of its actions preventing review

    d. Because it   failed to perform due process of law.

3. The trial court abused its discretion because it never heard any post-conviction evidence

   It was the general rule, that relief from a final conviction on the grounds of incompetent or ineffective counsel will be granted only when the trial was a farce, or a mockery of justice, or was shocking

to the conscience of the reviewing court, or the purported

representation was only perfunctory, in bad faith, a sham, a

pretense, or without preparation.

    a. It is the relator's contention the records of trial, failure to

       investigate, and ineffective counsel reflect actions exceeding

       this standard.(id APPENDIX  ONE CONSTITUTIONALY

       INEFFECTIVE COUNSEL)

          i. A close reading of Williams v. Beto (1 Williams v.

             Beto, 5th Cir. 1965, 354 F.2d 698, 704.)  reveals

             opinion did not intend to adopt the farce mockery test in

             lieu of the reasonably effective assistance standard.

    b.  presence of multiple acts of errors and, the omissions and the

       resulting prejudice, are persuasive all through the records and

       demonstrate facts exceeding the two pronged requirements of

       Strickland (Strickland v. Washington, 466 U.S. 668)

    c. .The facts in the records, not presented, but eluded to in

       opening and closing of defense in that the injury as finally

       testified in trial, does not reflect the prior statements made in

the hospital records, is not sufficiently explained by prosecutors claim transposition errors. The testimony fails to equate to commonly known medical fact that in a lateral cause of injury to the knee the lateral ligaments will show disturbance before the ACL tears, - there are NO disturbances of lateral ligaments. (APPENDIX THE FORENSIC EXAMINER Spring 2005  By Matthew Donohoe, MA, ATC; Helen Aslanian, BS; and Kenneth Solomon, PhD, PE, Post PhD .

**"In order to achieve rupture of the anterior cruciate ligament due to abduction, the medial collateral ligament must first be ruptured. When the medial collateral ligament is ruptured due to abduction, the rupture of the anterior cruciate liga-ment is inevitable.)**

**Smilli IS. Injuries of the Knee Joint. UCLA BIOMED WE 870 S641i; 1951.** )

    d. The radiology report and orthopedic surgeon state no collateral ligament damage is apparent.

TEXAS HEALTH HARRIS HEB
RADIOLOGIC INTERPRETATION

PATIENT:     LEVEE,CATHEY
PATIENT ID:  9060052031      PHYSICIAN: PECKENPAUGH, DANIEL E
BIRTHDATE:   09/11/1958      COPY TO:
LOCATION:    61-01O          MRN:      E2051258

ADMITTING DIAGNOSIS:  POSS BROKEN KNEE
REASON FOR EXAM:     DERANGEMENT

| EXAM DESCRIPTION | EXAM DATE | EXAM TIME | ORDER # | EXAM CODE |
|---|---|---|---|---|
| MRI EXT LWR RT JOINT WO CONT | 04/10/2010 | 2229 | EM1308-10 | 561609 |

Examination:  MRI right knee without contrast

Ordering Physician:  DANIEL E PECKENPAUGH

Date: 4/10/2010 10:29 PM

History: DERANGEMENT

technique: Multiplanar, multi-sequential and right right knee without contrast

Findings:

The anterior cruciate ligament is disrupted. Posterior cruciate ligament is intact. Contusions are seen in the postero-medial and posterior lateral tibia, anterior aspect of the tibia and anteromedial femoral condyles. Fat fluid level seen within a moderate joint effusion suggest articular disruption. Discrete cortical disruption on MRI is not appreciated. Consider thin section CT to identify the sites of likely nondisplaced fracture which is not clearly evident but likely in one of the area of contusions and likely in the posterior aspect of the tibial plateaus.

The medial meniscus is diffusely abnormal with no significant identifiable anterior horn or body and a truncated posterior horn. There is a displaced meniscal fragment seen within the posterior intercondylar notch, image 8 series 6. The lateral meniscus appears intact.

The quadriceps and patellar tendons are intact. The medial collateral ligament appears intact. Extensive soft tissue edema noted about the knee including edema superficial to the medial collateral ligament, likely reactive. The lateral collateral ligament complex is intact.

Small hypointense normality within patient's joint effusion measuring 3.6 mm on image 4 series 6 likely a loose osteocartilaginous body, possibly from either the postero-medial or posterior lateral tibial

CC0022

**TFL066**

e. The complaints made at the time of the injury are far too different than the story made up after the hospital visit.(see PRIOR INCONSISTANT STATEMENTS)

    i. And differ from Testimony

      `43.10 He wrapped his ankle around the lower part of my leg and flipped it out at a right angle

ii.

STATE VS. THEODORE FLOYD LEVEE

me standing in front of you?

A.   Yes.

Q.   Okay.  So if I'm standing about where he was, which leg did he kick you with?

A.   This leg.

Q.   So you're pointing to my right leg?

A.   Yes.

Q.   Okay.  Describe exactly what he did with his right leg that hurt you.

A.   He wrapped his ankle around the lower part of my leg and flipped it out at a right angle.

Q.   So -- I'm going to stand back so the Judge can see me.

So if -- he did this to your right leg, correct?

A.   Yes.

Q.   So you're saying that he brought your leg -- he swept it outward, is that correct, right angle away from your body?

A.   Yes.

Q.   Okay.  How did it feel when he did that?

A.   Extremely painful.

Q.   What did you believe had happened to your leg at that point?

A.   I believed it was broken because of the noise I

**TFL068**

f. The addition of the rib injury, a month later, never substantiated as an injury and testimony the pictures of the right side of the body reflect and verify an injury to the left side of the body is too far a reach.

4. The complaint, in that it was a preexisting injury as shown in the evidence submitted and not attested to, and is absent the collateral ligament damage, lacking substantive evidence proving such an action, when in fact it could not have occurred. The additional allegation of a rib injury, unsubstantiated despite the complete total physical of April 10 2010, and the release in the business records affidavit stating no other injury no other claim. Proof does not in fact exist in the medical evidence as it supposes the possibility and complainant's testimony of the photos reflecting the allegation of a later discovered rib injury, as testified, is outrageous – it refers to an injury on the other side of the body. The allegation of 80% disabled told to prosecutor and police but differing in examination of Doctor

**TFL069**

see APPENDIX 4 ; COMPLAINT OF RIB INJURY

Dr. Kadoko and the subsequent admission of fraud in a car accident,

contradicts itself in the record. see APP 25  DR. Kadoko APRIL 28 2010

The failure to present evidence in the records of prior statements referred

to in opening and again in closing of multiple claims cannot be

trivialized as prosecutor stated as transposition errors. There is no logic

nor reason that can explain all of the actions that have resulted in arrival

at this point of mandamus. Why the court gave this much credit can only

be an abuse of discretion. Given a fair opportunity, a fighting chance, the

reasonable doubt standard would be exceeded and clear, compelling

substantial evidence shown in the record, the complainant desires to gain

materially and to hide contention of relator of the addiction and abuse of

prescriptions by complainant, was the purposes of fictional evidence

made to appear real. The court's refusal to exercise discretion in

substandard performance of defense counsel is a bit outrageous. It

exceeds

**TFL070**

outrageous when the court actually manipulated the plea to conform to the structure of requirement of law under rule 11 colloquial and ignores the content opposing the will of the court and counsel.

4 See id. Doctor Kadoko April 28 2010.  APP 24

5 Doctor Stanton and Doctor Kadoka release for rx abuse

In Walker v. Packer, the Texas Supreme Court attempted to re-instate mandamus as an "extraordinary remedy, available only in limited circumstances." 6 The Court's analysis focused on reaffirming two basic requirements: there must be a clear abuse of discretion committed by the trial court in applying the law and there must be no adequate remedy by appeal.7

If not but for the abuse of discretion of the court the relator would and did attempt to appeal. The courts blindness to the wrongful actions of counsel in this adjudication are apparent in the record. Taken as a whole, evidence in record utilized, no reasonable jurist would find the relator

**TFL071**

guilty. Actions violated relator's rights and prejudiced the outcome.8

The court abused its discretion by the rule of law.

6 Walker v. Packer, 827 S.W.2d 833, 840

7 Id. at 840.

8 "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable," Strickland v. Washington, supra, 466 U.S. at 687(III), 104 S.Ct. 2052

# ARGUMENT

Supreme Court Justice Frankfurter stated that "it is the duty of the Government to establish … guilt beyond a reasonable doubt. This is basic in our law and rightly one of the boasts of a free society—is a requirement and safeguard of due process of law in the historic, procedural context of 'due process'." See: Leland v. Oregon, 343 U.S. 790, 802-03 (1952) [dissenting opinion].

That due process was subverted and abused in an unexplainable failure befuddling the relator, because in fact, there is no substantial evidence a crime took place because the injuries testified to do not match medical evidence, because the testimony varies from the prior statements dramatically and because forensic facts do not support the allegation.

Because the Court Ignored the hard evidence, the failure of counsel, and the conviction was by dubious testimony that a reasonable person could see was conflicted, it resulted in a gross miscarriage of justice and was outrageously compounded because the Tarrant County District Attorney's Office actions to prevent revue, later, outright misleading the

**TFL073**

Federal Magistrate in the statement of law, statements of the COMPACT agreement, and an affidavit so wrought with error it challenges the integrity of the District Attorney's office. In ADA Rodgers affidavit to the Federal Court it is without a doubt myth and allows empowerment of those who are exempt from consequence, to pervert justice in a manner that is in itself as gross a crime as the allegation against the relator. See id 18 APPENDIX EIGHTEEN; FFraud on the Federal Court –

and 13. APPENDIX; PROSECTORS FFALSE AFFIDAVIT TO FFEDERAL COURT

One can only contemplate the reason and no option points to serving the law and the People of The State of Texas.

"In another case, the Supreme Court observed that "guilt in a criminal case must be proved beyond a reasonable doubt and by evidence confined to that which long experience in the common-law tradition, to some extent embodied in the Constitution, has crystallized into rules of evidence consistent with that standard. These rules are historically grounded rights in our system, developed to safeguard men from dubious and unjust convictions, with resulting forfeitures of life, liberty

and property." See: <u>Brinegar v. United States, 338 U.S. 160, 174 (1959)</u>."

It is obvious these rules were ignored because facts in evidence, neglected by counsel and prosecution and the Court resulted in false conviction.

"The Supreme Court in Winship recognized that the reasonable doubt standard protects three fundamental interests. First, it protects the defendant's interest in liberty; second, it protects an innocent person charged with a crime from the stigma of conviction; and, third, it engenders public confidence in criminal law by giving "concrete substance" to the constitutional presumption of innocence. Id., 397 U.S. at 363-64."

"In a concurring opinion in Winship, Justice Harlan pointed out that the reasonable doubt standard is "bottomed on a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free." Id., 397 U.S. at 372."

**TFL075**

This standard is without conscious in this Tarrant County District Court case and resulting actions prompting this mandamus.

As reflected in documentation and trial records, relator suffers because of the trial courts unjust persecution, abuse of discretion and in the Courts failure to uphold the CODE OF JUDICAL CONDUCT.

1. **Trial court failed to allow withdrawal of coerced plea agreement, any review, appeal, habeas corpus**. This violation is substantiated in the records as reflected by this mandamus as a whole. Motions to withdraw a guilty plea filed prior to sentencing should be granted "if for any reason the granting of the privilege seems fair and just." Kercheval v. United States, 274 U.S. 220, 224, 71 L.Ed. ,1009, 47 S.Ct. 582 (1927).

2. **Trial court failed to allow any presentation of facts in punishment by relators in endeavor for relief from wrongful allegation and defective counsel**.

   See 9. APPENDIX; "DON'T-- DO NOT SAY ANOTHER WORD"

a. It was the general rule, that relief from a final conviction on the grounds of incompetent or ineffective counsel will be granted only when the trial was a farce, or a mockery of justice, or was shocking to the conscience of the reviewing court, or the purported representation was only perfunctory, in bad faith, a sham, a pretense, or without preparation

b. It is the relator's contention the records of trial, failure to investigate, and ineffective counsel reflect actions exceeding this standard.

See id. APPENDIX 2. ARGUMENT; CONSTITUTIONALY INEFFECTIVE COUNSEL

   i. A close reading of Williams v. Beto <u>Williams v. Beto, 5th Cir. 1965, 354 F.2d 698, 704</u> reveals opinion did not intend to adopt the farce mockery test in lieu of the reasonably effective assistance standard.

   ii. Presence of multiple acts of errors and, the omissions and the resulting prejudice, are persuasive all through the records and demonstrate facts exceeding the two

pronged requirements of STRICKLAND v. WASHINGTON, 466 U.S. 668 (1984) ; error and resulting harm.

See also id. APPENDIX 1. ARGUMENT; CONSTITUTIONALY INEFFECTIVE COUNSEL

3. **The trial court failed to note the facts in the records and testimony that are inconsistent.** The Court has never submitted any findings of fact. In a trial to the court where no findings of fact or conclusions of law are filed, the trial court's judgment implies all findings of fact necessary to support it. Pharo v. Chambers Cnty., 922 S.W.2d 945, 948 (Tex. 1996); In re Estate of Rhea, 257 S.W.3d 787, 790 (Tex. App.-Fort Worth 2008, no pet.).

   a. Prior statements are not presented, but eluded to in opening and closing of the ineffective defense counsel;

      1. In that the injury as finally testified in trial, does not reflect and is in opposition to the prior statements or injuries in the hospital records, See

APPENDIX 3. PRIOR

STATEMENTS OF COMPLAINANT. This is

explained by ADA Rodgers in closing;

Trl. Rcd. II STATE VS. THEODORE FLOYD LEVEE Prosecutors closing argument Pg. 21

medical records, what we have is the victim In a very pained and upset state giving reports to doctors and police officers, and they are writing that information down. So, yes, there may be some transposition issues, but the fact remains someone hooking an ankle and pulling their leg out could be a kick, could be a sweep. Grabbing with the ankle and pulling out, those are semantics that can be explained as to she's Just gIving the description to people who are transposing it. Regardless, we have physical, medical evidence showing these injuries took place, and they're absolutely consistent with what the victim stated, not to mention this good relationship that the Defendant has with these girls, that he's demonstrated this whip-kick to Alex.

This "whip kick" was created by complainant's

father as sworn in AFFIDAVIT FOR DIVORCE and

is in the manifestation of the lie perpetuated in

coached  false testimony, by evidence prosecution

court and counsel failed to review or allow under a

perverted MOTION IN LIMINE. See APPENDIX

**TFL079**

17. ARGUMENT; SWORN AFFIDAVIT FOR DIVORCE see APP 17

2. Complaint of rib injury is false, because there was no indication of any injury for a month and compounding the falsehood – the complaint and evidence reflect an injury to the right chest area and the radiology report is clearly indicative of a past injury to the LEFT chest area. See also id 4. APPENDIX id.. ARGUMENT COMPLAINT OF RIB INJURY

3. The complainant of Fibula Fracture is one of a chronic condition for fractures due to medicine and exsisting medical problems and manipoulated to allow the false conviction. In 2006 prior injury is in evidence; See also APPENDIX 7. PREEXSISITNG FIBULAR FRACTURE APRIL

25 2006.  The complainant actually appeared in court with a like fracture in the opposite fibular.  Inconsistencies are not sufficiently explained by prosecutors claim in closing of transposition errors. See also APPENDIX 5. ARGUMENT FAILURE DEFENSE OPENING; See also APPENDIX 6. ARGUMENT DEFENSE CLOSING STATEMENT referencing facts not presented in testimony.

**4. The court failed to recognize the testimony did not establish any medically substantive fact for cause of injury and was contrary to evidence.**

a. "Under the sudden onset doctrine, a causal connection may be inferred if the injury 'develops coincidentally with the negligent act, such as broken bones ., immediate, continuing back pain ., or an obvious wound.' DeMoulin v. Kissir, 446 S.W.2d 162, 165 (Mo.App.1969). The testimony of a lay witness is sufficient to establish the nature, cause and extent of an injury 'when the facts fall within the realm of lay understanding.' Griggs v. A.B. Chance Company, 503 S.W.2d 697, 704 (Mo.App.1973)."

"However, when the injury is a 'sophisticated injury, which requires surgical intervention or other highly scientific technique for diagnosis, the proof of causation is not within the realm of lay understanding.' " Id. quoting from Griggs v.

A.B. Chance Co., 503 S.W.2d 697, 704 (Mo.App.1973).

Testimony conflicts commonly known medical fact that in an abduction as a cause of injury to the knee the lateral ligaments will show disturbance before the ACL tears, - there are NO disturbances of lateral ligaments. See APPENDIX 8. ARGUMENT; THE FORENSIC EXAMINER, Spring 2005 e.g.  By Matthew Donohoe, MA, ATC; Helen Aslanian, BS; and Kenneth Solomon, PhD, PE, Post PhD .)

**"In order to achieve rupture of the anterior cruciate ligament due to abduction, the medial collateral ligament must first be ruptured. When the medial collateral ligament is ruptured due to abduction, the rupture of the anterior cruciate liga-ment is inevitable."**

**Smilli IS. Injuries of the Knee Joint. UCLA BIOMED WE 870 S641i; 1951 e,g.** )

b. Illustration show facts inconsistent with prosecutions presentation. See Argument 10. OF THE KNEE

c. The radiology report and orthopedic surgeon state no collateral ligament damage. APP 2 . HEB EMERGENCY ROOM RECORDS

d. Facts contrary to testimony, existed in the medical records reviewed by Court.

e. To further the manipulation ADA Rodgers swore to the Federal Magistrate that collateral ligament damage did exist.

   IT DID NOT. Id. APPENDIX 13. PROSECUTOR RODGERS FALSE AFFIDAVIT
   FEDERAL COURT. "(5) Posterior crucial ligament was torn"

# APPENDIX 9. ARGUMENT; RADIOLOGY REPORT TEXAS

# HEALTH HARRIS HEB 4/10/2010

MRN: 106210HEB  Visit: 9060052031  DocType: 9500                    CONFIDENTIAL INFORMATION

TEXAS HEALTH HARRIS HEB
RADIOLOGIC INTERPRETATION

PATIENT:     LEVEE,CATHEY
PATIENT ID:  9060052031       PHYSICIAN: PECKENPAUGH, DANIEL E
BIRTHDATE:   09/11/1958       COPY TO:
LOCATION:    61-01O           MRN:    E2051258

ADMITTING DIAGNOSIS:  POSS BROKEN KNEE
REASON FOR EXAM:    DERANGEMENT

| EXAM DESCRIPTION | EXAM DATE | EXAM TIME | ORDER # | EXAM CODE |
|---|---|---|---|---|
| MRI EXT LWR RT JOINT WO CONT | 04/10/2010 | 2229 | EM1308-10 | 561609 |

Examination:  MRI right knee without contrast

Ordering Physician:  DANIEL E PECKENPAUGH

Date: 4/10/2010 10:29 PM

History: DERANGEMENT

technique: Multiplanar, multi-sequential and right right knee without contrast

Findings:

The anterior cruciate ligament is disrupted.  Posterior cruciate ligament is intact.  Contusions are seen in the postero-medial and posterior lateral tibia, anterior aspect of the tibia and anteromedial femoral condyles.  Fat fluid level seen within a moderate joint effusion suggest articular disruption.  Discrete cortical disruption on MRI is not appreciated.  Consider thin section CT to identify the sites of likely nondisplaced fracture which is not clearly evident but likely in one of the area of contusions and likely in the posterior aspect of the tibial plateaus.

The medial meniscus is diffusely abnormal with no significant identifiable anterior horn or body and a truncated posterior horn.  There is a displaced meniscal fragment seen within the posterior intercondylar notch, image 8 series 6.  The lateral meniscus appears intact.

The quadriceps and patellar tendons are intact.  The medial collateral ligament appears intact.  Extensive soft tissue edema noted about the knee including edema superficial to the medial collateral ligament, likely reactive.  The lateral collateral ligament complex is intact.

Small hypointense normality within patient's joint effusion measuring 3.6 mm on image 4 series 6 likely a loose osteocartilaginous body, possibly from either the postero-medial or posterior lateral tibial

CC0022
Job # 13340852 at 05/04/10 12:57:51

**TFL085**

f. The complaints made at the time of the injury are far too different than the story made up after the hospital visit.

## APPENDIX 3. ARGUMENT; PRIOR INCONSISTANT STATEMENTS IN EVIDENCE -BUSINESS RECORDS AFFIDAVIT TEXAS HEALTH HARRIS HEB ER RECORDS 4/10/2010

| CL PRIOR STATEMENTS 4/10/10 HEB EMERGENCY ROOM AFFIDAVIT IN EVIDENCE | | | | |
|---|---|---|---|---|
| 4/10/2010 | 19:28 | (7:28) | Domestic dispute with husband kicked in knee fell now cannot stand on leg<br><br>PD not notified 51 y.o. DOB: 911111958<br><br>Visit Date: 411012010<br><br>Account Number9:0 60052031 MRN:0 70013282<br><br>Room #: 61<br><br>Chief Complaint: Knee Injury (Major)<br><br>HPI<br><br>7:28 PM Cathe████████████ale presents to the ER complaining of right knee injury onset pta.<br><br>Pt. states her husband allegedly kicked her right knee.<br><br>Pt. reports her husband did a type of maneuver where he grabbed her ankle and kicked her knee, severely twisting her knee.<br><br>Pt. states when she tries to walk on knee it feels wobbly and goes out on her.<br><br>No other injuries at this time.<br><br>No other complaints.<br><br>Pt. has RA and mild right knee menisectomy as a teenager.<br><br>Denies any other injury during this incedent. | ER pg 11-13 |
| 4/10/2010 | 19:33 | (7:33) | Admiting Diag. Possible broken knee Injury: kicked in knee,pain. | ER pg 24 |

| 4/10/2010 | 19:45 | (7:45) | kicked right knee | ER pg 11 |
|---|---|---|---|---|
| 4/10/2010 | 20:13 | (8:13) | Comment Dr. Peckepaugh PTA Domestic dispute with husband Kicked in knee. | ER pg 10 |
| | | | | |

| 4/10/2010 | 20:27 | (8:27) | Husband tripped her | ER pg 9 |
|---|---|---|---|---|
| 4/10/2010 | 20:32 | (8:32) | Patient stated a below-DF,  My husband tripped me.-DF | ER Pg 8 |

| 4/10/2010 | 23:01 | (11:00) | he purposely bumped me into the wall , I stumbled  & he did a "military take down" kick to my right knee. | Vic Vol Statement Pg1 |
|---|---|---|---|---|

g. And differ from TestimonyAPPENDIX 11. ARGUMENT

Trl Rcd **43.10 He wrapped his ankle around the lower**

**TFL087**

# part of my leg and flipped it out at a right angle

me standing in front of you?

A. Yes.

Q. Okay. So if I'm standing about where he was, which leg did he kick you with?

A. This leg.

Q. So you're pointing to my right leg?

A. Yes.

Q. Okay. Describe exactly what he did with his right leg that hurt you.

A. He wrapped his ankle around the lower part of my leg and flipped it out at a right angle.

Q. So -- I'm going to stand back so the Judge can see me.

So if -- he did this to your right leg, correct?

A. Yes.

Q. So you're saying that he brought your leg -- he swept it outward, is that correct, right angle away from your body?

A. Yes.

Q. Okay. How did it feel when he did that?

A. Extremely painful.

Q. What did you believe had happened to your leg at that point?

A. I believed it was broken because of the noise I

**5.  The court failed to note the addition of the rib injury, as testified to as being discovered a month later, was never reviewed in substantiated medical evidence**. See id.id APP 4 APPENDIX id. ARGUMENT COMPLAINT OF RIB INJURY. Because the evidence so much differed from testimony and was actually contrary to that true medical evidence as an injury caused in the allegation, Court and counsel failed to notice and council was constitutionally ineffective in failing to provide any response with substantive evidence. Testimony and the pictures of the right side of the body reflect injury to right side of body Radiology report a month later verify a prior injury to the LEFT side of the body – no time frame.

Medical evidence and testimony are inconsistent.

**6. The complaint of ACL disruption, absent medical substantive evidence and in that it was also a 1975 preexisting injury as shown in the evidence submitted and not attested to, causes the need for further substantiation to a rational mind.**

   a.  AND Absent the collateral ligament damage, exceeds reasonable doubt of a crime. See id. APPENDIX 8. ARGUMENT; THE FORENSIC EXAMINER Spring 2005

   b. Because it is lacking supporting substantive medical proof, it exceeds reasonable doubt standard of a crime taking place.

   c. The fact it could not have occurred as testified is reasonable doubt of a crime.  see 10. APP 10 INJURY TO KNEE

   d. The additional allegation of a rib injury, unsubstantiated despite the complete total physical of April 10 2010, never noted in any of the multiple examinations, therapeutic visits or any other complaint cause the reasonable doubt standard to apply.

# See APPENDIX 12 DENIES ANY OTHER INJURIES AT

# THIS TIME exceeds reasonable doubt of a crime.

**ED Physician Note (continued)**

knee, severely twisting her knee. Pt states when she tries to walk on knee, if feels wobbly and goes out on her. No other injuries at this time. No other complaints. Pt has hx of RA and mild right menisectomy as a teenager. Denies any other injury during this incident.

**FAMHX:** none

Past Medical History
Diagnosis                                                            Date
  • Rheumatic Disease
  • Hypertension

Past Surgical History
Procedure                                                            Date
  • Appendectomy
  • Tonsillectomy

**Tobacco Use History:  reports that she has never used tobacco.**
**Alcohol Use History:  reports that she does not drink alcohol.**
**Drug Use History:  reports that she does not use illicit drugs.**

**Allergies:  No Known Allergies**

Previous Medications
HYDROCORTISONE (CORTEF) 5 MG TABLET              take 5 mg by mouth three(3) times daily.
LEVOTHYROXINE SODIUM (SYNTHROID) 100 MCG TAB     take 100 mcg by mouth every day.
OTHER MED                                        atterol 30 mg po qam 50 po qpm

Review of Systems
Musculoskeletal: Positive for joint pain **(Right knee pain secondary to injury)**. Negative for falls.
Neurological: Negative for loss of consciousness.

| ED Triage Vitals | | |
|---|---|---|
| BP | 04/10/10 1919 | **171/90 mmHg** |
| Pulse | 04/10/10 1919 | **123** |
| Resp | 04/10/10 1919 | **20** |
| Temp | 04/10/10 1919 | **98 °F (36.7 °C)** |
| Temp src | 04/10/10 1919 | **Oral** |
| SpO2 | 04/10/10 1919 | **98 % WNL on RA** |
| Pain Scale | 04/10/10 1919 | **9** |
| Oxygen Flow Rate (L/min) | -- | |
| O2 Delivery Device | 04/10/10 1919 | **Room Air** |
| Trauma Level | -- | |

**TFL091**

Id. See APPENDIX 4. ; COMPLAINT OF RIB

INJURY

1. Complainant's statement in the business records affidavit stating no other injury no other claim. See id APPENDIX 2. ARGUMENT; HEB EMERGENCY ROOM RECORDS No other injury – no other complaint.

2. The addition, a month later, in the allegation of a broken rib as being caused in the assault, the claim exceeds logic and reasonable doubt standard is ignored.

3. Proof does not in fact exist in the medical evidence as it supposes the possibility and complainant's testimony of the photos reflecting the allegation of a later discovered rib injury.

   a. Allegation as testified, is outrageous – it refers to an injury on the other side of the

body. See APPENDIX 4. ARGUMENT

COMPLAINT OF RIB INJURY

e. The allegation of 80% disabled told to prosecutor and police and used extensively by prosecutor differs in **April 28 2010 Medical Examination of Doctor Kadoko, id APP 25** is a false statement and exceeds reasonable doubt.

1. Complainant's subsequent admission of fraud in a car accident, and the lack of medical prescription in the use of a wheel chair, to Dr. Kadoko to insist on surgical knee replacement of an existing condition, contradicts allegations in the record. Car accident was used as the source of addition illegal narcotic acquisition and complainant feared exposure by relator and destroyed the credibility with false allegations. The claim of in scooter at thgee advice of counsel and the claim to police of 80% disabled is ludicris. see App 26 POLICE REPORT 80% DISABLED

**TFL093**

See APPENDIX 25. Dr. Kadoko

April 28 2010;

See also APP 16. AUTO

ACCIDENT LAWSUIT DISMISSED.

2. Discovery of addiction in Prescription drug abuse

history causes reasonable doubt for truthfulness

and doubt a crime had taken place. See

APPENDIX 15. ARGUMENT; New Evidence

ABUSE OF PRESCRIPTION DRUGS,

CHRONIC FOR FRACTURES

**7. The Trial Court took no notice of failure to present evidence in the records of prior statements.** Counsel referred to in opening and again in closing of multiple claims cannot be trivialized as prosecutor stated as transposition errors. Id. See APPENDIX id.. ARGUMENT FAILURE DEFENSE OPENING; See also id. APPENDIX id. ARGUMENT DEFENSE CLOSING STATEMENT Opening statement and closing statements in the trial record. The Court noted need to further examine medical records and failed to accurately note the inconsistencies. See id. APPENDIX 3. ARGUMENT; PRIOR STATEMENTS OF COMPLAINANT; See also 2. ARGUMENT;  id 1. APP One CONSTITUTIONALY INEFFECTIVE COUNSEL

8. **Court failed to note deficient counsel.**  There is no logic nor reason that can explain all of the actions that have resulted in arrival at this point of requiring mandamus. Why the court failed to note deficient counsel and gave this much credit to testimony absent substantive evidence can only be an abuse of discretion. See id. APPENDIX id. ARGUMENT; CONSTITUTIONALY INEFFECTIVE COUNSEL    id. 1 APP ONE

**9. The Trial Court failed to notice complainant desired to gain materially as motive to misrepresent facts in criminal trial.**

Counsel failed to present knowledge of and did suppress contention of relator of the addiction and abuse of prescription narcotics by complainant, and was, in fact the purpose of complainant's fictional evidence made to appear real. The divorce proceedings resulted in a windfall for complainant in pension, property and revenge. Id. APPENDIX id.. APP FIFTEEN ARGUMENT; New Evidence ABUSE OF PRESCRIPTION DRUGS, CHRONIC FOR FRACTURES

10. **The court's refusal to exercise discretion in substandard performance of defense counsel is outrageous.** It exceeds outrageous when the court actually manipulated the plea to conform to the structure of requirement of law under rule 11 colloquial and ignores the content in false conviction and desire to appeal that is opposing the will of the court and counsel. See id. 9 APP NINE Do not say another word; See also

Trl. Rcd. II Pg. 37.14 id 9. APP NINE Dont say another word

THE COURT:  No, it cannot.  This will remain on your record indefinitely.

THE DEFENDANT:  I have to follow my counsel's --

THE REPORTER:  I can't hear you, sir.

THE DEFENDANT:  I -- on the advice of counsel, I accept.

THE COURT:  No.  This is an independent decision on your part.  You may give (sic) the advice of counsel, but you may not simply state that you are pleading guilty and in effect waiving your right of appeal by simply stating that it's his recommendation that you rely upon solely.

This is where you are admitting guilt, you're pleading guilty freely and voluntarily, you're waiving any right of appeal.  Do you understand that?  It's not subject to any condition whatsoever.  This has to be a free and voluntary choice on your part.  Do you understand that?

THE DEFENDANT:  I do now, Your Honor.

THE COURT:  Now, what is your decision?

THE DEFENDANT:  I'll plead.

THE COURT:  Okay.  Now, Mr. Levee, based upon your response -- your response is being received and accepted as a knowing and intentional waiver on your

**TFL099**

In Walker v. Packer, the Texas Supreme Court attempted to re-instate mandamus as an "extraordinary remedy, available only in limited circumstances." The Court's analysis focused on reaffirming two basic requirements: there must be a clear abuse of discretion committed by the trial court in applying the law and there must be no adequate remedy by appeal.

It is clear in the complete record the Court exceeded this standard and actually stonewalled any attempt at relief.

If not but for the abuse of discretion of the court the relator would succeeded in attempts to appeal and stood trial in protective order allegations.

The courts blindness to the wrongful actions of counsel in this adjudication are apparent in the record.

Taken as a whole, evidence in record utilized, no reasonable jurist would find the relator guilty nor would a reasonable court circumvent every attempt to correct the gross errors.

Actions of the officers of the court violated relator's rights and prejudiced the outcome.

The court abused its discretion by the rule of law.

Walker v. Packer, 827 S.W.2d 833, 8407 Id. at 840.

"Counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable," Strickland v. Washington, supra, 466 U.S. at 687(III), 104 S.Ct. 2052; See id. 2. ARGUMENT; CONSTITUTIONALY INEFFECTIVE COUNSEL

The trial Court abused its discretion in failing to perform in compliance with Canon 1: Upholding the Integrity and Independence of the Judiciary CODE OF JUDICAL CONDUCT

"An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining and enforcing high standards of conduct, and should personally observe those standards so that the integrity and independence of the

Judiciary is preserved. The provisions of this Code are to be construed and applied to further that objective."

This Trial Court, in the preponderance of this record, failed to administer justice

## PRAYER

Relator is innocent. It is because of that fact the request is made for any opportunity to substantiate evidence.

Medical evidence supports relators contention no crime took place.

Medical evidence refutes contention of complainant who was using the claim and in fact succeeded in obtaining favorable treatment in divorce court.

Complainant was suffering from rheumatoid arthritis and suffered from a narcotics addiction at the time of the incident and used a campaign of distortion and fear to destroy credibility of relator to avoid detection. Later, the orthopedic surgeon discovered the addiction and refused to treat the complainant any further.

Overall the possible relief is in remand to the State Court of Criminal Appeals for a full and fair hearing of the merits of the relator.

A hearing for relief from the judgments of trial court that prevented review or appeal affording a forum that allows the factual presentation of all the evidence is desired.

Any opportunity to prove by substantial evidence, innocence before lawful authority is relator's outcome.

Because of interference with the Rule 11 procedure and denial of withdrawal of guilty plea, the court may allow return to plea, sentence and allow the appeal.

Citing State v. Williams, 666 N.W.2d 58, 60, 65 (Wis. 2003) (prohibiting the judge from playing any role in the plea bargaining process and allowing the defendant to withdraw a plea resulting from the trial judge's invitation to the defendant, his counsel, and the prosecutor to "have a little chat in chambers").

Realtor submits interference on the part of the trial court

Because the motion for new trial was allowed to expire then the court may allow the motion and hold a hearing to determine if substantial evidence verifies contentions of relator.

"Appellant', s motion for new trial, supported by his affidavit was filed in a timely manner.

**TFL104**

The motion raised a matter not determinable from the record, namely, that trial counsel was ineffective for failing to inform appellant of a plea bargain offered by the State. Because appellant's motion for new trial raised a matter not determinable from the record, upon which he could be entitled to relief, see, Ex parte Wilson, 724 S.W.2d 72, 74 (Tex.Cr. App.1987); and Randle v. State, 847 S.W.2d 576 (Tex.Cr.App.1993), we hold the trial judge abused his discretion in failing to hold a hearing pursuant to Rule 31(d). Mclntire, 698 S.W.2d at 660. Accordingly, the judgment of the Court of Appeals is reversed and the cause is remanded to the trial court for a hearing on allegation IX of appellant's motion for new trial. Mclntire, 698 S.W.2d at 661. Reyes v. State, 849 S.W.2d 812 (Tex. Crim. App. 1993)

Because of the failures in 11.072   Habeas Corpus, the court may allow an amended writ and allow hearing to determine if substantial evidence verifies contentions of relator

b. As stated in State v Guerrero (June 5, 2013, PD-1258-12)

"Def did not meet his burden of proving, by a preponderance of the evidence, facts that would entitle him to relief;

counsel did not file a proper habeas application under 11.072;

counsel's statements were not competent evidence, and even if they were, those statements did not prove, by a preponderance of the evidence, that def was improperly denied right to counsel before pleading guilty";

it was not sworn to, and it evaded the requirement of a sworn pleading for an application for habeas corpus relief.

The motion did not contain affidavits, associated exhibits, a memorandum of law, or anything else to establish specific facts that might entitle def to relief.

Even if counsel's statements were accepted as competent evidence, def still was not entitled to relief because those statements did not prove, by a preponderance of evidence, that def's waiver of counsel was unknowing, unintelligent or involuntary.

**TFL106**

As stated in 11.072 sec. 4, described in Ex parte Hargett, 819 S.W.2d 866, 868-69 (Tex. Crim. App. 1991), and employed in Ex parte Gonzales, 12 S.W.3d 913, 914-15 (Tex. App. - Austin 2000, pet. ref'd), no longer applies to applications for a writ of habeas corpus filed by a person who is serving or who has served a community supervision term. Ex parte Villanueva (April 30, 2008, PD-1836-06)

The writ issues by operation of law, represents a significant departure from prior writ law that allowed a judge, in his or her discretion, to refuse to issue a writ.

Under prior law, when the trial judge refused to issue a writ, an applicant had no right to appeal. In providing for automatic issuance, Section 4 eliminates a trial judge's discretion to refuse to issue a writ. Sections 4 and 8, taken together, signify that the rule governing appellate review.

Because this relator had no knowledge of 11.072 writ then no appeal could be offered.

Because it is in the interest of justice, relator prays this court apply its

**TFL107**

discretion in order to obtain any hearing that will determine truth in the conviction of an innocent person.

Because of the failure to act on "a judicial writ issued by the proper court to the individual, official, or board to whom it is addressed, to perform some specific legal duty to which the party applying for the writ is entitled under legal right to have performed", will result in the continued miscarriage of justice, persecution of an innocent person and allow those who chose to abuse the law for their own outcome to flourish unchecked.

Because it is in the interest of the State of Texas and its people to insure the State and Federal Constitutions are upheld and justice be served this prayer is for the lawful authority to assess the true substantive facts that would have prevented this miscarriage of justice.

TFL109

APPENDIX

5939
(4
5

## 22. APPENDIX TWENTY TWO "I can't give up my right to appeal"

STATE VS. THEODORE FLOYD LEVEE

dollars that will be paid over the term of the probation, in addition to the completion of certain classes, among them the batterer intervention program, community service restitution.

Also pending in County Criminal Court No. 5 are two cause numbers, and this is in the form of a plea-bargain agreement in Cause Nos. 1196215 and 1201875, that at the time of the sentencing, the Defendant, having been found guilty, the Defendant, should he accept his responsibility in the unadjudicated offenses pursuant to Section 12.45 of the Texas Penal Code, may take into account the instant offenses and bar any further prosecution should the Defendant accept his responsibility by a plea of guilty.

Mr. Levee, in those respective cause numbers for the offenses of violation of a protective order, how do you plead in the two cause numbers pending in County Court -- County Criminal Court No. 5, guilty or not guilty?

THE DEFENDANT: Your Honor, I'm sorry. I'm guilty of one; I'm not guilty of the other. And I can't accept this, and I can't give up my right to appeal because the information just then was a lie.

THE COURT: All right. Thank you very much.

# APPENDIX TWENTY ONE; TRIAL RECORD PACER DOCUMENT

# TRIAL REPORTER'S RECORD I

RA 001

REPORTER'S RECORD
VOLUME 1 OF 1
TRIAL COURT CAUSE NO. 1239907R

STATE OF TEXAS                )(       IN THE 432ND JUDICIAL
                              )(
VS.                           )(       DISTRICT COURT OF
                              )(
THEODORE FLOYD LEVEE          )(       TARRANT COUNTY, TEXAS


* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

TRIAL ON MERITS

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *


On the 13th day of October, 2011, the following proceedings came on to be heard in the above-entitled and -numbered cause before the Honorable Ruben Gonzalez, Jr., Judge Presiding, held in Fort Worth, Tarrant County, Texas:

Proceedings reported by machine shorthand.


ANGIE TAYLOR, CSR, RPR
Official Court Reporter
432nd DISTRICT COURT

COPY

RA 003

STATE VS. THEODORE FLOYD LEVEE

A P P E A R A N C E S

HONORABLE TIM RODGERS - SBOT NO. 24046741
HONORABLE LLOYD WHELCHEL - SBOT NO. 00798579
Assistant District Attorneys
401 W. Belknap Street
Fort Worth, Texas  76196
Phone:  817-884-1400


Attorney(s) for the State of Texas.


HONORABLE STEVEN BELL - SBOT NO. 00785689
9400 N. Central Expressway, #416
Dallas, Texas 75231
Phone:  214-739-4477


Attorney(s) for the Defendant.

<div align="center">

CHRONOLOGICAL INDEX
VOLUME 1
TRIAL ON MERITS
</div>

OCTOBER 13, 2011                                    PAGE        VOL

Pretrial Matters........................        6           1


| DEFENSE WITNESSES | DIRECT | CROSS | VOIR DIRE | VOL |
|---|---|---|---|---|
| Theodore Levee | 14 | | | 1 |

Defendant's Plea........................        17          1
Opening Statement by Mr. Bell.........        18          1
Rule Invoked............................        19          1


| STATE'S WITNESSES | DIRECT | CROSS | VOIR DIRE | VOL |
|---|---|---|---|---|
| Cathey Levee | 24,54 | 61 | 52 | 1 |
| Catherine Levee | 87 | 110 | | 1 |
| Alexandra Levee | 138 | 148 | | 1 |

State Rests.............................        159         1


| DEFENSE WITNESSES | DIRECT | CROSS | VOIR DIRE | VOL |
|---|---|---|---|---|
| Theodore Levee | 161,205 | 180,209 | | 1 |

Defendant Rests........................        213         1

STATE VS. THEODORE FLOYD LEVEE

CHRONOLOGICAL INDEX (Cont'd)

| OCTOBER 13, 2011 | | | PAGE | VOL |
|---|---|---|---|---|
| STATE'S WITNESSES | DIRECT | CROSS | VOIR DIRE | VOL |
| Alexandra Levee | 214,221 | 219 | | 1 |

| | PAGE | VOL |
|---|---|---|
| Both Sides Rest and Close.............. | 223 | 1 |
| Proceedings Concluded.................. | 224 | 1 |
| Court Reporter's Certificate.......... | 225 | 1 |

EXHIBIT INDEX

| STATE NO. | DESCRIPTION | OFRD | ADMT | VOL |
|---|---|---|---|---|
| 1 | Photo | 49 | 49 | 1 |
| 2 | Photo | 49 | 49 | 1 |
| 3 | Photo | 49 | 49 | 1 |
| 4 | Photo | 50 | 53 | 1 |
| 5 | Photo | 50 | 53 | 1 |
| 6 | Photo | 50 | 53 | 1 |
| 7 | Photo | 50 | 53 | 1 |
| 8 | Photo | 50 | 53 | 1 |
| 9 | Photo | 50 | 51 | 1 |
| 10 | Riata Records | 55 | 56 | 1 |

P R O C E E D I N G S

(October 13, 2011 ~ 9:52 a.m.)

(Open court, Defendant present)

THE COURT:  The Court calls Cause No. 1239907R, styled the State of Texas versus Theodore Floyd Levee for the purposes of a trial before the Court.

Are both sides ready?

MR. RODGERS:  The State's ready.

MR. BELL:  The Defense is ready.

THE COURT:  All right.  And, Mr. Bell, do you believe your client is competent?

MR. BELL:  Yes, sir.

THE COURT:  All right.  Mr. Levee, is your full name Theodore Floyd Levee?

THE DEFENDANT:  Yes, sir.  However, It's pronounced Levee.

THE COURT:  I'm sorry.

THE DEFENDANT:  Levee.

THE COURT:  Levee?

THE DEFENDANT:  Yes, sir.

THE COURT:  Thank you, sir.

And, Mr. Levee, are you an American citizen?

THE DEFENDANT:  Yes, I am, Your Honor.

THE COURT:  All right.  Now, are there any pretrial matters that need to be taken up at this time by either side?

MR. RODGERS:  As far as the State, Your Honor, there is a -- there is a divorce pending in this case between the listed victim and the Defendant. Defense Counsel and I have talked a great deal about the fact that that's in existence.  However, I am going to do an oral Motion in Limine asking that issues related to the divorce not relevant to this, not be gone into for purposes of -- of speeding this up and because they're not relevant.

So I think Defense Counsel and I are on the same page on that, but I did want to get that Motion in Limine on the record.

THE COURT:  Mr. Bell, do you have a response?

MR. BELL:  We are in agreement with that. I would, again, reiterate the same thing from the Defense, that the issues in the divorce case that are not relevant to this, that they can be liminied out.

THE COURT:  Okay.  Now, with regard to the respective witnesses that will be testifying, if either side has an issue with regard to whether or not that that should be heard by the Court, I expect you to make

a timely objection with regard to those matters.

MR. RODGERS: Yes, Your Honor.

THE COURT: Mr. Bell?

MR. BELL: No objection.

THE COURT: All right. Now, Mr. -- State, do you have any other pretrial matters?

MR. RODGERS: Yes, Your Honor. One of the witnesses that we're going to be calling is a daughter of the victim, Catherine Levee.

THE COURT: Is that also the Defendant's daughter?

MR. RODGERS: Stepdaughter, Your Honor.

THE COURT: All right.

MR. BELL: Actually, adopted. She's actually adopted.

MR. RODGERS: Adopted daughter. There is a pending aggravated assault case in which Cathey, the daughter, Catherine, who goes by Katy, she is charged with aggravated assault against the listed victim here, Cathey Levee -- Levee, the mother. I had -- there has been a Brady Notice on file for -- for quite some time to that extent.

I have already talked to the family. I've talked to the Defense Counsel for Katy Levee, Brian Willett. He understands she's testifying today because

she is a witness in the case.  He understands that we are not going to go into any matters related to that assault above and beyond the fact that it is pending.

And that -- I just want to make the Court aware that we have made Defense Counsel aware of that fact through Brady Notice, it's in existence, and we have talked to Defense Counsel for Katy Levee about it.

THE COURT:  All right.  Mr. Bell, are you going to limit your cross-examination of this particular witness, or do --

MR. BELL:  I will -- I will --

THE COURT:  I need to have the defense attorney on standby.

MR. BELL:  I will limit it only to the extent that obviously she would take the Fifth with regard to that offense.

THE COURT:  Okay.  Does she need to have her attorney present in your opinion?

MR. BELL:  I would not anticipate so, but again...

THE COURT:  Well --

MR. BELL:  Yeah.  Yeah.  I'm not -- she's not my client, so I can't -- I mean, obviously, I don't know --

THE COURT:  No, but what I'm asking is that

do you anticipate to go into any matters to try -- attempt to impeach her? And if you are, that's fine. I just need to have her attorney present.

Now, I don't want to limit your cross-examination. She's not your client. However, in good faith and as an officer of the Court, can you tell me whether or not that would be a prudent step? The State's telling me that they don't anticipate the need of the -- of the attorney to -- to be present that's representing that particular witness.

MR. BELL: At this response -- at -- at this juncture, it's difficult for me to tell you that because she hasn't given any type of statement that I have seen --

THE COURT: All right.

MR. BELL: -- so, I mean, she -- if -- from what I can tell, unless Tim can tell me wrong, she didn't talk to the police. She's never testified apparently in the divorce hearing. She didn't testify in the protective order. So I don't know exact -- exactly what she's going to say. So it's difficult to make that determination.

Now, what I can tell you is if I get to that point, we can stop it at that point and have her lawyer present.

THE COURT:  All right.  You --

MR. BELL:  She's never testified.  It's hard for me to tell you that for sure.

THE COURT:  Thank you.  You need to notify her counsel to be present when she testifies.

MR. RODGERS:  He's out of town, Your Honor.

THE COURT:  Well, that's a problem that you should have anticipated, because if she has a pending case and it's your -- you're also prosecuting her, and he's not going to limit his cross-examination.

MR. RODGERS:  Well, I would -- I'd urge a Motion in Limine because the two incidents are totally separate and apart.  Of course, I think it's relevant that the charges are pending, they exist at the time -- at this moment for purposes of her credibility, and she understands that my getting her testimony here and having her here has nothing absolutely whatsoever to do with her pending case, and she's not being given anything in exchange for her testimony in relation to the case.

THE COURT:  That's not my point.  My point is that you can't limit his cross-examination under the Rules of Evidence, and as a result, you anticipate calling her as a witness, she has a right to have her attorney present to advise her.  You cannot advise her.

MR. BELL:  Now, what I can tell you that I have learned -- and I work to determine whether or not this is going to become a factor -- that there were some prior issues with regard to your complainant and this individual that if -- you know, depending on how she testifies, we -- we might very well get into that they were assaultive in nature and some prior violence between the two.

So that -- and quite honestly, that's why I said it's difficult for me to determine what the Court -- what I might got -- get into prior to hearing her testify.  She's never said anything.

THE COURT:  I understand that, Mr. Bell --

MR. BELL:  But I do understand the Court's reservation with that, and honestly, probably, she should have somebody present, but...

THE COURT:  I understand that.

All right.  Now, with that in mind, where's Mr. Willett; do you know?

MR. RODGERS:  San Antonio, Your Honor.

THE COURT:  When is he due back?

MR. RODGERS:  I don't think it's this week.

THE COURT:  Do you know if you consulted -- gave your approval to put his witness up on the stand without him being represent?

MR. RODGERS:  I spoke to him this morning, Your Honor, on the phone, on the cell phone, told him what was going on.  I had told him about the pending case, and I don't -- he did know it was this morning, and so I called again -- to call his -- to tell him this morning.

He spoke to his client on the phone using my cell phone and discussed the matters with her, and then I got back on the phone.  He said, Yeah, go ahead. She understands what to talk about, what not to talk about, and she understands that this has nothing to do with her current case.  And, again, I would urge that it's not relevant to any facts about --

THE COURT:  Well, we -- I don't know what's relevant until the testimony comes out, okay, in terms of the questions that occur.  I -- I can't make that determination now.  I understand that you're making an argument.  I'm just trying to find out where he is -- where she is in terms of, one, her location, Mr. Willett's location, and has Mr. Willett conferred with her to a sufficient degree that she is willing to take the stand without him being present.  And it's your indication that that is -- that is correct?

MR. WHELCHEL:  Yes, Your Honor.

THE COURT:  All right.  All right.  With

that being said, we'll go ahead and proceed.

Now, if she decides that she wishes to have her attorney advise her of anything at that point or begin to go into any other matters other than, well -- I'll take it up at that point, if in the event that there is some matter that's -- that may affect her.

All right.  Are there any pretrial -- other matters, State, that you need to go into prior to trial?

MR. RODGERS:  Not from the State.

THE COURT:  Mr. Bell, do you have any matters that you wanted to place on the record or present to the Court?

MR. BELL:  I believe that the -- we've exchanged evidence, I believe, as recently as two days ago.  Mr. Rodgers gave me everything.  I understand that that -- that there was a plea-bargain offer on the table.  It's my understanding that my client is rejecting that.

THE COURT:  Did you want to place your client on the record rejecting that for the record, or you're just simply -- what you wanted to state, that's sufficient?

MR. BELL:  That's my understanding.  We've discussed it, and he has rejected the offer.  Raise your --

STATE VS. THEODORE FLOYD LEVEE

THE COURT: You want to call him as a witness?

MR. BELL: Yes, sir.

THE COURT: Okay. Mr. Levee.

(Defendant sworn)

THE COURT: Please put down your hand, sir, and please listen to the questions of your lawyer.

THEODORE LEVEE,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. BELL:

Q. State your name for the record.

A. Theodore Floyd Levee.

Q. Mr. Levee, we spent the better part of a year to go over your case; is that correct?

A. That's correct.

Q. I've actually --

THE REPORTER: I'm sorry. Can -- can you slow down and speak up, please?

Q. (BY MR. BELL) I've been involved in this case and to some extent involving the divorce case with regard to the protective order, correct?

A. That's correct.

Q. And we've had plenty of opportunity to go over it the last year, seen a voluminous amount of documents,

correct?

A.   Yes, sir.

Q.   And you understand that the State had offered a plea bargain in this case?

A.   Yes, sir.

Q.   And you've rejected that plea bargain and you want to go to trial, do you?

A.   If I understand the terms of the plea bargain, I will reject it.

Q.   Okay.  It's my understanding that the plea bargain -- I do not believe we discussed a fine; However, we discussed a deferred adjudication for ten years in this case.  Again, I don't believe we discussed a fine.  It -- it was irrelevant at that point.

But the State has offered you a ten-year deferred adjudication probation in this case.  And what that means, in essence, is if you serve out the terms and conditions of that probation, this would not be a conviction on your record at the end of that term period.  As long as you don't violate and the State does not proceed to adjudication on it, the case will be dismissed and you would not have a record for this offense.  Do you understand that?

A.   Yes.

Q.   And based upon that, you're rejecting their

offer?

A.   That's correct.

MR. WHELCHEL:  Judge, I'd also ask that whether or not the defense counsel has informed his client, that he also has the right of nondisclosure, potentially, and that, you know, if he's convicted here today, he will be a convicted felon.  He still has the opportunity to ask you for probation, but he would not have that ability -- or that right at the end of today if he's convicted.

Q.   (BY MR. BELL)  You understand -- because -- we did not get to step two, but you understand what an issue of nondisclosure is, that after a certain period of time, if you completed a deferred adjudication, you could apply to the Court for nondisclosure, which means, in essence, somebody would be able to tell you were arrested, but they -- law enforcement could not reveal to them what it is or what it's about, just that it did occur.  You would not have a felony conviction.  In fact, you can't -- you cannot expunge the records, but the arrest -- the arrest will remain out there, but law enforcement or the District Attorney's Office or anyone else could not reveal, at least any government entity, that they can instruct cannot to reveal what this offense was or what it was about?

A.   In all good conscience, I must reject the offer.

THE COURT:   Okay.   Now, Mr. Levee, do -- I do want to make one matter clear to you.   You understand that in the event if I find that the evidence is sufficient, that you've been proven beyond a reasonable doubt that you committed the offense, deferred will not be possible.   Do you understand that?

THE DEFENDANT:   Yes, Your Honor.

THE COURT:   All right.   Are both sides ready to proceed?

MR. RODGERS:   The State's ready.

MR. BELL:   The Defense is ready.

THE COURT:   And -- and, Mr. Bell, was there any other matter that you wish to place on the record before we proceed?

MR. BELL:   Not at this time.

THE COURT:   All right.   State, you may approach and read the Indictment to the Defendant.

MR. BELL:   Judge, we'd waive formal reading of the Indictment.

THE COURT:   Thank you.

MR BELL:   My client will enter a plea of not guilty to the charge alleged.

THE COURT:   All right.   Thank you very

much.

State, you may proceed with your opening statement.

MR. RODGERS: We'd waive opening, Your Honor.

THE COURT: All right. Mr. Bell, do you wish to make an opening statement?

MR. BELL: Just a brief opening statement, Your Honor.

THE COURT: Please be seated, Mr. Levee.

DEFENDANT'S OPENING STATEMENT

MR. BELL: This is a case that obviously has gotten to the criminal courts, but also has been, to some extent, tried in the family courts as well. As a result, I understand we're going to limit in here what we talk about, but I believe that that case has a great effect on what part he's due and the potential financial outcome down the street. The effect of what happens here has an effect on that.

That being said, I believe it's -- this is a factual differential, in essence that there are two folks and an incident occurred. There's just varying degrees of how it occurred and what ultimately resulted.

I believe the Court will find that the complainant was, in fact -- did suffer some sort of

injuries; however, I believe that the trier of fact, by looking at all the varying stories and the different versions that have been given in different forms and courtrooms and to police departments vary greatly.

And I believe based upon that, that after hearing all the evidence, that the Court will see the differential and, you know, realize that the Court -- State has not -- excuse me -- proved their case beyond a reasonable doubt.

THE COURT:  Thank you.

State, call your first witness.

MR. RODGERS:  The State calls Cathey Levee -- Levee.

So the Court's aware, Judge, she is in a motorized wheelchair, so would you like me to set her to the right of the witness stand?

THE COURT:  That's fine.  Thank you very much.

MR. BELL:  One other preliminary matter, and I -- I should have -- there's nobody here.  It's just that we invoke the Rule.  Anybody that's going to testify in this hearing -- you don't -- nobody's down here, so I don't think it's an issue.  That's why I actually didn't mention it.  But we'd invoke the Rule at this point, so anybody that's going to testify in this

phase of the trial.

THE COURT:  In this phase, not the punishment phase?

MR. BELL:  I would anticipate yes.  The -- the concern I have is that there have been some -- I don't know who's here, I don't know what family members might be here, and there has been some violence at the other courthouse after a hearing, and so as a result of that, I think it's a good idea that --

THE COURT:  All right.  Well, why don't you bring in all the witnesses that you have present.  We'll swear them in, and I'll instruct them now.

And that includes your witnesses, Mr. Bell, if any are here.

MR. WHELCHEL:  And for the record, I have already instructed all of our witnesses not to discuss anything having to do with the case starting about an hour ago.

THE COURT:  All right.

MR. BELL:  And I have one -- the only witness that I have, with the exception of my client, that might be here, is his daughter that's here, but she was not even in the state, I believe, when this happened, so...

THE COURT:  Do you anticipate calling her

as a witness?

MR. BELL:  Only in guilt -- only in punishment, Judge, if we get to that point.

THE COURT:  State, are you invoking the -- the Rule as well?

MR. RODGERS:  No, Your Honor, I don't have a problem with her being in here.

MR. BELL:  So my only issue is just because of what happened down the street.  I don't want to get some folks in here who -- while they may not be involved -- we -- we create some sort of disturbance.

THE COURT:  Very good.  Bring in the witnesses that will be testifying, State.

(Witnesses enter courtroom)

THE COURT:  Would you please raise your right hands.

(Witnesses sworn)

THE COURT:  Please put down your hands, ladies.

I need you to identify yourselves by your first and last name, beginning from this side to this side.  Ma'am?

THE WITNESS:  Cathey Levee.

THE COURT:  Ms. Levee.

THE WITNESS:  Andrea Levee.

STATE VS. THEODORE FLOYD LEVEE

THE COURT:  Andrea Levee?  Thank you.

THE WITNESS:  Alexandra Levee.

THE COURT:  Thank you, Ms. Levee.

THE WITNESS:  Catherine Levee.

THE COURT:  Thank you, Ms. Levee.

You've all been sworn in as witnesses in the State of Texas versus Theodore Floyd Levee.  That means that you cannot discuss this case amongst yourselves.  And when I said a moment ago, you've been sworn in as witnesses, both sides have invoked the Rule.  And the Rule means that you may not discuss this case amongst yourselves before or after you testify, meaning that if somebody comes in and testifies, you may not discuss their testimony with anybody else, nor may you discuss it with amongst yourselves or discuss this case with anybody else with the exception of the lawyers that are involved in the case or the investigators that represent them.  Do you understand?

THE WITNESS:  Yes, sir.

THE COURT:  Failure to comply may result in your testimony being stricken from the consideration of the Court for the purposes of the trial.  Do you have any questions?

THE WITNESS:  No, sir.

THE COURT:  If you do have any questions at

a later time, I'm instructing you to contact the respective side or the lawyer that intends to call you and ask them a question for clarification.

Thank you very much.  You are excused.  You may not be present during the testimony of each other during the trial.

(Witnesses exit courtroom)

(Witness approaches)

THE COURT:  All right.  Thank you.  Now, before I go any further, I forgot to ask one thing.  Mr. Bell, I was reviewing the Court's file.  There is not a written waiver of a jury trial in this case that I can see, but before we begin --

MR. BELL:  We -- we put it on the record.

THE COURT:  I just wanted to make sure that it was on the --

MR. BELL:  I believe it's my understanding, if I remember correctly, we -- we had some questions about -- Mr. Rodgers, I believe he was here.  We had some questions about probation issue, and we researched that.  We put all that on the record the day we were set for trial.

Do you remember doing that?

MR. RODGERS:  I do remember doing that.

THE COURT:  All right.  I just wanted to

verify that with both sides before we continue.

Do you require -- Mr. Bell, do you waive any further admonishments with regard to his right to have a jury trial?

MR. BELL: No, sir.

THE COURT: And the effect -- it may affect his full right of appeal in terms of a jury trial. Does that need to be admonished with the client?

MR. BELL: We discussed -- we discussed it, and he understands.

THE COURT: All right. Thank you, Mr. Bell.

All right, State. You may proceed.

MR. RODGERS: Thank you, Your Honor.

STATE'S DIRECT EVIDENCE

CATHEY LEVEE,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. RODGERS:

Q. Ma'am, would you please state your name for the record?

A. Cathey Levee.

Q. And unfortunately, for the record, you're in a motorized wheelchair, correct?

A. Correct.

STATE VS. THEODORE FLOYD LEVEE

Q.   And for that reason, we can't get a microphone in front of you, so I'm going to need you to speak up very loud and clearly.  Okay?

A.   Okay.

Q.   All right.  Ms. Levee, please don't find me to be impolite, but how old are you?

A.   Fifty-three.

Q.   Do you know a person by the name of Theodore, or Ted, Levee?

A.   Yes.

Q.   And how do you know him?

A.   He's my husband.

Q.   Do you see the person you know as Ted Levee in the courtroom today?

A.   Yes, sir.

Q.   Now, if I am standing behind chair number one, and you're counting to your right, two, three, four, what chair would the person you've identified as Ted Levee be in?

A.   Number four.

MR. RODGERS:  Your Honor, may the record reflect the witness has identified the Defendant?

THE COURT:  The record will so reflect.

Q.   (BY MR. RODGERS)  How long have you been married to Mr. Levee?

A.    Almost nine years.

Q.    Do you have any children with him?

A.    Yes.

Q.    And how many?

A.    Three.

Q.    And are they with him, or has he adopted them?

A.    He has adopted them.

Q.    How many children do you have total?

A.    Three.

Q.    Can you tell us their names and ages?

A.    Alexandra Levee, 21; Andrea Levee, 19; Catherine Levee, 17.

Q.    And, again, these are not children you had with the Defendant, but he's adopted them?

A.    Correct.

Q.    Now, you understand what we're here to discuss, correct?

A.    Yes.

Q.    We're here to talk strictly about the assault that's been alleged to have been committed by this Defendant?

A.    Yes.

Q.    But there is a pending divorce; is that right?

A.    Yes.

Q.    And how long has this divorce been pending

between you and the Defendant?

A.   Since last May, 2010.

Q.   You understand we are here to talk about the assault itself and not about issues relating to the divorce?

A.   Yes.

Q.   I want to draw your attention to April 10th, 2010.   Where were you living at that time?

A.   In our house in Hurst.

Q.   Do you remember the address?

A.   401 Parkview Court, Hurst 76053.

Q.   Is that address in Tarrant County?

A.   Yes.

Q.   In the State of Texas?

A.   Yes.

Q.   Who all was living in the house at that time?

A.   Katy -- Catherine, myself and Mr. Levee.

Q.   The Defendant?

A.   Yes.

Q.   Where was Alex living at that time?

A.   In an apartment.

Q.   I want to start, I guess, mid-afternoon, morning of April 10th, 2010.   Were y'all doing anything special that day?

A.   Yes.

Q. What was it?

A. We had gone to a Rangers game.

Q. Texas Rangers baseball game?

A. Yes.

Q. What time did you go?

A. Around 10:00 o'clock in the morning. We went early because Katy had won an art contest, and that's why we were going.

Q. Who all was going?

A. Alexandra, Andrea, Katy and myself.

Q. The Defendant wasn't going?

A. No.

Q. Do you remember what he was doing that day?

A. Staying home.

Q. At that time, going to the game, did you just go on foot, or did you have to take a wheelchair?

A. I had to take the wheelchair.

Q. Tell the Court why you were in a wheelchair at that time?

A. I had been in a -- a car accident that hurt my lower back in 2009, and had been in a wheelchair for several months, but was getting well and used the wheelchair only for long distances.

Q. Did you use the wheelchair at home at that time?

STATE VS. THEODORE FLOYD LEVEE

A.   No.

Q.   Did you use it at work?

A.   Sometimes.

Q.   Were you able to walk short distances?

A.   Yes.

Q.   Now, you were also -- you've also been diagnosed with rheumatoid arthritis, correct?

A.   Yes.  Yes.

Q.   And how long have you had that diagnosis?

A.   Since -- approximately 2001.

Q.   Before the car accident, how did the rheumatoid arthritis affect your walking and getting around normally?

A.   It just hurt.  It was painful, but I didn't use a wheelchair or anything.  I just hurt.

Q.   Aches and pains?

A.   Uh-huh.

Q.   Is that a yes?

A.   Excuse me.  Yes, sir.

Q.   The court reporter can't take down uh-huhs or huh-uhs --

A.   Yes, I'm sorry.

Q.   -- so if you can answer yes or -- you're okay.  It's okay.

          So at the time you were going to the

Rangers game on April 10th, you were using the wheelchair but only because it was long distances?

A. Yes.

Q. Your house at that time was a two-story house, correct?

A. Yes.

Q. How did you get up and down the stairs?

A. I walked.

Q. So you were able to walk upstairs okay?

A. Yes.

Q. Do you remember about what time the Rangers game ended or that you left the Rangers game?

A. We left before it ended. I don't recall the time. It was approximately 4:00.

Q. Did you go straight home?

A. Yes.

Q. Did all four of you come back to the house?

A. Yes.

Q. Once you got there, what happened?

A. I left the wheelchair in the car; I walked in the house; I walked upstairs and went into my bedroom.

Q. Where was the Defendant at that time?

A. Upstairs.

Q. Did he come out to meet you when you came inside?

A.   Yes.

Q.   Did your children come inside also?

A.   Yes.

Q.   Where did they go?

A.   They stayed downstairs.

Q.   What happened next?

A.   Alexandra said she wanted to go tanning, then Andrea said she wanted to go tanning.

Q.   How did the Defendant react to that?

A.   Mr. Levee wanted to go tanning with Alexandra.

Q.   Was that something he did usually?

A.   No.

Q.   Without going into anything that was said, how did Alex and Andrea react to the Defendant wanting to tan with them?

MR. BELL:   I'm going to object to hearsay without obviously --

THE COURT:   I'm going to sustain the objection to any hearsay.

You may proceed.

Q.   (BY MR. RODGERS)   Just based on appearances, was Alex happy that the Defendant wanted to go with -- with her?

A.   No.

Q.   So what did you do?

A.  I told him he couldn't go with her, it was inappropriate.

Q.  And by, "you told him," you mean the Defendant?

A.  Yes.

Q.  How did he react?

A.  He got very angry.

Q.  Did he say anything?

A.  Yes.

Q.  What did he say?

A.  That I had a dirty mind and that I had ruined his life and he was sorry he married me and he hated me and...

Q.  Was he saying these things quietly or was he saying them loudly?

A.  Very loudly.

Q.  Did you then say, Okay, go ahead and go?

A.  No.

Q.  What did you do?

A.  I told the girls to hurry up and get out of the house.

Q.  Now, which girls were going?

A.  Andrea and Alexandra only.  They told Katy to stay.

Q.  Why is that?

A.  Because Ted was acting crazy that morning and

they feared for me.

Q.   So did Katy stay?

A.   Katy stayed.

Q.   What happened after Alex and Andrea left?

A.   Mr. Levee started increasing his behavior, yelling at me, cursing at me.

Q.   What did you do?

A.   I went into my bedroom and told Katy quietly that we needed to pack a bag and go to a hotel or someplace until Mr. Levee calmed down.

Q.   Did she do that?

A.   Yes.

Q.   What bedroom were you in when you told Katy to pack some bags?

A.   My bedroom, the master bedroom.

Q.   You said upstairs.  Is that upstairs?

A.   Yes.

Q.   Where did Katy go after you told her that?

A.   She went to her room and got some things and then came back to stay with me.

Q.   Is her room also upstairs?

A.   Yes.

Q.   When she came back into the bedroom after gathering some things, you and Katy are in -- in your bedroom?

A.    Yes.

Q.    Where is the Defendant?

A.    In the bedroom.

Q.    What's he doing?

A.    Pacing back and forth, yelling at me.  When he figured out we were leaving, he said I could go but Katy couldn't.

Q.    How did you feel about that?

A.    I would not allow Katy to stay alone with him.

Q.    What did you do?

A.    I continued to gather things and took my phone out of my purse, and he took the phone and threw it at the wall.

Q.    Was Katy in the room when he did that?

A.    Yes.

Q.    Who were you going to call?

A.    Either 9-1-1 or my parents.

Q.    After he threw your phone against the wall, did it break it?

A.    It came apart, but it was not broken.

Q.    What did you do next?

A.    I told Katy to find the phone, and then I led him out of the bedroom because I feared for Katy's safety, so I came out of the bedroom and he followed me.

MR. BELL:  Judge --

THE COURT:  I'm sorry.  Go ahead, Mr. Bell.

MR. BELL:  I'm having a hard time hearing her.  I heard she did something with her -- him.  I'm having a hard time seeing her as it is, but I'm having a hard time hearing her.

THE COURT:  All right.  Could you please speak up --

THE WITNESS:  Yes, sir.

THE COURT:  -- Mrs. Levee?

Thank you.

MR. RODGERS:  May we have a moment to maybe try to set the microphone by her, Judge?

THE COURT:  You may, but I don't believe it can be moved.

We're off the record.

(Pause in proceedings)

MR. BELL:  If we could go back because I couldn't hear the last couple of things that she said.

THE COURT:  Counsel, would you go back to the point -- we're back on the record.

Could you please go back to the point where you were asking her questions about the phone and then continue from that point, I think is where Mr. Bell left off.

MR. BELL:  Yes, sir.

STATE VS. THEODORE FLOYD LEVEE

MR. RODGERS:  Yes, Your Honor.

Q.   (BY MR. RODGERS)  Ms. Levee, you testified that at some point the Defendant grabbed your phone, threw it against the wall?

A.   Yes.

Q.   And then after which, you said you were able to put it back together?

A.   No, I did not put it back together.  It was lost in the room.  He threw it against the wall --

(Cell phone disturbance)

THE COURT:  Just a moment.

MR. BELL:  I'll turn it off.

THE COURT:  That's fine, Mr. Bell.  I just wanted to --

MR. BELL:  It's on vibrate.

THE COURT:  I just want to make sure you're able to hear everything.

You may proceed.

Q.   (BY MR. RODGERS)  After the Defendant threw the phone against the wall, what did you do?

A.   I told Katy to find the phone, and then I led Mr. Levee out of the room because he was following me. And we went into the hallway while Katy looked for the phone.

Q.   If you would, describe to the Court, as you

walk out of your bedroom, what the hallway looks like and what's around you.

A.   As -- as you leave my bedroom, on the right there is a full wall.  On the left-hand side, there's a bannister similar to this kind of banister here that you curve around, and it goes to the stairs that lead to the downstairs.

Q.   So when you say you walked outside and led him out there, where did you go?

A.   Into the hallway.

Q.   What happened then?

A.   He had been following me and pacing, and I was trying to get away from him and lead him away from Katy, and he shoved me into the banister and hurt my chest. And I screamed, and then Katy showed up at the doorway and said, I found the phone.

MR. BELL:  Objection; hearsay, Your Honor.

THE COURT:  Sustained as to hearsay.

Q.   (BY MR. RODGERS)  Again, Ms. Levee, don't go into what anybody said unless I specifically -- specifically ask you.  Okay?

A.   Okay.

Q.   Okay?

A.   Yes.

Q.   Going back to his pushing you into the

STATE VS. THEODORE FLOYD LEVEE

banister -- I want to get into that and get into the fine details of that. When you walked out of the bedroom, which direction were you facing?

A. I was leaving the bedroom going -- there's an upstairs den that it leads to if you don't go downstairs, and all the kids' bedrooms are on the right. I was just leaving the bedroom because I didn't want him to go back in there with Katy. I really didn't have a destination or a plan.

Q. As you walked out, did he follow right behind you?

A. Yes.

Q. And how long was it after you left the room before you say he pushed you?

A. Very soon, but I don't recall a time.

Q. Did you feel -- were you facing towards him or away from him when he pushed you?

A. Facing towards him.

Q. And so were you able to see how exactly he pushed you?

A. Yes.

Q. Okay. And describe to the Court where his hands were and his arms where, exactly how it is he shoved you or pushed you.

A. He used his shoulder and body-slammed me into

the banister.

Q.   What part of your body hit the banister?

A.   My breasts, my ribs.

Q.   Okay.  And so we can understand exactly how your body was positioned, if you were faced him and -- were you facing away from the banister when he pushed you?

A.   I can stand up and show you because I don't really understand --

MR. RODGERS:  Okay.  Your Honor, may the witness stand up?

THE COURT:  She may.

MR. RODGERS:  And may I approach the witness?

THE COURT:  You may.

Q.   (BY MR. RODGERS)  And only do as -- as much as you're comfortable with.  Okay?

A.   Okay.  My banister is taller than this, but he was facing me exactly as you're facing me.  And I took a step, and he body-slammed me.  And I went into the banister and stood back up.  I -- I screamed.  Then my daughter showed up at the door, and then he looked at me and he wrapped his leg around me and took it out from under me and it went at a right angle this way and I heard it break.

Q.   Okay.  So the record is clear, the banister as -- as you're facing me, the banister was to your left?

A.   Yes.

Q.   And where was the bedroom?

A.   Behind me.

Q.   Back behind you.  Okay.

And so if -- you said I was where the Defendant was.

A.   Yes.

Q.   And so you -- as -- he body-checked you with which shoulder?

A.   This one.

Q.   His right shoulder, which made you hit the banister?

A.   Yes.

Q.   Okay.  And you said, so the record is clear also, you're -- you're spinning to your left a little bit and hitting the banister; is that correct?

A.   Uh-huh.

Q.   Is that a yes?

A.   If that's left, yes, I'm -- yes.

Q.   Okay.  All right.  Now, at that point was he -- did he say anything immediately before or after he shoved you?

A.   No.

Q.   Okay.  How was his demeanor?  How's he acting?

A.   Angry and aggressive.

May I sit down?

Q.   Do you need to sit down?

How did it feel when you hit the banister?

A.   Extremely painful.

Q.   And you said afterwards, you -- you stood back up.  How did you react as far as your body language?

A.   I tried to avoid him.  I was trying to get away.

Q.   And you said Katy came out at that point?

A.   Yes.

Q.   Without going into what she said, did she say anything at that point?

A.   Yes.

Q.   And in that moment, did she sound excited to you?

A.   Yes.

Q.   Did it appear as though she was excited after having heard you screaming and excited by what was happening at that moment?

A.   Yes.

Q.   In that instant, in that moment of excitement, what did she say?

MR. BELL:  Object on the grounds of hearsay.  I also believe she's a witness, so if she's got something to say, she can testify to it when she takes the stand.

THE COURT:  Your --

MR. RODGERS:  Excited utterance, Your Honor.

THE COURT:  Overruled.

Q.   (BY MR. RODGERS)  Ms. Levee, what did she say?

A.   I found the phone, and when she heard me scream, I believe she said, Stop, you're killing her.

Q.   Did he stop?

A.   No.  That was when he kicked me.

Q.   Okay.  Now, thinking back to how we were situated, was he still in front of you at that point?

A.   Yes.

Q.   And your right leg was the leg away from the banister, correct?

A.   Correct.

Q.   Now, you said he kicked you.  What leg did he use?

MR. RODGERS:  May I approach the witness again, Your Honor?

THE COURT:  You may.

Q.   (BY MR. RODGERS)  Would it help you if you saw

me standing in front of you?

A.   Yes.

Q.   Okay.  So if I'm standing about where he was, which leg did he kick you with?

A.   This leg.

Q.   So you're pointing to my right leg?

A.   Yes.

Q.   Okay.  Describe exactly what he did with his right leg that hurt you.

A.   He wrapped his ankle around the lower part of my leg and flipped it out at a right angle.

Q.   So -- I'm going to stand back so the Judge can see me.

So if -- he did this to your right leg, correct?

A.   Yes.

Q.   So you're saying that he brought your leg -- he swept it outward, is that correct, right angle away from your body?

A.   Yes.

Q.   Okay.  How did it feel when he did that?

A.   Extremely painful.

Q.   What did you believe had happened to your leg at that point?

A.   I believed it was broken because of the noise I

heard.

Q. What was the noise?

A. A breaking sound.

Q. What happened next?

A. I fell to the floor.

Q. What did the Defendant do then?

A. Continued cursing and pacing and told me I was a drama queen, that there was nothing wrong with me.

Q. Was Katy still there?

A. Yes.

Q. What did she do?

A. She came and sat down by me with the phone.

Q. Did the Defendant stay with you at that time?

A. No. He continued to pace, going up and down the stairs, going into the bedroom and just being verbally aggressive and threatening.

Q. Did you stand up at that time?

A. I tried to stand up because I thought maybe my leg wasn't broken, and I fell to the ground again in terrible pain.

Q. What did you do then?

A. I started inching on my bottom trying to get away from Mr. Levee and get closer to the stairs to try and get out of the house.

Q. Were you able to do that?

A.    Not at that time.

Q.    Where was Katy through all this?

A.    Sitting right next to me.

Q.    Were you finally able to get over to the stairs?

A.    Yes.

Q.    How long did it take you?

A.    I'm not exactly sure of time, maybe 20 minutes, because Mr. Levee kept yelling at us and being aggressive, and I was very afraid.

Q.    When you said you were unable to stand up, describe exactly what you felt when you -- when you tried to stand up that made it to where you couldn't.

A.    When I stood up, my right leg collapsed at a right angle.  It -- it was broken in half.  It wouldn't support any weight.  Something was terribly wrong with it.  I didn't know if it was a broken knee, a broken leg.  I had no idea.  It just wouldn't -- was very painful and it --

Q.    So --

A.    Knees aren't supposed to bend at a right angle.

Q.    And this is the -- the leg that the Defendant swept with his -- with his leg?

A.    Yes.

Q.    In this, and again, approximately 20 minutes

when you're trying to get over to the stairs, what's the Defendant doing?

A. Pacing back and forth, going downstairs, telling me he's going to destroy my wheelchair. He went and got things to threaten us.

Q. How did he threaten you?

A. With a shotgun.

Q. What did he do with the shotgun?

A. He started making that noise -- I'm not -- cocking it, and making that scary noise and threatened to kill us and threatened to kill himself.

Q. Did he stay in the -- the house the whole time you were in the house?

A. He was very agitated and was running around the bedroom and the hallway and downstairs, and I don't know what he was doing downstairs. And then he would go out to the car and try and get the wheelchair out --

MR. BELL: Objection, Your Honor. I'm going to object as to what he was doing outside. If she wasn't out there, she can't -- she has no idea what he's doing. It's outside of her view. Speculation.

THE COURT: I understand your point. I'll allow you to cross-examine on that and draw those inferences out.

MR. BELL: Thank you.

THE COURT:  Thank you, Mr. Bell.

MR. RODGERS:  May I proceed, Judge?

THE COURT:  You may.

Q.    (BY MR. RODGERS)  Now, you mentioned that Katy had gotten your phone back together?

A.    Yes.

Q.    Did you call anybody at that time?

A.    She tried first.

Q.    Okay.  So you saw her trying to call somebody?

A.    She asked me what to do.  I said call 9-1-1.

Q.    And did she call 9-1-1?

A.    She tried, but it wouldn't answer.  It was like several rings, so I said, Give me the phone.

Q.    What did you do with it?

A.    I called my father.

Q.    Were you able to speak to your father and tell him you needed help?

A.    Yes.

Q.    And did your father start your way to come help you?

A.    Yes.

Q.    Were you able to make it down the stairs?

A.    On my bottom, scooting down.

Q.    So you still weren't able to walk on your leg?

A.    Correct.

Q.   So I guess on your bottom, you were just kind of scooting your way down?

A.   Yes.

Q.   Does your dad finally get there?

A.   Yes.

Q.   How long did it take?

A.   Five or six minutes.

Q.   Does he live pretty close by?

A.   Yes.

Q.   Once he got there, what happened?

A.   Ted went into the bedroom and shut the door. Katy and Daddy helped me onto the seat of a walker that rolled, and Dad moved me out to his car to take me to the emergency room.

Q.   Which emergency room did you go to?

A.   Harris HEB.

Q.   And once you got there, did you get treated?

A.   Yes.

Q.   How long were you in the hospital?

A.   Till -- I went in approximately 5:00 or 6:00, and I didn't get out until 1:00 or later in the morning.

MR. RODGERS:   May I approach the witness, Your Honor?

THE COURT:   You may.

Q.   (BY MR. RODGERS)   Ms. Levee, I'm going to show

you what's been marked as State's Exhibit 1 through 3. Take a look at these, please.

A.   (Witness complies).

Q.   And once you've looked at them, are these photographs taken of you at the hospital that evening?

A.   Yes.

Q.   Do they fairly and accurately show your injuries at that time?

A.   Yes.

MR. RODGERS:  Your Honor, we would offer State's 1 through 3, inclusive, in evidence.

MR. BELL:  I have no objection to them.

THE COURT:  State's Exhibit 1, 2, 3 are admitted into evidence.

(State's Exhibit Nos. 1-3 admitted)

THE COURT:  May I see them?

Just give me a moment.

MR. RODGERS:  Yes, sir.

THE COURT:  Okay.  You may proceed.

MR. RODGERS:  Actually, Your Honor, may I approach the witness again?

THE COURT:  You may.

Q.   (BY MR. RODGERS)  Ms. Levee, I'm going to show you State's Exhibits 4 through 8.  You've seen these before, correct?

A.   Yes.

Q.   These are photographs that were taken of your injuries a couple of days after the assault?

A.   Yes.

Q.   How long after the assault were these pictures taken?

A.   Either the 12th or the 13th.

Q.   So we're talking two or three days later?

A.   Yes.

Q.   And do State's Exhibits 4 and 8 accurately reflect the picture -- the injuries you had at that time?

A.   They're -- yes, they are accurate.

Q.   And I want to show you State's Exhibit No. 9. Are these the medical records -- your medical records from HEB hospital from that night?

A.   Yes.

MR. RODGERS:  Your Honor, we would offer State's Exhibits 4 through 9, inclusive, into evidence. For the record, State's Exhibit No. 9, we've had a business records affidavit and notice of intent to offer these business records on file for the required amount of time.

MR. BELL:  I have no objection to State's Exhibit 9.  However, State's Exhibit 4, 5, 6, 7 and 8, I

don't believe the proper predicate has been laid.  I have no idea when these pictures were taken; they're not time stamped; I don't know who took them; I don't know if they were taken -- or the person took the pictures, if they were taken a day later, a week later, a month later, and I would object to them on that grounds.  We have no idea whether -- I have no idea if they even relate to this offense.

THE COURT:  Okay.  May I see the photograph?

Okay.  State's Exhibit No. 9 is admitted without objection.  Defense has lodged an objection --

(State's Exhibit No. 9 admitted)

MR. BELL:  My objection --

THE REPORTER:  I'm sorry.  I couldn't hear you.

MR. BELL:  He was asking about Exhibit 9. I have no objection to this, and I asked if I could really look at it while he's doing that.

THE COURT:  Okay.  Mr. Bell, I'm going to allow you to voir dire the witness with regard to State's Exhibits No. 4 through 8.  After reviewing the -- the Court's notes and the record, the witness has identified herself in the exhibits and that they were taken two days -- two to three days after the assault,

so you do -- she can authenticate herself, identifying herself as purported to be what it is.

MR. BELL:  Okay.

THE COURT:  So if you'd like to voir dire, I'll allow -- allow you to do that.  Otherwise, I'm going to overrule your objection.

MR. BELL:  May I briefly voir dire the witness?

THE COURT:  You may.

MR. BELL:  May I see the pictures?

THE COURT:  Yes, sir.

Okay.  Now you may proceed.

### VOIR DIRE EXAMINATION

BY MR. BELL:

Q.   With regard to the pictures that you've submitted, who took these pictures?

A.   My daughter and a friend of hers.

Q.   Which daughter would that be?

A.   Alexandra.

Q.   Okay.  How did she take them?  What type of camera?

A.   With a digital camera.

Q.   And where were these pictures taken at?

A.   In my den upstairs.

Q.   Okay.  And how long after the alleged incident

were these pictures taken?

A.    Two to three days.

Q.    These were taken -- by the 15th of April is when these pictures were taken.  It happened roughly the 10th or 11th, so these were taken by the 15th of April?

A.    Before.

Q.    Okay.

A.    No later than the 12th -- I mean, excuse me, the 13th.

Q.    Okay.  And you're stating that all of these injuries -- alleged injuries that had these pictures taken, they were all as a result of what occurred that day?

A.    Yes.

Q.    I --

THE REPORTER:  I can't hear you, sir.

Q.    (BY MR. BELL)  Which -- whose -- which daughter took these?

A.    Alexandra.

THE COURT:  Thank you, Mr. Bell.  Do you have any further objection?

MR. BELL:  Not with regard to these exhibits.

THE COURT:  All right.  Your objection is overruled.  State's Exhibit 4 through 8 are admitted.

(State's Exhibit Nos. 4-8 admitted)

MR. RODGERS:  May I approach, Your Honor?

THE COURT:  You may.

DIRECT EXAMINATION (RESUMED)

BY MR. RODGERS:

Q.   Ms. Levee, as I kind of hold these pictures up so you and the Judge can see, in the pictures of the -- of any foot or leg, is that your right leg?

A.   Yes.

Q.   In looking at State's Exhibits 7 and 8, I understand it's probably not fun having these out in public, but these are -- are pictures of your chest area, correct?

A.   Yes.

Q.   And where -- when did you sustain those injuries?

A.   When he shoved me into the banister.

Q.   When you were discharged from the hospital -- you said approximately 1:00 a.m.?

A.   Yes.

Q.   Where was your next -- where did you next go for any treatment for that leg?

A.   Dr. Kadoko, the orthopedic surgeon that the hospital told me to go to.

Q.   Now, the Judge has State's Exhibit No. 9, which

are the medical records from the hospital. What was the diagnosis at that time of your injuries?

A.    Ruptured ACL, ruptured meniscus, bone fragments under my knee and a broken fibula in two places.

Q.    After going to Dr. Kadoko, where did you go next for treatment?

A.    Riata Therapy.

Q.    And what was the purpose of going to Riata Therapy?

A.    To build up strength in my legs so I could have surgery.

MR. RODGERS:  May I approach witness, Judge?

THE COURT:  You may.

Q.    (BY MR. RODGERS)  Ms. Levee, I'm going to show you what's been marked as State's Exhibit No. 10. We've -- we've looked at these before, but are these the records from Riata Therapy for when you were going there for treatment?

A.    Yes, sir.

MR. RODGERS:  Your Honor, we would offer State's Exhibit No. 10 into evidence.

MR. BELL:  We've previous -- previously discussed this.  We have no objection to the admission of those records.

THE COURT:  Thank you.  State's Exhibit No. 10 is admitted.

(State's Exhibit No. 10 admitted)

MR. RODGERS:  May I approach, Judge?

THE COURT:  You may.

Q.  (BY MR. RODGERS)  Ms. Levee, when did you first go to Riata?

A.  I don't recall the first date.

Q.  Was it about three days after the injury?

A.  Yes, it was very soon after the injury.

Q.  Okay.  And at some point during that time you were going to Riata, did you actually have surgery on your knee?

A.  No.

Q.  Did you at some point have surgery on your knee?

A.  Yes.

Q.  When was that?

A.  In June.

Q.  And what was the surgery for?

A.  I had a cadaver ACL put in, the meniscus repaired, the bone fragments removed, the fibula was set.  And that was the surgery.

Q.  So this was approximately two months after the injury?

A.   Yes.

Q.   In that two-month time period, did you have the normal use of your right leg?

A.   No.

Q.   Explain the extent to which you could use your right leg in that time.

A.   I could walk short distances like to the bathroom with my walker.  I could stand for periods of time.  I had a very sturdy brace on my right leg that didn't allow the knee to bend at all that I wore at all times.

Q.   Would you have been able to use your right leg at all without that brace during that time?

A.   No.

Q.   And after your knee surgery in June, were you able to use your leg normally at that point?

A.   No.

Q.   Immediately after the surgery?

A.   No.

Q.   And did you continue going to physical therapy after the surgery?

A.   Yes.

Q.   In fact, I guess according to the records the Judge has, it was till about mid July?

A.   Yes.

Q.   Tell the Court the status of your right knee at this time.

A.   It does not have normal function.  I cannot bend it as far as I used to.  It wobbles when I stand, and I have a different gait that has caused me to walk differently, and that's caused me to break bones in my other leg and has caused erosion --

MR. BELL:  I'm going to object to speculation as far as all the medical testimony as to what has caused other injuries.  It may or may not be as a result of -- if a doctor can testify to that, that's fine, but I don't think she has the medical expertise to -- to do that.

THE COURT:  Sustained.

Q.   (BY MR. RODGERS)  Have you ever walked as well as you did before the injury after --

A.   No, sir.

Q.   -- after the assault?

A.   No, sir.

Q.   Well, you have already commented on the fact you are in a -- in a motorized wheelchair now, and you also have a walking boot on your left foot.  What is that for?

A.   Broken bones in my right -- or excuse me, my left ankle.  The --

MR. BELL:  Judge, I object.  If she's going to go into a line of answers that involve related back to the other incident -- you know, she may -- she can explain what she's got obviously going on in her left ankle, but if she starts giving medical testimony that is directly related to the right or something that happened on that incident day --

THE COURT:  I think what you're trying to say, Mr. Bell, is that if it's not directly related to the specific incident, it's not relevant.

MR. BELL:  Correct.

THE COURT:  All right.  Please limit the testimony to the relevant testimony as to the injury sustained on those dates and anything that stems from it with regard to that specific injury.

MR. RODGERS:  Yes, Your Honor.

THE COURT:  Thank you.

Q.   (BY MR. RODGERS)  Ms. Levee, I guess what I wanted to make clear is the fact that the left ankle or leg injury you have right now did not occur on April 10th, 2010?

A.   Correct.

Q.   Okay.  Just so the Court is clear, that is something, at least not directly related, correct?  It didn't occur from the trauma of that night?

A.   It did not occur from the trauma of that night.

Q.   Okay.  At the time of the assault, did the Defendant have any injuries?

A.   No.

Q.   All right.  Had he had some shoulder surgery around that time?

A.   Yes.

Q.   Tell the Court about that.

A.   He had had surgery on April the 9th to repair a rotary cuff.

Q.   Was he in any sort of brace or cast at that time?

A.   He was supposed to be, but he wasn't wearing it.

Q.   Which shoulder had been repaired?

A.   I -- I don't remember.

Q.   But he did have an injury -- surgery shortly before that?

A.   Yes.

Q.   The -- the leg sweep that you described that he did to your leg, had you ever seen that kick or move before?

A.   Yes.

Q.   When?

A.   He did it to the kids.  He did it to Alexandra.

Q.   Had -- had they suffered injury from it?

A.   No.  She was a volleyball player and knew how to fall --

MR. BELL:  Objection; relevance.

THE COURT:  I'm sorry.  I didn't hear you, Mr. Bell.

MR. BELL:  Object to the relevance of the answer.  I mean, it's a yes or no question.

THE COURT:  Sustained.

Q.   (BY MR. RODGERS)  Did the Defendant ever talk about where he learned such a kick or move?

A.   Yes.

Q.   What did he say?

A.   He said he learned it in the military.

Q.   Was he proud of it?

A.   Yes.

MR. RODGERS:  Pass the witness, Your Honor.

THE COURT:  All right.  Cross-examination, Mr. Bell?

MR. BELL:  Yes, sir.

CROSS-EXAMINATION

BY MR. BELL:

Q.   Ms. Levee, we've actually -- I've actually cross-examined you before, haven't I?

A.   Yes, sir.

Q.   Okay.  And that would have been some eight, nine months ago at a protective order hearing, correct?

A.   Yes, I believe that's an accurate day.  Yes.

Q.   That -- that would be the only opportunity that I've ever had any contact with you with regard to this incident, correct?

A.   Yes.

Q.   I want to, first, if we could, talk specifically about the incident that occurred that day.  Okay?

A.   Yes.

Q.   You testified that you and Mr. Levee and Katy were all in your bedroom, correct?

A.   Yes.

Q.   And you attempted to get him out of the bedroom, correct?

A.   Yes.

Q.   And how did you do that?

A.   I walked out and he followed me.

Q.   Okay.  Now, did you ask him to follow you out?

A.   No.

Q.   Okay.  Did you motion for him to follow you out?

A.   No.

Q.   Okay.  Were you happy that he was following you

out?

A.   Yes.

Q.   Okay.   And that was your intent, correct?

A.   Yes.

Q.   Now, explain to the Judge, if you can, you walked into a hallway?

A.   Yes.

Q.   That is -- that is off of your bedroom, correct?

A.   Yes.

Q.   That at the other end of the hallway is the stairs, correct?

A.   No.

Q.   Okay.   Where are the stairs when you walk out of the bedroom?

A.   If this were the banister --

Q.   Yes, ma'am.

A.   -- where that opening is, the stairs go down.

Q.   Okay.   So where I'm standing in the courtroom, there's a hall -- there's a hallway, and there's a banister -- it's a hallway?

A.   Uh-huh, yes.

Q.   Being a banister -- being a banister on your left side, correct?

A.   Yes.

Q.   Okay.  And then a full wall on your right?

A.   Yes.

Q.   What do you think the width is of that hallway?  The standard -- kind of standard hallway?

A.   Yes.

Q.   Okay.  And so you walked out of the bedroom, correct?

A.   Yes.

Q.   And he followed you out?

A.   Yes.

Q.   Okay.  And then tell me what happened from there.  How far out of the bedroom did you come?

A.   Halfway.

Q.   How long is the hallway, do you think?  Is it the full length of this banister?

A.   No, that's much longer.

Q.   Okay.  What is -- on your right side coming down that hallway, are there any other doorways?

A.   No.

Q.   Okay.  So it's just a hallway and banister.  What's in -- what's at the other end of the hallway?

A.   If you take a right, there's another hallway that leads to the children's rooms and the bathroom.

Q.   Okay.

A.   If you go straight, there's the den.  You have

to make a U-turn like where I showed you to go down the stairs.

Q.    Okay.  What's behind the -- what's behind the wall to your right?

A.    The bathroom.

Q.    Okay.  So is it fair to say that it's at least -- from your doorway to the end of that walkway is at least 10, 15 feet?

A.    I don't believe it's that long at all.

Q.    Okay.  How far out of the bedroom did you get -- how far out of the bedroom did you get, feet-wise?  Two foot, three foot, four foot?

A.    Four or five feet, maybe.

Q.    Clear of the doorway?

A.    Yes, clear of the doorway.

Q.    And he follows you out of the -- follows you out, correct?  He's behind you?

A.    Yes.

Q.    Okay.  And how does he get -- does he get past you --

A.    Yes.

Q.    How does he get past you?

A.    He just walks past me.

Q.    Okay.  So it's a -- a narrow hallway, and he gets past you?

A.    Yes.

Q.    All right.  And then you indicate that he turns around?

A.    Yes.

Q.    Okay.  And then tell me what happens.

A.    He started walking back towards me.

Q.    Okay.  Having a conversation with you, talking to you?

A.    Yelling at me.

Q.    Just yelling at you.

Okay.  Does he stop?  Does he keep walking past you?

A.    He's trying to go back into the bedroom, and I was in his way, and he shoved me into the banister.

Q.    So is it -- is it fair to say -- from what you're saying is you tried to block his way into the bedroom?

A.    No.

Q.    Okay.  Well, you said he tried to walk past you, correct?

A.    Yes.

Q.    Okay.  So that would mean you -- close to the banister or close to the wall?

A.    I was close to the banister, and I was trying to avoid him to let him get back where he wanted.  I

didn't want to confront him.

Q.   Okay.  Because you just testified that you were trying to get him out of the bedroom.  That was your intent.

A.   Uh-huh.

Q.   And now what you're telling me is that you're trying to keep him from getting back into the bedroom?

A.   I'm sorry.  I don't understand the question.

Q.   A few moments ago you testified that you were trying to get him out of the bedroom.

A.   Yes.

Q.   And you were trying to do that because of what reason?

A.   To protect Katy.

Q.   Who was in the bedroom?

A.   Yes.

Q.   Okay.  You got him out of the bedroom, correct?

A.   Yes.

Q.   Okay.  And then he comes past you.  How far past you does he go?

A.   He doesn't go past me.  He shoves me into the banister.

Q.   Okay.  You just testified that he came past you and then he turned around and tried to get back into the bedroom; did you not?

A.    Yes.  Oh, I'm -- he passed me.  He turned around to go back into the bedroom.  I was trying to avoid contact because I didn't want to make him mad.  He shoved me into the banister and then kicked my leg.

Q.    Okay.  You said that he tried to get around you to get back in the bedroom.  That's what you just testified to; did you not?

A.    Yes.

Q.    Okay.  So that means that he would have moved over -- you're saying he moved over toward the wall to try and get around you to get back in the bedroom, correct?

A.    He was trying to pass me.  He did not try to avoid me.

Q.    Okay.  And so --

A.    He ran into me purposefully.

Q.    And so again -- and let's get into that running into you.  You indicate that he bumped you pretty hard with his shoulder --

A.    Yes.

Q.    -- correct?

Now, I want you to tell the Judge, two days earlier -- actually one day earlier, I believe, Mr. Levee was out -- was out, was he not?  He was out for some surgery?

A.   Yes.

Q.   Okay.  And he had that surgery?

A.   Yes.

Q.   And he was taking some pretty hard medication, correct, because you were giving it to him, right?  Were you not giving -- did you not give him his medication?

A.   He -- he took his own medicine.

Q.   Okay.  So you didn't give him any medication; you don't know anything about that?

A.   He kept telling me he was in pain, give him medicine.  The medicine was out.  I said take whatever you need.  He took his own medicine.

Q.   Okay.  He was take -- he was in pain because he had had shoulder surgery, correct?·

A.   Yes.

Q.   He had rotator cuff surgery?

A.   Yes.

Q.   And that had happened on Friday, less than 24 hours -- or roughly 24 hours from when this incident occurred --

A.   Yes.

Q.   -- correct?

Okay.  And he was on medication, correct?

A.   Yes.

Q.   And it was a prescription medication --

A.   Yes.

Q.   -- correct?

And if I were to tell you that medication was Vicodin, would you have any reason to doubt that?

A.   No.

Q.   So the day that this happened, he was on Vicodin for the pain?

A.   Yes.

Q.   And he had been telling you for 24 hours how bad the shoulder was hurting, correct?

A.   Yes.

Q.   Okay.  And I want to understand.  It's your testimony that he tried to get around you and he hit you pretty hard with his -- with his shoulder, his right shoulder, correct?

A.   He did not try to get around me.  He shoved me into the banister to go around me.

Q.   Okay.

A.   He didn't try to get around -- because the hallway is large enough for two people to pass through. He didn't try to get around me to get back into the bedroom.  He shoved me into the banister.

Q.   With his shoulder?

A.   Yes.

Q.   And that would have been his right shoulder?

A.   Yes.

Q.   Okay.

A.   Yes.

Q.   And if I were to tell you you -- you were not -- you were a poor historian with regard to what surgery he had had less than 24 hours before this incident.  Okay?  You don't remember, correct?

A.   I don't remember which shoulder, but I know the surgery.

Q.   Okay.  So it was a pretty significant surgery, correct?  It was one that he was supposed to be wearing a brace to keep the arm secured, correct?

A.   Yes, he had day surgery.

Q.   Okay.  I understand that, but it was one that he was given a brace to wear to keep the arm secure, because it was a pretty significant --

A.   Yes.

Q.   -- surgery for day surgery, correct, if you know?

A.   I don't know if it was significant surgery because it was day surgery.  He was released with a brace.

Q.   Okay.  So it's your interpretation or speculation that he -- as opposed to try and get around you, he bumped you hard with his shoulder?

A.  Yes.

Q.  His right shoulder?

A.  His right shoulder and full body.

Q.  Okay.  If I were to tell you that the right shoulder is where he had had rotator cuff surgery less than 24 hours earlier, do you have any reason to doubt me or disbelieve me on that?

A.  No.

Q.  Okay.  So you're testifying that if I tell you that, that he -- within 24 hours, he's bumping you hard with his body when he's just had rotator cuff surgery, correct?

A.  Yes.

Q.  And he's been complaining over the last 24 hours about how bad it's hurting?

A.  Yes.

Q.  And he's out of meds because it was hurting bad enough he took all he could give -- that they'd given him, correct?

A.  I don't know how many he took.

Q.  You told me he was out, correct?

A.  No, sir.  I said the medicine was out and -- for him to get.

Q.  Okay.  So what -- so what -- so what you meant was he wasn't out of the medication, but he was taking

it --

A.   Yes.

Q.   -- correct?

Okay.  So you indicate that he bumped you hard?

A.   Yes.

Q.   And then you fell into the banister.  So he -- he -- he came -- I want to understand.  He came into you, okay, like I'm standing in front of you, and he bumped you.  And how did you fall?  Did you fall forward into the banister?

A.   Yes.

Q.   If -- I guess what I'm confused about is if he -- it would seem that if he hit you hard enough, you'd be going backwards after he hit you; you wouldn't be falling forward.  That's kind of -- I'm confused.

A.   Because I was trying not to touch him because I knew it would make him mad.  I was slightly turned towards the banister to avoid touching him.  So I was kind of hugging the banister, and when he shoved me with his body, I -- my chest went into the banister.

Q.   Okay.  So were you kind of -- so now you're -- so you weren't standing up straight then when he came towards you; you kind of slumped down because you thought he was going to try bump you.  Is that what

you're saying now?

A.   I wasn't slumped down.  I was trying to avoid contact.  I was standing up straight trying to avoid contact.

Q.   Okay.

A.   Leaving the bedroom.

Q.   And so -- and so -- and so he hit you -- how far away was it when he started towards you?  Was he two foot away from you, three foot away from you?  How far away was he?

A.   I guess two or three feet.

Q.   Did he say anything to you before he decided to proceed forward?

A.   He had been yelling and -- mean things all morning long.  I don't recall if he said anything as he bumped me into the banister.

Q.   Okay.  Were you -- you could tell he was coming towards you --

A.   Yes.

Q.   -- correct?

And you said he was trying to get around you.  You testified to that earlier.

A.   Okay.  He was walking towards the bedroom.  I was trying to avoid contact, but instead of avoiding contact, he shoved me into the banister.

correct?

A.   We rode in separate cars, yes.  We came here together.

Q.   You didn't all -- you didn't all ride down here together today?

A.   In separate cars.  We came here together in separate cars.  We're -- we're all here together --

Q.   You're all here together, but you did not ride together?

A.   No, sir.

Q.   Okay.  Who did you ride down here with?

A.   I rode with my mother.

Q.   Okay.

A.   Katy rode with Andy.

Q.   Okay.  Did you and your mother discuss it on the way down here?

A.   How scared we are.

Q.   Did you discuss the incidents that happened that day?

A.   Yes.

Q.   Okay.  So you and your mother discussed it.  She was the only one in the car with you, correct?

A.   Yes.

Q.   Okay.  Have you and Katy talked about it before?

A.   No.

Q.   You and Katy never discussed this?

A.   We have before, not recently.

Q.   Not recently?

A.   No.  Katy is in TWU in Denton at college. She's just been real busy with school.

Q.   Now, I just want to touch briefly.  When you got back that day from the Ranger game, okay, before you come into the house, where was Mr. Levee?

A.   I believe he was in the house.

Q.   So you think he was in the house somewhere?

A.   Because we came -- yes.

Q.   So you believe he was in the house, but you're not sure?

A.   He was in the house, yes, I'm sure.

Q.   Okay.  How do you know he was in the house?

A.   Because we all came in the house as a family, my mother and me and my two sisters, to talk about the fun day we had at the Rangers game and we're so proud of Katy for winning the award.

Q.   He didn't go to the Ranger game, did he?

A.   No, he did not.

Q.   Okay.  Why did he not go to the Rangers game?

A.   Because he chose to have shoulder surgery, and he was manic and angry and sick and in a lot of pain

because he had surgery.

Q.  Did you see him -- he -- he had the shoulder surgery the day before --

A.  Uh-huh.

Q.  -- correct?

Okay.  Did you see him that day?

A.  The day before?

Q.  Yes.

A.  I don't recall.

Q.  Okay.  You don't know if you saw him the day before?

A.  No.  I wasn't living at the house, and I don't recall.

Q.  Okay.  So you could have seen him that night; you just don't remember?

A.  Yes.

Q.  Okay.  The four of you ride back from the Ranger game, correct?

A.  Yes, sir.

Q.  You had a good day --

A.  Yes.

Q.  -- correct?

A.  Yes, sir.

Q.  You arrived back in the house; you're talking about what a wonderful day you've had and you're all

inside, right?

A. Yes, sir.

Q. Do you see the Defendant -- Mr. Levee, do you see him when y'all get home?

A. Yes, sir.

Q. Where do you see him?

A. In the house.

Q. Where in the house?

A. I think it was upstairs.

Q. Are you sure?

A. I believe he came downstairs because I mentioned that I wanted to go tanning, and he insisted that he wanted to go with me. I'm -- I'm pretty positive that he was upstairs, that he came downstairs to greet us.

Q. Okay. You're pretty sure he did, or you don't remember?

A. I'm sure.

Q. Okay. Because you testified that he was hurting, he was angry, he clearly wasn't feeling good --

A. Uh-huh.

Q. -- correct?

A. Uh-huh.

Q. So you must have had -- either talked to him or learned that from someone?

A.    Not necessarily.  I have -- I have lived with him.  I -- I do know that if you have a major surgery --

Q.    Okay.

A.    -- you're going to be in a lot of physical pain.  I also know how he spoke to my mother when I pulled up before we went to the Rangers game, so all that information combined gave me the -- the understanding of -- of -- of what he was going through and what he was of -- that state that he was in.

Q.    Clearly in a lot of pain from the surgery, correct?

A.    Clearly.

Q.    Now, you don't -- if you remember -- because you don't remember if you saw him or not.  If you remember seeing him, was he wearing a brace?

A.    The day of, yes.

Q.    Okay.  And so he was wearing a brace the day you saw him?

A.    Yes.

Q.    Okay.  Which shoulder did he have surgery on?

A.    The right shoulder.

Q.    Okay.

A.    I believe so.

THE COURT:  Counsel, can you clarify what shoulder?  I understand it's the right shoulder, but

whose right shoulder?

Q.   (BY MR. BELL)   As far as -- for purposes of the record, when we're referring to the -- the shoulder, I'm referring to his shoulder.

A.   Yes.

Q.   Okay.  So it was his shoulder?

A.   Yes.

Q.   Okay.  Did you go upstairs when you got home?

A.   No.

Q.   Okay.  But you think he might have come downstairs?

A.   He did come downstairs because he asked to go tanning with me.

Q.   Okay.  And then you ultimately did not do that, correct?

A.   Correct.

Q.   And you and your, I guess, closest in age sister and you went?

A.   Yes, sir.

Q.   Okay.  And you left the house at that point?

A.   Yes, sir.

Q.   Okay.  And you -- you had seen no physical violence at that point, correct?

A.   Define physical violence for me, please.

Q.   Physical violence would be violence of some

sort of contact between parties.

A.    So objects do not count?

Q.    No.  Had you -- had you -- had you seen him hit anybody that day?

A.    Hit a person when I came home from the Rangers game, no.

Q.    Okay.  And you -- you and your sister left, correct?

A.    Yes.

Q.    Okay.  And the next time you had contact with regard to this is when you got a phone call?

A.    Yes.

Q.    You weren't present for any of it.

A.    I was not present for the incident, no.

Q.    Okay.  While you were at the Ranger game, did you have any communication with Mr. Levee?

A.    I do not recall.

Q.    Okay.  So you don't remember if you might have talked to him or text messaged him --

A.    I do not recall.  He was manic and crazy and mean and scary, and I did not want to talk to him, so I probably did not text him.  I do not recall, though.

Q.    So if I were to produce records that indicate you did, then that would be -- you would assume those records are correct.  It's possible.

A.   It is possible, but I'm telling you that I do not recall.

Q.   Okay.

MR. BELL:   Judge, I have nothing further of this witness.

MR. RODGERS:   Nothing further, Judge.

THE COURT:   All right.   Thank you, Ms. Levee.   You may step down.   Thank you very much.

(Witness retires)

THE COURT:   State, call your next witness.

MR. RODGERS:   The State rests, Judge.

Did we hear back from the officer so I can have a brief second to talk to him?

I got a voicemail, so I'd like to check and see if that's the officer --

THE COURT:   We're going to -- we'll be in recess.

(Recess from 2:33 p.m. to 3:14 p.m.)

(Open court, defendant present)

THE COURT:   Mr. Bell, you've had an opportunity to -- to confer with the State with regard to a potential witness and a police officer that, according to one of the State's witnesses, may or may not have received a statement from them -- from that witness.

State, have you had sufficient opportunity to review that information?

MR. RODGERS:  I have, Your Honor.  I spoke to Officer Dibley on the cell phone.  After she had an opportunity to review all her files and actually call a warehouse, somebody in a warehouse to physically take control of the paper file and review it, she has told me there are no written or orally recorded statements taken from any other witnesses and that the only documentation that she had are reports and supplements which are already in the possession of the D.A.'s Office and had been given to the Defense.

And so any statements that were referred to by the witnesses were simply statements made to her, and the only documentation of those are the reports.

THE COURT:  All right.  Mr. Bell, do you accept the representations made by the state?

MR. BELL:  Yes, Your Honor, I do.

THE COURT:  All right.  Do you also waive or withdraw your subpoena for the officer?

MR. BELL:  Yes, sir, I do.

THE COURT:  All right.  Mr. Bell, are you ready to proceed with your portion?

MR. BELL:  Yes.

THE COURT:  Call your witness.

MR. BELL:   Call Mr. Levee to the stand.

THE COURT:   Mr. Levee, please raise your right hand.

(Defendant sworn)

THE COURT:   Please be seated.

State, you may proceed.

### DEFENDANT'S DIRECT EVIDENCE

THEODORE LEVEE,

having been first duly sworn, testified as follows:

### DIRECT EXAMINATION

BY MR. BELL:

Q.   State your name for the record.

A.   Theodore Floyd Levee.

Q.   Mr. Levee, we've had 18 months to go over this case, have we not, at least?

A.   Yes, sir.   It's been that long since this incident occurred.

Q.   And I'm going to try and focus in as -- as closely as possible on -- on the date of the incident. Okay?

A.   Yes, sir.

Q.   There's quite a few collateral matters going on, but we really need to focus on -- on what we have happened that day.   Okay?

A.   Yes.

Q.   Now, actually, let's start with the day before. Explain to the Judge -- you had surgery, correct?

A.   That is correct.

Q.   Okay.  Explain to the Judge what type of surgery you had.

A.   I had three incisions, and they repaired a -- a major tear in the right rotator cuff.  They had to go in the front, the side and the back, and they had to replace material and then close.

We had some complications with medicine. The surgery took a little bit longer.  I had Andrea drive me to the surgical center in Ennis, Texas, and --

THE REPORTER:  I'm sorry, sir.  I'm going to have to --

THE WITNESS:  I let them know that I had problems with allergies, I'm having autoimmune disease, I don't react well to -- I can't take Demerol, iodine, several -- so I have a compromised immune system from celiac problems.  So we got that out of the way.  I went into the surgery, and it took longer.

THE COURT:  Ask your next question --

Q.   (BY MR. BELL)  You had -- you had major shoulder surgery --

A.   Yes, major --

Q.   -- on Friday, the day before this incident?

A.   My step -- my -- my adopted daughter, Andrea, had --

Q.   One of the -- one of the ones that was here today?

A.   Andrea didn't come in.  She was on the list.  I think she's here.  She swore in.

Q.   Okay.  But as you say, she was here this morning?

A.   Yes.

Q.   Okay.

A.   She and I drove down early, we had lunch together, I took her, got a haircut, we got some pictures taken in a -- a field with bluebonnets, and met a friend of mine, and then after the surgery, I was out of it --

Q.   Okay.  About what time of the day on Friday did you have the surgery?

A.   It was -- we started surgery around 1:00, 1:30 and --

Q.   Okay.  About what time was the surgery complete?

A.   Probably 4:00.

Q.   Okay.  What -- were you put under anesthesia totally out for that surgery?

A.   I was put on general anesthesia, and they had

to make sure that I went all the way under.

Q.   Okay.   So you were -- you were all the way under for the surgery?

A.   Yes.

Q.   Okay.   And you indicated you were done about 4:00 o'clock?

A.   I -- I believe so.

Q.   Okay.   From what you remember?

A.   Yes, sir.

Q.   Okay.   There was someone there to drive you home?

A.   My daughter Andrea drove me -- the doctor instructed her to drop off the prescription that I needed, the prescription right away.

Q.   Okay.

A.   And I remember being in the drive -- drop off later at the CVS.

Q.   So y'all dropped off the script and you went home?

A.   That's correct.

Q.   But obviously it was kind of fuzzy because you were -- you were --

A.   I know that I talked to my wife Cathey, and she agreed to pick up my prescription at CVS on her way home from work.

Q.   Okay.  And so you went home.  Did you go to sleep at that point?  What did you do?

A.   I was out.

Q.   Okay.  And then I assume you were out for the rest of the night?

A.   In and out.

Q.   Okay.  And when did you fully regain, I guess, some -- I say regain -- some of your senses?  Was it the next morning when that happened?

A.   I recall that Cathey wanted me to go to the Rangers game because Katy was going to get an award.  She was sure Katy was going to win because she'd already talked to the teachers at the school.

And -- and we had words before that Katy was the daughter of an employee of the district, be hard to give a four-person trip to Disney World to her daughter.  So there was a little bit of -- of talk about that, and then she left with the children approximately noon --

Q.   Okay.

A.   -- somewhere around there.

Q.   Okay.  So she left about noon; you stayed home, correct?

A.   Yes.

Q.   Okay.  You weren't feeling good that day?

A.   I couldn't do anything.

Q.   Okay.  Was your arm -- were you in pain?

A.   Very much.

Q.   Okay.  Were you taking pain medication?

A.   Cathey left some pain medication by the bed for me.

Q.   Okay.  So you were taking pain medication then?

A.   Yes.

Q.   What was that pain medication?

A.   I don't know.  I know now.  It was --

Q.   Okay.  Well you --

A.   -- Vicodin --

THE REPORTER:  I'm sorry.

THE COURT:  All right.  First off is that, Mr. Levee, there is no race to talk here.

THE DEFENDANT:  I'm sorry.  I'm a little nervous.

THE COURT:  I understand.  And -- and that's why I'm here to tell you just to relax.

THE DEFENDANT:  Yes, sir.

THE COURT:  You're going to have an opportunity to say whatever you would like.  Your attorney and you cannot talk at the same time.

THE DEFENDANT:  I understand.

THE COURT:  The reporter is trying to take

down what's being said, and if you continue to talk over each other, she's not going to be able to take an accurate record of what's being said.

Now, Mr. Bell knows that.  Perhaps you don't appreciate it as much, but you have to hold your comment until the question is completed, and then you will respond.  And I can assure you Mr. Bell will wait for your response to be completed as well.

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  You may proceed.

Q.    (BY MR. BELL)  You were taking medication that day, correct?

A.    Yes.

Q.    Okay.  And were you in pain?

A.    Yes.

Q.    Okay.  Were you instructed to wear a brace?

A.    Yes.

Q.    Explain to the Judge briefly what type of brace you were to wear as a result of that surgery.

A.    It was a pillow Velcro brace to hold my arm out from my body because I had no support in the arm whatsoever.  With this type of rotator cuff surgery, it takes four to six weeks to get to the point where you can use the arm again.

So I had a Velcro, over-the-shoulder and

then another strap that came across the front, and then there was a about two, three-inch foam pillow across the front of it.

Q. Okay.

A. And it completely closed in the arm.

Q. Okay. Now, they left for the game about 12:00, you said, correct?

A. I remember them leaving. I -- I -- I would have to guess it was about 12:00.

Q. Okay. And you had some communication back and forth with them via text message --

A. Cathey --

THE REPORTER: I'm sorry. I didn't hear the last part.

Q. (BY MR. BELL) You had some correspondence back and forth with them via text message, correct?

A. Yes, sir, in addition to cell phone calls.

Q. Okay. And about what time -- did you stay pretty much immobile all that afternoon?

A. Yes.

Q. Okay. Were you kind of in and out? Were you awake? Taking a nap? What were you doing?

A. In and out.

Q. Okay. About what time did Cathey and the girls arrive home?

A.    Probably between 4:00 and 5:00 o'clock.

Q.    All right.  And were you anticipating their arrival?

A.    Yes.

Q.    Okay.  Why?

A.    I hadn't eaten all day.  I talked to Cathey on the phone.  I had talked to Alexander and texted her, and she said --

MR. RODGERS:  Objection; hearsay.

THE COURT:  Sustained as to hearsay.

Q.    (BY MR. BELL)  You were anticipating their arrival home?

A.    Yes.

Q.    And that's because you hadn't eaten all day and you were hungry, correct?

A.    And I had a text message to that effect.

Q.    Okay.  So you knew they were coming home?

A.    Yes.

Q.    Okay.  When they arrived home, where were you?

A.    In bed.

Q.    And where is that in the home?

A.    Upstairs in the master bedroom.

Q.    Okay.  Tell me -- when they got home, did you -- did all of them come see you?  Who came to see you?  Or did you go see them?

A.   I was in bed.  I had the front door open.  I vaguely recall Cathey -- Katy going and passing to her room, and Cathey came into the upstairs bedroom.

Q.   Okay.  So Cathey is in the room with you?

A.   That's correct.

Q.   And Katy's --

A.   Gone to her -- I could see her --

Q.   -- somewhere down the hall.  She's somewhere but not in the room with you?

A.   That's correct.

Q.   Okay.  All right.  Now, tell me what happens next.

A.   I received a text message from Alexandra that they were going to come home --

MR. RODGERS:  Objection; hearsay as to what a text message said.

THE COURT:  Let him finish his -- well, wait a minute.

Overruled.  He's just simply talking about the text messaging and what occurred thereafter.

You may -- you may continue your statement -- or answer, excuse me.

THE DEFENDANT:  The text message said that they were coming home.  I had texted Cathey, Did Katy win?  Cathey didn't answer.  I called her cell phone

STATE VS. THEODORE FLOYD LEVEE

three or four times.  She didn't answer.

I text messaged Alexandra, Did Katy win? She texted me back no.

I texted her, Awe.  I said, When are y'all coming home, and she said now.

Q.   (BY MR. BELL)  Okay.  Once they arrived home, Cathey's in the bedroom with you, Katy is somewhere upstairs, correct?

A.   Yes.

Q.   The other two were there, or they were gone?

A.   They left.  I asked Cathey where they went.

Q.   Okay.  They're gone.

A.   Yes.

Q.   What happens next?

A.   I asked Cathey where Andrea and Alexandra went because I was anticipating going downstairs and -- and eating.  And the rule in our house was we eat together.

Q.   Okay.  And you guys had had some sort of disagreement about you hanging out with them.  Cathey had some -- some issue with that, correct?

A.   There was some contention.  Cathey was a bit unreasonable anytime that I spent too much time with the children.  She wanted a separate relationship.  And she had, over the course of the marriage, objected to the amount of time that I spent with the children.  And she

had a problem with the children from the beginning of the relationship.

Q.   Okay.  So that -- that had been a -- as you heard in prior testimony, there had been some disagreement about that that day, correct?

A.   Yes.

Q.   Okay.  Now, y'all had a conversation about that, correct?

A.   Yes.

Q.   When -- when she got home?

A.   Yes.

Q.   Okay.  What's the next thing that happened?

A.   Cathey escalated an argument about me being inappropriate with our daughters by spending the time with them.

And, if I may, I -- on Thursday before the rotator cuff surgery, I -- we had rented Alexandra an -- an -- an apartment.  Cathey put it in her name.  It had a hot tub.  I was hurt, and I wanted to go sit in the hot tub.  I had texted Alexandra that if I could come sit in the hot tub, and she said I'll go with you; I have company.  This is in text messaging.

She said, My friend will leave in a few minutes.  Come over --

MR. RODGERS:  Objection; the text messages

are hearsay, Your Honor.

THE COURT:  Sustained.

Q.    (BY MR. BELL)  Let's move forward a little bit. Okay?

The two of you had a disagreement in the bedroom.  You're arguing, correct?

A.    That's correct.

Q.    Okay.  And she ultimately left the room?

A.    Yes.

Q.    Okay.  Tell me what happened next.

A.    She went out of the room, was gone for about 10 or 15 minutes.  And I went to leave the room, started down the hallway.  Cathey came around the corner from where the girls' bedrooms are and looked at me and was angry, and actually ran into me on the left side and my shoulder went into the wall.

And when I looked back, Cathey was on the floor behind me facing the bedroom with her left leg out and her right leg tucked in, and she started screaming at me that I broke her leg.

Q.    Did you -- you were walking out of the bedroom; she's walking, we assume, towards the bedroom, correct?

A.    She was coming back into the bedroom from the girls' room.  And -- and she's walking at a brisk pace for her, and that's pretty unusual because she had had a

slow gait from the arthritis.

But it's been that way -- the car accident didn't affect that at all, but the arthritis did make her -- and she has staples in her ankles from childhood. She's never walked right because she was, I guess -- my understanding from her, she's pigeon-toed. Her parents had an operation done that was supposed to straighten her feet out, and it -- it fused her ankles. So she always walked funny.

Q. So let me understand this. I want the Court to understand. You're coming out of the bedroom?

A. That's correct.

Q. She's going into the bedroom?

A. Yes.

Q. The two -- the two of you collide with one another, correct?

A. Yes.

Q. And you keep going past her?

A. Actually, I went to the wall, and she went past me.

Q. Okay.

A. I didn't go any further because I hit the wall, and I had -- I remember, the pain.

Q. Okay. So why -- why would it have been painful if you hit the wall?



A.   Because it was my right shoulder, and I was just out of surgery.  And I was up like this, and I -- I -- it was like -- my best way to describe it is back in high school there used to be guys that there were a little bigger than you, they come around a corner, and if you didn't move out of the way, they'd bump you to move you out of the way.  That was exactly the same behavior I got then, which was very unusual for Cathey.

Q.   Do you remember if your feet got tangled up?

A.   The feet got tangled up.

Q.   Okay.  Did the feet get tangled intentionally?

A.   No.  I was going against the wall and trying to move my foot.  To the best of my knowledge, I was trying to correct my balance.

Q.   Did you intentionally trip her?

A.   No.

Q.   This whip-kick that you've heard referred to, did you -- did you -- did you try and bring your foot around and trip her?

A.   No.

Q.   Did you put your foot on the inside of hers with the intent to try to pull it out from under it?

A.   No.

Q.   You've heard the testimony.

A.   Yes.

Q.   You've heard the testimony from both girls.

A.   Yes.

Q.   From -- from -- let me rephrase it.

You heard the testimony of the complainant?

A.   Yes.

Q.   Okay.  And you heard how she said it happened?

A.   Yes.

Q.   And is that true?

A.   No.

Q.   Okay.  Now, you've also heard the testimony of Katy.

A.   Yes.

Q.   Okay.  Was Katy present when the two of you bumped in together?

A.   No.

Q.   Was Katy present whenever Cathey went to the floor?

A.   No.

Q.   Where was Katy, if you know?

A.   She was to the right, and I assume she was in the bathroom because it looked like she came out of the bathroom.  She could have been in her bedroom, but she came from the right.  The hall wall that we're talking about is -- is in conjunction with the bathroom wall. And we were pretty loud, and it was an argument.

Q.   You don't disagree that there was --

A.   I do not disagree, and -- and Cathey and I frequently had verbal exchanges.  She's very emotional, and she'd been going through an especially hard time for the two years that Alexandra was out of the house.

Q.   Now, the police had never been called out there before, correct, that you're aware of?

A.   They -- they came by for a party and told us to turn it down once when we first moved in.  They came by when there was a hit-and-run on the parked car out in front of the house.  There was a citation because --

Q.   Hold on.  Hold on for a second.

The police had never been called out there on a domestic violence --

A.   No.

Q.   -- correct?

A.   No.

Q.   Nothing of this alleged incident had they ever been called out before?

A.   No.

Q.   Okay.  And no allegation had ever been made against you for this before?

A.   No.

Q.   Okay.  Now, there's some mention by your older daughter, Alexandra -- Alex, I believe -- is it

Alexandra --

A.   Alexandra.

Q.   -- about you being in the military.  Tell the Judge, were you in the military and for how long.

A.   I enlisted on my 17th birthday.  I went to Fort Knox, Kentucky, for basic training, and I was found to have a vision deficiency.  I have diplopia, amblyopia, and colorblindness, and I made it through at AAFES (phonetic), the original physical, but I was discharged after 4 months and 25 days with an honorable discharge for not meeting medical fitness standards at the time of enlistment.  But it qualified me for my GI benefits.

Q.   Did you ever receive any formal training in combat through the military?

A.   There was a basic combat course.  It involved marksmanship, they have training.  There was some physical PT, standard military.  Most of it involved pugil sticks, a -- a little boxing.

Q.   Okay.  With regard to the type incident and the type kick that they're referring to, have you ever received any kind of training like that before?

A.   No.  I'm not aware of a kick that would destroy you from the ankle all the way up to the hip.  I had no knowledge --

Q.   Do you know --

A.     -- of that.

Q.     Do you know where they might have learned it?

A.     In the original paperwork I saw from the hospital --

MR. RODGERS:  Objection.

THE COURT:  Just a moment.

MR. RODGERS:  Testifying to hearsay and speculation as to how they know.

THE COURT:  Sustained.

Q.     (BY MR. BELL)  There's also been some testimony about a shotgun.  Was there a shotgun in the house?

A.     In -- in the garage.

Q.     Okay.  Was that shotgun ever pulled out that day?

A.     No, sir.

Q.     Okay.  Would you have been capable of cocking that shotgun that day?

A.     No, sir.

Q.     You would -- you would not have been physically able to -- to pull the mechanism apart, correct?

A.     I -- I probably could pick it up with one hand, but as far as -- it was a Mossberg .12 gauge shotgun. And -- and it had a cable lock in it, and I removed the ammunition and put the gun in the garage because of a prior incident between Katy and her mother and to --

MR. RODGERS:  Objection; nonresponsive.

THE COURT:  Sustained.

Q.  (BY MR. BELL)  Okay.  Now, I'm going to make it very clear for the Court.  On this date, did you kick Cathey Levee in the knee?

A.  No.

Q.  Did you sweep your leg around with your foot knowingly and recklessly or intentionally with an intent to cause her an assault?

A.  No.

MR. BELL:  Judge, I'll pass the witness.

THE COURT:  Cross-examination?

CROSS-EXAMINATION

BY MR. RODGERS:

Q.  So there was some anger between you and Cathey, right?

A.  No more than we normally experienced from time to time in the course of three daughters and the extra stresses that we were living through.

Q.  So there was nothing out of the ordinary for that day in particular?

A.  Cathey was extremely angry that I would have the surgery on a day when Katy was going to get an award, and we had a bone of contention because I didn't feel that the Fort Worth Independent School District

would award one of their employees' children an all expense paid trip to Florida Disney World.

Q.   So all that y'all are saying, everything that y'all are going for -- going through on this day is all about you -- her being upset that you chose to have the surgery then and you thinking it's ridiculous that they think Katy might get the award.  That's what you're saying all this is about?  Is that a yes or a no?

A.   No.

Q.   No.  So there's obviously a lot of history there that y'all are upset about too, isn't there?

A.   Yes.

Q.   She's not comfortable with your relationship with her daughters, right?

A.   She was comfortable with my relationship with her daughters.

Q.   Didn't you just testify that she thought you were being inappropriate with her daughters?

A.   At that time, at that instance, yes.

Q.   Didn't you testify to that?

A.   Yes.

Q.   Didn't you just say during testimony that from the beginning, she's always been uncomfortable about you and her daughters?

A.   No.  I said she was uncomfortable with her

daughters.

Q.   So you're saying that some of the problem here is -- has to do with her relationship with her own daughters?

A.   That's correct.

Q.   And then you're just a -- a pawn that's getting rocked up into this, right?

So if this relationship with her and her daughters is so difficult, you're saying they're rallying behind her is a new thing.  It'd be out of character for them, wouldn't it?

A.   There were times the children wanted their mother's approval very badly --

Q.   Okay.  So --

THE REPORTER:  I'm sorry.  Excuse me.

MR. BELL:  Object that he would allow the witness to answer the question.

MR. RODGERS:  Well, then, I'm going to object to nonresponsive because it was a yes or no question.

THE COURT:  Sustained as to nonresponsive.

Q.   (BY MR. RODGERS)  You said that there's a strained relationship between Cathey and her daughters, correct?

A.   Yes.

Q.   So wouldn't it be out of character for a strained relationship for them to ally behind their mother against you?

A.   No.

Q.   So the strained relationship wasn't really with their mom; it was really with you, wasn't it?

A.   No.

Q.   So you don't think Alex was uncomfortable with how you treated her?

A.   No.

Q.   You don't think Alex was ever uncomfortable with you touching her or wanting to go tan with her?

A.   There were comments made, but, no, we did not have that problem.

Q.   You did not.

So they never told you they're not comfortable with anything you do?

A.   No.

Q.   And you've gone tanning with Alex before, haven't you?

A.   One time I went because I was going to a wedding, and --

Q.   So you've gone tanning with her before, correct?

A.   Once.

Q.   Once.

A.   And it wasn't with her.  I went to the men's side; she went to the --

MR. RODGERS:  Objection; nonresponsive.

THE COURT:  Sustained.

Q.   (BY MR. RODGERS)  You went tanning with Alex, correct?

A.   Once.

Q.   And Cathey had a problem with that, didn't she?

A.   Yes.

Q.   She didn't think it was appropriate, did she?

A.   No.

Q.   And you didn't like her limiting how much time you spent with your adopted daughter, did you?

A.   That's not correct.

Q.   You were okay with it?

A.   That's not correct.

Q.   Which is it?  Did you have a problem with it, or were you okay with it?

A.   The tone and the way that she said it was totally different than the way that it was.

Q.   Okay.  So her emotions that she was expressing to you, you say it wasn't really all about that.  You know her emotions better than she does.  Is that what you're saying?

A.    If you had --

MR. BELL:  Speculation on what her emotions are, Your Honor.

THE COURT:  I believe that he's redirecting a response.  Cross-examination.  Overruled.

THE DEFENDANT:  There was tremendous agitation before I came into the family, and I was acting as a -- a parent at all times, appropriate, and a peacemaker between a mother and the children, who had tremendous problems.

Q.    (BY MR. RODGERS)  So you were never inappropriate with the girls?

A.    Never.

Q.    Would you ever cuss at the girls?

A.    Yes.

Q.    Would you ever call them names?

A.    At times there were some emotions that I called names.

Q.    Have you ever called your daughter a slut?

A.    Yes.

Q.    You've called your daughters that you had a great relationship with sluts?

A.    In this situation with the circumstances that were involved and the emotions at that level, that happened.

Q.   Have you ever spooned with your daughter before?

A.   No.

Q.   You've never laid with them and stroked their hair?

A.   I have never been inappropriate with my daughters.

Q.   That wasn't my question.

A.   I -- I have had -- Katy wanted to watch a TV program with her mother at a computer.  I was under a quilt and a bed and fully clothed, and she laid on top of the bed next to me.

Alexandra and I would sit on the trampoline.  One evening, after she was having a particularly hard time, she put her head on my arm, but no body contact.

If my daughters hugged me, it was an A-frame, and there are specific rules and reasons why.

Q.   Because you wouldn't dream of being inappropriate with these girls --

A.   That's correct.

Q.   -- right?

You wouldn't do -- you wouldn't have it because you're not that type of man, right?

A.   That's exactly correct.  And there's another

reason.

Q. You ever call names other than slut?

A. There was a lot of name calling in that house. I don't --

Q. I'm asking you. Have you called names other than slut?

A. We've cussed each other out.

Q. Have you called them names other than slut?

A. I don't recall.

Q. You don't recall.

Your testimony is that you did not want to go tanning with Alex, correct?

A. No, I -- I couldn't go tanning with Alex.

Q. You couldn't?

A. No.

Q. So you didn't want to go with them?

A. I didn't ask to go.

Q. So you didn't get upset with Cathey because she didn't want you to go?

A. No.

Q. How much painkillers had you taken right before this happened?

A. I don't know.

Q. You don't recall, do you?

A. No.

Q.    Things are kind of fuzzy for you because you were taking Vicodin, weren't you?

A.    Yes.

Q.    And you weren't supposed to take Vicodin because it has negative effects on you, doesn't it?

A.    Yes.

Q.    And so you didn't check the medicine that you were taking, right?

A.    I wasn't in a state to.

Q.    So when Vicodin -- when you take Vicodin, you have a bad reaction, right?

A.    Yes.

Q.    Do you have blackouts?

A.    No.

Q.    Do you have -- what's a bad reaction you get?

A.    I can't sleep or --

Q.    What else?

A.    -- if I do sleep, I have my eyes closed, and I have to lay still.  I have extreme nausea from it.  It is not a pleasant experience.

Q.    Do you have Valium in the house?

A.    Yes.

Q.    Whose Valium is it?

A.    Mine.

Q.    So when Alex and Andrea left, Katy chose not to

go with them, right?

A.    Katy didn't go.  I don't know if she chose or not.

Q.    Did you find that to be unusual, she didn't want to go with her sisters?

A.    She never went.

Q.    So Katy's there.  And -- and how would you say your relationship is with Katy at that time.  In a word, good or bad?

A.    It's hard to quantify, but I was probably the closest person to Katy in the house.

Q.    Okay.  So in that moment you're her best friend of anybody in the house?

A.    I didn't say best friend.

Q.    Closest.  Okay.  So --

A.    I was her father, and I was appropriate with her, and she looked to me for good judgment.

Q.    You think she was closer to you than Cathey?

A.    Based on the information that I have and the doctor's information, absolutely at that point she was.

Q.    At that point she felt closer to you than Cathey?

A.    Yes.

Q.    And so when she comes out and sees her mother on the ground crying, why would she think that you had

done something to her in that moment then?

A.   Her mother was screaming at me that I broke my leg and calling me a -- a -- a mother-fucker, son of a bitch, you bastard, you broke my leg.

Q.   Okay.  And so you're saying that's why she assumed you did something bad?

A.   She was screaming in a loud voice and -- and agitated and really balling me out as if I'd done something on purpose.

MR. RODGERS:  May I ask the witness to step down, Your Honor?

THE COURT:  You may.

Q.   (BY MR. RODGERS)  Mr. Levee, if I can get you to step down.  We're going to come over here just so we can understand exactly how this happened.

Now, to set stage, you say that you were coming out of the bedroom and Cathey was going back in, correct?

A.   That's correct.

Q.   Now, you heard Cathey's description of the hallway in relation to the bedroom, right?

A.   Yes.

Q.   Would you say that's an accurate description of how things are laid out?

A.   I measured a 48-inch-wide hallway.  It's

approximately eight feet long.

Q.   Okay.  48 by --

A.   Maybe closer to 10, but a 48-inch width.

Q.   Just an eight foot tape measure?

A.   I had to guesstimate it because I couldn't go back to the house.

Q.   Okay.  So --

A.   I know the 48 inches is the dimension of the hallway.

Q.   Because you measured that before you had to leave?

A.   The hallway was as wide as the door plus the jamb.

Q.   So that's yes --

A.   48 --

THE REPORTER:  I'm sorry.

Q.   (BY MR. RODGERS)  You have to wait till I finish asking the question before you answer.  Okay?  I know it's difficult, but...

So 48 inches wide, eight to ten feet long, right?

A.   Yes, sir.

Q.   About how far out of the bedroom were you when you were leaving when Cathey went back in?

A.   I was about two feet from the corner.

Q.    Okay.

A.    Of the end closest to the den on the right-hand side.

Q.    So were you close to the exit to go to the stairs?

A.    I was about two feet from the end of the stairway, would be actually right over the banister to the left, but you walk a U, and you go down the stairs.

Q.    That's right.  She mentioned the U.  Okay.

So as you leave the bedroom, where are you going?

A.    To get something to eat.

Q.    Okay.  Because y'all been arguing, and you're still hungry, right?

A.    Yes.

Q.    You were so eager for them to get home because you -- you were just starving.  You needed some food, right?

A.    Well, I thought we were going to eat together. I waited to eat.

Q.    Okay.  Now, once they got home, how long was it before y'all bumped into each other?

A.    I -- I can't determine.  Less than an hour.

Q.    Less than an hour.  Okay.

So in all your hunger, the argument between

y'all got in the way of you eating, you forgot about how hungry you were for a bit, right?

A.   I wouldn't phrase it quite like that.

Q.   Okay.  Well, let me ask you this then:  You were about two feet away from the exit to the stairs, right?

A.   Yes.

Q.   Okay.  How quickly were you leaving the bedroom?

A.   Not very.

Q.   Okay.  So a normal walk?

A.   Less than.

Q.   How dizzy were you feeling because of the medicine?

A.   Nauseous.

Q.   You were pretty nauseous?  You wanted to get some food in your stomach, right?

A.   That's correct.

Q.   Any dizziness otherwise other than the nauseous?  Unsteady on your feet?

A.   It was a -- a -- a disoriented state is the best I can recall.

Q.   Okay.  So when you're about two feet away --

THE REPORTER:  I need to be able to hear you better.

THE COURT: Are you done with the demonstration?

MR. RODGERS: Well, I'll -- I'll turn a little bit if that's okay. If -- I'll -- I'll get to the demonstration, Judge.

THE COURT: All right.

Q. (BY MR. RODGERS) So she was about -- you were about two feet away from the -- the corner, correct?

A. That's correct.

Q. Where was she coming from?

A. The end of the hallway that goes from the bathroom to the girls' bedroom.

Q. Okay. And she was walking towards you, correct?

A. Yes.

Q. Was she saying anything at that time, without going into what she was saying?

A. No. I didn't even know she was around the corner.

Q. So you say she came around the corner pretty quickly?

A. Yes.

Q. And came at you pretty quickly?

A. She had a look in her eye, and she was mad, and, yes, she came at me aggressively.

Q. And she body-checked you, correct?

A. Yes.

Q. Okay. Now, if I get you to come step in front of me so the Judge can see.

What part of her body hit your body? In fact, I'm going to be her. I'm going to be you, and you be her, and I want you to walk into me the way she walked into you?

A. The wall was right here. She was -- okay. The wall's here now, and I was coming down the hallway. She came around the corner, looked at me and cut into my side. Part of her hit me, which drove me this way. I went into the wall over here, and then when I looked back, she was on the floor.

Q. Okay. So she walks into you, and -- and for the record, you're saying your right shoulder hit her left shoulder?

A. No. Her left shoulder hit my left shoulder.

Q. Okay. Her left -- she brought her left shoulder into your left shoulder?

A. That's correct.

Q. Would you say some of the body weight was also behind that?

A. Enough that it moved me into the wall.

Q. Okay. So -- so I -- the Judge can understand

how far over she was.  Did your shoulders hit about like this, just clip, or did she hit more of you --

A.    Because of the width of the hallway, she came right into me like I was in a lane of traffic and she cut across the center lane.

Q.    So would you say her shoulder hit you about mid chest?

A.    I can't recall.

Q.    Okay.  But regardless of how she hit you, it pushed you straight to the right?

A.    It drove me to the right.

Q.    Drove you straight to the right, and your shoulder hit the wall?

A.    That's correct.

Q.    That caused you a lot of pain, right?

A.    Yes.

Q.    Okay.  However, when she hits you square, it pushed you to the right, and yet she continued to go forward, right?

A.    I had a little forward momentum, too, because I was moving when she checked me.

Q.    Right.  So y'all -- y'all were both moving. But when she hit you, you went to the right; however, you're saying she went straight forward, right?

A.    Well, it's a 48-inch-wide hallway.  There's no

place else for her to go.

Q.   All I'm asking is she went forward, right?

A.   Don't know.

Q.   You don't know?

A.   I didn't see her until she was sitting on the floor.

Q.   Okay.  How exactly did your legs get caught up?  Can you explain that to the Judge?

A.   It's a 48-inch-wide hallway.  She was close enough into me that I went over this way.

Q.   And at that point your left leg --

A.   I -- I -- I can't tell you.

Q.   You just know your legs hit each other.

A.   Our legs hit each other.

Q.   And the way you're describing it or showing that we are set up right now, your left leg would have hit her left leg, right?

A.   That's correct.

Q.   Okay.  Not her right leg?

A.   I don't know.

Q.   Well, you know how you're set up.  Your left leg did not hit her right leg, right?

A.   I don't recall --

MR. BELL:  Judge, object, asked and answered.  He said he doesn't -- he said he doesn't

know.

THE COURT:  I think he's trying to clarify.

THE DEFENDANT:  To the best of my knowledge --

THE COURT:  Just a moment.

THE DEFENDANT:  -- I --

THE COURT:  Just a moment.  When I ask you just a moment, please stop.

THE DEFENDANT:  Yes, sir.

THE COURT:  All right.  Mr. Bell, I think what the attorney -- the State's asking is that he's trying to ask a clarifying question, and it's assisting me.  So I'm going to overrule your objection.

MR. BELL:  Okay.

THE COURT:  Thank you very much.

You may proceed.

MR. BELL:  Thank you.

Q.   (BY MR. BELL)  Given how you told the Judge how y'all were -- were in -- in relation to each other, it appears as though your left leg would have hit each other, correct?

A.   That's correct.

Q.   And in that hitting motion -- the hitting of the left leg, you're saying she still carried forward?

A.   That's correct.

Q.   All right.  Thank you.  Please have a seat.

You said when you turned around -- after you -- she hit you and you hit the wall, you turned around, and she was behind you on the ground, right?

A.   Yes.

Q.   And you said her left leg was how?

A.   Straight in front of her.

Q.   Straight in front of her.

Was she still facing the --

A.   Bedroom.

Q.   -- bedroom?

A.   Yes, sir.

Q.   Okay.  So her left leg was straight in front of her away from you, right?

A.   Yes, sir.

Q.   And where was her right leg?

A.   It was tucked to the right angle.

Q.   So the left -- the right leg was pointed out to the right angle away from her body, right?

A.   Because of the width of the hallway, it was in close like a chicken wing, and she immediately started screaming at me, and I freaked.  But the leg was --

Q.   Let me stop you there?

A.   -- like that.

MR. RODGERS:  Objection; nonresponsive.

THE COURT:  Sustained.

Q.   (BY MR. RODGERS)  Was her right leg at a 90-degree angle away from her body?

A.   No.

Q.   No.

Okay.  You said it was like a chicken wing. Are you saying it was kind of tucked up underneath her?

A.   Yes, sir.

Q.   Was she leaning against the banister at that time?

A.   No.

Q.   Was she hanging over the banister at that time?

A.   No.

Q.   The way that she hit you, obviously, she was acting aggressively, she was moving fast.  Did you hear her hit the banister?

A.   No.

Q.   You said that it's very unusual for her to -- this is not like her to carry this action, correct?

A.   That's correct.

Q.   She's not one to walk quickly, right?  Because it's very difficult for her, isn't it?

A.   I've seen her walk quickly on occasion when she's really mad, especially in an -- an emotional state with the children.

Q. Not like her, though, is it?

A. Generally not. She moves pretty slow.

Q. You're bigger than she is, right?

A. Sir?

Q. You're bigger than she is, right?

A. At the time she weighed about 175 or 180 pounds, and I weighed about 180 pounds.

Q. Okay. So you can handle yourself, right though? You weren't -- you weren't weak in the knees, you weren't having any leg injuries or anything like that, right?

A. I -- I was woozy from the medication.

Q. But --

A. I'd been in bed all day.

Q. I'm talking about injuries. Did you have any other injuries other than the shoulder?

A. Yes, sir. I have an ulnar nerve transposition in my left arm --

THE REPORTER: I'm sorry?

THE WITNESS: An ulnar nerve transposition in my left arm.

Q. (BY MR. RODGERS) Any problems with your legs or knees?

A. Feet. I've had four neuromas removed from my left foot, and it has some problems sometimes.

Q.   Okay.  So that with the wooziness, you probably weren't in real control of your body, huh?

A.   I -- I -- I don't understand the question.

Q.   Did you have any bruises from (sic) your arm from hitting the wall?  Did you have bruises?

A.   I didn't check for bruises because I was stitched and in pain.  I don't -- I -- I felt like the -- the stitches might have stretched a little.

Q.   After she was down on the ground, you thought she was being a drama queen, didn't you?

A.   Yes.

Q.   And you told her she was being a drama queen.

A.   Yes.

Q.   Didn't try to help her at all?

A.   I couldn't.  I --

Q.   You didn't --

A.   I --

Q.   -- call 9-1-1, right?

A.   No, sir.

Q.   You didn't help her get to the hospital, did you?

A.   Wasn't able to.

Q.   So that's a no, you did not, correct?

A.   No, sir.

Q.   You didn't try to go with her to the hospital,

did you?

A.   No, sir.   She was still in an excited state, screaming saying she'd take care of it herself.   I went downstairs to get a portable wheelchair for her with one arm because I couldn't help her up.   I couldn't do anything for her.   I had one arm, and I was hurting, and she was on the floor.

And after the expression of she's a drama queen and I looked at the leg, I came to a realization that she was hurt, and I became extremely upset because I never want her to hurt.

Q.   How long did it take you to get down to the hospital and check on her?

A.   I got arrested.

Q.   Didn't go down to the hospital, did you?

A.   Couldn't.   Called the hospital, and they shut the phone off on my cell, and Cathey, unbeknownst to me, was making a police complaint.

Q.   Pretty surprised that Alex would lie on you like this?

A.   I've seen it before.

Q.   Pretty surprised that Katy would lie about this?

A.   Not a problem with Katy --

Q.   Do you think that's a -- this is a big

conspiracy on you, don't you?

A.    As with many of the conspiracies in the past.

Q.    You think they're all making this up, right?

A.    I can't understand why.

Q.    You demonstrated this whip-kick before, haven't you?

A.    No, sir.  I don't have a whip-kick.

Q.    You've never shown somebody this before?

A.    I don't have a whip-kick.

Q.    Alex is making that up?

A.    I don't have a whip-kick.

Q.    Okay.  Whip-kick, whatever, have you ever played around with the girls and swept their leg jokingly?

A.    Not a sweep at all.  We've talked a little bit and I showed them a little bit about balance, because Katy and I took a -- a -- a defense course together, and it was called Hapkido.  Hapkido is based upon somebody else's energy being used to move them through.  There are no offensive movements in it at all.  If somebody moves towards you, you will bring their weight with you and move them down.

And I did it specifically because I didn't want Katy to learn something aggressive, but at the same time, Katy had a lot of problems.  A lot of problems.

MR. RODGERS:  Objection; nonresponsive.

THE COURT:  Sustained.

Q.  (BY MR. RODGERS)  So there have been oftentimes when y'all have demonstrated some sort of moves, right?

A.  Just balance?  Just balance.

Q.  That must be what Alex is talking about, right?

A.  No.

MR. RODGERS:  Pass the witness.

THE COURT:  Redirect?

REDIRECT EXAMINATION

BY MR. BELL:

Q.  Prior to this date, Cathey suffered a variety of medical issues, did she not?

A.  Many.

Q.  And she was considered disabled, correct?

A.  By the arthritis she was disabled.  She also inferred that she had Lyme's disease and was taking a -- treatment for that.  In addition, there was a car accident, and there's a lot of questions about the car accident.

Q.  And she had a -- had handicap sticker on her car, correct?

A.  She always did.

Q.  Okay.  You were taking painkillers that day?

A.  Me?

Q.   Correct.

A.   Yes, sir.

Q.   Okay.  Were they the painkillers that the doctor gave you?

A.   No, sir.

Q.   What painkillers were you taking?

A.   I found out they were of the extra strength Vicodin prescribed to Cathey.

Q.   Cathey had given those to you?

A.   Yes.

Q.   Were -- is it possible -- once Cathey past by you to the left, you don't know exactly what happened, do you?  You didn't see.

A.   I can't say what happened.

Q.   Could she have hit the banister?

A.   I can't see it the -- the angle of the leg and the distance that the leg would have had to go down, it would be awfully hard for her to hit the banister, awfully hard.

Q.   So When you turned around, she was down?

A.   When I turned around and she was down, no. I -- and, if I may, in all the information that I've had the banister --

MR. RODGERS:  Objection; nonresponsive, and talking about information he's got, which is hearsay.

THE COURT: I'm going to sustain that as to hearsay. You may rephrase.

Q. (BY MR. BELL) When you -- after she brushed against you, when you turned around, she was down on the ground, correct?

A. Yes, sir.

Q. You don't know what happened in that time period before you turned around, correct?

A. No, sir.

Q. After you realized that she was truly injured, you did try to help her, didn't you?

A. Yes, sir. I went down to try and find a wheelchair -- a collapsable one that I bought her before after the accident before she got the electric wheelchair because of her complaints of pain and her level of sedation.

Q. Okay. You couldn't get that back upstairs, correct?

A. It wasn't in the garage.

Q. You couldn't find it?

A. No, sir.

Q. But you went upstairs, and she was still screaming at you?

A. Yes, sir. By that time she'd scooted up against the wall.

Q.   Okay.

A.   She scooted backwards, sitting against the wall and -- and calling me names and screaming at me, and I -- I was very upset.

Q.   She told you she'd deal with it at that point?

A.   She didn't want me near her, and there wasn't anything I could do.

Q.   So at that point, her parents came and picked her up and, we assume, took her to the hospital, correct?

A.   Well, I -- I -- she told me she had called her dad and he was coming to get her, and she kept screaming at me.  And Katy was upset and screaming, and I was in a disoriented state.  I went into the bedroom.

Q.   And not --

A.   Shut the door.

Q.   Not too very long after that, the police came out and arrested you?

A.   That's correct.

Q.   Again, you understand what you're charged with?

A.   Yes, sir.

Q.   Did you do this?

A.   No, sir.

Q.   Did you do it in any way, shape or form as they've alleged you did it?

A.    No, sir.

MR. BELL:   Pass the witness.

THE COURT:   Redirect -- I mean recross? Excuse me.

RECROSS-EXAMINATION

BY MR. RODGERS:

Q.    So you knew at the time she was 80 percent disabled, right?

A.    No, sir.

Q.    You didn't know that?

A.    She wasn't.

Q.    Did you not just testify that, yes, she was 80 percent disabled from rheumatoid arthritis as well as a traffic accident, and she always had a wheelchair placard?

A.    No, sir.

Q.    You did not just say that?

A.    Not the way you just said it.

Q.    Okay.   What percentage disabled were you aware she was?

A.    The rheumatoid arthritis limited her somewhat. She was slower, and she had joint pain.   She was under treatment.   She refused to take the medication --

MR. RODGERS:   Objection to what she did or did not do.

THE DEFENDANT:  She --

THE COURT:  All right.  Mr. Levee --

THE DEFENDANT:  Yes, sir.

THE COURT:  -- when there's an objection being lodged by either attorney, you have to stop speaking and allow me to rule.

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Sustained as to nonresponsive.

Move on to your next question.

Q.   (BY MR. RODGERS)  You also just testified that a traffic accident also limited her mobility, correct?

A.   Allegedly.

Q.   And you saw her on a regular basis, obviously. Y'all were married, right?

A.   Very seldom outside of work did I see anybody else --

MR. RODGERS:  Objection; nonresponsive.

MR. BELL:  Let him answer.  He's trying to answer the question.

THE COURT:  Let me just double check the question again.

Just answer the question yes or no.

Rephrase your question.  Let's move on.

Q.   (BY MR. RODGERS)  Y'all were married, right?

A.   Yes.

Q.   You spent a lot of time with each other, correct?

A.   Yes.

Q.   Did a traffic accident affect her mobility?

A.   I can't answer that.

Q.   Did you see her have less mobility after being involved in a traffic accident?  Just personal observations, Mr. Levee.

A.   No.

Q.   Didn't affect her at all?

A.   Not for a while.

Q.   Not for a while?

A.   That's correct.

Q.   Did it affect her ever?

A.   The perception was there.

Q.   The perception by you was that it --

A.   No, sir, it wasn't my perception.

Q.   Okay.  You knew she walked slowly, correct?

A.   Most of the time, yes.

Q.   You knew that she had sometimes difficulty walking long distances, right?

A.   No.

Q.   You -- you knew she had rheumatoid arthritis, right?

A.   Yes.

Q.    She had a wheelchair sometimes, right?  You just testified you brought her folding wheelchair, right?

A.    I brought her the folding wheelchair because of a complaint that she had --

MR. RODGERS:  Objection; nonresponsive.

THE COURT:  Sustained.

THE DEFENDANT:  Yeah, I bought her a folding wheelchair.

Q.    (BY MR. RODGERS)  So this person that requires a wheelchair decides she wants to take you on in a hallway, decides she just wants to try to knock you down, right?

A.    No.

Q.    Did you see Andrea at all?

A.    No.

Q.    So she never saw you that day before they went tanning?

A.    Not to my knowledge.

Q.    And if they saw you and you talked to her --

A.    I never talked to Andrea.

Q.    You never talked to Andrea that day?

A.    No.

MR. RODGERS:  Pass the witness.

THE COURT:  Any final questions, Mr. Bell?

MR. BELL:  I don't believe so, Your Honor.

THE COURT:  Okay.  Sir, you may step down.

THE DEFENDANT:  Thank you, Your Honor.

(Defendant returns to counsel table)

THE COURT:  Call your next witness.

MR. BELL:  Judge, the Defense would rest.

THE COURT:  All right.  Closing arguments, gentlemen?

MR. RODGERS:  Your Honor, if I may, can I talk to someone out here?

THE COURT:  I'm sorry.  Let me -- let me withdraw that.

Do you have any -- do you have any rebuttal?

MR. RODGERS:  I may have one rebuttal witness, Your Honor.  May I have about two minutes?

THE COURT:  You may.  We'll be in recess.

(Recess from 4:03 p.m. to 4:07 p.m.)

(Open court, defendant present)

MR. RODGERS:  May I proceed, Your Honor?

THE COURT:  Just a moment.

You may proceed.  Thank you.

MR. RODGERS:  For the record, the State does call Andrea Levee.

THE COURT:  And I understand that.  Thank

you for bringing that to the record's attention.

MR. RODGERS:  Yes, Judge.

THE COURT:  All right.  Previously I placed you under oath; is that correct?

THE WITNESS:  Uh-huh.

THE COURT:  All right.  You're still under oath.

You may proceed.

MR. RODGERS:  Thank you, Your Honor.

STATE'S REBUTTAL EVIDENCE

. ANDREA LEVEE,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. RODGERS:

Q.   Ma'am, could you go ahead and -- and spell -- let me ask you this:  You're Andrea Levee, correct?

A.   Yes.

Q.   Okay.  And we need you to speak up really loud here.  You're very soft-spoken.  I understand I just woke you up, right?

A.   Yes.

Q.   Okay.  I need you to answer yes or no.  You can't say uh-huh or huh-uh.  Okay?

A.   Yes, sir.

Q.   And I need you to act like you're yelling at

me.  Okay?  Because you are very soft-spoken.  I want you to talk so the clock behind me can hear you very loudly.

A.    Yes, sir.

Q.    Not a good start.  One more time.

A.    Yes, sir.

Q.    Better.  Okay.

Can I call you Andy?

A.    Yes, sir.

Q.    Thank you.

We went back to old Andy.  Speak up, please.

A.    Yes, sir.

Q.    Andy, is your mother Cathey Levee?

A.    Yes.

Q.    And are you a sister of Alexandra and Catherine Levee?

A.    Yes.

Q.    Okay.  Whose you're adopted father?

A.    Ted Levee.

Q.    Do you see him in the courtroom?

A.    Yes.

Q.    I'm standing behind chair number one.  If we count to my left two, three, four, what chair would he be in?

A.    Four.  The fourth chair.

MR. RODGERS:  May the record reflect the witness has identified the Defendant?

THE COURT:  The record will so reflect.

Q.    (BY MR. RODGERS)  Andy, I want to draw your attention to April 10th, 2010.  Did you go to a Rangers game with your mother and sisters that day?

A.    Yes.

Q.    When you got back from the Rangers game, did you go back to the house in which Cathey and the Defendant lived?

A.    Yes.

Q.    Once you got there, was the Defendant there?

A.    Yes.

Q.    Did he come down and talk to y'all?

A.    I don't recall.

Q.    Okay.  Did you see him when you got there?

A.    Yes.

Q.    Tell the Court, when you first saw him, how he was acting.  Was he -- what mood was he in?  Was he happy, sad, angry?

A.    I don't recall.

Q.    Okay.  Where were you and Alex going to go after you got to the house?

A.    To go tan.

Q.   And did Katy go with you?

A.   No.

Q.   Did the Defendant say anything when he found out you and Alex were going to go tan?

A.   He wanted to come with us.

Q.   And was he in your presence when he expressed that?

A.   I don't recall.

Q.   Was he downstairs with you all when you were about to leave to go to the -- to go tan?

A.   I'm -- I'm sorry?

Q.   How do you know he wanted to go tan with you?

A.   He told my older sister --

         MR. BELL:  Objection as to -- objection as to hearsay, Your Honor.

         THE COURT:  Sustained as to hearsay unless you have an exception.

         MR. RODGERS:  Statement by party opponent, Your Honor.  It's the Defendant.

         THE COURT:  Overruled.  That's -- that's not an exception.  You may proceed.

Q.   (BY MR. RODGERS)  When you and Alex left, did the Defendant go with you?

A.   No.

Q.   Was he happy about that?

A.    No.

Q.    What did he do?

A.    He was angry, got mad at my mom, got into a fight.

Q.    And when you say they got into a fight, what do you mean by that?

A.    Words were thrown, yelling, things were said, I hate you, You ruined my life.

Q.    The Defendant said that?  Who said that?

A.    Ted Levee.

Q.    And was he downstairs or upstairs when this was taking place?

A.    I don't recall.

Q.    So you don't remember where he was when he made the statement?

A.    Huh-uh.

Q.    Is that a no?

A.    Yes, sir.

Q.    Okay.  Did he seem like he was out of his mind to you as far as -- did he seem like he was under the influence of any drugs at that time?

A.    Yes.

Q.    In what way?

A.    From the surgery he had prior the -- from the other day, he was still kind of loopy from that, so...

Q.    Kind of slurring his words?

A.    Uh-huh.

Q.    Is that a yes?

A.    Yes, sir.

Q.    Did he have a -- a -- a brace on his shoulder at that time?

A.    Yes.

Q.    Which arm?

A.    I -- I don't remember.

Q.    Okay.

        MR. RODGERS:  Pass the witness, Your Honor.

        THE COURT:  Cross-examination?

        MR. BELL:  Just a couple of questions.

        THE COURT:  All right.  You may step down. Thank you very much.

        MR. BELL:  Just a couple of brief questions.

        THE COURT:  Oh, I'm sorry --

        MR. BELL:  I said a couple of brief questions.

        THE COURT:  You may proceed.

                    CROSS-EXAMINATION

BY MR. BELL:

Q.    When you arrived back home, you don't remember whether you saw Mr. Levee or not, do you?

A.   I'm sorry?

Q.   You do not remember whether or not you saw Mr. Levee, do you?

A.   I saw him at the house.  I just don't remember if it was upstairs or downstairs.

Q.   Okay.  You don't remember?

A.   Huh-uh.

Q.   Okay.

THE COURT:  You must answer -- you must answer with a yes or no because we can't take down huh-uh and uh-huh.

THE WITNESS:  I'm sorry.

THE COURT:  That's quite all right.

Q.   (BY MR. BELL)  How long were you there?

A.   I don't recall exactly the time.

Q.   You don't recall -- you don't recall much from that day, do you?  Yes or no.

A.   No.

Q.   When this alleged event happened, you weren't there, correct?

A.   No.

Q.   But you've heard family talk about it?

A.   Uh-huh.

Q.   And you --

THE COURT:  Is that a yes or a no?

THE WITNESS:  Yes, sir.

Q.   (BY MR. BELL)  And you've heard your mom talk about it, correct?

A.   Yes.

Q.   Heard Katy talk about it?

A.   Yes.

Q.   Heard your other sister talk about it?

A.   Yes.

Q.   Heard your grandparents talk about it?

A.   Yes.

Q.   Was it possible that quite a bit of the information that you have about what might have happened could have come from those conversations?

A.   Yes.

MR. BELL:  Nothing further, Your Honor.

MR. RODGERS:  May I redirect?

THE COURT:  You may.

REDIRECT EXAMINATION

BY MR. RODGERS:

Q.   Is the fact that the Defendant came down and wanted to go tanning with y'all something you heard from somebody else or is it something you remember happening?

MR. BELL:  Objection; mischaracterization what she testified to.  She said she didn't know if he was upstairs, downstairs, she doesn't remember.

222

THE COURT:  Gentlemen, I can distinguish between that.  Thank you.  You may continue.  And overrule your objection.

Q.   (BY MR. RODGERS)  The fact that the Defendant expressed that he wanted to go tanning with you and Alex, do you remember that happening, or are you getting that from somebody else?

A.   I remember that.

Q.   And the fact that he got upset when he was told he can't go with you, are you remembering that or -- because you experienced it or because somebody else told you?

A.   I remember that.

Q.   Because of -- because somebody told you or because you experienced it yourself?

A.   Because I experienced it.

MR. RODGERS:  Pass the witness.

THE COURT:  Any further questions, Mr. Bell?

MR. BELL:  Nothing further, Your Honor.

THE COURT:  Thank you.  You may step down now.  Thank you very much.

(Witness retires)

THE COURT:  State, call your next witness.

MR. RODGERS:  The State would close.

MR. BELL:   Judge, may I have a couple of minutes with my client?

THE COURT:   You may.   We'll take a brief recess.

(Recess from 4:17 p.m. to 4:32 p.m.)

(Open court, Defendant present)

THE COURT:   All right.   Mr. Bell, I believe it is your case now.

MR. BELL:   Judge, the Defense would rest, and we have no more witnesses.

THE COURT:   Okay.   So both sides rest and close, correct?

MR. RODGERS:   Yes, Judge.

THE COURT:   All right.   We discussed a matter off the record, and basically it's in terms of scheduling.   The Court has not had sufficient time to review State's Exhibits 9 and 10, which are the medical records associated with this case.

What we will do is that we will reconvene at 2:00 p.m. tomorrow for closing arguments, and I will render the decision and verdict at that time.

Are there any other matters need to be taken up at this moment?

MR. RODGERS:   Not from the State.

MR. BELL:   None from the Defense, Your

Honor.

THE COURT:  All right.  Thank you, Mr. Bell.  We'll be off the record, and that will be the end of the proceedings for today.

(Proceedings adjourned at 4:35 p.m.)

THE STATE OF TEXAS          )

COUNTY OF TARRANT           )

        I, Angelica Taylor, Official court reporter in and for the 432nd Judicial District Court of Tarrant County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and -numbered cause, all of which occurred in open court or in chambers and were reported by me.

        I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

        WITNESS MY OFFICIAL HAND this the 15th day of February, 2012.

ANGELICA TAYLOR, TEXAS CSR NO. 7180
Cert Exp. Date: 12/31/2013
Official court reporter
432nd Judicial District Court
401 West Belknap Street
Fort Worth, Texas 76196

ANGIE TAYLOR ~ (817) 884-2341
OFFICIAL COURT REPORTER ~ 432ND DISTRICT COURT     RA 227

# TRIAL REPORTER'S RECORD II

**RA 228**

RA 229

REPORTER'S RECORD
VOLUME 1 OF 1
TRIAL COURT CAUSE NO. 1239907R

| STATE OF TEXAS | ) ( | IN THE 432ND JUDICIAL |
| VS. | ) ( | DISTRICT COURT OF |
| THEODORE FLOYD LEVEE | ) ( | TARRANT COUNTY, TEXAS |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

TRIAL ON MERITS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

On the 14th day of October, 2011, the following proceedings came on to be heard in the above-entitled and -numbered cause before the Honorable Ruben Gonzalez, Jr., Judge Presiding, held in Fort Worth, Tarrant County, Texas:

Proceedings reported by machine shorthand.

ANGIE TAYLOR, CSR, RPR
Official Court Reporter
432nd DISTRICT COURT

COPY

A P P E A R A N C E S

HONORABLE TIM RODGERS - SBOT NO. 24046741
HONORABLE LLOYD WHELCHEL - SBOT NO. 00798579
Assistant District Attorneys
401 W. Belknap Street
Fort Worth, Texas   76196
Phone:   817-884-1400


            Attorney(s) for the State of Texas.



HONORABLE STEVEN BELL - SBOT NO. 00785689
9400 N. Central Expressway, #416
Dallas, Texas 75231
Phone:   214-739-4477



            Attorney(s) for the Defendant.

STATE VS. THEODORE FLOYD LEVEE

CHRONOLOGICAL INDEX
VOLUME 1
TRIAL ON MERITS

| OCTOBER 14, 2011 | PAGE | VOL |
|---|---|---|
| Closing Argument by Mr. Bell........... | 4 | 1 |
| Closing Argument by Mr. Rodgers........ | 16 | 1 |
| Court's Ruling......................... | 23 | 1 |
| Both Sides Rest and Close............. | 32 | 1 |
| Sentencing as to Cause No. 1239907R.... | 32 | 1 |
| Defendant's Plea Withdrawal as to Cause Nos. 1196215 and 1201875........ | 33 | 1 |
| Plea Agreements as to Cause Nos. 1196215 and 1201875.................. | 35 | 1 |
| Appellant's Admonishments.............. | 36 | 1 |
| Sentencing as to Cause No. 1239907R.... | 40 | 1 |
| Defendant's Plea as to Cause No. 1196215 | 41 | 1 |
| Appellant's Admonishments.............. | 42 | 1 |
| Allocution............................. | 42 | 1 |
| Proceedings Concluded.................. | 43 | 1 |
| Court Reporter's Certificate.......... | 43 | 1 |

PROCEEDINGS

(October 14, 2011 ~ 2:20 p.m.)

(Open court, Defendant present)

THE COURT:  All right.  We're back on the record.  Both sides have rested and closed.

Closing arguments, gentlemen?

MR. RODGERS:  The State would waive open/close and reserve right to close/close, Judge.

MR. BELL:  May I proceed, Your Honor?

THE COURT:  Mr. Bell, you may proceed.

DEFENDANT'S CLOSING ARGUMENT

MR. BELL:  Divorce is an ugly thing.  It creates a lot of antagonism, a lot of hurt and a lot of separation of families, a lot of division of families.

And the result of that, quite often, there's some bad things that as we -- as we get passed and into the divorce occur.  But quite often divorce isn't about what happened the day you separate; it's about what happened up to that point.

And I think this -- this incident is a good example of that.  I don't think divorce is a result of this incident.  I think this is just kind of a culmination, the straw that broke the camel's back.

The interesting thing about this case is that we've had four different test -- folks testify for

the State.  Two of them were obviously the victim and her daughter that were either there or partially there, and the other two that weren't there.

Ironically, they all describe my client the same way, and they use words like manic and depressive and words that, quite honestly, you don't use in normal terminology, which clearly tells us that they've sat and they've discussed it.  And all of them have readily agreed that they've sat and they've discussed this event on many occasions.  And at one point, I guess on the anniversary, it even arose to an incident.  And so that being said, there's no question on this day everybody was upset.

From what Katy said, they were a little upset with -- with Mr. Levee because he had not gone to the Ranger game.  He had chosen to have shoulder surgery.  And there's no contention about that.  There's no contention that he had had shoulder surgery.  They all agreed that he was in an arm brace.  They all seen him or claimed to have seen him in the arm brace that day or the next day, less than 24 hours after it occurred.

So the important thing here is to look at what the different witnesses have said and -- and how their statements vary, see whether or not the State has,

in fact, proven beyond a reasonable doubt each and every element that they have to prove.

The complainant testified. She testified that she was out in the hallway, went out there, that he went around her and turned around and looked at her, may or may not have said anything and then rushed back into her and -- and knocked her into the banister with that very shoulder that he just had surgery on.

And I would contend with you that anybody's that's had surgery shoulder would know that he was probably lucky to put his shirt on that day, much less drive into somebody regardless of what kind of pain medication he's on.

Then she claims he somehow put his foot around her and pulled it out from under her. Interestingly enough is that's one story she gives. In the medical records she gives another story where she says that he grabbed her ankle and kicked her knee.

THE COURT: And what -- what exhibit are you referring to?

MR. BELL: Those -- that's the medical records from the -- those are the ER reports.

THE COURT: Okay.

MR. BELL: That's an ER report on State's Exhibit No. 9, I believe page seven. It's page seven,

Your Honor.

Then at another point in those medical records, she said her husband tripped her, which seems to be kind of inconsistent with having grabbed her ankle and kicked her knee.

The story she gives to the police is that he kicked her several times. We didn't hear about that in testimony either. She's given three or four different versions of what happened.

She then tells us that he goes downstairs and gets a shotgun, brings it upstairs and is walking up and down the hallway cocking the shotgun. Now, mind you, he just had major shoulder surgery. There's some contention. One says he has the brace on; one says he doesn't.

I contend to you regardless whether he had the brace on or not, he couldn't cock a shotgun having just had that surgery indicating that he was going to kill himself and kill the rest of them in the hallway upstairs.

I'll contend to you that something did happen to the complainant that day, and I have no disagreement, nor does my client, that she got hurt. There was some sort of injury that was suffered. But the event that occurred happened a little bit

differently than she described.

The daughter testified.  What's interesting about the daughter is she didn't see the push and she said she was watching the faces, but just knows that her mom got tripped and next thing she knows, she's on the floor.

The interesting thing about that is -- I don't disagree with what she says other than I don't think it's true.  But when she discusses the gun, ironically -- now, remind you, she testified she was sitting on the floor with her mother as they made this call to her grandparents to come get her -- she claimed she hears what sounds like a shotgun being clicked downstairs, but he never, ever came upstairs, never saw him with a shotgun in his hand walking up and down the hallway, as her mother said he did.

Now, my contention with that is I don't think that's something you might forget.  How would you not -- how would you forget it?  It's not remembering it.  You never forget if somebody walked up and down the hallway with a shotgun that you thought was loaded or unloaded, for that fact.  To me, that's significantly different.

Alex, next daughter, testified same thing. She was there that day.  She's not sure where she saw

him in the house, but for a brief moment, she didn't live in the house. She saw him that day same thing. He's manic, he's depressive, same -- same terminology that the other parties used.

But what she did tell the officer at the hospital was, while there had been verbal abuse in the home, she had never seen Mr. Levee do anything violent. No physical abuse had they ever seen. Never done anything illegal. He had never done anything illegal.

Her issue of this -- this big issue about the tanning and so forth was he was asking her questions about her personal life. That was the big issue. He doesn't disagree that there was conversation about their personal issues and personal life that day. They had disagreements like any family does.

Andrea testified. While she testified, I guess effectively that she's the one that actually took him over to have his surgery and brought him home. She can remember he was manic. She can remember he was upset that day, but she can't even recall, when she came back into the house, where she saw him at.

If you asked her, Was it upstairs? I don't recall. Did he come downstairs? I don't recall.

She doesn't recall seeing him. She just knows how he was acting that day.

Mr. Levee testified -- and honestly, his story's dramatically different than what the other parties say happened. He doesn't testify whether he hit her with his right shoulder like they claim. He -- he said it happened totally different.

He's told you -- and he and I talked about it. And I said, Don't testify. He said, I want to testify. I want to testify. I want to tell the truth. I want to tell what happened. So you understand that you don't have to. But I want to. It doesn't matter.

MR. RODGERS: I'm going to object to arguing things that are not in evidence, the conversations that were outside the hearing, Judge.

THE COURT: I can discriminate between what's before the Court or not. But thank you, Mr. Rodgers. I'm going to overrule the objection.

MR. BELL: He's not test -- he's testified that he had been home all day waiting for them. They got home. He does admit that Katy came in the bedroom, apparently, with her mom and that Katy left. They had some sort of discussion. The complainant leaves. He's been home all day. He's on medication; he's hungry. He thought they were coming home to eat. He even testified that their rule in the house was, We eat at home together. That's why he had been waiting.

After a few minutes, he gets up and goes down the hallway, gets towards the end of the hallway, and she comes around the corner. I don't think she did it intentionally. I think she came around the corner, and he was there, so she came into him.

He's on medication. He's clearly said he's a bit drowsy from that. He's on medication he's not supposed to be taking. He's supposed to be taking a different pain medication. The one that he's taking makes him -- he can't sleep and makes him kind of goofy acting, from what he testified to.

He goes into and says pain in the shoulder, hits his shoulder. In the process of it, she goes over him, and he looks around and she's on the floor.

Now, what they testified to was that he looked around and said, You're being a drama queen; You're not hurt. He doesn't deny that. But then he also tells you that when he realizes she is hurt, he does go downstairs and tries to get her wheelchair, the wheelchair she has because she's already been denoted in records as being disabled.

She already had in the medical records, you will find, where she had a car wreck back in '09, and she's been using the wheelchair since '09 to get around. Her own daughter testified that she had good days and

bad days prior to this.  Some days she could get up those stairs; some days she couldn't.  She wasn't in good shape.

He realizes that.  He goes downstairs.  He tries to find the secondary wheelchair again.  He can't find it.  He goes back upstairs.  They're still arguing.  She's cussing at him.  He readily admits that he's cussing at her.  He goes back in the bedroom.  Her parents put her in the hospital.  Next thing you know, police come to arrest him.

Everybody talks about how bad Mr. Levee is.  He's a bad guy.  He's manic.  He's done all these different things.  Well, he adopted all three of them.  They're not his children.  He agreed to be responsible for them until they were 18 years old.

Prior to all this, the police had never been called out there before with regard to any kind of incident.  There never been any level of physical violence per one daughter, who said while she'd seen the -- the -- the verbal abuse between them, that she'd never seen anything physical.

They testified to something different at times, but at the end of the day, that's what the police report says.

If you look at the medical records again,

there's several different versions from the complainant as -- as to how it happens.  I said on page three she tells the doctor that, He tripped me.  And I can't denote -- that's -- that's in the medical records from the hospital.  He tripped me.

On page seven he said my husband grabbed my ankle and kicked my knee.  She didn't testify to either one of those things.  And there's even some question as to the -- the level of injury this alleged fracture that they note on the MRI that -- that she can't even see it on the MRI.

And the ACL is not torn; it's disrupted. She waits two months to have surgery, and surgery by choice.

The State has to prove beyond a reasonable doubt in this case that he knowingly, recklessly committed an assault by either kicking her in the knee with his foot, which there's no testimony of that; or by sweeping her leg with his foot causing serious bodily injury.

I think it's really questionable, based upon all the different stories we've given by the witnesses that it happened that way.  As to whether or not it caused serious bodily injury, I don't know that it rises to that.  I know the State has tried to prove

that through medical records and rehabilitation. I don't know that it rises to serious bodily injury. She has had, on her own testimony, rheumatoid arthritis since 2001.

THE COURT: Before you go any further, do you have any authority that you would like me to review in relation to my decision with regard to the serious bodily injury?

MR. BELL: No, sir.

THE COURT: All right.

MR. BELL: She's had rheumatoid arthritis since 2001. She was in a car wreck in 2009. She's been in a wheelchair. Her own daughter says she uses it to get up and down the stairs before this happened. She's already in bad shape.

Now, I understand you find your victim as you find them, but at the end of the day, how much of this -- the fracture and things of that nature they allege, how much of it could have already been there?

This has been a -- a difficult case for, I think, all parties involved because it does involve a divorce down the street. And so a lot of emotions have become entangled that you probably wouldn't normally get in a case like this.

To say that the removal of Mr. Levee from

the home has all of a sudden made it a happy place and there's no more violence, well, I contend, Your Honor, that in light of the fact that one daughter in the home is now charged with a criminal offense against her mom in the home a year later, there's some level of violence that still -- still occurs and he's not there anymore.

I don't believe the State has proven their case beyond a reasonable doubt.  I believe that something did happen out there that day.  I don't think there's any contention about that.  I just don't believe it happened as though she's indicated.

I do believe she fall (sic), and I believe she suffered some sort of injuries, but not as a result of a manner and means that they've alleged, in a different way my client's testified to.

There's obviously the felony case -- the aggravated assault he can be found guilty of is obviously the possibility it's just an assault.  I question whether they've even risen to finding him guilty of an assault based upon what he said and the variance of the testimony.

For those reasons, we'd ask that you find Mr. Levee not guilty.

THE COURT:  Thank you, Mr. Bell.

State?

STATE'S CLOSING ARGUMENT

MR. RODGERS:  Judge, if there's an assault, it's an aggravated assault.  It's clear we have serious bodily injury here.  All parties who testified were very clear that the victim, Ms. Levee, was able to walk relatively well.  She was able to go upstairs by herself.  She was able to use her right leg while in pain.  She was able to use her right leg.

It is after this assault, after this violent assault, that she is no longer able to use that leg normally.  She has protracted loss of use of that bodily member.  She could not use that leg, as the records reflect, for at least three months.

Having had ACL reconstructive surgery shows there is serious bodily injury there.  There -- there's no doubt about that.  Having to rehab your leg to get your strength back just to have the surgery to rehab your leg some more, we have serious bodily injury.  We have that protracted loss of a body member.

Now, Mr. Bell talked about the disparity between the testimony of the State's witnesses, while moments before that discussing how they all got together and got their story straight.  Now, those cannot be reconciled with each other.

The witnesses were honest about what they

remembered and how they remembered it.  And, yes, Andrea says she doesn't remember if he was upstairs or downstairs, but don't you know if they were all in the car riding together getting their stories straight, she would have known where he was.

They're testifying to what they remember. They're testifying to what they recall from a moment in time over a year ago, year and a half ago.  Whereas, Alex and Andrea did not see the actually event.  What's very telling about their testimony is the fact that it is so disparate from what the Defendant testified to.

And talking about disparities between witnesses, what we have in this -- this testimony of this Defendant is disparity from one statement to the other, disparity during direct examination as compared to cross-examination.

He changed his story several times when he realized, Oh, you know what, that kind of sounds bad. Yeah, she was 80 percent disabled before that.  That's right.  When you -- she's walking towards you and you knock her down, she's 80 percent disabled, right?  No, not really.  Didn't you just tell your attorney she was? No.

That's a sign of a man who's not telling the truth.  That's a sign of a man who can't get his

story straight, because if you're telling the truth, it's easy just to stick to that story.

Now, what's very compelling about his testimony, when I get him in front of you, Judge, and I have him place me versus him in relation to how the assault took place, what he describes to you seems physically impossible by what we know by common sense.

What he says is this woman that he just describes as walking so slowly, being so feeble, being 80 percent disabled, all of a sudden whips around the corner like she's running somewhere, and they run into each other. And not only do they run into each other, but it's in such a force that her shoulder was about midline on his body and vice versa and that she pushes forward and hits him that way.

He says he shoves -- gets shoved laterally into the wall. And somehow how he's forced laterally into the wall, she ends up behind him and somehow suffers the horrible injury to her leg.

We have one person telling that totally incredible story, and then we have four people on the other side who are consistent with each other in the important main details of what happened. He was very upset that day. And maybe they have talked about the fact that, you know what, he was -- he was manic, he was

all over the place.  Maybe they've seen that term.

But we do understand that Alex and Andrea saw the Defendant come down and ask to go tanning.  The Defendant flat out refuses to admit that that happened.  Cathey Levee and Katy Levee corroborate that he came downstairs, he was upset, he was angry.  That set the stage for the assault that was to take place later.

Ms. Levee testifies that she tried to avoid him when he came at her at the banister.  And if you recall, Judge, he was facing with the banister to her left, and she curved -- curved over trying to avoid him.  And that's when he checked him into -- he checked her into the banister, and that is reflected in those medical records.  That is something the Defendant could not account for.

In trying to piece together the story based upon everything that he thought he needed to explain the injuries to the legs, he forgot about the injuries to the chest.  Because the fall that he describes that she went through does not account for that.

And then he says, Well, I went down to try to help her.  I went to try to get her wheelchair, and then I wanted to call 9-1-1.  Well, that doesn't account for the fact that by his own admission when he realized they were calling her parents, he locked himself in the

room.  He knew he had done something wrong.

His testimony is --

MR. BELL:  Judge, I'm going to object to, he locked himself in the room.  I think that's a mischaracterization of the testimony.  I don't remember anything about locking the room.  He just went in the room.

THE COURT:  Sustained.

MR. RODGERS:  Went into the room and closed the door, I believe was the testimony, Judge.  That's not a sign of somebody who's wanting to help his loving wife.

Now, again, inconsistencies in his own testimony.  He talked about the fact that, I had a great relationship with the girls; I was closer to them than their mother, but I call them slut all the time.  Yeah, things get heated, so, yeah.  So what?  I call them slut.

Those don't match each other.  That is a symptom of a very unhealthy relationship with his family, and yet he wonders why they can get up here and tell the truth on him.

Defense Counsel talked about how the victim told the PD she was kicked several times in the leg.  We don't know that.  He asked her if she remembered that.

She did not. All that's in evidence is she doesn't remember. We don't know that. We told her that.

In talking about inconsistencies in the medical records, what we have is the victim in a very pained and upset state giving reports to doctors and police officers, and they are writing that information down.

So, yes, there may be some transposition issues, but the fact remains someone hooking an ankle and pulling their leg out could be a kick, could be a sweep. Grabbing with the ankle and pulling out, those are semantics that can be explained as to she's just giving the description to people who are transposing it.

Regardless, we have physical, medical evidence showing these injuries took place, and they're absolutely consistent with what the victim stated, not to mention this good relationship that the Defendant has with these girls, that he's demonstrated this whip-kick to Alex.

If they're going to get their story straight, why don't every single one of these girls come in and say, I've seen that whip-kick before; he learned it in the Army. They didn't. Andrea had never seen it.

Defense tries to explain it away by, Okay, I guess there was a -- a Hapkido class and we showed

leverage moves, but I've never heard of a whip-kick. Pretty creative little girl to be able to make that up, because it seems to be exactly what caused the injuries to Ms. Levee's leg.

We have one story that makes no sense, and then on the other side, we have four ladies, scared of this man and his anger, and medical findings that corroborate everything they've said, Judge.

We've proved the case beyond a reasonable doubt, and we ask you to find him guilty.

THE COURT:  All right.  And do you have any case law that you would like for the Court to consider with regard to the serious bodily injury matter?

MR. RODGERS:  Are you asking me, Judge?

THE COURT:  Yes, I am.

MR. RODGERS:  No, Your Honor.  I would just ask the Court to rely on, you know it when you see it. We have a serious injury, surgery required, a lack of use of that leg for a long period of time, arguably to this day.

THE COURT:  Okay.  But the definition is contained in 1.07 of the Penal Code, and that would be under -- I believe it's (A)(46); is that correct?

MR. RODGERS:  Yes, sir.

THE COURT:  Is that correct?

MR. BELL:  Yes, sir.

MR. WHELCHEL:  Judge, in reference to that, I point out to the Court -- to the Court is protracted loss or impairment at the time.  It is not protracted loss impairment after you've had surgery.  That's not the definition.

THE COURT:  I understand.

MR. WHELCHEL:  Okay.

THE COURT:  Thank you very much.

All right.  Let me just state for the record right now that obviously this is a bitter divorce that's going on, and that does not play any part in my decision.

My -- my decision is with regard to the facts that are relevant to the 10th day of April, 2010, as alleged in the Indictment and those facts that were presented and considered by the Court only.

Now, Mr. Levee, would you please rise with your lawyer?

Mr. Levee, after reviewing all the facts and the testimony of the witnesses and listening to the respective argument of Counsel, it is hereby the Court's decision that you are found guilty of the offense of aggravated assault with serious bodily injury.

Are both sides ready to proceed on to

punishment?

MR. RODGERS:  The State's ready, Judge.

MR. BELL:  Judge, I'd ask that we do a PSI on this.

THE COURT:  All right.  Now, if -- if -- both sides are agreeable to the Presentence Investigation Report?

MR. RODGERS:  We are, Judge.

THE COURT:  All right.  Now, Mr. Levee, you have been found guilty of the offense.  You are now convicted of that offense.  There is a pending Presentence Investigation Report that needs to be prepared.  I'll be relying heavily on it.

I will be listening to any letters of recommendation or any matters that will be presented to the Court.  I ask for your full cooperation.  Your cooperation does play a factor in my decision making. You understand that at this point -- well, let me ask, is there any opinion as to the conditions of bond?

MR. WHELCHEL:  Actually, yes.  We'd ask his bond be held insufficient and for this reason:  This Defendant has been residing in Florida, and while he has appeared every time this Court has asked him to, this Court has just now convicted this Defendant of a second-degree felony where he's facing potentially going

to prison for the next 20 years.

The ensure his appearance and participation for this PSI, at the Court's convenience, not this Defendant's, we'd ask that his bond be held insufficient to ensure that appearance.

THE COURT:  Do you have a response, Mr. Bell?

MR. BELL:  Judge, may I respond?  The purpose of a bond is to assure that the Defendant comes back.  The Defendant has been in Miami going to school now for the better part of six to eight months.  Based upon his history of coming to court, based upon several issues, quite honestly, at the very beginning when he appeared before you several times, I don't believe that there is any reason to believe that he won't come back.

I feel like he would be fully cooperative. He's been cooperative up to this point, and I don't think there's any reason to hold his bond insufficient. I believe, honestly, with the Court's approval, what will happen is he will be here for the presentence report, but he will most likely go back to Miami to continue his schooling and work and travel as required by the Court, obviously.

THE COURT:  All right.  First --

MR. BELL:  He has -- he has nowhere to stay

here.  He -- he -- he does not live here anymore.

THE COURT:  Mr. Whelchel?

MR. WHELCHEL:  I don't understand -- under the interstate compact, I know that he's a convicted felon.  He hasn't been sentenced yet.  I don't -- I don't know what impact allowing him to go back to Florida as a convicted felon has on the interstate compact.

THE COURT:  And -- and let me just explain. Mr. Bell, are you familiar with the interstate compact that we're discussing?

MR. BELL:  Not as to -- no.

THE COURT:  All right.  There is a statute that is a compact among the several states that before a person that is convicted of a crime in another state, before they're received or allowed to reside within the destination that they wish to be, they must seek the approval of that entity there.

Otherwise, the jurisdiction that allows it to occur is going to be responsible as a result of that defendant being allowed to be -- reside in that other location without apprising the receiving state.

MR. BELL:  I understand that.

THE COURT:  Okay.  There is an issue, however, that the case has not been completed as of yet

because we're pending sentencing.

Now, I am going to table this at this time point and allow you to find me some authority that allows me to continue on with the bond.

Now, first off that must -- first thing that needs to be satisfied, you must contact the bondsman. Number one, the bondsman must be agreeable to allow Mr. Levee to return to Florida to continue, and Mr. Levee is no longer going to be allowed -- well, we will set the dates of when he needs to appear, and he must make himself available as a condition of the bond for the presentence investigation report in the future.

So he needs to make the necessary arrangements. He would necessarily have -- you also have to provide the authority that -- or this -- the -- the -- you understanding what I'm asking --

MR. BELL: Well, I'm going to agree with the Court. Until he's punished, though, it's my belief -- because I have had those situations with probation until -- until he actually transfers, but he hasn't been sentenced yet.

THE COURT: I --

MR. BELL: The bonding company, I can take care of that issue. That's not a problem.

THE COURT: All right. Well, you're --

you're sure of that, but I'm not so sure.  I have to have some written authorization -- or not authorization, but confirmation that they'll remain on the bond. That's essential.

MR. BELL:  That's no problem.  I can get that to you.

THE COURT:  Okay.  Then I also need the legal authority -- and we're going to confirm with the -- an authority in Miami, Dade County, to determine whether or not that we can and they would allow Mr. Levee to reside there pending sentencing.

Now, if they're of the opinion that he does not, that solves the -- that answers the question right then and there.

MR. BELL:  Okay.

THE COURT:  All right.  I'm going -- we will be off the record.

(Recess from 2:48 p.m. to 4:21 p.m.)

(Open court, Defendant present)

THE COURT:  Let's go on the record.

All right.  Mr. Bell, you've had significant time to discuss with your client with regard to a potential plea-bargain agreement with regard to punishment, plea in bar in two other pending cases in County Criminal Court No. 5.  Have you and your client

had sufficient time to discuss the options to your satisfaction?  And what is your decision?

MR. BELL:  Yes, sir, we have.  And it's my client's decision to enter into an agreement with the State wherein he will enter a plea of guilty here, waive his right to appeal.  In return, the State has agreed to a plea in bar with regard to the two pending charges of -- a cost of all (sic) -- in County Criminal Court No. 5 that will be 12.45 and it will be dismissed at the conclusion of this hearing.

THE COURT:  And is --

MR. BELL:  Additionally, we have requested a PSI earlier and we will withdraw our request for a PSI and request that you sentence Mr. Levee today.

THE COURT:  Okay.  And what is the agreed sentence, State?

MR. RODGERS:  Your Honor, it's my understanding, and that both parties have agreed, that in exchange for the Defendant -- or the State plea in barring the -- the two misdemeanor cases, the Defendant would go into agreement with the State that the Defendant be sentenced to a thousand dollar fine, sentenced to ten years probation, probated over -- or ten years in prison, probated over a period of ten years, and that he be -- be given the standard

conditions of probation as required by the felony courts, in addition to a no-contact, stay-away order from the victim and her children.  In addition, that if the Defendant lives in Tarrant County or any of the immediately surrounding counties, that he be required to wear a GPS monitor.

THE COURT:  All right.  And, Mr. Bell, is that with the agreement of you and the Defendant?

MR. BELL:  With the exception of the -- I thought we talked about $500.

MR. RODGERS:  A hundred dollars per year.

MR. BELL:  Oh, a hundred dollars per year.

Okay.  I apologize.  That, I did convey.

(Discussion between Mr. Bell

and the Defendant)

MR. BELL:  But with that exception, yes, that is the agreement.

MR. RODGERS:  Also -- if it please the Court, there was also a discussion of restitution to the victim because of medical bills that she sustained as a result of this injury.  She estimates it was anywhere between 800 to a thousand dollars, and so we would request that the Court order that restitution be paid to the victim.

THE COURT:  Upon the proof -- upon the

Court receiving proof of those out-of-pocket expenses that are directly attributable to the event on that date and also the showing that it has not been paid for or otherwise taken into consideration by the insurance company, if there was insurance, the Court will order that as a condition of the probation to be paid throughout -- during the term of the probation.

All right. Mr. Bell, is that agreeable to you?

MR. BELL: Related specifically to the --

THE COURT: On April 10th, 2010.

MR. BELL: Correct, yes, sir.

THE COURT: And I'm sorry I talked over each other. Did you get all that?

THE REPORTER: No.

THE COURT: Mr. Bell, would you please restate whether it's with your client's agreement?

MR. BELL: Yes, sir.

THE COURT: Okay. And for the record is that all costs associated with the Defendant's out-of-pocket expenses that was not covered by insurance for the specific event on April 10th, 2010, shall be paid by the Defendant. That is what was stated previously.

MR. BELL: Yes, sir.

THE COURT:  All right, Mr. Bell.

Are you ready to proceed to sentencing, Mr. Bell?

MR. BELL:  Yes, sir.

THE COURT:  All right.  Do both sides rest and close for punishment purposes?

MR. RODGERS:  Yes, Your Honor.

MR. BELL:  Rest and close.

THE COURT:  All right.  Now, the Court, after both sides have agreed to the plea-bargain agreement, insofar as the --

MR. RODGERS:  Your Honor, if I may?  We got the plea in bar form here.

THE COURT:  Thank you.

Insofar as in Cause No. 1239907R, the Court -- styled the State of Texas versus Theodore Floyd Levee, the -- upon the Court finding -- or receiving your initial plea at the -- the beginning of the trial of not guilty, has found you guilty of the offense of aggravated assault serious bodily injury, assesses your punishment at ten years confinement in the Institutional Division of the Texas Department of Criminal Justice. It's also the further order of the Court that you be placed on community supervision for a period of ten years.  There will be a fine in the amount of a thousand

dollars that will be paid over the term of the probation, in addition to the completion of certain classes, among them the batterer intervention program, community service restitution.

Also pending in County Criminal Court No. 5 are two cause numbers, and this is in the form of a plea-bargain agreement in Cause Nos. 1196215 and 1201875, that at the time of the sentencing, the Defendant, having been found guilty, the Defendant, should he accept his responsibility in the unadjudicated offenses pursuant to Section 12.45 of the Texas Penal Code, may take into account the instant offenses and bar any further prosecution should the Defendant accept his responsibility by a plea of guilty.

Mr. Levee, in those respective cause numbers for the offenses of violation of a protective order, how do you plead in the two cause numbers pending in County Court -- County Criminal Court No. 5, guilty or not guilty?

THE DEFENDANT: Your Honor, I'm sorry. I'm guilty of one; I'm not guilty of the other. And I can't accept this, and I can't give up my right to appeal because the information just then was a lie.

THE COURT: All right. Thank you very much.

THE DEFENDANT: I can't -- I can't --

THE COURT: Don't -- do not say another word.

All right. Mr. Levee, based upon what you have just stated, the Court will reject any form of a plea bargain with regard to this matter. And it was at that time, Mr. Levee, that you had indicated, through your attorney, that you were going to accept your responsibility in -- to these two causes. Now, those two causes shall remain in force and effect with all the bond conditions as well.

State, do you still have a recommendation with regard to punishment in these -- in the cause pending before the Court under Cause No. 1239907R?

MR. RODGERS: We do, Your Honor. We make the same recommendation including the batterer's intervention -- prevention program as you stated before. We ask that the Defendant -- the Court keep an open mind to days in jail as a condition of probation.

THE COURT: Thank you.

And, Mr. Bell, would you -- I'm going to give you an opportunity, based upon the circumstances -- if you would like to reoffer or request a Presentence Investigation Report, I'm going to allow you to do that for the purposes of what -- on the basis of what the

Defendant just stated.  What is your preference?

MR. BELL:  Can I have a moment to consult with him, Your Honor?

THE COURT:  You may.

MR. BELL:  Can we go outside?

THE COURT:  Yes, you may.  You have --

We'll be off the record.

(Recess from 4:29 p.m. to 4:34 p.m.)

(Open court, Defendant present)

THE COURT:  All right.  We're back on the record once again.

The parties have had an opportunity to consult with one another, and there is, once again, a plea-bargain agreement as regarding punishment.  In essence, the plea bargain is that if Mr. Levee pleads guilty pursuant to a 12.45, guilty to the offense -- unadjudicated offense of a violation of protective order and hereby waives his right of appeal in Cause No. 1239907R, that would be agreeable to both parties, the State and the Defense, based upon a sentencing including probation as previously set forth earlier on the record.

Is that correct, Mr. Bell?

MR. BELL:  That is correct.

THE COURT:  And is that correct, Mr. Rodgers?

MR. RODGERS:  That is correct, Your Honor. And in addition to that, the State would agree to dismiss Cause No. 1201875, which is the second violation protective order committed on April 28th, 2010.

THE COURT:  And you would dismiss that in the form of a DM04, correct?

MR. RODGERS:  Yes, Your Honor.

THE COURT:  Under the Tarrant County codes?

MR. RODGERS:  Yes, Your Honor.  Him having pled to the other violation protective order.

THE COURT:  All right.  Is that with your understanding and agreement, Mr. Levee?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Now, let me just tell -- tell you at this point, as I was going to cover it at the point where you changed your mind, you're waiving a -- any right of appeal in this case.  This, in effect, becomes a plea bargain.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  All right.  This will be a final conviction that will follow you that you cannot remove at a later time, do you understand that, or have expunged?

THE DEFENDANT:  Can it be expunged at a later time?

THE COURT:  No, it cannot.  This will remain on your record indefinitely.

THE DEFENDANT:  I have to follow my counsel's --

THE REPORTER:  I can't hear you, sir.

THE DEFENDANT:  I -- on the advice of counsel, I accept.

THE COURT:  No.  This is an independent decision on your part.  You may give (sic) the advice of counsel, but you may not simply state that you are pleading guilty and in effect waiving your right of appeal by simply stating that it's his recommendation that you rely upon solely.

This is where you are admitting guilt, you're pleading guilty freely and voluntarily, you're waiving any right of appeal.  Do you understand that? It's not subject to any condition whatsoever.  This has to be a free and voluntary choice on your part.  Do you understand that?

THE DEFENDANT:  I do now, Your Honor.

THE COURT:  Now, what is your decision?

THE DEFENDANT:  I'll plead.

THE COURT:  Okay.  Now, Mr. Levee, based upon your response -- your response is being received and accepted as a knowing and intentional waiver on your

part, understanding the consequences of that decision and that this is a free and voluntary choice. You're pleading guilty to this offense, in effect, by waiving any right of appeal. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. You understand that you have the right to have a direct appeal to the Second Court of Appeals here in Fort Worth, Texas. You're waiving that right. And have you had sufficient time to discuss this with your attorney to your satisfaction and under -- understanding the consequences of that decision?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. State, do you have anything else to add with regard to any admonishments?

MR. WHELCHEL: Not as to the admonishments -- well, one thing, Judge. Because the Defendant currently lives in the state of Florida, he's accepted a probation -- a felony probation. There is no guarantee that Florida will accept him. Under the interstate compact, he cannot be released to Florida until they accept him. As part of the plea agreement, the Defendant has agreed that if he lives in Tarrant County or any of the surrounding counties, he would wear a GPS.

It is now 4:40 on a Friday afternoon. The ability to put a GPS on this Defendant today, I think, is impossible. Because of that, I request he go into custody --

MR. BELL: Judge, may I respond --

MR. RODGERS: -- and released to CSCD until Monday morning.

MR. BELL: If I may respond. Probation has told me that it will take about 48 hours -- and he can respond -- whether that's Monday or Tuesday before he can -- before they actually will give approval, I think for him -- so it's not going to be a -- a great number of days. It's only going to be for the weekend or --

PROBATION OFFICER: They have 72 hours to respond yes and (sic) no. I have no --

MR. BELL: Obviously, if they respond no, then we put a GPS on him; if they respond yes, then he -- then they got 45 days to accept him. So in essence, I would ask that he be out on -- you know, allowed out on his own recognizance for the weekend. He's come into town for hearings before. He's done other things he has to have --

THE COURT: Mr. Bell, let's get through the sentencing first, and then I'll take up the conditions

of probation at that point.

MR. BELL:  Okay.

THE COURT:  But with regard to any further admonishments to ensure that the Defendant has been apprised of his rights and that this is a free and voluntary decision on his part --

MR. BELL:  Okay.

THE COURT:  -- Mr. Bell, do you have anything else to add or request of the Court to admonishment your client about?

MR. BELL:  Nothing else, Your Honor.

THE COURT:  All right.  Mr. Levee --

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  -- in Cause No. 1239907R, the State of Texas versus Theodore Floyd Levee, the Court having found you guilty upon your plea of not guilty of the offense of aggravated assault serious bodily injury, assesses your punishment at ten years confinement in the Institutional Division of the Texas Department of Criminal Justice.

It is also the decision of this Court to suspend your sentence for a period of ten years and place you on community supervision.  There will be a number of terms and conditions that will be required that has been previously discussed and will be made part

of the plea-bargain agreement.  And this plea-bargain agreement waives any right of appeal.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  And as I've also asked you previously, is this a free and voluntary choice with the understanding of the consequences of that decision?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  Now, I will have you sign the conditions of the probation momentarily. Make sure you understand each and every one of the conditions.  I will expect you to follow them.  If you violate any one of the terms of conditions of your probation, you may be revoked and it will be required to serve the term of incarceration.  Do you understand your sentence?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Based upon what you've stated previously, part of the plea-bargain agreement includes a plea in bar.

With regard to Cause No. 1196215, pending in County Criminal Court No. 5, for the offense of violation of a protective order, to that offense, you may plead guilty or not guilty.  What is your plea?

THE DEFENDANT:  Guilty, Your Honor.

STATE VS. THEODORE FLOYD LEVEE

THE COURT:  Are you pleading guilty because you are guilty and for no other reason?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  I'll receive and accept your plea, and pursuant to Section 12.45 of the Texas Penal Code, it is hereby the order of the Court that any -- that your offense, as stated, shall be pled in barred with regard to the violation of the protective order pending in County Criminal Court No. 5.  I will execute the plea in bar form and order it -- that it be filed in this cause.

Now, because I followed this agreement, you will not have any right of appeal.  Do you understand?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Now, it's my understanding as well as is that at this point the injured party would like to make a right of allocution addressed to the Defendant; is that correct?

MR. RODGERS:  That is correct, Your Honor.

THE COURT:  All right.  We'll be off the record.

(Proceedings concluded at 4:42 p.m.)

THE STATE OF TEXAS          )

COUNTY OF TARRANT           )

        I, Angelica Taylor, Official Court Reporter in and for the 432nd Judicial District Court of Tarrant County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and -numbered cause, all of which occurred in open court or in chambers and were reported by me.

        I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, admitted by the respective parties.

        WITNESS MY OFFICIAL HAND this the 15th day of February, 2012.


                    _Angelica Taylor_____
                    ANGELICA TAYLOR, TEXAS CSR NO. 7180
                    Cert Exp. Date: 12/31/2013
                    Official Court Reporter
                    432nd Judicial District Court
                    401 West Belknap Street
                    Fort Worth, Texas 76196

re; Theodore Floyd Levee

No C-432-009597-1239907-A

| Theodore Floyd | ) | |
| Levee | ) | IN THE COURT OF CRIMINAL |
| | ) | APPEALS OF THE STATE OF TEXAS |
| v | ) | |
| | ) | |
| Hon. Ruben | ) | |
| Gonzales Jr. | | |

INTERROGATORIES OF Theodore Floyd Levee

TO: Skye Blue Levee

You are requested to answer the following written interrogatories fully and in writing, based on all information reasonably available to you at the time your response is made.

DUTY TO SUPPLEMENT

You are under a duty to supplement your answers to interrogatories if you discover that they were incomplete or incorrect when made, or if you discover that they are no longer complete and correct. Supplementation must be made reasonably promptly after you discover the need for supplementation.

20. APPENDIX 20; AFFIDAVIT OF SKYE LEVEE

INTERROGATORIES

1. Are you the daughter of Theodore Floyd Levee and his former wife, your mother, Pamela Levee Fitzgerald?

   a. Answer;

2. Were you in attendance at this trial? ;

   Criminal Cause # 1239907R, styled The State of Texas v. Theodore Floyd Levee, in which relator is charged with the offense of Aggravated Assault Causing Serious Bodily Injury (22.02(a)(1) of Cathey Edmondson Levee, in the 432nd District Court of Tarrant County Texas conducted October 13 -14 2011

   a. Answer;

3. Were you available to testify at that trial if called?

   a. Answer;

4. Was there any occasion where Defense Counsel Steven Bell and you met or talked before that trial?

   a. Answer

5. Following the courts verdict, in recess pending answer concerning bond to Florida were you in the company of Risa Runo and Theodore Levee during the conversation of an agreement instigated by Steven Bell counsel for the defense?

   a. Answer:

6. Did you observe Mr. Bell specifically state Mr. Levee "needed to plead guilty or he was going straight to jail for the next ten years and if he pleaded guilty he could be on a plane by tomorrow going home to Miami and continue his life"?

   a. Answer;

7. Did Mr. Bell address Mr. Levee, Ms. Runo and you, in his discussion of the terms of that offer of an agreement?

   a. Answer;

8. Did Mr. Levee participate in that discussion?

   a. Answer;

9. Did you observe Ms. Runo ask Mr. Bell questions of appealing the guilty verdict?

   a. Answer;

10. Did you observe Mr. Bell state he would not appeal?

20. APPENDIX 20; AFFIDAVIT OF SKYE LEVEE

      a.  Answer;

11. Did you observe Mr. Bell stating no appeal of the court's verdict was available?

      a.  Answer;

12. Did you observe Mr. Bell state no attorney would appeal this case?

      a.  Answer;

13. Was the exact word Mr. Bell used to "plead"?

      a.  Answer;

14. Did you observe Mr. Bell advising Mr. Levee to agree with the court and accept the offer in spite of his continued profession of innocence?

      a.  Answer;

15. Is it your opinion Mr. Bell instructed Mr. Levee to agree to the courts offer and to misstate his guilt in order to obtain the probation and immediate return home to Florida?

      a.  Answer;

20. APPENDIX 20; AFFIDAVIT OF SKYE LEVEE

16. Upon return to the court did you observe the Judge asking Mr. Bell if he advised his client of his right to appeal?

    a. Answer;

17. Did you observe Mr. Bell answering the Judges question as "I don't do appeals"?

    a. Answer;

18. Did you observe Mr. Bell at any time stating he was "through with this case"?

    a. Answer;

19. Please state you recollection of the demeanor and actions of Mr. Bell during that period of time

    a. Answer;

20. Please state your recollection of the demeanor and actions of Mr. Levee during that period of time

    a. Answer;

21. Is the attached affidavit bearing your signature your statement requested when Theodore Floyd Levee attempted to obtain relief?

    a. Answer;

Subject:    Court date and what I remember

From:    Skye (skyebcd@yahoo.com)

To:  Thelevee@yahoo.com;

Date: Sunday, March 18, 2012 5:48 PM

My name is Skye Levee, and i was in the hearing all day of Ted Levee. I am Ted Levee's daughter. What I remember most about the trial was how Ted Levee's attorney came out to tell him he had to take What the judge was offering and that if he didn't he would be in the mercy of the judge and go straight to jail. The judge was offering "10 to 10".. Which

I think was 10 yrs probation, but what I didn't realize that meant forever with a felony. Ted Levee sat on a bench outside of court room in a state of shock.. Head down.. Saying nothing.. What seemed to be an eternity.   When he finally went into the court room.. He was confused.. And spoke out of disbelief.. Which I understand came across as disrespectful towards the judge.  Ted Levee requested to go outside to speak to his attorney again.  This is after being outside for a while, so the judge again wasn't happy. This was a late afternoon on Friday..  Already way paste the normal time of the court.

Several times during testimony Ted Levee's attorney didn't say things that should have been said.  Ted Levees attorney did say the other side had to prove without a reasonable doubt.  This was the only thing the kept us very positive.. Their was doubt all over the place!!  Ted Levee's attorney failed to show light of several things and the other side showed many things that were not relevant.. But was painting Ted Levee as a person capable of doing what he was accused of

Doing.

Thank you so much.  Skye Levee

## 20. APPENDIX 20; AFFIDAVIT OF SKYE LEVEE

My name is Skye Levee, and i was in the hearing all day of Ted Levee. I am Ted Levee's daughter. What I remember most about the trial was how Ted Levee's attorney came out to tell him he had to take What the judge was offering and that if he didn't he would be in the mercy of the judge and go straight to jail. The judge was offering "10 to 10".. Which I think was 10 yrs probation, but what I didn't realize that meant forever with a felony. Ted Levee sat on a bench outside of court room in a state of shock.. Head down.. Saying nothing.. What seemed to be an eternity. When he finally went into the court room.. He was confused.. And spoke out of disbelief.. Which I understand came across as disrespectful towards the judge. Ted Levee requested to go outside to speak to his attorney again. This is after being outside for a while, so the judge again wasn't happy. This was a late afternoon on Friday.. Already way paste the normal time of the court.

Several times during testimony Ted Levee's attorney didn't say things that should have been said. Ted Levees attorney did say the other side had to prove without a reasonable doubt. This was the only thing the kept us very positive.. Their was doubt all over the place!! Ted Levee's attorney failed to show light of several things and the other side showed many things that were not relevant.. But was painting Ted Levee as a person capable of doing what he was accused of

Doing.  Affidavit of Skye Levee

re; Theodore Floyd  Levee
                    No C-432-009597-1239907-A
Theodore Floyd Levee      )
v                         )IN THE COURT OF CRIMINAL
Hon. Ruben Gonzales Jr.  )APPEALS OF THE STATE OF TEXAS
                          )
                          )

INTERROGATORIES OF Theodore Floyd Levee

TO: Skye Blue Levee
You are requested to answer the following written interrogatories fully and in writing, based on
all information reasonably available to you at the time your response is made.

DUTY TO SUPPLEMENT
You are under a duty to supplement your answers to interrogatories if you discover that they
were incomplete or incorrect when made, or if you discover that they are no longer complete
and correct. Supplementation must be made reasonably promptly after you discover the need for
supplementation.

INTERROGATORIES
1. Are you the daughter of Theodore Floyd Levee and his former wife, your mother, Pamela
   Levee Fitzgerald?
   b. Answer;  YES

2. Were you in attendance at this trial? ;
   Criminal Cause # 1239907R, styled The State of Texas v. Theodore Floyd Levee,
   in which relator is charged with the offense of Aggravated Assault Causing
   Serious Bodily Injury (22.02(a)(1) of Cathey Edmondson Levee, in the 432nd
   District Court of Tarrant County Texas conducted October 13 -14 2011
   a. Answer;  YES

3. Were you available to testify at that trial if called?
   a. Answer;  YES

4. Was there any occasion where Defense Counsel Steven Bell and you met or talked before
   that trial?
   a. Answer  YES

5. Following the courts verdict, in recess pending answer concerning bond to Florida were
   you in the company of Risa Runo and Theodore Levee during the conversation of an
   agreement instigated by Steven Bell counsel for the defense?

## 20. APPENDIX 20; AFFIDAVIT OF SKYE LEVEE

re; Theodore Floyd Levee
              No C-432-009597-1239907-A
Theodore Floyd Levee      )
v                         ) IN THE COURT OF CRIMINAL.
Hon. Ruben Gonzales Jr.   ) APPEALS OF THE STATE OF TEXAS
                          )
                          )

INTERROGATORIES OF Theodore Floyd Levee

TO: Skye Blue Levee
You are requested to answer the following written interrogatories fully and in writing, based on all information reasonably available to you at the time your response is made.

DUTY TO SUPPLEMENT
You are under a duty to supplement your answers to interrogatories if you discover that they were incomplete or incorrect when made, or if you discover that they are no longer complete and correct. Supplementation must be made reasonably promptly after you discover the need for supplementation.

INTERROGATORIES

1. Are you the daughter of Theodore Floyd Levee and his former wife, your mother, Pamela Levee Fitzgerald?
   b. Answer:  YES

2. Were you in attendance at this trial? ;
   Criminal Cause # 1239907R, styled The State of Texas v. Theodore Floyd Levee, in which relator is charged with the offense of Aggravated Assault Causing Serious Bodily Injury (22.02(a)(1) of Cathey Edmondson Levee, in the 432nd District Court of Tarrant County Texas conducted October 13 -14 2011
   a. Answer;  YES

3. Were you available to testify at that trial if called?
   a. Answer;  YES

4. Was there any occasion where Defense Counsel Steven Bell and you met or talked before that trial?
   a. Answer  YES

5. Following the courts verdict, in recess pending answer concerning bond to Florida were you in the company of Risa Runo and Theodore Levee during the conversation of an agreement instigated by Steven Bell counsel for the defense?

re; Theodore Floyd Levee

No C-432-009597-1239907-A

Theodore Floyd Levee )
v )IN THE COURT OF CRIMINAL
Hon. Ruben Gonzales Jr. )APPEALS OF THE STATE OF TEXAS
)
)

INTERROGATORIES OF Theodore Floyd Levee

TO: Skye Blue Levee

You are requested to answer the following written interrogatories fully and in writing, based on all information reasonably available to you at the time your response is made.

DUTY TO SUPPLEMENT

You are under a duty to supplement your answers to interrogatories if you discover that they were incomplete or incorrect when made, or if you discover that they are no longer complete and correct. Supplementation must be made reasonably promptly after you discover the need for supplementation.

INTERROGATORIES

1. Are you the daughter of Theodore Floyd Levee and his former wife, your mother, Pamela Levee Fitzgerald?

   b. Answer: YES

2. Were you in attendance at this trial? ;
   Criminal Cause # 1239907R, styled The State of Texas v. Theodore Floyd Levee, in which relator is charged with the offense of Aggravated Assault Causing Serious Bodily Injury (22.02(a)(1) of Cathey Edmondson Levee, in the 432nd District Court of Tarrant County Texas conducted October 13 -14 2011

   a. Answer; YES

3. Were you available to testify at that trial if called?

   a. Answer; YES

4. Was there any occasion where Defense Counsel Steven Bell and you met or talked before that trial?

   a. Answer YES

5. Following the courts verdict, in recess pending answer concerning bond to Florida were you in the company of Risa Runo and Theodore Levee during the conversation of an agreement instigated by Steven Bell counsel for the defense?

# 20. APPENDIX 20; AFFIDAVIT OF SKYE LEVEE

re; Theodore Floyd Levee
              No C-432-009597-1239907-A

Theodore Floyd Levee    )
v                  ) IN THE COURT OF CRIMINAL
Hon. Ruben Gonzales Jr.  ) APPEALS OF THE STATE OF TEXAS
                    )
                    )

INTERROGATORIES OF Theodore Floyd Levee

TO: Skye Blue Levee
You are requested to answer the following written interrogatories fully and in writing, based on all information reasonably available to you at the time your response is made.

DUTY TO SUPPLEMENT
You are under a duty to supplement your answers to interrogatories if you discover that they were incomplete or incorrect when made, or if you discover that they are no longer complete and correct. Supplementation must be made reasonably promptly after you discover the need for supplementation.

INTERROGATORIES

1. Are you the daughter of Theodore Floyd Levee and his former wife, your mother, Pamela Levee Fitzgerald?
   b. Answer: YES

2. Were you in attendance at this trial? ;
   Criminal Cause # 1239907R, styled The State of Texas v. Theodore Floyd Levee, in which relator is charged with the offense of Aggravated Assault Causing Serious Bodily Injury (22.02(a)(1) of Cathey Edmondson Levee, in the 432nd District Court of Tarrant County Texas conducted October 13 -14 2011
   a. Answer; YES

3. Were you available to testify at that trial if called?
   a. Answer; YES

4. Was there any occasion where Defense Counsel Steven Bell and you met or talked before that trial?
   a. Answer YES

5. Following the courts verdict, in recess pending answer concerning bond to Florida were you in the company of Risa Runo and Theodore Levee during the conversation of an agreement instigated by Steven Bell counsel for the defense?

a. Answer: YES

6. Did you observe Mr. Bell specifically state Mr. Levee "needed to plead guilty or he was going straight to jail for the next ten years and if he pleaded guilty he could be on a plane by tomorrow going home to Miami and continue his life"?

   a. Answer: NO → THE SECOND PART IS NOT TRUE.

7. Did Mr. Bell address Mr. Levee, Ms. Runo and you, in his discussion of the terms of that offer of an agreement?

   a. Answer: YES

8. Did Mr. Levee participate in that discussion? YES

   a. Answer:

9. Did you observe Ms. Runo ask Mr. Bell questions of appealing the guilty verdict?

   a. Answer: YES

10. Did you observe Mr. Bell state he would not appeal?

    a. Answer: YES

11. Did you observe Mr. Bell stating no appeal of the court's verdict was available?

    a. Answer: NO

12. Did you observe Mr. Bell state no attorney would appeal this case?

    a. Answer: YES

13. Was the exact word Mr. Bell used to "plead"?

    a. Answer: NO

14. Did you observe Mr. Bell advising Mr. Levee to agree with the court and accept the offer in spite of his continued profession of innocence?

    a. Answer: YES

15. Is it your opinion Mr. Bell instructed Mr. Levee to agree to the courts offer and to misstate his guilt in order to obtain the probation and immediate return home to Florida?

    a. Answer: YES

16. Upon return to the court did you observe the Judge asking Mr. Bell if he advised his client of his right to appeal?

    a. Answer: YES

17. Did you observe Mr. Bell answering the Judges question as "I don't do appeals"?

    a. Answer: ✗ YES

18. Did you observe Mr. Bell at any time stating he was "through with this case"?

    Answer: YES

a.

19. Please state you recollection of the demeanor and actions of Mr. Bell during that period of time

    a. Answer;

*FRUSTRATED AND DIDN'T WANT TO BE AROUND TED LEVEE EVER AGAIN.*

20. Please state your recollection of the demeanor and actions of Mr. Levee during that period of time

    a. Answer;

*SHOCK*

21. Is the attached affidavit bearing your signature your statement requested when Theodore Floyd Levee attempted to obtain relief?

    a. Answer;

Subject:     Court date and what I remember

From:     Skye (skyebcd@yahoo.com)

To:     Thelevee@yahoo.com;

Date:     Sunday, March 18, 2012 5:48 PM

My name is Skye Levee, and i was in the hearing all day of Ted Levee. I am Ted Levee's daughter. What I remember most about the trial was how Ted Levee's attorney came out to tell him he had to take What the judge was offering and that if he didn't he would be in the mercy of the judge and go straight to jail. The judge was offering "10 to 10".. Which I think was 10 yrs probation, but what I didn't realize that meant forever with a felony. Ted Levee sat on a bench outside of court room in a state of shock.. Head down.. Saying nothing.. What seemed to be an eternity. When he finally went into the court room.. He was confused.. And spoke out of disbelief.. Which I understand came across as disrespectful towards the judge. Ted Levee requested to go outside to speak to his attorney again. This is after being outside for a while, so the judge again wasn't happy. This was a late afternoon on Friday.. Already way paste the normal time of the court.

Several times during testimony Ted Levee's attorney didn't say things that should have been said. Ted Levees attorney did say the other side had to prove without a reasonable doubt. This was the only thing the kept us very positive.. Their was doubt all over the place!! Ted Levee's attorney failed to show light of several things and the other side showed many things that were

not relevant.. But was painting Ted Levee as a person capable of doing what he was accused of Doing.

Thank you so much. Skye Levee

I, Skye Blue Levee have read the above Interrogatories, and that the Responses to Interrogatories are within my personal knowledge and are true and correct. _Skye Levee_

Before me, the undersigned Notary Public, on this day personally, Skye Blue Levee, and after being duly sworn stated under oath that she is the witness in this action; that Skye Blue Levee has read the above **Interrogatories**, and that the Responses to **Interrogatories** are within her personal knowledge and are true and correct.

X_____

SUBSCRIBED AND SWORN TO BEFORE ME on [*date*].

_____ [Seal]

_____ [*signature*]
_____ [*typed name*]
Notary Public in and for the State of Texas My commission expires: _____

**CERTIFICATE OF SERVICE**

I certify that a true copy of the above Interrogatories has this day been _____ [delivered in person or delivered in person by my agent or delivered by courier with receipted delivery or sent by certified mail or sent by telephonic document transfer before 5:00 p.m. of the recipient's local time] to _____ [names and addresses of all parties].

Signed on _____ [date]

_____ [signature]
_____ [typed name]
Attorney for _____

Affidavit of Risa Runo

## 20. APPENDIX 20; AFFIDAVIT OF SKYE LEVEE

# 19. APPENDIX NINETEEN ; AFFIDAVIT OF RISA RUSSO

I, Risa Runo, went to court with Ted Levee and his daughter, Skye, on Oct. 2011 to hear closing

statements and be there for support for both Ted and his daughter.

We returned to the court room

where judge Gonzales found Ted guilty. I was shocked , along with Skye, and Ted went into shut down.

We went back to the hail where Ted just kept looking at the floor saying, "But I didn't do it. Bell was

telling us that Ted needed to plead guilty or he was going straight to jail for the next ten years.

 If he pleaded guilty he could be on a plane by tomorrow going home to Miami and continue his life. I said,

I asked about an appeal and he said that he would not appeal. That he was done with this case. I said what about another attorney appealing and he said that there was no way we would find any attorney to appeal this case.

Said his best chance was to plead guilty and both violations would go away, they would be

dismissed, there would be a $100 fine, and he could go home tomorrow and get on with his life,

Mr. bell was speaking to Skye and me, more like bullying.

Skye kept saying, "Papa just plead guilty and get on with your life."

She did not understand until later, that a felony on your record never goes away.

Ted never said anything or even looked up. He just told his attorney,

 "I will do whatever you want me to do, but I didn't do it, and I want to die."

It's like he wasn't there anymore. When they went back into court and the judge asked Ted for his plea he said I can't do this, I can't plead guilty to something I did not do.

 He and Bell went back outside, Bell was visibly agitated and so were the other people working in

the court.

I even heard one of them complaining about "This would be happening on Fri afternoon." I

don't know what was said in the hall this time because Bell told Skye and me to stay.

When they came back before the judge he asked Bell if he had advised Ted of his rights to an appeal? Bell replied" No, your honor, I don't do appeals"

This was the first Skye and I had ever heard about this, he had led us to believe that he did appeals but that there would never be a chance of one with him or any other attorney.

Ted pled guilty and the next shocker was that the judge wanted to know how he plead on the

Po violations( the ones that were supposed to be dismissed according to Bell)

Bell did get one dismissed considering Ted was standing with Bell in the court in front of a judge when the supposed violation happened.

The next let-down by Bell in the court room was that the $100 fine was now a $1000.

We still thought Ted would at least be able to go home to Miami and go back to school.

After court, Ted was not in his right mind. He wanted to die. My parents and I were very worried about him and all agreed that one of us needed to be with him at all times for fear that he would commit suicide. I am not sure how he could have been found guilty, but I do not feel that he was represented properly by his attorney and find this all to be a travesty of justice.

I, Risa Runo, went to court with Ted Levee and his daughter, Skye, on Oct. 2011 to hear closing statements and be there for support for both Ted and his daughter. After hearing closing statements we went into the hall to talk to his attorney, Steven Bell. I asked Mr. Bell why several things had not been brought up in court ie. Cathey kept changing her story about what happened the evening of the supposed assault (my opinion is that an abuse victim always remember, if anything you can't forget the details), that she told the doctor performing the knee surgery that she was in a wheelchair only on the advice of an attorney that she is using for a car accident and that she is really quite active, proving that she lies. Have this in writing from doctor that performed the knee surgery, also that the doctor did not want to do the surgery and she insisted. There has been no doctor statement verifying the supposed 80% disability. Mr. Bell said that he did not and would not bring any of these things up because they did not pertain to this case. I responded that I did not understand because the prosecution was bringing up things that had nothing to do with this case either and that proving that Cathey is lying has everything to do with this case .His response was again , I'm not bringing it up because it's not part of this case. He did say that the judge would have to find him not guilty with any reasonable doubt. That made me feel better because there were so many holes in her story. We returned to the court room where judge Gonzales found Ted guilty . I was shocked , along with Skye, and Ted went into shut down. We went back to the hall where Ted just kept looking at the floor saying, " But I didn't do it. Bell was telling us that Ted needed to plead guilty or he was going straight to jail for the next ten years. If he pleaded guilty he could be on a plane by tomorrow going home to Miami and continue his life. I said, What life? He was in school to be paralegal and with a felony on his records that will never happen. He said that if he did not plead guilty he was going straight to jail for the next ten years. I asked about an appeal and he said that he would not appeal. That he was done with this case. I said what about another attorney appealing and he said that there was no way we would find any attorney to appeal this case. Said his best chance was to plead guilty and both violations would go away, they would be dismissed, there would be a $100 fine, and he could go home tomorrow and get on with his life. Mr. bell was speaking to Skye and me, more like bullying. Skye kept saying, "Papa just plead guilty and get on with your life." She did not understand until later, that a felony on your record never goes away. Ted never said anything or even looked up. He just told his attorney, "I will do whatever you want me to do, but I didn't do it, and I want to die." It's like he wasn't there anymore. When they went back into court and the judge asked Ted for his plea he said I can't do this, I can't plead guilty to something I did not do. He and Bell went back outside, Bell was visibly agitated and so were the other people working in the court. I even heard one of them complaining about "This would be happening on Fri afternoon." I don't know what was said in the hall this time because Bell told Skye and me to stay. When they came back before the judge he asked Bell if he had advised Ted of his rights to an appeal? Bell replied " No, your honor , I don't do appeals" This was the first Skye and I had ever heard about this, he had led us to believe that he did appeals but that there would never be a chance of one with him or any other attorney. Ted pled guilty and the next shocker was that the judge wanted to know how he plead on the po violations( the ones that were supposed to be dismissed according to Bell) Bell did get one dismissed considering Ted was standing with Bell in the court in front of a judge when the supposed violation happened. The next let-down by Bell in the court room was that the $100 fine was now a $1000. We still thought Ted would at least be able to go home to Miami and go back to school. After court, Ted was not in his right mind. He wanted to die. My parents and I were very worried about him and all

agreed that one of us needed to be with him at all times for fear that he would commit suicide. I am not sure how he could have been found guilty, but I do not feel that he was represented properly by his attorney and find this all to be a travesty of justice.

)

I, Risa Runo [name], being duly sworn do depose.

2505 Goldenrod Ave
Fort Worth Tx 7611
[signature of affiant] 817-874-4788

AFFIDAVIT OF RISA RUNO

re; Theodore Floyd Levee

No C-432-009597-1239907-A

| | | |
|---|---|---|
| Theodore Floyd | ) | |
| Levee | ) | IN THE COURT OF CRIMINAL |
| | ) | APPEALS OF THE STATE OF TEXAS |
| v | ) | |
| | ) | |
| Hon. Ruben | ) | |
| Gonzales Jr. | | |

INTERROGATORIES OF Theodore Floyd Levee

TO: RISA RUSO

You are requested to answer the following written interrogatories fully and in writing, based on all information reasonably available to you at the time your response is made.

DUTY TO SUPPLEMENT

You are under a duty to supplement your answers to interrogatories if you discover that they were incomplete or incorrect when made, or if you discover that they are no longer complete and correct. Supplementation must be made reasonably promptly after you discover the need for supplementation.

INTERROGATORIES

1. How long have you know Theodore Floyd Levee

   a. Answer;   *20 years*

2. What is your relationship to Theodore Floyd Levee

   a. Answer;   *very good friends, like family*

3. Were you in attendance at this trial? ;

   Criminal Cause # 1239907R, styled The State of Texas v. Theodore Floyd Levee,

   in which relator is charged with the offense of Aggravated Assault Causing Serious

   Bodily Injury (22.02(a)(1) of Cathey Edmondson Levee, in the 432nd District

   Court of Tarrant County Texas on October 14 2011

   a. Answer;   *yes*

4. Were you available to testify at that trial if called?

   a. Answer;   *yes*

5. Was there any occasion where Defense Counsel Steven Bell and you met or talked before that trial?

   a. Answer   *no*

6. Following the courts verdict, in recess pending answer concerning bond to Florida were you in the company of Skye Levee and Theodore Levee during the conversation of an agreement instigated by Steven Bell counsel for the defense?

   a. Answer:   *yes*

46

7. Did you observe Mr. Bell specifically state Mr. Levee "needed to plead guilty or he was going straight to jail for the next ten years and if he pleaded guilty he could be on a plane by tomorrow going home to Miami and continue his life"?

    a. Answer; *yes*

8. Did Mr. Bell address Mr. Levee, Skye Levee and you, in his discussion of the terms of that offer of an agreement?

    a. Answer; *yes, he said you plead guilty or you are going straight to jail for 10 years with no chance of appeal*

9. Did Mr. Levee participate in that discussion?

    a. Answer; *He was there, but not there. He had kind of shot down. Never seen him that way before.*

10. Did you ask Mr. Bell questions of appealing the guilty verdict?

    a. Answer; *he said it was agree to this (guilty plea) or go to jail for 10 years. Do you want that on your conscience? That you sent your friend to jail?*

11. Did you observe Mr. Bell state he would not appeal?

    a. Answer; *yes, he refused over and over, said we would never find an attorney to appeal*

12. Did you observe Mr. Bell stating no appeal of the court's verdict was available?

    a. Answer; *he said he would not appeal it, that he was done with this case. Said we would never find another attorney to appeal it, either.*

47

13. Did you observe Mr. Bell state no attorney would appeal this case?

   a. Answer; yes

14. Was the exact word Mr. Bell used to "plead"?

   a. Answer; yes he said, you need to plead guilty

15. Did you observe Mr. Bell advising Mr. Levee to agree with the court and accept the offer

   in spite of his continued profession of innocence?

   a. Answer; Yes, Ted kept saying, I can't plead guilty to something I did not do.

16. Is it your opinion Mr. Bell instructed Mr. Levee to agree to the courts offer and to

   misstate his guilt in order to obtain the probation and immediate return home to Florida?

   a. Answer; yes, he said to plead guilty and Ted would be on a plane the next day on his way home to Florida. That did not happen. He was stuck here

17. Upon return to the court did you observe the Judge asking Mr. Bell if he advised his

   client of his right to appeal?

   a. Answer; Yes, Bell says, I don't do appeals. Never told us this.

18. Did you observe Mr. Bell answering the Judges question as "I don't do appeals"?

   a. Answer; Yes, says, I don't do appeals. New information to us. Only said he would not appeal when we were asking about an appeal

48

19. Did you observe Mr. Bell at any time stating he was "through with this case"?

    a. Answer; yes

20. Please state you recollection of the demeanor and actions of Mr. Bell during that period of time

    a. Answer; He was angry and agitated with us (Ted, Skye, me) Seemed to be real chummy & nice with the prosecutor. Seemed like he just wanted to be done with the case and did not care to give us even correct information. He bullied us into agreeing to the so called deal.

21. Please state your recollection of the demeanor and actions of Mr. Levee during that period of time

    a. Answer; When they came back with a guilty verdict, Ted shut down. He just kept sayin "But, I didn't do it." Up until then, all of us believed in the justice system, and believed that the truth would prevail. Ted became very quiet. As we were leaving court he did not care if he was hit by a car. He was in no shape to make a decision,

22. Is the attached affidavit bearing your signature your statement requested when Theodore Floyd Levee attempted to obtain relief?

    a. Answer; *Yes*

I, Risa Runo, went to court with Ted Levee and his daughter, Skye, on Oct. 2011 to hear closing statements and be there for support for both Ted and his daughter. After hearing closing statements we went into the hall to talk to his attorney, Steven Bell. I asked Mr. Bell why several things had not been brought up in court ie. Cathey kept changing her story about what happened the evening of the supposed assault (my opinion is that an abuse victim always remember, if anything you can't forget the details), that she told the doctor performing the knee surgery that she was in a wheelchair only on the advice of an attorney that she is using for a car accident and that she is really quite active, proving that she lies. Have this in writing from doctor that performed the knee surgery, also that the doctor did not want to do the surgery and she insisted. There has been no doctor statement verifying the supposed 80% disability. Mr. Bell said that he did not and would not bring any of these things up because they did not pertain to this case. I responded that I did not understand because the prosecution was bringing up things that had nothing to do with this case either and that proving that Cathey is lying has everything to do with this case .His response was again , I'm not bringing it up because it's not part of this case. He did say that the judge would have to find him not guilty with any reasonable doubt. That made me feel better because there were so many holes in her story. We returned to the court room where judge Gonzales found Ted guilty . I was shocked , along with Skye, and Ted went into shut down. We went back to the hall where Ted just kept looking at the floor saying, " But I didn't do it. Bell was telling us that Ted needed to plead guilty or he was going straight to jail for the next ten years. If he pleaded guilty he could be on a plane by tomorrow going home to Miami and continue his life. I said, What life? He was in school to be paralegal and with a felony on his records that will never happen. He said that if he did not plead guilty he was going straight to jail for the next ten years. I asked about an appeal and he said that he would not appeal. That he was done with this case. I said what about another attorney appealing and he said that there was no way we would find any attorney to appeal this case. Said his best chance was to plead guilty and both violations would go away, they would be dismissed, there would be a $100 fine, and he could go home tomorrow and get on with his life. Mr. bell was speaking to Skye and me, more like bullying. Skye kept saying, "Papa just plead guilty and get on with your life." She did not understand until later, that a felony on your record never goes away. Ted never said anything or even looked up. He just told his attorney, "I will do whatever you want me to do, but I didn't do it, and I want to die." It's like he wasn't there anymore. When they went back into court and the judge asked Ted for his plea he said I can't do this, I can't plead guilty to something I did not do. He and Bell went back outside, Bell was visibly agitated and so were the other people working in the court. I even heard one of them complaining about "This would be happening on Fri afternoon." I don't know what was said in the hall this time because Bell told Skye and me to stay. When they came back before the judge he asked Bell if he had advised Ted of his rights to an appeal? Bell replied " No, your honor , I don't do appeals" This was the first Skye and I had ever heard about this, he had led us to believe that he did appeals but that there would never be a chance of one with him or any other attorney. Ted pled guilty and the next shocker was that the judge wanted to know how he plead on the po violations( the ones that were supposed to be dismissed according to Bell) Bell did get one dismissed considering Ted was standing with Bell in the court in front of a judge when the supposed violation happened. The next let-down by Bell in the court room was that the $100 fine was now a $1000. We still thought Ted would at least be able to go home to Miami and go back to school. After court, Ted was not in his right mind. He wanted to die. My parents and I were very worried about him and all

agreed that one of us needed to be with him at all times for fear that he would commit suicide. I am not sure how he could have been found guilty, but I do not feel that he was represented properly by his attorney and find this all to be a travesty of justice.

)

I, Ris Runo [name], being duly sworn do depose.

2505 Goldenrod Ave
Fort Worth Tx 76111
[signature of affiant] 817-874-4788

I, Risa Runo, have read the above Interrogatories, and that the Responses to Interrogatories are within my personal knowledge and are true and correct.

_____

Before me, the undersigned Notary Public, on this day personally, Risa Runo, and after being duly sworn stated under oath that she is the witness in this action; that Risa Runo has read the above **Interrogatories**, and that the Responses to **Interrogatories** are within her personal knowledge and are true and correct.

X _Risa Runo_____

SUBSCRIBED AND SWORN TO BEFORE ME on [*date*].



CRISTINA ESTELA VENTURA-GRIMES
NOTARY PUBLIC
STATE OF TEXAS
MY COMM. EXP. 10/29/16

[Seal]

_____ [*signature*]

_Cristina Estela Ventura Grimes_ [*typed name*]

Notary Public in and for the State of Texas My commission expires: _10/29/16_

## APPENDIX EIGHTEEN; Fraud on the Federal Court – Misstatement of law Responant Conder Affidavit

In the matter of the attempt for relief by Theodore Floyd Levee in application for Habeas Corpus writ 28 U.S.C.2254 materially false, fictitious, and fraudulent statements and representations where made under oath.

Criminal District Attorney Joe Shannon, Assistant Criminal District Attorney Steven W. Condor and Assistant District Attorney Timothy Rodgers, filed false statements in deference to the law and the direction of the United States District Court Magistrate in comment and in submitted and filed affidavit.

The federal false statement statute[1] is used in a number of areas when information or reports must be filed with a department or agency of the United States, or when the government gathers information from individuals and companies in the course of exercising its authority. The statute prohibits making "any materially false, fictitious, or fraudulent statement or representation" in relation to any matter "within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States." [2]

The following affidavit and sworn by Assistant prosecutor Rodgers and utilized by Mr. Shannon and Mr. Condor in the denial of the Habeas Corpus of Theodore

---

[1] § 14.07 False Statements (18 U.S.C. § 1001)
[2] 1-14 The Prosecution and Defense of Public Corruption §

**4-001**

Levee is a fraud, a sham and an intentional act of misrepresentation of facts with the intention of depriving relator of constitutional rights.

This action further hampered relator's ability to obtain due process and is instrumental in the delay in filing this extraordinary writ of mandamus.



Theodore Levee

Relator

## Fraud on the Federal Court

The District Attorney of Tarrant County Texas was respondent counsel in

22 U.S.C. 2254 application and committed fraud on the court.

As respondent counsel The District Attorney Office of Tarrant County Texas

misstated the requirement of service for the applicant in as 11.072 writ of Habeas

Corpus to the Magistrate of the *United* States District Court of North Texas Fort

Worth Division. That misstatement of law concerning the requirement of service

was contrary to fact of law and caused the dismissal with prejudice of the federal

habeas corpus 28 U.SW.C. 2254

The statement to Federal Magistrate was;[3]

"The petitioner further suggests some misfeasance by the Tarrant County District Clerk's Office because he was not personally served with the State's answer by the district clerk's office. That service requirement applies to article 11.07 writs. See Tex. Code Crim. Proc. art.11.07 §7.
 Article 11.072 places the onus of service on the State. See Tex. Code Crim. Proc. art. 11.072 §5(d).
 The State fulfilled its responsibility by serving Mr. Richards (the petitioner's state writ attorney) on May 11, 2011. What information provided to the petitioner by Mr. Richards is outside the State's knowledge or control."

---

[3] Case 4:13-cv-00211-Y Doc 43 1 of 5  Page ID 789

FACTUAL Tex. Code Crim. Proc. art. 11.072 Sec. 5. (d) Any answer, motion, or other document filed by the state must be served on the applicant by certified mail, return receipt requested, or by personal service.

11.13 APPLICANT - The word applicant, as used in this Chapter, refers to the person for whose relief the writ is asked, though the petition may be signed and presented by any other person.

In that act relator was prevented from review of wrongful conviction, with prejudice. The action was based on failure of relator to appeal the 11.072 Writ of Habeas Corpus presented to the trial court; Relator contends that he knew nothing about the writ and could not appeal what he did not know.

Respondent in claim relator failed to exhaust states remedies chided the court in the misstatement of requirement of service specifically to the applicant / relator as made by The District Attorney Office of Tarrant County Texas and was further proof of the unknown writ.

The actions of The Tarrant County District Attorney's Office in the trial and then in attempts at circumvented the 28 U.S.C. 2254 application for review further suppressed review and delayed this ultimate mandamus writ.

In that the federal 2254 writ was dismissed with prejudice for failure to exhaust state court remedies, as required by 28 U.S.C. § 2254(b), the respondent lied.

The proper focus is not on the conduct of the prosecutor, but whether the trial was fair. Smith v. Phillips, 455 U.S. at 219.

The action of the Tarrant County District Attorney's Office is additionally compromised in the affidavit filed by the assistant prosecutor in the trial - Mr. Rodgers in that the court was clear all evidence would only be considered was in the trial record.

That affidavit as stated by Mr. Rodgers – was on information not a part of and actually refuted in trial record. It is obviously intended to mislead. (see Affidavit Rodgers )

Petitioner next alleges that the prosecutor committed more than thirty acts of misconduct. Only five of these alleged acts of misconduct are set forth with sufficient particularity in the instant petition to enable this Court to make a determination on the merits. Petitioner claims that the prosecutor **misstated** the **law, misstated** the facts, made impermissible **statements** of personal belief or opinion, and presented arguments based on facts not in evidence.

The standard for granting habeas relief on a claim of prosecutorial misconduct is that the prosecutor's conduct renders the trial "fundamentally unfair." See *Darden v. Wainwright, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986)*; *Smith v. Phillips, 455 U.S. 209, 219, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982)*. A trial is "infected with unfairness," and habeas relief is warranted, when the prosecutor makes improper remarks and these remarks resulted in "actual" **prejudice.** *Brecht v. Abrahamson, 507 U.S. 619, 637-38, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)* (citing *United States v. Lane, 474 U.S. 438, 449, 106 S. Ct. 725, 88 L. Ed. 2d 814 (1986))*; *Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995)*. Habeas relief is available only if the error had a substantial and injurious effect or influence on the jury's verdict. *Thompson v. Borg, 74 F.3d 1571, 1576 (9th Cir. 1996)*. The proper focus is not on the conduct of the prosecutor, but whether the trial was fair. *Smith v. Phillips, 455 U.S. at 219*.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| THEODORE FLOYD LEVEE, | § | |
| PETITIONER | § | |
| | § | |
| V. | § | NO. 4:13-CV-00211-Y-BJ |
| | § | |
| LEIGHTON ISLES, DIRECTOR, | § | |
| COMMUNITY SUPERVISION & | § | |
| CORRECTIONS DEPARTMENT | § | |
| TARRANT COUNTY, TEXAS, | § | |
| RESPONDENT | § | |

RESPONDENT'S MOTION TO SUPPLEMENT
APPENDIX IN SUPPORT OF PRELIMINARY RESPONSE
TO PETITIONER'S WRIT OF HABEAS CORPUS

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Respondent LEIGHTON ISLES, DIRECTOR, COMMUNITY SUPERVISION AND CORRECTIONS DEPARTMENT, TARRANT COUNTY, TEXAS, by and through the Criminal District Attorney of Tarrant County, Texas, and files this Motion to Supplement its Appendix in Support of its Preliminary Response. Respondent would respectfully show the court the following:

## I. JURISDICTION

This Court has jurisdiction over the subject matter and parties pursuant to 28 U.S.C. §§2241 and 2254.

1

## II.   STATEMENT OF THE CASE

On February 12, 2013, the petitioner filed a petition for writ of habeas corpus in the United States District Court for the Southern District of Florida against Shari Britton, Chief of Probation & Parole Field Services and Interstate Compact for the Florida Department of Corrections. See Petition; Docket, page 2. On March 14, 2013, this petition was transferred to the United States District Court for the Northern District of Texas. See Docket, page 2.

On June 13, 2013, the Court determined that the respondent was the proper party-respondent to this habeas corpus petition. See Order – June 13, 2013; Docket, page 4. That same day, the Court directed the respondent to file a preliminary response on or before July 15, 2013. See Order – June 13, 2013. The respondent filed his preliminary response on June 26, 2013. See Respondent's Preliminary Response.

On June 27, 2013, the Court determined that this petition was timely filed within the one-year limitation of 28 U.S.C. 2244(d). See Supplemental Order to Show Cause. The Court ordered the respondent to address each of the petitioner's claims on its merits by July 27, 2013. See Supplemental Order to Show Cause. On July 26, 2013, this Court extended the respondent's deadline to August 26, 2013. See Order Granting Motion to Extend Time.

The respondent filed his reply on August 23, 2013. See

2

**4-009**

Respondent's Reply. On September 4, 2013, the petitioner filed a document stating that he had no knowledge of his state court application for writ of habeas corpus. See Petitioner's Request for Clarification. The respondent has since received notice that the Court does not have a copy of the petitioner's state court application for writ of habeas corpus.

### III.   NEED FOR SUPPLEMENTATION

On April 11, 2012, the petitioner (through his attorney, the Hon. David L. Richards) filed an article 11.072 application for writ of habeas corpus. See Ex parte Levee, No. C-432-009597-1239907-AP (application). The petitioner did not attach a copy of this writ application to his original petition. See Petition.[1]

---

[1] The petitioner claims to have no knowledge of this writ application. See Petitioner's Request for Clarification. However, he discusses his representation by Mr. Richards in his supporting brief. See Brief in Support of Petition.

The petitioner further suggests some misfeasance by the Tarrant County District Clerk's Office because he was not personally served with the State's answer by the district clerk's office. See Petitioner's Request for Clarification. That service requirement applies to article 11.07 writs. See Tex. Code Crim. Proc. art. 11.07 §7. Article 11.072 places the onus of service on the State. See Tex. Code Crim. Proc. art. 11.072 §5(d). The State fulfilled its responsibility by serving Mr. Richards (the petitioner's state writ attorney) on May 11, 2011. See State's Reply to Petition for Writ of Habeas Corpus. What information provided to the petitioner by Mr. Richards is outside the State's knowledge or control.

3

The respondent requests that the record be supplemented to include the state writ application filed by Mr. Richards on the petitioner's behalf in order for the Court to have a complete record of the entire state court proceedings.

WHEREFORE, PREMISES CONSIDERED, the respondent prays that the Court grant his motion to supplement the appendix to his preliminary response to include the petitioner's state writ application.

Respectfully submitted,

JOE SHANNON, JR.
Criminal District Attorney
Tarrant County, Texas

s/Steven W. Conder
STEVEN W. CONDER, Assistant
Criminal District Attorney
401 W. Belknap
Fort Worth, Texas   76196-0201
(817) 884-1687
FAX (817) 884-1672
State Bar No. 04656510

4

**4-011**

iii. Mail or deliver some form of acknowledgment of filing to the applicant (a postcard or a file-marked copy noting the date of the filing of the application should suffice).

iv. Mail or deliver a file-marked copy of the application to the district attorney's office.

v. If the application is made *pro se*, presume that the applicant intended it to be presented to the district judge. Mail or deliver a file-marked copy of the application to the judge's office.

vi. After the writ application has been filed, the applicant has been delivered an acknowledgment, and the district attorney and district judge have received copies, there are no further requirements of the District Clerk unless the trial court acts upon the writ, and then only in the event that notice of appeal is given.

When a written notice of appeal from a judgment or an order in habeas corpus proceedings is filed, the appellate procedures are the same as any criminal case, except that the District Clerk has only fifteen (15) days to prepare, certify, and forward the Clerk's record to the Court of Appeals. If the appellant requests, the court reporter must also prepare and certify the reporter's record and forward it to the Court of Appeals within fifteen days after the notice of appeal is filed. On reasonable explanation, the appellate court may shorten or extend the time to file the record.

*TRAP Rule 31.1*

The Clerk's record and reporter's record shall be prepared as in any criminal case.

*TRAP Rule 34*

### b. Post-Conviction Application for Writ of Habeas Corpus/Non-Death Penalty Cases

For post-conviction applications, it is suggested that a letter extension, such as a dash and an "A" (i.e., "-A"), be added after the case number to designate the first writ, a "-B" for the second writ, etc. When the writ application is a post-conviction application in which the applicant seeks relief from a felony judgment imposing a penalty other than death, the Clerk should:

i. Determine whether the application is invoking Article 11.07, Section 3 of the Code of Criminal Procedure or the Texas Constitution. If the application invokes neither or is unclear, presume that the application is made pursuant to Article 11.07, Section 3.

If the application is made under the Texas Constitution, follow the procedures utilized in pre-conviction applications. As the indictment is still "pending" within the meaning of Article 11.07, Section 2, the writ must be returnable in the county in which the indictment is pending (the trial court retains the discretion to decide whether to issue the writ).

*CCP Art. 11.08 CCP Art. 11.10*

If the application is made pursuant to Article 11.07, Section 3, the writ must be filed with the Clerk of the court in which the conviction being challenged was obtained. The Clerk shall then assign the application to that court. The Clerk should assign a case number ancillary to that of the conviction being challenged.

*CCP Art. 11.07, Sec. 3*

ii. Send a copy of the application by certified mail, return receipt requested, to the attorney representing the State in the particular trial court or obtain a signed acknowledgment of delivery of the

application from the attorney.

iii. The attorney representing the State shall answer the application not later than the 15th day after the date the application is received.

*CCP
Art. 11.07,
Sec. 3(b)*

If the attorney for the State files an answer, the Clerk must mail or deliver to the applicant a copy of the answer. The Clerk must mail or deliver a copy of any motion or other pleading relating to an application for writ of habeas corpus filed by the State to the applicant.

*CCP
Art. 11.07,
Sec. 7*

iv. The trial court has twenty (20) days in which to act upon the application after the State has had its opportunity to respond.

*CCP
Art. 11.07,
Sec. 3(c)*

If the trial court has not acted upon the application within thirty-five days after the State received a copy of the application, or if the trial court decides that there are no previously unresolved facts material to the confinement of the applicant, the District Clerk is required to immediately forward a transcript to the Court of Criminal Appeals.

The writ transcript must include a copy of the application for post-conviction writ of habeas corpus, any answers filed, and a certificate reciting the date upon which the finding was made or the date upon which the thirty-five (35) days expired.

The transcript should have a cover sheet which lists the applicant's name, the county, the date of conviction, the offense, the sentence, the Court of Appeals' case number or South Western Reporter citation (if appeal was taken from the conviction), the designation of the convicting court and the name of the present presiding judge.

v. If the trial court enters an order designating the issues of fact to be resolved, the District Clerk has no further duties (other than mailing or delivering a copy of the order to the applicant) until such time as the trial court resolves such factual issues. The Clerk must mail or deliver a copy of any order relating to a writ of habeas corpus to the applicant.

*CCP
Art. 11.07,
Sec. 3(d)
CCP
Art. 11.07, Sec. 7*

vi. When the trial court enters findings of fact or approves the findings of a person designated to make them, the District Clerk is required to immediately forward a transcript to the Court of Criminal Appeals.

*CCP
Art. 11.07,
Sec. 3(d)*

The writ transcript must include a copy of the application for post-conviction writ of habeas corpus, any answers filed, any motions filed, transcripts of all depositions and hearings, any affidavits, and any other matters such as official records used by the trial court in resolving the factual issues.

The transcript should have a cover sheet which lists the applicant's name, the county, the date of conviction, the offense, the sentence, the Court of Appeals' case number or South Western Reporter citation (if appeal was taken from the conviction), the designation of the convicting court, and the name of the present presiding judge.

c. **Post-Conviction Application for Writ of Habeas Corpus/Death Penalty Cases**

**4-013**

# APPENDIX SEVENTEEN; SWORN AFFIDAVIT FOR DIVORCE

Cause No._____

| | | |
|---|---|---|
| IN THE MATTER OF THE MARRIAGE OF | | IN THE DISTRICT COURT |
| **CATHEY JUNE LEVEE** AND **THEODORE FLOYD LEVEE** | | _____JUDICIAL DISTRICT |
| AND IN THE INTEREST OF **CATHERINE NICOLE LEVEE** | | |
| A MINOR CHILD | | TARRANT COUNTY, TEXAS |

---

**Affidavit of Cathey Levee**

---

STATE OF TEXAS

COUNTY OF TARRANT

 BEFORE ME, the undersigned authority, on this day personally appeared **Cathey Levee**, and made the following statements and swore that they were true:

 "My name is **Cathey Levee**. I am the Petitioner in the above referenced matter. I am over eighteen (18) years of age and have never been convicted of a felony. I am of sound mind and fully competent to make this affidavit. I am personally acquainted with the facts stated herein, which are true and correct to the best of my knowledge.

 "I am requesting the Court to enter a *Temporary Restraining Order* against Respondent herein, my husband **Theodore (Ted) Levee**, as more fully set forth below.

 "I am the wife of **Theodore (Ted) Levee**. We have one daughter who is still a minor (16) and still living at home, whose name is **Catherine (Katy) Levee,** and two older children who do not live at home anymore, **Alexandra Levee** and **Andrea Levee**. I have filed for divorce against **Ted** in this cause. I am asking for a *Temporary Restraining Order* against him for family violence. I already have a *Temporary Protective Order* that was granted to me through the Tarrant County District Attorney's Office, a copy of which is attached. My husband has been very violent towards me, violated the *Temporary Protective Order* and was arrested, but was released. He is still making threats towards me and my daughters, to kill me or us; he has broken into my house and feels like he can do so at any time; and my daughters and I are very scared of him. He broke my leg in the assault that resulted in the *Temporary Protective Order* and I can't walk as I am in a wheelchair or walker. If he comes over, I can't get away from him.

My husband and I were married December 14, 2002. Shortly thereafter he legally adopted my three daughters from a previous marriage. During our entire relationship **Ted** has been very abusive; mentally, emotionally and physically to my daughters and to me. He is extremely controlling with my daughters and with me. **Ted** has always had an obsessive fixation with my oldest daughter **Alexandra**. She has told me for years that he made her feel "strange" but would not be specific. The abuse towards the children began in 2002. This abuse was almost always directed at **Alexandra** and **Katy**. He would "thump" them on their foreheads, pushing, shoving, screaming and calling them names, telling them that they had no rights and that they were his property. In the beginning of our marriage his abuse was confined to shoving me or bumping me around the house, but after a while he began having explosive temper outbursts and would even tell me to get out of the car miles from home and tell me to walk home after calling me stupid, fat and ugly and taking my phone away.

Ever since **Ted** was diagnosed with **Rapid Cycling Bipolar Disorder with Delusional Tendencies** I have been watchful and afraid. When he could not sleep I told him to take his medicine and rest. He would not do it. He got mad at me and tried to make me leave. He told me to pack my bags and I said no. On April 9th he karate kicked my neck and only missed me by a few inches. Later that night he tried to make me have sex and I said no. He got very angry and said if that's the way it is then get out of his house. He started pulling suitcases out of the closet and told me to pack my bags. It was the middle of the night and I told him no. Since he had just had surgery he could not move well but he was extremely verbally abusive. He finally went downstairs and tried to sleep in the easy chair. The next day when we got home I went upstairs to check on him and he was VERY ANGRY. He asked if **Alexandra** was going to stay and I said she had plans. Again he told me to *"shut the fuck up cunt," "bitch,"* and *"whore,"* he wasn't talking to me and said that I had ruined his life for 8 years and how terrible a person I was. He went crazy and started telling me how much he hated me. I quietly told **Katy** to pack a bag that we were going somewhere else for the night but he caught us and shoved me and took my phone and threw it across the room. I told him I didn't want to stay with a violent person who had tried to kill me. I said to just let me and **Katy** go that I couldn't stay with a person who had tried to break my neck. He started shoving me as I tried to get my things, then said if he'd wanted to kill me he would have, then grabbed for my neck. **Katy** came in and said *"Stop, you're killing her!"* He took his bottle of Valium and ate the whole bottle, about 200 pills and started chewing them up. I became afraid that he would kill himself and I said that only girls kill themselves with pills so he spit them out all over **Katy** and me. This is not the first time he has spit in my face. When gets manically angry he spits at me, punches holes in walls or breaks things. He then went and got the shotgun and made that scary noise they make and started pacing in the upstairs hallway. This isn't the first time he has used the gun to threaten **Katy** and me. He did it last summer when he was mad at me for something, while **Katy** and I were in the bathroom. I told **Katy** on that summer occasion that if she heard the noise again to call 911. On Saturday, April 10, 2010, he was acting the same way, angry, abusive and scary. I became afraid and

I took my phone from my purse and he knocked me down and took it away from me. He threw it across the room and blocked my path and tried to put his hands around my neck. I got away and tried get my things but he wouldn't leave the bedroom. He kept calling me terrible names and said he was going to kill me. **Katy** screamed for him to leave me alone. I tried to get him out of the bedroom where **Katy** was. He just kept saying he was going to kill me and himself for ruining his life. I went into the hallway and he followed me. **Katy** came into the hallway with my phone just as he shoved me into the banister wall, severely bruising my right breast and then did a military-type kick to my right leg, flipping it out from under me at a 90° degree angle and I heard bone break. I screamed for **Katy** to call 911. She screamed at **Ted** *"Stop you're killing her!"* He told her to shut up, that I was just a drama queen. I crawled and dragged myself back to the bedroom and took the phone that **Katy** had found for me. I called my parents. **Ted** hadn't let me talk to them in two years, because he blamed all the children's and my problems on them. He said we were all crazy and he was the only sane person in the house. He called us *"white trash"*, *"whores,"* *"sluts"* and *"liars"* and wanted to *"kill us all."* He has threatened to kill my parents, **Georgie and Ted Edmondson**, and **Alexandra** on multiple occasions. He said that I was *"the devil"* and the children were *"spawns of Satan"*. Meanwhile he went outside and was trying to take my wheelchair out of my van and saying that he was taking it away from me. I have had to use it about 80° of the time since last summer's car wreck. My parents came and I had my dad take me to the hospital in the van so he wouldn't destroy my chair or steal the van from me. When I got to the hospital they gave me an X-ray and an MRI. The doctor said I had a sports injury; my dad called it a "whip kick" and said that it was an illegal move in the sports industry. The doctor told me I had suffered a ruptured ACL, torn meniscus, bone fragments under the kneecap, and my fibula was broken in two places. When they asked how it happened I said my husband did it. The next thing I knew the police were there and I was asked to file a report. **Ted** was arrested and I was told I'd be safe until Monday. He kept trying to call me from jail. I filed for some sort of a protective order that was supposed to prevent him from coming to the house or contacting me.



On Sunday, April 11th, **Alexandra** stayed at the house to take care of me. The police called about noon and said someone had bonded **Ted** out and that he would be released in 10 minutes; that he understood he wasn't to come to our house and to leave me, the kids and my parents alone. **Alexandra** and I panicked. In about 15 minutes **Ted** walked through the front door, with his keys the police gave him back saying *"Heeee's baaaeek"*, like Jack Nicholson in that horror movie. He called for **Alexandra** to come downstairs and I wouldn't let her, so he came upstairs. I was trying to call 911 and he took my laptop downstairs into the driveway and smashed it. I finally got 911 on the phone. He kept running up and down the stairs taking and breaking things, screaming that he was going to kill me, ruin my life, get me fired and send **Alexandra** to hell. The police finally came and they had to draw a gun on him, he was so irrational. They arrested him again. I asked the police officer how he got out and they said everyone had a right to be bonded but that we would be safe because he had broken the protective order and the judge wouldn't like that. Well, he was bonded out and was **released again** on Monday, April 12, 2010. The police called again to let me know he

would be released in 20 minutes, but that he understood not to come over and to call 911 if he did. I had my dad come over with a gun and we waited. The police called and said **Ted** wanted his stuff. I was so scared I had **Dad, Alexandra, Andrea** and **Katy** pack the car he drives, with all his things so he would go away, and then **Andrea** took the car, which is registered in my name, to the hospital for him to pick up and leave it there and she brought my van home. He went straight to the bank and drained our account, checks are bouncing all over the place and my lights will be turned off on Tuesday if I can't find a way to pay them. I don't know what to do. Now I am two months behind on all my bills.

I am physically, spiritually and emotionally traumatized beyond belief and have to have surgery as soon as my leg stops swelling. I have not been released to work but must go and try and provide for the children and me. I will never walk normally again. I'll find out Friday, April 23, 2010 when I'll have surgery but will probably have to wait until school is out because I cannot afford to take time off. I am terrified of surgery as my health is very poor. He had his younger daughter, Sarah Levee, who is a lawyer in Chicago, call to tell me that he would cancel my insurance because I put the pictures of my leg on FaceBook for documentation. She has contacted me several times. The scariest thing is that he changed his relationship status on his FaceBook site to *"widowed"* and the last thing he said to me before he was arrested the second time was that he was *"going to kill me."* He is telling his friends at work that we are back together, he is giving me money and that my leg isn't broken and it's all okay. He said I just *"tripped"* and bruised easily because of rheumatoid arthritis. **Ted** is also telling them how much **Alexandra** loves her *"Papa"* and how great their relationship is. His friends believe him. He has not removed the *"widowed"* status and it is still there today.

I am truly in fear for my life and for my children's. I am terrified of **Ted** and have to have one of my daughters sleep with me at night. **Ted** had also stopped me from receiving the settlement money from the law firm of Modjarrad & Abusaad that we were awarded, for a claim that he initiated for **Andrea** when she was released from the mental health hospital to her grandparents. He filed a lawsuit, again, against my parents to try and prevent them from seeing **Andrea, myself** and the other **girls**. (I received the check on Saturday, April 24th after pleading with their secretary and telling them the situation; a representative came to my house and delivered it.) This is also the firm that is handling my car accident settlement and since **Ted** went to see them last week, they have not returned any of my calls to try and find out how to proceed with my auto claim. I am using my wheelchair almost 100 percent of the time now. I am not supposed to be walking, at work or driving a car with my severe leg injury and cannot have surgery until I get some money and am sure that I have insurance. **Ted** told **Andrea's** counselor in a previous manic episode that I was faking my back injury and was not hurt in the accident last summer, and that I was going out dancing and wearing high heels. Then he threatened to call the insurance company to take back my wheelchair. He is trying to control every aspect of mine and the children's lives. **Ted** has cut me off from all sources of funds and I cannot pay my bills. He has prevented me from reaching my attorney for my car accident and getting any money. Additionally, on April 19, 2010, I found the ladder he used to climb on top of

the roof which was propped up against the house; it was NOT there last week. I had **Alexandra** and a friend of hers move it to the garage so he could not enter the house from the roof. He has also threatened to burn the house down on multiple occasions and yesterday on April 28th; I noticed that all the batteries were gone from the fire alarms. I truly believe he has entered our home while I have been at work. Additionally, on April 29th, **Ted** came to the house and after watching my house sitter work in the yard drove up into the driveway and confronted her aggressively. She told him she knew who he was and he was not to be within 200 feet of the house because of the protective order, he was verbally aggressive and threatening to her and made her feel afraid. After she called me, I called the Hurst police department and filed a report.

All three girls have been able to reduce their psychiatric medications since he was arrested on Monday, April 12, 2010, and feel safer. I, however, am having severe anxiety attacks to the point that I feel like I am having a heart attack. I asked **Katy** why she didn't need all her antidepressants and other medicines and she said it was because **Ted** was gone. I asked **Alexandra** and **Andrea** the same question and they said that the only reason any of them put up with his horrible behavior was to protect me, because they knew I was sick and needed help paying bills and needed my insurance to go to the doctor. **Alexandra**, **Katy** and **Andrea** agreed that if they had had a choice, he would have been gone a long time ago, because having bipolar disorder wasn't an excuse for his awful behavior with me or them.

I am even more afraid of him now than ever because I have filed for this divorce against him. The children will not contact him. He left a message with our family therapist to tell me that he wants the children or me to call him. He also said he has an attorney. The therapist will not see **Ted** at all anymore but gave me the message. **Ted** is sneaky and a night stalker. I do not want him around me or my children. I fear that if he is around any of us, he will hurt me or the girls or steal **Katy** and "groom" her for sexual abuse, or rape **Alexandra** at her apartment. Last night I asked **Katy** if he had ever been inappropriate with her and she said yes. I asked her why she didn't tell me sooner, and she said it was because it started when she was twelve and she really didn't put the pieces together until this year when she turned 16. I asked her what he did and she said that he told her "*If I thought you were whore's, I'd be fucking all four of you*". She said he made other comments like that, but that she couldn't remember them all at this time; but that she didn't like it when he forced her to hug him or lie down in the bed with him at night and "cuddle". I had already told **Ted** that this wasn't appropriate for a teenager and he, again, just told me I had a dirty mind. All the children are calling him **Ted**, not "**Papa**", and do not want to see him or speak to him. I feel guilty that they felt they needed to take abuse in order to protect me. I need protection from this man for me and all my children.

I need the Court to enter orders to protect me and my children from my husband. I ask for a Protective Order for family violence, for a Temporary Restraining Order, and anything else the Court can give me to protect us. I need this as soon as possible.

"Further affiant saith not."

Cathey Levee

**Cathey Levee, Affiant**

SIGNED under oath before me on April 30, 2010.

Beverly AJ McGee

Notary Public, State of Texas



BEVERLY A.J. McGEE
Notary Public, State of Texas
My Commission Expires
**JULY 25, 2012**

Affidavit for Divorce (Ambiguities)

# APPENDIX SIXTEEN. AUTO ACCIDENT LAWSUIT DISMISSED.

## REGISTER OF ACTIONS
### CASE NO. 2011-003833-1

| | | |
|---|---|---|
| **Cathey Levee vs Michael Musacarella** | § | Case Type: **Injury/Damage - Motor Vehicle Accident** |
| | § | Date Filed: **05/23/2011** |
| | § | Location: **County Court at Law No. 1** |
| | § | |
| | § | |

### PARTY INFORMATION

| | | **Lead Attorneys** |
|---|---|---|
| **Defendant** | **Musacarella, Michael**<br>467 Arwine DR<br>Hurst, TX 76053 | **JASON N THOMAS**<br>*Retained*<br><br>817-424-1001(W) |
| **Plaintiff** | **Levee, Cathey** | **Gabriel A. Riveros**<br>*Retained*<br><br>972-789-1664(W) |

### EVENTS & ORDERS OF THE COURT

**OTHER EVENTS AND HEARINGS**

| | |
|---|---|
| 05/23/2011 | **Original Petition Doc ID# 1** |
| 05/26/2011 | **Citation** |

| | Served | 06/02/2011 |
|---|---|---|
| Musacarella, Michael | Response Received | 06/27/2011 |
| | Returned | 06/06/2011 |

| | |
|---|---|
| 06/27/2011 | **Defendant's Original Answer Doc ID# 2** |
| 06/27/2011 | **Vacation Letter Doc ID# 3** |
| 08/08/2011 | **Designation of Lead Counsel Doc ID# 4** |
| 08/17/2011 | **Letter Re: Objection & Response to Discovery Doc ID# 5** |
| 08/25/2011 | **Notice to Take Deposition Doc ID# 6** |
| 09/27/2011 | **Defendant's First Amended Original Answer Doc ID# 7** |
| 11/22/2011 | **Certified Deposition of Custody Records Doc ID# 8** |
| 11/29/2011 | **Certified Deposition of Custody Records Doc ID# 9** |
| 12/30/2011 | **Certified Deposition of Custody Records Doc ID# 10** |
| 02/21/2012 | **Vacation Letter Doc ID# 11** |
| 06/06/2012 | **Motion to Substitute Counsel Doc ID# 12** |
| 06/08/2012 | **Order to Substitute Counsel Doc ID# 13** |
| 07/16/2012 | **Notice of Dismissal by Court Doc ID# 14** |
| 07/30/2012 | **Letter Requesting Setting for Trial Doc ID# 15** |
| 10/02/2012 | **Order Setting Trial Doc ID# 16** |
| 10/29/2012 | **Rule 11 Agreement Doc ID# 17** |
| 11/26/2012 | *CANCELED* **Jury Trial** (9:00 AM) (Judicial Officer Pierson, Don) |
| | *Settled* |
| | *11/26/2012 Reset by Court to 11/26/2012* |

### FINANCIAL INFORMATION

| | | | | |
|---|---|---|---|---|
| | **Defendant Musacarella, Michael** | | | |
| | Total Financial Assessment | | | 22.00 |
| | Total Payments and Credits | | | 22.00 |
| | **Balance Due as of 11/04/2012** | | | **0.00** |
| 06/28/2011 | Transaction Assessment | | | 22.00 |
| 06/28/2011 | Mail | Receipt # CCL-0308748 | Amis & Farish | (22.00) |
| | **Plaintiff Levee, Cathey** | | | |
| | Total Financial Assessment | | | 223.00 |
| | Total Payments and Credits | | | 223.00 |
| | **Balance Due as of 11/04/2012** | | | **0.00** |
| 05/23/2011 | Transaction Assessment | | | 219.00 |
| 05/23/2011 | Transaction Assessment | | | 4.00 |

05/23/2011 | Mail | Receipt # CCL-0306945 | Modjarrad & Associates PC | (223.00)

## CASE NO. 2011-003833-1

**Cathey Levee vs Michael Musacarella**

§ Case Type: **Injury/Damage - Motor Vehicle Accident**
§ Date Filed: **05/23/2011**
§ Location: **County Court at Law No. 1**
§
§

---

### PARTY INFORMATION

**Defendant** | **Musacarella, Michael** | **Lead Attorneys**
467 Arwine DR | **JASON N THOMAS**
Hurst, TX 76053 | *Retained*
| 817-424-1001(W)

**Plaintiff** | **Levee, Cathey** | **Gabriel A.. Riveros**
| *Retained*
| 469-209-7725(W)

---

### EVENTS & ORDERS OF THE COURT

**DISPOSITIONS**

12/07/2012 | **Order of Non Suit** (Judicial Officer: Pierson, Don)

**OTHER EVENTS AND HEARINGS**

| | |
|---|---|
| 05/23/2011 | **Original Petition      Doc ID# 1** |
| 05/26/2011 | **Citation** |

| | | |
|---|---|---|
| | Musacarella, Michael | Served | 06/02/2011 |
| | | Response Received | 06/27/2011 |
| | | Returned | 06/06/2011 |

| | |
|---|---|
| 06/27/2011 | **Defendant's Original Answer      Doc ID# 2** |
| 06/27/2011 | **Vacation Letter      Doc ID# 3** |
| 08/08/2011 | **Designation of Lead Counsel      Doc ID# 4** |
| 08/17/2011 | **Letter Re: Objection & Response to Discovery      Doc ID# 5** |
| 08/25/2011 | **Notice to Take Deposition      Doc ID# 6** |
| 09/27/2011 | **Defendant's First Amended Original Answer      Doc ID# 7** |
| 11/22/2011 | **Certified Deposition of Custody Records      Doc ID# 8** |
| 11/29/2011 | **Certified Deposition of Custody Records      Doc ID# 9** |
| 12/30/2011 | **Certified Deposition of Custody Records      Doc ID# 10** |
| 02/21/2012 | **Vacation Letter      Doc ID# 11** |
| 06/06/2012 | **Motion to Substitute Counsel      Doc ID# 12** |
| 06/08/2012 | **Order to Substitute Counsel      Doc ID# 13** |
| 07/16/2012 | **Notice of Dismissal by Court      Doc ID# 14** |
| 07/30/2012 | **Letter Requesting Setting for Trial      Doc ID# 15** |
| 10/02/2012 | **Order Setting Trial      Doc ID# 16** |
| 10/29/2012 | **Rule 11 Agreement      Doc ID# 17** |
| 11/26/2012 | *CANCELED*  **Jury Trial** (9:00 AM) (Judicial Officer Pierson, Don) |
| | *Settled* |
| | *11/26/2012 Reset by Court to 11/26/2012* |
| 12/06/2012 | **Motion for Non Suit      Doc ID# 18** |
| 12/07/2012 | **Order for Non-Suit      Doc ID# 19** |
| 12/07/2012 | **Civil Docket      Doc ID# 20** |

---

### FINANCIAL INFORMATION

| | |
|---|---|
| **Defendant** Musacarella, Michael | |
| Total Financial Assessment | 22.00 |
| Total Payments and Credits | 22.00 |
| **Balance Due as of 10/17/2014** | **0.00** |

| 06/28/2011 | Transaction Assessment | | | 22.00 |
| 06/28/2011 | Mail | Receipt # CCL-0308748 | Amis & Farish | (22.00) |

**Plaintiff** Levee, Cathey
Total Financial Assessment     223.00
Total Payments and Credits     223.00
**Balance Due as of 10/17/2014**     **0.00**

| 05/23/2011 | Transaction Assessment | | | 219.00 |
| 05/23/2011 | Transaction Assessment | | | 4.00 |
| 05/23/2011 | Mail | Receipt # CCL-0306945 | Modjarrad & Associates PC | (223.00) |

APPENDIX FIFTEEN; NEW EVIDENCE –ABUSE OF PRESCRIPTION DRUGS, CHRONIC FOR FRACTURES

1. Dr Kadoko termination of patient – rx abuse



Thursday, October 20, 2011

Cathey Levee                    CERTIFIED MAIL: P 7011 0470 0003 7360 5192

RE:    Termination of Patient-Physician Relationship

Dear Ms. Cathey Levee

Please accept this as notice of the termination of the physician-patient relationship that exists between us, effective immediately. This action is being taken because of you receiving medication from another provider. We maintain a zero tolerance policy for such and sincerely regret that we have to terminate our relationship under these circumstances.

We strongly recommend that you locate another orthopedic surgeon to continue your care. We also recommend that you present to an Emergency Room in the event of any medical emergencies. A copy of your medical chart is available to you upon request and for a copy fee.

We wish you a speedy recovery and the best medical outcomes.

Sincerely,

Robert G Kadoko, MD

J. MICHAEL STANTON, D.O., F.A.O.C.A.
*Diplomate, American Osteopathic Board of Anesthesiology*
*Diplomate, American Academy of Pain Management*

LEROY GILLAN, C.R.N.A., C.H., M.P.H.



PATRICK K. STANTON, D.O., F.A.O.C.A.
*Diplomate, American Osteopathic Board of Anesthesiology*
*Diplomate, American Academy of Pain Management*

SUE BIDDY, F.N.P.-C.
*American Academy of Nurse Practitioners*

Date: 10/19/11

Robert Kadoko MD
2008 L. Don Dodson #110
Bedford, TX  76021

Reference:     Cathey Levee

Dear Dr. Kadoko:

Thank you for your referral. We would like to make you aware of the status of Cathey Levee.

**Cathey Levee** is being referred back to you at this time for one of the following reasons:

☐     We have made several attempts to reach this patient and have not received a response.

☐     Treatment for services has been completed.

☐     We have administered treatment for this patient but due to lack of response of follow up evaluation, we are unable to administer continued care.

☒     *Other: Returning full management back to Dr. Robert Kadoko.*

If you have any further questions regarding Cathey Levee, please feel free to contact our office.

Sincerely,

Metroplex Pain Management

PKS/akt

1600 Central Drive, Suite 160· Bedford, Texas 76022 · (817) 268-0104 · FAX (817) 268-6102 · www.mpm-med.com

Page 4
PATIENT NAME:                        LEVEE, CATHEY
MEDICAL RECORD #:                    26004
DATE:                                10/18/2011

I will return full management to Dr. Willis and to Dr. Kadoko.

Electronically Signed By:

Patrick K. Stanton, D.O., F.A.O.C.A.
Diplomate, A.O.B.A.
Diplomate, American Academy of Pain Management
PKS/jmt/42774700

D:    10/18/2011
T:    10/18/2011

Cc:   Patrick K. Stanton, D.O., F.A.O.C.A.

:00079

Page 3
PATIENT NAME:                           LEVEE, CATHEY
MEDICAL RECORD #:                       26004
DATE:                                   10/18/2011

**REVIEW OF SYSTEMS:**                  Reviewed and documented in the electronic
medical record.

**PHYSICAL EXAMINATION:**               Reveals the blood pressure to be 113/78.
Pulse 128. Respirations 20. Temperature is 97.6. Height 69 inches. Weight 170 pounds. Skin shows no rash, erythema or edema. Heart: regular rate and rhythm. Lungs: Clear to auscultation. Neurological examination reveals cranial nerves II through XII to be grossly intact at the time of examination. There is decreased sensation noted to the third and fourth toes of the right foot. The patient has positive straight leg lifting on the left. No gross sensory or motor deficits are appreciated. Pupils are equal and reactive to light bilaterally. Extraocular muscles appear to be intact. Abdomen is soft without appreciated masses. The patient is awake, alert, and oriented to time and place.

**IMPRESSION:**
1. Rheumatoid arthritis.
2. Status post septic hip I&D.
3. Status post multiple fibular fractures.
4. History of spousal abuse.
5. History of hypothyroidism.
6. History of migraine headaches.
7. Posttraumatic stress disorder.
8. Anxiety.
9. Osteopenia.
10. Pain of the right knee. The patient is status post ACL reconstruction.

**RECOMMENDATIONS/PLAN:**               I spoke with the nurses at both Dr. Kadoko
and Dr. Willis' office, and I also spoke with the patient. My recommendation would be for the patient to find 1 physician to prescribe her narcotics. She has a long relationship with Dr. Willis. I would recommend that she continue that relationship with Dr. Willis. I also indicated to the patient that she should make Dr. Willis aware of the fact that she is receiving scripts from Dr. Kadoko as well as receiving scripts from him for hydrocodone. I explained the rationale for getting them from Dr. Kadoko and not getting them from Dr. Willis per her report.

Page 2
**PATIENT NAME:**                         LEVEE, CATHEY
**MEDICAL RECORD #:**                     26004
**DATE:**                                 10/18/2011

**PHARMACY HISTORY:** The patient's pharmacy history is positive for receiving hydrocodone 10/325, receiving 300 tabs on July 6th from Dr. Willis filled at CVS, receiving 300 tablets on August 1, 2011 by Dr. Willis at CVS, receiving hydrocodone 360 on October 6, 2011 filled at CVS Pharmacy by Dr. Willis. She has received hydrocodone 60 each time on August 19, 2011, September 2, 2011 and September 24, 2011, all filled at Walgreen's Pharmacy. Those pharmacies were surveyed, speaking with Melissa at the CVS Pharmacy phone number 817-282-2581, and the Walgreen's Pharmacy speaking with Barbara registered pharmacist at 817-868-9202.

**ALLERGIES:** No known food, drug or environmental allergies.

**MEDICATIONS:** The patient's home medications include hydrocodone as mentioned above. She also takes Adderall 30 mg once a day as prescribed by her psychiatrist Dr. Grant, thyroid replacement as prescribed by Dr. Block, B-complex, calcium, and vitamin D. She also takes Cortef as prescribed by Dr. Block. Flexeril as prescribed by Dr. Willis, hydrocodone as mentioned above, ibuprofen as prescribed by Dr. Willis, magnesium over-the-counter, Neurontin as prescribed by Dr. Willis, prednisone as prescribed by Dr. Willis, progesterone as prescribed by Dr. Block her endocrinologist, Prozac as prescribed by Dr. Grant, Restoril as prescribed by Dr. Grant, and Xanax as prescribed by Dr. Willis.

**PAST SURGICAL HISTORY:** Positive for right fallopian tube removed in 2000. PICC line placed in September 2011. Triple arthrodesis to her foot at the age of 11, Achilles tendon stretching at the age of 11, I&D of her septic left hip in 1996, I&D of septic right hip in September 2011. She had right ACL and meniscus repair as mentioned above. She has had tonsillectomy and appendectomy.

**PAST MEDICAL HISTORY:** Positive for rheumatoid arthritis, currently treated by Dr. Willis, rheumatologist in Dallas. Migraine headaches, the last episode 2 months ago, treated by Dr. Stahlman her PCP in Balch Springs. She has posttraumatic stress disorder, depression, and anxiety treated by Dr. Grant, anemia treated by Dr. Stahlman, and fibromyalgia treated by Dr. Willis.

She denies any history of cardiac disease, cardiac dysrhythmia, asthma, emphysema, tuberculosis, epilepsy, polio, meningitis, stroke, coma, hepatitis, jaundice, liver disease or kidney problems.

She does have a history of osteopenia.

**SOCIAL HISTORY:** The patient reports that she works full time as a counselor at Dunbar High School in Fort Worth. She last worked on September 6, 2011. She was married for 9 years, but separated. She has 2 cups of coffee per day. She has 2 cups of tea per day. She does not smoke. She has 2 glasses of wine or alcoholic liquor approximately 2 times per week.

**FAMILY HISTORY:** Positive for 3 children. She has a maternal history of renal disease, maternal history of breast cancer.



J. MICHAEL STANTON, D.O., F.A.O.C.A.
*Diplomate, American Osteopathic Board of Anesthesiology*
*Diplomate, American Academy of Pain Management*

LEROY GILLAN, C.R.N.A., C.H., M.P.H.

PATRICK K. STANTON, D.O.
*Diplomate, American Osteopathic Board of Anesthesiology*
*Diplomate, American Academy of Pain Management*

SUE BIDDY, F.N.P.-C.
*Certified, American Academy of Nurse Practitioners*

## CONSULTATION

PATIENT NAME:                LEVEE, CATHEY

MEDICAL RECORD #:            26004

DATE:                        10/18/2011

**HISTORY OF PRESENT ILLNESS:** The patient presents with a very complex history. She reports that she has multiple pain sites. She reports that on April 10, 2010, she was assaulted by her husband, and subsequently underwent a right ACL reconstruction. That surgery was completed June 23, 2010. She subsequently had a gait disturbance. She has had left fibular fractures, she reports x5 in the last year. She has been seen and evaluated in the past by Dr. Guerra, a pain management specialist, between in 2000 and 2001 for treatment of rheumatoid arthritis pain. On September 7, 2011, she underwent septic hip surgery I&D by Dr. Kahn at Baylor Grapevine Hospital. She reports pain in multiple locations. She describes bilateral hand and feet pain primarily involving the joints, and she rates that pain as 8 out of 10 with pain medication. She has right knee pain that she rates as 6 out 10 with pain medications, left occipital pain that she rates as 6 out of 10 with pain medications, bilateral shoulder pain that she rates as a 5 out of 10 with pain medications, low back pain that she rates as a 4 out of 10 with pain medications, and left ankle pain that she rates as 4 out of 10 with pain medications. She reports numbness and tingling involving all fingertips including the thumbs, and all toe tips. She does report weakness, indicating that she has weakness in her right knee. She reports walking more than 20 feet with a walker is her maximal effort. Beyond that, she has to utilize a wheelchair. She denies any loss of bladder or bowel control.

She has a long history of the use of hydrocodone for control of her pain. That is currently prescribed by both Dr. Willis and by Dr. Kadoko. She reports that she has been taking 12 hydrocodone per day since April 2010. Prior to that she was taking 8 to 10 hydrocodone per day, and did that for approximately 2 years before April 2010. She reports that she was started on hydrocodone 10/500, approximately 6 to 8 tabs per day in 2000. She reports that she has been on some form of a narcotic continuously since 1996. She reports exacerbation of symptoms with walking, stretching, lifting, sitting, or getting from a sitting to a standing position. She reports palliation with pain medications. Stretching helps somewhat. Physical therapy helps. Biofeedback helps and her medications help. She reports she sleeps approximately 16 hours per day with multiple interruptions. The longest period is no longer than 4 hours. She describes cephalgia that is occipital in origin, and it happens approximately 2 times per week. She reports that she was involved in an abusive relationship and was significantly beaten on April 10, 2011. She reports that her husband just was sentenced to 10 years probation for that abuse.

1600 Central Ave., Suite 160 - Bedford, TX 76022 - (817) 268-0104 - FAX (817) 268-6102 - www.mpm-med.com



# TEXAS ORTHOPEDIC & SPINE ASSOCIATES

2008 L. Don Dodson Drive | Suite 110 | Bedford, Texas 76021 | Phone: 817.318.0384 | Fax, 817.445.1038
www.tosa.com

## LEVEE, CATHEY

53 Y old Female, DOB: 09/11/1958
401 PARKVIEW COURT, HURST, TX 76053
Home: 817-994-3684
Provider: KADOKO, ROBERT G

Telephone
Encounter

**Answered by**  Langley, Tina

Date: 10/18/2011
Time: 03:00 PM

**Caller**  Dr. Pat Stanton

**Message**  Received call from Dr. Stanton stating that patient is getting Norco 10/325 from our office and Dr. Willis' office. He states that the patient received Norco on 7/6/11 # 300 8/1/11 # 300 and 10/6/11 # 360. Dr. Stanton states that the patient is getting her medications from Dr. Willis filled at CVS and is using Walgreens to fill our presciptions. He states that at this point he will not be prescribing her any pain medication and will consider taking the patient over for pain management at Dr. Willis' request.

**Action Taken**  Langley,Tina 10/18/2011 3:04:17 PM > This against our office policy, and is a significant violation of the doctor-patient relationship. Because of this, she is discharged from my care. I will see her only on an emergency basis for 1 month. Please send her a note to this effect.

Patient: LEVEE, CATHEY  DOB: 09/11/1958  Provider: KADOKO, ROBERT G  10/18/2011

Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)

**Progress Note**

**Patient:** LEVEE, CATHEY
**DOB:** 09/11/1958  **Age:** 53 Y  **Sex:** Female
**Phone:** 817-994-3684
**Address:** 401 PARKVIEW COURT, HURST, TX-76053

**Provider:** Robert Kadoko, MD
**Date:** 09/23/2011

## Subjective:
**CC:**
1. 4 WEEK F/U.

**HPI:**
Orthopedic History:
The primary pain or problem is in the Right Knee and Left foot/ankle pain. They were referred here by: hospital ER. The pain level (1-10) is 6/10 in the ankle, throbbing constantly - 7/10 in the knee, throbbing . The problem started with an altercation 4-12-2010 right knee and 3 days ago ankle pain began no known injury. The following tests have been done none since the last visit - she had septic hip surgery on the right on 9/7/2011. The following treatments have been done none - she states she does not feel the ankle is healing at all.

**Medical History:** Hypothyroidism, Hypotension, Arthritis, Lung disease (Arthritis Node), Rheumatoid arthritis.

**Surgical History:** Hip Surgery (Septic Hip drainage) , Knee Surgery (Right Menisectomy) , Ankle Surgery (triple arthidosis) bilateral , Tonsillectomy .

**Family History:** 1daughter(s) - healthy.

**Social History:** Handedness: Right, no PCP, no Alcohol. Caffeine: yes, daily. no Recreational drug use. Occupation: Full-Time, , Full Duty.

**Medications:** Arava , Ibuprofen , Adderall , Progesterone , Cortef , Armour Thyroid , Minocycline HCl , Soma 350 MG Tablet 1 tablet as needed Four times a day, Phenergan 50 MG tablet 1 tab(s) every 6 hours as needed, Norco 10-325 MG Tablet 1-2 tablet as needed for pain every 4 hrs, Soma

**Allergies:**

## Objective:
**Vitals:** Ht 69, Wt 160, BMI 23.63, BP 175/104, Temp 96.9, HR 116.

**Examination:**
X-Rays Studies::
X-Rays taken here: KADOKO,ROBERT G 8/19/2011 12:53:52 PM > . Ankle X-Rays: Left AP/LAT/Mortise views show: Distal third fibula fx, healing callus is visible. Severe, severe degenerative changes in the tibio-talar jt sp triple arthrodesis. .

**Physical Examination:**
General:
General appearance: Alert and Oriented x 3 (Time, Place, Person). General appearance: pleasant, well nourished.

## Therapeutic Interventions:

## Assessment:
**Assessment:**
1. Sprain and strain of cruciate ligament of knee - 844.2 (Primary)
2. Tear of medial cartilage or meniscus of knee, current - 836.0
3. Closed fracture of metatarsal bone(s) - 825.25, Left
4. Closed fracture of lateral malleolus - 824.2

52F with new lateral malleolus fx. It is at least 2 months old maybe longer. Xrays today show acute-on-chronic fx. Considered placing in cast but last cast caused severe skin problems. She cannot use crutches because of severe upper extremity weakness. Secondly she is on 6 weeks of IV abx for hip infection. So I

## Plan:

**1. Sprain and strain of cruciate ligament of knee** Continue Norco Tablet, 10-325 MG, 1-2 tablet as needed for pain, Orally, every 4 hrs, 60, Refills 0 ; Start Soma Tablet, 350 MG, 1 tablet as needed, Orally, Four times a day, 60, Refills 0 ; Start Phenergan tablet, 50 MG, 1 tab(s), orally, every 6 hours as needed, 60, Refills 0 .

The patient states she has been hurting for about the past three days. She went to her arthritis doctor, but he told her if her pain is not in a joint its probably not arthritis. The xrays show a fracture that is about 8 weeks old and is healing. Regarding her foot, I will give her Dr. Ahuero's name if she would like further consult regarding her flat feet and previous ankle fusion. Continue with the walker boot. The one she has is not sufficient, I will provide her with a walker boot.

### Procedures:
DME SCRIPT:
Orthosis ONE WALKER BOOT FOR THE LEFT LEG.

### Immunizations:

**Diagnostic Imaging:** X ray: Ankle, left 2v Lofton,Schon 8/19/2011 12:57:54 PM >

**Labs:**
**Procedure Codes:** 73600 X-RAY ANKLE - 2 VIEWS

**Preventive:**

**Follow Up:** 4 Weeks (Reason: F/U and xrays)

**Provider:** Robert Kadoko, MD
**Patient:** LEVEE, CATHEY **DOB:** 09/11/1958 **Date:** 08/19/2011

Electronically signed by ROBERT KADOKO , MD on 01/24/2012 at 09:44 AM CST
Sign off status: Pending

: 00034

**Progress Note**

**Patient:** LEVEE, CATHEY
**DOB:** 09/11/1958  **Age:** 52 Y  **Sex:** Female
**Phone:** 817-994-3684
**Address:** 401 PARKVIEW COURT, HURST, TX-76053

**Provider:** Robert Kadoko, MD
**Date:** 08/19/2011

## Subjective:

**CC:**
1. LEFT LEG.

**HPI:**
Orthopedic History:
The primary pain or problem is in the  Right Knee and Left foot/ankle pain. They were referred here by:  hospital ER. The pain level (1-10) is  8, throbbing, aching in right knee and 10/10 in left foot. The problem started with  an altercation 4-12-2010 right knee and 3 days ago ankle pain began no known injury. The following tests have been done  none since the last visit. The following treatments have been done  casting for the past 3 weeks, patient has been wearing a boot on her right ankle.

**Medical History:** Hypothyroidism, Hypotension, Arthritis, Lung disease (Arthritis Node), Rheumatoid arthritis.

**Surgical History:** Hip Surgery (Septic Hip drainage) , Knee Surgery (Right Menisectomy) , Ankle Surgery (triple arthidosis) bilateral , Tonsillectomy .

**Family History:**  1daughter(s) - healthy. Non-Contributory

**Social History:** Handedness: Right. no PCP. no Alcohol. Caffeine: yes, daily. no Recreational drug use. Occupation: Full-Time, , Full Duty.

**Medications:** Soma , Arava , Ibuprofen , Adderall , Progesterone , Cortef , Armour Thyroid , Minocycline HCl , Norco 10-325 MG Tablet 1-2 tablet as needed for pain every 4 hrs, Medication List reviewed and reconciled with the patient

**Allergies:** N.K.D.A.

## Objective:

**Vitals:** Ht 69, Wt 160, BMI 23.63, BP 150/103, Temp 97.0, HR 125.

**Examination:**
X-Rays Studies::
X-Rays taken here: KADOKO,ROBERT G 8/19/2011 12:53:52 PM > . Ankle X-Rays: Left AP/LAT/Mortise views show: Distal third fibula fx, healing callus is visible. Severe, severe degenerative changes in the tibio-talar jt sp triple arthrodesis. .

**Physical Examination:**
General:
General appearance:  Alert and Oriented x 3 (Time, Place, Person).  General appearance: pleasant, well nourished.

## Therapeutic Interventions:

## Assessment:

**Assessment:**
1. Sprain and strain of cruciate ligament of knee - 844.2 (Primary)
2. Tear of medial cartilage or meniscus of knee, current - 836.0
3. Closed fracture of metatarsal bone(s) - 825.25, Left
4. Closed fracture of lateral malleolus - 824.2
52F with new lateral malleolus fx. It is at least 2 months old maybe longer. She has had pain for 1 week? It does not add up well but will treat as semi-acute fx. Boot and pain meds. Review in 4 weeks with xrays.

00033

**Progress Note**

**Patient:** LEVEE, CATHEY
**DOB:** 09/11/1958  **Age:** 52 Y  **Sex:** Female
**Phone:** 817-994-3684
**Address:** 401 PARKVIEW COURT, HURST, TX-76053

**Provider:** Robert Kadoko, MD
**Date:** 01/26/2011

## Subjective:

**CC:**
  1. 3 week follow up.

**HPI:**
  Orthopedic History:
    The primary pain or problem is in the Left Knee and Left foot pain. They were referred here by: hospital ER. The pain level (1-10) is 8, throbbing, aching. The problem started with no known injury, patient has a history of foot and ankle fracture patient states about 2 weeks ago she began having pain. The following tests have been done none since the last visit. The following treatments have been done casting for the past 3 weeks. The pain relief provided by these treatments is moderate.

**Medical History:** Hypothyroidism, Hypotension, Arthritis, Lung disease (Arthritis Node), Rheumatoid arthritis.

**Surgical History:** Hip Surgery (Septic Hip drainage) , Knee Surgery (Right Menisectomy) , Ankle Surgery (triple arthidosis) bilateral , Tonsillectomy .

**Family History:** 1daughter(s) - healthy.

**Social History:** Handedness: Right. no Smoking. no PCP. no Alcohol. Caffeine: yes, daily. no Recreational drug use. Occupation: Full-Time, , Full Duty.

**Medications:** Norco 10-325 MG Tablet 1-2 tablet as needed for pain every 4 hrs, Soma , Arava , Ibuprofen , Adderall , Progesterone , Cortef , Armour Thyroid , Minocycline HCl

**Allergies:**

## Objective:

**Vitals:** Ht 69, Wt 160, BMI 23.63.

**Examination:**
  Left foot:
    Inspection: Severe pes planus no erythema, no ecchymosis, mild swelling, moderate diffuse tenderness. has grade 1 ulcer on the medial malleolus and 1st MTPJ - no exudate. Range of Motion: within normal limits. Stability: no gross instability. Strength: within normal limits. Sensation: sensation intact to light touch. Vascular: capillary refill within normal limits, no edema present.
  X-Rays Studies::
    X-Rays taken here: TODAY show: , KADOKO,ROBERT G 1/26/2011 5:10:15 PM > . Foot X-Rays: Left AP/LAT/Oblique views show: 2nd, 3rd midshaft MT fxs. Prolific callous formation, age unknown. <20% displacement on any view. Progression of healing.

## Therapeutic Interventions:

## Assessment:

**Assessment:**
1. Sprain and strain of cruciate ligament of knee - 844.2 (Primary)
2. Tear of medial cartilage or meniscus of knee, current - 836.0
3. Closed fracture of metatarsal bone(s) - 825.25, Left
52F 6 wk out from foot fx. She still has pain but now has ulcers, still benign. I have to DC the cast, she will use a walker boot. Will use boot till pain is gone, review in 3 wk.

## Plan:

**1. Sprain and strain of cruciate ligament of knee** Continue Norco Tablet, 10-325 MG, 1-2 tablet as needed for pain, Orally, every 4 hrs, 60, Refills 0 .
Removed the cast in the office today and took xrays. The patient has blistering of the skin, preventing me from putting on another one today. Continue with the walker boot for approximatly 3 weeks or until the pain is gone. Use bactroban/neosporin to treat the blistered areas. She states its impossible for her to be NWB for the next three weeks but will do the best she can.

**Immunizations:**

**Diagnostic Imaging:** X ray: Foot, left

**Labs:**
**Procedure Codes:** 73620 X-RAY FOOT - 2 VIEWS

**Preventive:**

**Follow Up:** 3 Weeks

**Provider:** Robert Kadoko, MD
**Patient:** LEVEE, CATHEY  **DOB:** 09/11/1958  **Date:** 01/26/2011

**Electronically signed by ROBERT KADOKO , MD on 01/24/2012 at 09:44 AM CST**
**Sign off status: Pending**

00031

**Progress Note**

**Patient:** LEVEE, CATHEY
**DOB:** 09/11/1958  **Age:** 52 Y  **Sex:** Female
**Phone:** 817-994-3684
**Address:** 401 PARKVIEW COURT, HURST, TX-76053

**Provider:** Robert Kadoko, MD
**Date:** 12/29/2010

## Subjective:

**CC:**
1. 2 MONTHS.

**HPI:**
Orthopedic History:

The primary pain or problem is in the Left Knee and Left foot pain. They were referred here by: hospital ER. The pain level (1-10) is 8 patient states her knee fell much better but is complaining of deep aching pain in her left foot. The problem started with no known injury, patient has a history of foot and ankle fracture patient states about 2 weeks ago she began having pain. The following tests have been done Xray at today visit. The following treatments have been done none, patient came in wearing a post-op boot. The pain relief provided by these treatments is none.

**Medical History:** Hypothyroidism, Hypotension, Arthritis, Lung disease (Arthritis Node), Rheumatoid arthritis.

**Surgical History:** Hip Surgery (Septic Hip drainage) , Knee Surgery (Right Menisectomy) , Ankle Surgery (triple arthidosis) bilateral , Tonsillectomy .

**Family History:** 1daughter(s) - healthy.

**Social History:** Handedness: Right. no Smoking. no PCP. no Alcohol. Caffeine: yes, daily. no Recreational drug use. Occupation: Full-Time, , Full Duty.

**Medications:** Norco 10-325 MG Tablet 1-2 tablet as needed for pain every 4 hrs, Soma , Arava , Ibuprofen , Adderall , Progesterone , Cortef , Armour Thyroid , Minocycline HCl

**Allergies:** N.K.D.A.

## Objective:

**Vitals:** Ht 5'9, Wt 170, BMI 33.20.

**Examination:**
Left foot:

Inspection: Severe pes planus no erythema, no ecchymosis, mild swelling, moderate diffuse tenderness. Range of Motion: within normal limits. Stability: no gross instability. Strength: within normal limits. Sensation: sensation intact to light touch. Vascular: capillary refill within normal limits, no edema present.

X-Rays Studies::

X-Rays taken here: TODAY show: . Foot X-Rays: Left AP/LAT/Oblique views show: 2nd, 3rd midshaft MT fxs. Prolific callous formation, age unknown. <20% displacement on any view.

**Physical Examination:**
General:

General appearance: no apparent distress pleasant well nourished. General appearance: pleasant, well nourished.

## Therapeutic Interventions:

## Assessment:

**Assessment:**
1. Sprain and strain of cruciate ligament of knee - 844.2 (Primary)
2. Tear of medial cartilage or meniscus of knee, current - 836.0
3. Closed fracture of metatarsal bone(s) - 825.25, Left

52F 5mth sp ACL reconstruction has had a complex postop period. Last visit was quite unfavorable. She returns and says she complained of a painful foot to the MA. There is nothing in the record of this by the MA. I asked why she did not tell me, 'I was so upset, I forgot'. Xrays today show minimally displaced MT fxs, she is wearing a removable boot. Plan is SLC, NWB for 6 weeks. Off work 2 weeks, she cant function well, and refill pain meds.

## Plan:

### 1. Closed fracture of metatarsal bone(s)
The relation ship with this patient is strained, but we need to proceed and manage her acute problem. Her fxs are obviously old, she reports she told the MA about her foot, I spoke to the MA who saw her that day, NikkiP, she does not recall that. Finally there is no record at all that she mentioned this. It is not the first time the patients recollection is different, but we will do the best we can. If her fx was displaced, it would have been a difficult problem.

**2. Others**  Start Norco Tablet, 10-325 MG, 1-2 tablet as needed for pain, Orally, every 4 hrs, 80, Refills 0 .
Return in 4 weeks, cast removal and repeat x-rays.

**Immunizations:**

**Labs:**
**Preventive:**

**Follow Up:** 4 Weeks (Reason: follow up)

**Provider:** Robert Kadoko, MD
**Patient:** LEVEE, CATHEY  **DOB:** 09/11/1958  **Date:** 12/29/2010

**Electronically signed by ROBERT KADOKO , MD on 01/24/2012 at 09:43 AM CST
Sign off status: Pending**

**Progress Note**

Patient: LEVEE, CATHEY
DOB: 09/11/1958  **Age:** 52 Y  **Sex:** Female
Phone: 817-994-3684
Address: 401 PARKVIEW COURT, HURST, TX-76053

**Provider:** Robert Kadoko, MD
**Date:** 12/08/2010

## Subjective:

### CC:
1. Knee pain-right.

### HPI:
Orthopedic History:
The primary pain or problem is in the  Right, Knee. They were referred here by:  hospital ER. The pain level (1-10) is  8, Patient states she has not had a change in symptoms still having pain.. The problem started with  an altercation. The following tests have been done  Xray, MRI. The following treatments have been done  surgery, physical therapy, medications, casting/splinting. The pain relief provided by these treatments is  mild.
Index injury is April 2010, sufferd an ACL injury. Had ACL reconstruction 6/24/10. Had some trouble getting all the PT, missed some appointments. Today, patient reports she was in a car accident in October with a prolonged hospital stay at HEB. She was discharged October 30, 2010.

**Medical History:** Hypothyroidism, Hypotension, Arthritis, Lung disease (Arthritis Node), Rheumatoid arthritis.

**Surgical History:** Hip Surgery (Septic Hip drainage) , Knee Surgery (Right Menisectomy) , Ankle Surgery (triple arthidosis) bilateral , Tonsillectomy .

**Family History:** 1daughter(s) - healthy.

**Social History:** Handedness: Right. no Smoking. no PCP. no Alcohol. Caffeine: yes, daily. no Recreational drug use. Occupation: Full-Time, , Full Duty.

**Medications:** Soma , Arava , Ibuprofen , Adderall , Progesterone , Cortef , Armour Thyroid , Minocycline HCl , Norco

**Allergies:** N.K.D.A.

## Objective:

**Vitals:** Ht 5'9, Wt 170, BMI 33.20.

### Examination:
Right knee:
Inspection: arthroscopy portals, benign, no drainage, healed - no effusion. Palpation: diffuse tenderness with no focal point. Knee Range of Motion: full extension, flexion stops at 100 degrees, painful. Stability: negative, Lachman's, negative, pivot-shift, 1+ anterior drawer test.
Strength: 4/5, knee extension, quad atrophy is noted. Sensation: normal to light touch dorsum, plantar leg + foot. Vascular: 2+ palpable distal pulses, brisk capillary refill < 3 secs, dorsalis pedis and posterior tibialis pulses, popliteal pulse +;. Wounds: no prior surgical scars identified, no prior traumatic scars identified.

### Physical Examination:
General:
General appearance:  pleasant, well nourished.

## Therapeutic Interventions:

## Assessment:

### Assessment:
1. Sprain and strain of cruciate ligament of knee - 844.2 (Primary)
2. Tear of medial cartilage or meniscus of knee, current - 836.0

: 00025

52F sp ACL reconstruction has had a complex few months including dx with lung nodes - not biopsied yet; had an MVA admitted to hospital for 4 days. She called today asking for an appt. Reports she had severe swelling a few days ago, which went down with steroids dose pak after she went to see her PCP. I do not see sign of infection, ligament injury, recommend rest and increase activity as tolerated.

**Plan:**

**1. Others**   Start Norco Tablet, 10-325 MG, 1-2 tablet as needed for pain, Orally, every 4 hrs, 80, Refills 0 .

**Immunizations:**

**Labs:**
**Preventive:**

After the meeting, she asked my MA for a note to stay off work for the past 3 days. I said I would give her today only, she reports she is better, and the PCP who gave her the steroids should give the note for the past 2 days. At this point her story and attitude changed, said she would like off the NEXT 3 days - she has NOT seen her PCP recently and the steroids were from an 'old' prescription. She also gave the reasoning that it is the hydrocodone, rather than the steroids as previously stated to the MA, that keep her from working. Her story is confusing, and I cannot justify more days off. I have had to work with her in the past regarding her situation. However, I have to stick what I can reasonably justify, and that is limited to off work today.

**Follow Up:** PRN (Reason: PRN)

**Provider:** Robert Kadoko, MD
**Patient:** LEVEE, CATHEY  **DOB:** 09/11/1958  **Date:** 12/08/2010

**Electronically signed by ROBERT KADOKO , MD on 01/24/2012 at 09:43 AM CST**
**Sign off status: Pending**

: 00026

**Progress Note**

**Patient:** LEVEE, CATHEY
**DOB:** 09/11/1958 **Age:** 52 Y **Sex:** Female
**Phone:** 817-994-3684
**Address:** 401 PARKVIEW COURT, HURST, TX-76053

**Provider:** Robert Kadoko, MD
**Date:** 11/08/2010

## Subjective:

**CC:**
1. Knee pain-right.

**HPI:**
Orthopedic History:
The primary pain or problem is in the Right, Knee. They were referred here by: hospital ER. The pain level (1-10) is 8, Patient states she has not had a change in symptoms still having pain.. The problem started with an altercation. The following tests have been done Xray, MRI. The following treatments have been done surgery, physical therapy, medications, casting/splinting. The pain relief provided by these treatments is mild.
Patient was in a Car accident back in October with a prolonged hospital stay at HEB, Patient was Discharge October 30, 2010.

**Medical History:** Hypothyroidism, Hypotension, Arthritis, Lung disease (Arthritis Node), Rheumatoid arthritis.

**Surgical History:** Hip Surgery (Septic Hip drainage) , Knee Surgery (Right Menisectomy) , Ankle Surgery (triple arthidosis) bilateral , Tonsillectomy .

**Family History:** 1daughter(s) - healthy.

**Social History:** Handedness: Right. no Smoking. no PCP. no Alcohol. Caffeine: yes, daily. no Recreational drug use. Occupation: Full-Time, , Full Duty.

**Medications:** Arava Tablet , Ibuprofen Tablet , Adderall Tablet , Progesterone Suppository , Cortef Tablet , Armour Thyroid Tablet , Minocycline HCl Capsule , Soma Tablet , Norco Tablet

**Allergies:** N.K.D.A.

## Objective:

**Vitals:** Ht 5'9, Wt 170, BMI 33.20.

**Examination:**
Right knee:
Inspection: arthroscopy portals, benign, no drainage, healed. Palpation: no pain to palpation. Knee Range of Motion: full extension, flexion stops at 130 degrees. Stability: negative, Lachman's, negative, pivot-shift, 1+ anterior drawer test. Strength: 4/5, knee extension, quad atrophy is noted. Sensation: normal to light touch dorsum, plantar leg + foot. Vascular: 2+ palpable distal pulses, brisk capillary refill < 3 secs, dorsalis pedis and posterior tibialis pulses, popliteal pulse +:. Wounds: no prior surgical scars identified, no prior traumatic scars identified.

**Physical Examination:**
General:
Build: average. General appearance: pleasant, well nourished.

## Therapeutic Interventions:

1. **Physical Therapy**
Exercise : strengthening Right Knee

## Assessment:

Assessment:

00023

as follows: right quadriceps the muscle strength is 4/5.

**Outside Test Results:**
**X-Rays:** Test Results: No tests to report at this time.
**Impression:**   Anterior cruciate ligament (ACL), acute tear (844.2).  Medial meniscus, acute tear (836.0).  Post-Op, S/P Surgery (V67.00).   Doing well, better than last time, but slowed a bit. Improved strength ROM, still needs brace and pain meds.  Reassured her.  She has skipped a few PT sessions - reccomend she do everything she can to get there.
**Plan:**

1.  Her rehab and recovery can take up to apprx 8 months. She is doing great and I do not want her to get discouraged. She may reduce her therapy to once weekly with a home program.
2.  The patient was instructed to return to the office in 2 months for follow-up.

**Procedures: Orders:**

**Prescriptions:**
Rx: Soma- 350 mg tablet , 1 tablet by mouth three times a day. Max daily dose: 3.  Dispense: 42 tablet. Refills: 0.  Allow Generic: Yes

**Patient Instructions:**
PT RX dispensed.

Signed by _____ Robert Kadoko, MD

CATHEY LEVEE on 8/6/2010 - Chart 0000394486

**Texas Orthopedic & Spine Associates**

2008 L. Don Dodson Drive, Suite 110, Bedford, TX 76021  -  Phone: 817-288-0084 - Fax: 817-445-1039

-----------------------------------------------------------------------------------------------------------------

**Visit Date: 8/6/2010**
Patient Name: LEVEE, CATHEY
DOB: 9/11/1958
Referred By: Robert Kadoko, MD
Primary Insurance: UNITED HEALTHCARE
Treating Physician: Robert Kadoko, MD

This 51 year old female presents today for followup orthopedic evaluation. She indicates the problem location is the right knee. She states her husband had surgery on Friday and was unable to sleep and very agitated. He did a military kick on her, knocking her right leg from underneath her. She heard a pop and was unable to stand or use the leg. She went to Harris HEB the same night, had xrays and pain medications, was placed in a leg immobilizer, and referred here.Pain is described as aching, deep, sharp and swelling. Severity of pain is 5-6 on a scale of 1-10 with 10 being the worst. She is still wearing brace for long distances due to pain/weakness.Date of Injury: 4/10/2010. Date of surgery is: 6/24/2010. ACL reconstruction - right. Global period ends 9/24/2010.

**Review of Systems:** No abnormal findings with the exception of the chief complaint.

**Allergies:** No known medical allergies.

**Medication History: Active:** ibuprofen -Pain & Pyrexia Meds- 800 mg tablet (active). **Norco** - Pain & Pyrexia Meds- 325 mg-10 mg tablet (1-2 every three hours as needed for pain.) (active); usage started on 7/9/2010 medication was prescribed by Myles, Robert M.D.. **Adderall** -Central Nervous System Meds- 30 mg tablet (One tablet in the morning.) (active), **Phenergan** - Gastrointestinal Tract Meds- 25 mg tablet (1 every four hours.) (active); usage started on 6/9/2010 medication was prescribed by Myles, Robert M.D., **progesterone** -Endocrine System Meds- 200 mg (active), **Cortef** -Endocrine System Meds- 20 mg tablet (active). **Prozac** -Central Nervous System Meds- 20 mg capsule (One by mouth every day.) (active), **armour thyroid tablets** -Imported- 2 gr tablet (active), **minocycline** -Infections & Infestation Meds- 100 mg capsule (Twice a day.) (active), **Adderall** -Nutrition Meds- 10 mg tablet (One tablet at lunch.) (active).

**Physical Exam:** Height: 5 ft. 9.000 in. Weight: 170 lbs. BMI: 25

Patient is a 51 year old female who appears his given age and in no apparent distress.

**Right Knee Examination:**

Inspection of the anterior aspect of right lower leg reveals incision 1 cm. Right lateral collaterals and right medial collaterals reveals no erythema and no ecchymosis. Arthroscopic portals are benign, without evidence of infection.

There is a mild effusion.

Right knee flexion is 135 degrees. Right knee extension is 0 degrees (full extension). Pain with knee flexion is mild.

Valgus laxity: none. Varus laxity: none. Lachman's test: +1. Pivot shift test: negative.

Right dorsalis pedial pulse and right posterior tibialis pulse 2/4.

SILT dorsum, plantar, 1st web space foot. Muscle strength is 5/5 for all groups tested, except

: 00021

explained that a completely torn ACL will not heal and surgical repair by suturing the ligament alone is rarely successful.

The various treatment options for a torn ACL were then considered. The first option is nonoperative treatment that emphasizes a good knee strengthening and rehabilitation program. Some patients are able to resume a fairly vigorous activity level with this treatment. Knee bracing may also be helpful to allow participation in higher risk and more vigorous recreational activities. The advantage of this approach is the avoidance of major knee reconstructive surgery. Instability symptoms and further injury to the knee, however, may occur. The patients who initially choose a non-operative treatment may later elect to proceed with surgical reconstruction of the ACL if instability symptoms are found unacceptable.

The second option is surgical repair and reconstruction of the ACL. This requires an extensive surgical procedure with a relatively long recovery. The resumption of vigorous athletic activities does not occur for nine to twelve months following the surgery. In most cases the reconstructive surgery involves reinforcing or augmenting the damaged ACL with a tendon graft. For the highly motivated and athletic person, surgical reconstruction of the ACL generally offers the best opportunity for a high level of athletic participation. Nearly 90% of patients who undergo surgical reconstruction are able to eventually resume athletic participation at a level very close to their preinjury level. The limitations or risks of surgical treatment include some loss of knee mobility, mild residual instability and discomfort, infection, and rarely blood clots.

With either treatment option, the knee has an increased risk of arthritis. Meniscus cartilage tears may also occur following injury to the ACL and this further increases the risk of knee arthritis. As a result, knee instability which may cause meniscus cartilage damage should be avoided if at all possible. Reconstruction of the anterior cruciate ligament restores knee stability and thus minimizes the risk of meniscus cartilage tears and arthritis.
Send letter to:
**Procedures:**
**Orders:**

**Patient Instructions:**
PT Knee RX dispensed.
PT Knee RX dispensed.

Signed by _____ Robert Kadoko, MD

:00010

full-time, hand dominance is. right, language preference. English, marital status. married.
Patient/Guardian denies alcohol use, tobacco exposure, illegal drug use.
**Review of Systems: Constitutional Symptoms:** (+) major trauma, **Hematologic / Lymphatic:**
(+) fever.

**Physical Exam:** Height: 5 ft. 9.000 in. Weight: 170 lbs. BMI: 25
General: Patient is a 51 year old female who appears her given age, well developed, well
nourished, distressed, with good attention to hygiene and body habitus, crying and depressed.
Oriented to person, place and time. Mood and affect appear stressed, tearful and crying.

Head & neck: Head is normocephalic, atraumatic, without any gross head or neck deformity.
Neck is supple and trachea is midline.
Cardiovascular: Peripheral pulses full to palpation, extremities warm with no edema.
Respiratory:Chest configuration non-hyperinflated and expansion symmetric.
Abdomen: Abdomen exam normal, no evidence of masses or tenderness.
Lymphatic: No neck, supraclavicular, or axillary lymphadenopathy noted.
Skin: Inspection of skin outside of affected area reveals no abnormalities.

**Right Knee Examination:**
Inspection of the anterior aspect of right lower leg and right gastrocnemius muscle reveals
extensive ecchymosis.
There is a severe effusion.
Right knee flexion is 30 degrees. Right knee extension is 0 degrees (full extension).
Pain with knee flexion is severe.
Patient very apprehensive, and ligamentous exam not conclusive.
Right dorsalis pedial pulse and right posterior tibialis pulse 2/4.
SILT dorsum, plantar, 1st web space foot.

**Test Results:**
**X-Ray Results: Test Results: MRI Right Knee films and report 4/10/2010 Impression: (+)
ACL tear complete. A lot of edema**
**Impression:** Anterior cruciate ligament (ACL), acute tear (844.2). Medial meniscus, acute tear
(836.0). She has at least a ACL and possibly meniscus tear. Rece PT for ROM then review for
ACL reconstruction has RA would reccomend allograft. .
Plan:
1. Discussion with the patient included; review and discussion of x-rays and MRI with
patient..
2. The patient has increased inflammation. I reccommend oral medications for pain control
and therapy to increase ROM. Once motion is achieved, then I recommend an ACL
reconstruction.
3. The patient was instructed to return to the office in 10 days for follow-up.
4. I explained the findings and diagnosis of a torn ACL to the patient. The considerable
significance of this particular knee injury was discussed. Injury to the ACL usually results in
knee looseness or instability which can greatly limit participation in recreational and athletic
activities. Knee instability or giving way is most likely to occur in sports which require
frequent cutting, stopping, or jumping. I also outlined the difficulties in treating a torn ACL. I

**Texas Orthopedic & Spine Associates**
2008 L. Don Dodson Drive, Suite 110, Bedford, TX 76021 - Phone: 817-288-0084 - Fax: 817-445-1039

-------------------------------------------------------------------------------------------------

**Visit Date: 4/12/2010**
Referred By: Robert Kadoko, MD
Patient Name: LEVEE, CATHEY
DOB: 9/11/1958
Primary Insurance: UNITED HEALTHCARE
Treating Physician: Robert Kadoko, MD

This 51 year old female presents today for initial orthopedic evaluation. She indicates the problem location is the right knee. She states her husband had surgery on Friday and was unable to sleep and very agitated. He did a military kick on her, knocking her right leg from underneath her. She heard a pop and was unable to stand or use the leg. She went to Harris HEB the same night, had xrays and pain medications, was placed in a leg immobilizer, and referred here.Pain is described as aching and throbbing, constant and tender. Patient indicates activity worsens condition. Symptoms are associated with decreased range of motion, pain with and without movement, soreness, bruising and swelling. Severity of pain is 10 on a scale of 1-10 with 10 being the worst. Prior tests/treatments for this condition include seen in ER on 4/10/2010 refered here, x-ray of knee 4/10/2010 and MRI of knee 4/10/2010. Patient occupation not known. The patient's main occupation is a counselor at Dunbar High School.
**Date of Injury: 4/10/2010.**

**Allergies:** No known medical allergies.
**Medication History:**
> **Active:**
>> **ibuprofen** -Pain & Pyrexia Meds- 800 mg tablet (active)
>> **Adderall** -Central Nervous System Meds- 30 mg tablet (One tablet in the morning.) (active)
>> **progesterone** -Endocrine System Meds- 200 mg (active)
>> **Cortef** -Endocrine System Meds- 20 mg tablet (active)
>> **armour thyroid tablets** -Imported- 2 gr tablet (active)
>> **minocycline** -Infections & Infestation Meds- 100 mg capsule (Twice a day.) (active)
>> **Adderall** -Nutrition Meds- 10 mg tablet (One tablet at lunch.) (active)

**Past Medical History: Endocrine Hx:** (+) hypothyroidism, **Cardiovascular Hx:** (+) hypertension, **Musculoskeletal Hx:** (+) arthritis conditions,.
**Past Surgical History:** Patient/Guardian admits past surgical history of hip surgery (septic hip drainage), knee surgery (right) (menisectomy), ankle surgery (triple arthidosis) bilateral, tonsillectomy.
**Family History:** Patient/Guardian admits a family history of cancer, cerebral vascular accident, hypertension, kidney disease, rheumatoid arthritis.
**Social History:** Patient/Guardian admits caffeine use, employment status. Currently employed

No. 324-476966-10

| | | |
|---|---|---|
| In the Matter of the Marriage of | : | IN THE DISTRICT COURT |
| Cathy June Levee | : | |
| and | : | |
| Theodore Floyd Levee | : | TARRANT COUNTY, TEXAS |
| and | : | |
| in the Interest of | : | |
| Catherine Nicole Levee, a Minor Child | : | 324TH JUDICIAL DISTRICT |

## AFFIDAVIT

STATE OF ___Texas___

COUNTY OF ___Tarrant___

BEFORE ME, the undersigned authority, personally appeared (Custodian) ___Phillip Klotz___ who being by me duly sworn, deposed as follows: (Please print your name)

I, the undersigned, am over eighteen (18) years of age, of sound mind, capable of making this Affidavit, and personally acquainted with the facts herein stated and do state that the facts in this Affidavit are true and correct.

I am the Custodian of Records for **Texas Ortho and Spine Associates/Dr. Robert G. Kadoko**. Attached hereto are _122_ pages of records concerning **Cathey June Levee**. These said records are kept in the regular course of business at 2008 L. Don Dodson Dr., Ste. 100, Bedford, TX 76021 and it was in the regular course of business at such address for an employee, or representative, or a doctor, with personal knowledge of the act, event, condition, opinion or diagnosis recorded to make the memorandum of record or to transmit information hereof to be included in such memorandum or record, and the memorandum or record was made at or near the time of the act, event, condition, opinion, or diagnosis, or reasonably soon thereafter. The records attached hereto are the originals or exact copies of the originals and **nothing has been removed** from the original file before making these true and correct copies.

_____
SIGNATURE OF CUSTODIAN

SUBSCRIBED AND SWORN TO before me, the undersigned authority, on this the ___30th___ day of ___January___, ___2012___.

_____
NOTARY PUBLIC
In and for the State of ___TX___
My Commission Expires: ___05/03/13___

Order No. 9936.002

APPENDIX FIFTEEN; NEW EVIDENCE –ABUSE OF PRESCRIPTION DRUGS, CHRONIC FOR FRACTURES

1. Dr Kadoko termination of patient – rx abuse



Thursday, October 20, 2011

Cathey Levee                    CERTIFIED MAIL: 7011 0470 0003 7360 5192

RE:    Termination of Patient-Physician Relationship

Dear Ms. Cathey Levee

Please accept this as notice of the termination of the physician-patient relationship that exists between us, effective immediately. This action is being taken because of you receiving medication from another provider. We maintain a zero tolerance policy for such and sincerely regret that we have to terminate our relationship under these circumstances.

We strongly recommend that you locate another orthopedic surgeon to continue your care. We also recommend that you present to an Emergency Room in the event of any medical emergencies. A copy of your medical chart is available to you upon request and for a copy fee.

We wish you a speedy recovery and the best medical outcomes.

Sincerely,

Robert G Kadoko, MD



**J. MICHAEL STANTON, D.O., F.A.O.C.A.**
*Diplomat, American Osteopathic Board of Anesthesiology*
*Diplomat, American Academy of Pain Management*

**LEROY GILLAN, C.R.N.A., C.H., M.P.H.**

**PATRICK K. STANTON, D.O., F.A.O.C.A.**
*Diplomat, American Osteopathic Board of Anesthesiology*
*Diplomat, American Academy of Pain Management*

**SUE BIDDY, F.N.P.-C.**
*American Academy of Nurse Practitioners*

Date: 10/19/11

Robert Kadoko MD
2008 L. Don Dodson #110
Bedford, TX 76021

Reference:    Cathey Levee

Dear Dr. Kadoko:

Thank you for your referral. We would like to make you aware of the status of Cathey Levee.

Cathey Levee is being referred back to you at this time for one of the following reasons:

☐    We have made several attempts to reach this patient and have not received a response.

☐    Treatment for services has been completed.

☐    We have administered treatment for this patient but due to lack of response of follow up evaluation, we are unable to administer continued care.

☒    *Other: Returning full management back to Dr. Robert Kadoko.*

If you have any further questions regarding Cathey Levee, please feel free to contact our office.

Sincerely,

Metroplex Pain Management

PKS/akt

1600 Central Drive, Suite 160- Bedford, Texas 76022 · (817) 268-0104 · FAX (817) 268-6102 · www.mpm-med.com

OCT. 19. 2011 10:54AM    817. 685. 9120                    NO. 2803   P.  6

Page 4
PATIENT NAME:                LEVEE, CATHEY
MEDICAL RECORD #:            26004
DATE:                        10/18/2011

I will return full management to Dr. Willis and to Dr. Kadoko.

Electronically Signed By:

Patrick K. Stanton, D.O., F.A.O.C.A.
Diplomate, A.O.B.A.
Diplomate, American Academy of Pain Management
PKS/jmt/42774700

D:    10/18/2011
T:    10/18/2011

Cc:    Patrick K. Stanton, D.O., F.A.O.C.A.

:00079

Page 3

**PATIENT NAME:** LEVEE, CATHEY
**MEDICAL RECORD #:** 26004
**DATE:** 10/18/2011

**REVIEW OF SYSTEMS:** Reviewed and documented in the electronic medical record.

**PHYSICAL EXAMINATION:** Reveals the blood pressure to be 113/78. Pulse 128. Respirations 20. Temperature is 97.6. Height 69 inches. Weight 170 pounds. Skin shows no rash, erythema or edema. Heart: regular rate and rhythm. Lungs: Clear to auscultation. Neurological examination reveals cranial nerves II through XII to be grossly intact at the time of examination. There is decreased sensation noted to the third and fourth toes of the right foot. The patient has positive straight leg lifting on the left. No gross sensory or motor deficits are appreciated. Pupils are equal and reactive to light bilaterally. Extraocular muscles appear to be intact. Abdomen is soft without appreciated masses. The patient is awake, alert, and oriented to time and place.

**IMPRESSION:**
1. Rheumatoid arthritis.
2. Status post septic hip I&D.
3. Status post multiple fibular fractures.
4. History of spousal abuse.
5. History of hypothyroidism.
6. History of migraine headaches.
7. Posttraumatic stress disorder.
8. Anxiety.
9. Osteopenia.
10. Pain of the right knee. The patient is status post ACL reconstruction.

**RECOMMENDATIONS/PLAN:** I spoke with the nurses at both Dr. Kadoko and Dr. Willis' office, and I also spoke with the patient. My recommendation would be for the patient to find 1 physician to prescribe her narcotics. She has a long relationship with Dr. Willis. I would recommend that she continue that relationship with Dr. Willis. I also indicated to the patient that she should make Dr. Willis aware of the fact that she is receiving scripts from Dr. Kadoko as well as receiving scripts from him for hydrocodone. I explained the rationale for getting them from Dr. Kadoko and not getting them from Dr. Willis per her report.

Page 2
PATIENT NAME:                          LEVEE, CATHEY
MEDICAL RECORD #:                      26004
DATE:                                  10/18/2011

**PHARMACY HISTORY:** The patient's pharmacy history is positive for receiving hydrocodone 10/325, receiving 300 tabs on July 6th from Dr. Willis filled at CVS, receiving 300 tablets on August 1, 2011 by Dr. Willis at CVS, receiving hydrocodone 360 on October 6, 2011 filled at CVS Pharmacy by Dr. Willis. She has received hydrocodone 60 each time on August 19, 2011, September 2, 2011 and September 24, 2011, all filled at Walgreen's Pharmacy. Those pharmacies were surveyed, speaking with Melissa at the CVS Pharmacy phone number 817-282-2581, and the Walgreen's Pharmacy speaking with Barbara registered pharmacist at 817-868-9202.

**ALLERGIES:** No known food, drug or environmental allergies.

**MEDICATIONS:** The patient's home medications include hydrocodone as mentioned above. She also takes Adderall 30 mg once a day as prescribed by her psychiatrist Dr. Grant, thyroid replacement as prescribed by Dr. Block, B-complex, calcium, and vitamin D. She also takes Cortef as prescribed by Dr. Block. Flexeril as prescribed by Dr. Willis, hydrocodone as mentioned above, ibuprofen as prescribed by Dr. Willis, magnesium over-the-counter, Neurontin as prescribed by Dr. Willis, prednisone as prescribed by Dr. Willis, progesterone as prescribed by Dr. Block her endocrinologist, Prozac as prescribed by Dr. Grant, Restoril as prescribed by Dr. Grant, and Xanax as prescribed by Dr. Willis.

**PAST SURGICAL HISTORY:** Positive for right fallopian tube removed in 2000. PICC line placed in September 2011. Triple arthrodesis to her foot at the age of 11, Achilles tendon stretching at the age of 11, I&D of her septic left hip in 1996, I&D of septic right hip in September 2011. She had right ACL and meniscus repair as mentioned above. She has had tonsillectomy and appendectomy.

**PAST MEDICAL HISTORY:** Positive for rheumatoid arthritis, currently treated by Dr. Willis, rheumatologist in Dallas. Migraine headaches, the last episode 2 months ago, treated by Dr. Stahlman her PCP in Balch Springs. She has posttraumatic stress disorder, depression, and anxiety treated by Dr. Grant, anemia treated by Dr. Stahlman, and fibromyalgia treated by Dr. Willis.

She denies any history of cardiac disease, cardiac dysrhythmia, asthma, emphysema, tuberculosis, epilepsy, polio, meningitis, stroke, coma, hepatitis, jaundice, liver disease or kidney problems.

She does have a history of osteopenia.

**SOCIAL HISTORY:** The patient reports that she works full time as a counselor at Dunbar High School in Fort Worth. She last worked on September 6, 2011. She was married for 9 years, but separated. She has 2 cups of coffee per day. She has 2 cups of tea per day. She does not smoke. She has 2 glasses of wine or alcoholic liquor approximately 2 times per week.

**FAMILY HISTORY:** Positive for 3 children. She has a maternal history of renal disease, maternal history of breast cancer.

J. MICHAEL STANTON, D.O., F.A.O.C.A.
*Diplomate, American Osteopathic Board of Anesthesiology*
*Diplomate, American Academy of Pain Management*

LEROY GILLAN, C.R.N.A., C.H., M.P.H.



PATRICK K. STANTON, D.O.
*Diplomate, American Osteopathic Board of Anesthesiology*
*Diplomate, American Academy of Pain Management*

SUE BIDDY, F.N.P.-C.
*Certified, American Academy of Nurse Practitioners*

## CONSULTATION

**PATIENT NAME:**                           LEVEE, CATHEY

**MEDICAL RECORD #:**                       26004

**DATE:**                                   10/18/2011

**HISTORY OF PRESENT ILLNESS:** The patient presents with a very complex history. She reports that she has multiple pain sites. She reports that on April 10, 2010, she was assaulted by her husband, and subsequently underwent a right ACL reconstruction. That surgery was completed June 23, 2010. She subsequently had a gait disturbance. She has had left fibular fractures, she reports x5 in the last year. She has been seen and evaluated in the past by Dr. Guerra, a pain management specialist, between in 2000 and 2001 for treatment of rheumatoid arthritis pain. On September 7, 2011, she underwent septic hip surgery I&D by Dr. Kahn at Baylor Grapevine Hospital. She reports pain in multiple locations. She describes bilateral hand and feet pain primarily involving the joints, and she rates that pain as 8 out of 10 with pain medication. She has right knee pain that she rates as 6 out 10 with pain medications, left occipital pain that she rates as 6 out of 10 with pain medications, bilateral shoulder pain that she rates as a 5 out of 10 with pain medications, low back pain that she rates as a 4 out of 10 with pain medications, and left ankle pain that she rates as 4 out of 10 with pain medications. She reports numbness and tingling involving all fingertips including the thumbs, and all toe tips. She does report weakness, indicating that she has weakness in her right knee. She reports walking more than 20 feet with a walker is her maximal effort. Beyond that, she has to utilize a wheelchair. She denies any loss of bladder or bowel control.

She has a long history of the use of hydrocodone for control of her pain. That is currently prescribed by both Dr. Willis and by Dr. Kadoko. She reports that she has been taking 12 hydrocodone per day since April 2010. Prior to that she was taking 8 to 10 hydrocodone per day, and did that for approximately 2 years before April 2010. She reports that she was started on hydrocodone 10/500, approximately 6 to 8 tabs per day in 2000. She reports that she has been on some form of a narcotic continuously since 1996. She reports exacerbation of symptoms with walking, stretching, lifting, sitting, or getting from a sitting to a standing position. She reports palliation with pain medications. Stretching helps somewhat. Physical therapy helps. Biofeedback helps and her medications help. She reports she sleeps approximately 16 hours per day with multiple interruptions. The longest period is no longer than 4 hours. She describes cephalgia that is occipital in origin, and it happens approximately 2 times per week. She reports that she was involved in an abusive relationship and was significantly beaten on April 10, 2011. She reports that her husband just was sentenced to 10 years probation for that abuse.

1600 Central Ave., Suite 160 - Bedford, TX 76022 - (817) 268-0104 - FAX (817) 268-6102 - www.mpm-med.com

 **TEXAS ORTHOPEDIC & SPINE ASSOCIATES**

2008 L. Don Dodson Drive | Suite 110 | Bedford, Texas 76121 | Phone: 817.268.0384 | Fax, 817.445.1038
www.tosa.com

**LEVEE, CATHEY**

53 Y old Female, DOB: 09/11/1958
401 PARKVIEW COURT, HURST, TX 76053
Home: 817-994-3684
Provider: KADOKO, ROBERT G

## Telephone Encounter

**Answered by**    Langley, Tina

Date: 10/18/2011
Time: 03:00 PM

**Caller**    Dr. Pat Stanton

**Message**    Received call from Dr. Stanton stating that patient is getting Norco 10/325 from our office and Dr. Willis' office. He states that the patient received Norco on 7/6/11 # 300 8/1/11 # 300 and 10/6/11 # 360. Dr. Stanton states that the patient is getting her medications from Dr. Willis filled at CVS and is using Walgreens to fill our presciptions. He states that at this point he will not be prescribing her any pain medication and will consider taking the patient over for pain management at Dr. Willis' request.

**Action Taken**    Langley, Tina 10/18/2011 3:04:17 PM > This against our office policy, and is a significant violation of the doctor-patient relationship. Because of this, she is discharged from my care. I will see her only on an emergency basis for 1 month. Please send her a note to this effect.

Patient: LEVEE, CATHEY   DOB: 09/11/1958   Provider: KADOKO, ROBERT G   10/18/2011

Note generated by eClinicalWorks EMR/PM Software (www.eClinicalWorks.com)

**Progress Note**

**Patient:** LEVEE, CATHEY
**DOB:** 09/11/1958  **Age:** 53 Y  **Sex:** Female
**Phone:** 817-994-3684
**Address:** 401 PARKVIEW COURT, HURST, TX-76053

**Provider:** Robert Kadoko, MD
**Date:** 09/23/2011

## Subjective:
**CC:**
1. 4 WEEK F/U.

**HPI:**
Orthopedic History:
The primary pain or problem is in the Right Knee and Left foot/ankle pain. They were referred here by: hospital ER. The pain level (1-10) is 6/10 in the ankle, throbbing constantly - 7/10 in the knee, throbbing . The problem started with an altercation 4-12-2010 right knee and 3 days ago ankle pain began no known injury. The following tests have been done none since the last visit - she had septic hip surgery on the right on 9/7/2011. The following treatments have been done none - she states she does not feel the ankle is healing at all.

**Medical History:** Hypothyroidism, Hypotension, Arthritis, Lung disease (Arthritis Node), Rheumatoid arthritis.

**Surgical History:** Hip Surgery (Septic Hip drainage) , Knee Surgery (Right Menisectomy) , Ankle Surgery (triple arthidosis) bilateral , Tonsillectomy .

**Family History:** 1daughter(s) - healthy.

**Social History:** Handedness: Right. no PCP. no Alcohol. Caffeine: yes, daily. no Recreational drug use. Occupation: Full-Time, , Full Duty.

**Medications:** Arava , Ibuprofen , Adderall , Progesterone , Cortef , Armour Thyroid , Minocycline HCl , Soma 350 MG Tablet 1 tablet as needed Four times a day, Phenergan 50 MG tablet 1 tab(s) every 6 hours as needed, Norco 10-325 MG Tablet 1-2 tablet as needed for pain every 4 hrs, Soma

**Allergies:**

## Objective:
**Vitals:** Ht 69, Wt 160, BMI 23.63, BP 175/104, Temp 96.9, HR 116.

**Examination:**
X-Rays Studies::
X-Rays taken here: KADOKO,ROBERT G 8/19/2011 12:53:52 PM > . Ankle X-Rays: Left AP/LAT/Mortise views show: Distal third fibula fx, healing callus is visible. Severe, severe degenerative changes in the tibio-talar jt sp triple arthrodesis. .

**Physical Examination:**
General:
General appearance: Alert and Oriented x 3 (Time, Place, Person). General appearance: pleasant, well nourished.

## Therapeutic Interventions:

## Assessment:
**Assessment:**
1. Sprain and strain of cruciate ligament of knee - 844.2 (Primary)
2. Tear of medial cartilage or meniscus of knee, current - 836.0
3. Closed fracture of metatarsal bone(s) - 825.25, Left
4. Closed fracture of lateral malleolus - 824.2

52F with new lateral malleolus fx. It is at least 2 months old maybe longer. Xrays today show acute-on-chronic fx. Considered placing in cast but last cast caused severe skin problems. She cannot use crutches because of severe upper extremity weakness. Secondly she is on 6 weeks of IV abx for hip infection. So I

00036

## Plan:

**1. Sprain and strain of cruciate ligament of knee** Continue Norco Tablet, 10-325 MG, 1-2 tablet as needed for pain, Orally, every 4 hrs, 60, Refills 0 ; Start Soma Tablet, 350 MG, 1 tablet as needed, Orally, Four times a day, 60, Refills 0 ; Start Phenergan tablet, 50 MG, 1 tab(s), orally, every 6 hours as needed, 60, Refills 0 .

The patient states she has been hurting for about the past three days. She went to her arthritis doctor, but he told her if her pain is not in a joint its probably not arthritis. The xrays show a fracture that is about 8 weeks old and is healing. Regarding her foot, I will give her Dr. Ahuero's name if she would like further consult regarding her flat feet and previous ankle fusion. Continue with the walker boot. The one she has is not sufficient, I will provide her with a walker boot.

**Procedures:**
DME SCRIPT:
  Orthosis ONE WALKER BOOT FOR THE LEFT LEG.

**Immunizations:**

**Diagnostic Imaging:** X ray: Ankle, left 2v Lofton,Schon 8/19/2011 12:57:54 PM >

**Labs:**

**Procedure Codes:** 73600 X-RAY ANKLE - 2 VIEWS

**Preventive:**

**Follow Up:** 4 Weeks (Reason: F/U and xrays)

**Provider:** Robert Kadoko, MD
**Patient:** LEVEE, CATHEY **DOB:** 09/11/1958 **Date:** 08/19/2011

**Electronically signed by ROBERT KADOKO , MD on 01/24/2012 at 09:44 AM CST**
**Sign off status: Pending**

: 00034

**Progress Note**

**Patient:** LEVEE, CATHEY
**DOB:** 09/11/1958 **Age:** 52 Y **Sex:** Female
**Phone:** 817-994-3684
**Address:** 401 PARKVIEW COURT, HURST, TX-76053

**Provider:** Robert Kadoko, MD
**Date:** 08/19/2011

## Subjective:

**CC:**
1. LEFT LEG.

**HPI:**
Orthopedic History:
The primary pain or problem is in the Right Knee and Left foot/ankle pain. They were referred here by: hospital ER. The pain level (1-10) is 8, throbbing, aching in right knee and 10/10 in left foot. The problem started with an altercation 4-12-2010 right knee and 3 days ago ankle pain began no known injury. The following tests have been done none since the last visit. The following treatments have been done casting for the past 3 weeks, patient has been wearing a boot on her right ankle.

**Medical History:** Hypothyroidism, Hypotension, Arthritis, Lung disease (Arthritis Node), Rheumatoid arthritis.

**Surgical History:** Hip Surgery (Septic Hip drainage) , Knee Surgery (Right Menisectomy) , Ankle Surgery (triple arthidosis) bilateral , Tonsillectomy .

**Family History:** 1daughter(s) - healthy. Non-Contributory

**Social History:** Handedness: Right. no PCP. no Alcohol. Caffeine: yes, daily. no Recreational drug use. Occupation: Full-Time, , Full Duty.

**Medications:** Soma , Arava , Ibuprofen , Adderall , Progesterone , Cortef , Armour Thyroid , Minocycline HCl , Norco 10-325 MG Tablet 1-2 tablet as needed for pain every 4 hrs, Medication List reviewed and reconciled with the patient

**Allergies:** N.K.D.A.

## Objective:

**Vitals:** Ht 69, Wt 160, BMI 23.63, BP 150/103, Temp 97.0, HR 125.

**Examination:**
X-Rays Studies::
X-Rays taken here: KADOKO,ROBERT G 8/19/2011 12:53:52 PM > . Ankle X-Rays: Left AP/LAT/Mortise views show: Distal third fibula fx, healing callus is visible. Severe, severe degenerative changes in the tibio-talar jt sp triple arthrodesis. .

**Physical Examination:**
General:
General appearance: Alert and Oriented x 3 (Time, Place, Person). General appearance: pleasant, well nourished.

## Therapeutic Interventions:

## Assessment:

**Assessment:**
1. Sprain and strain of cruciate ligament of knee - 844.2 (Primary)
2. Tear of medial cartilage or meniscus of knee, current - 836.0
3. Closed fracture of metatarsal bone(s) - 825.25, Left
4. Closed fracture of lateral malleolus - 824.2
52F with new lateral malleolus fx. It is at least 2 months old maybe longer. She has had pain for 1 week? It does not add up well but will treat as semi-acute fx. Boot and pain meds. Review in 4 weeks with xrays.

00033

**Progress Note**

**Patient:** LEVEE, CATHEY
**DOB:** 09/11/1958  **Age:** 52 Y  **Sex:** Female
**Phone:** 817-994-3684
**Address:** 401 PARKVIEW COURT, HURST, TX-76053

**Provider:** Robert Kadoko, MD
**Date:** 01/26/2011

## Subjective:

**CC:**
1. 3 week follow up.

**HPI:**
Orthopedic History:
The primary pain or problem is in the Left Knee and Left foot pain. They were referred here by: hospital ER. The pain level (1-10) is 8, throbbing, aching. The problem started with no known injury, patient has a history of foot and ankle fracture patient states about 2 weeks ago she began having pain. The following tests have been done none since the last visit. The following treatments have been done casting for the past 3 weeks. The pain relief provided by these treatments is moderate.

**Medical History:** Hypothyroidism, Hypotension, Arthritis, Lung disease (Arthritis Node), Rheumatoid arthritis.

**Surgical History:** Hip Surgery (Septic Hip drainage) , Knee Surgery (Right Menisectomy) , Ankle Surgery (triple arthidosis) bilateral , Tonsillectomy .

**Family History:** 1daughter(s) - healthy.

**Social History:** Handedness: Right. no Smoking. no PCP. no Alcohol. Caffeine: yes, daily. no Recreational drug use. Occupation: Full-Time, , Full Duty.

**Medications:** Norco 10-325 MG Tablet 1-2 tablet as needed for pain every 4 hrs, Soma , Arava , Ibuprofen , Adderall , Progesterone , Cortef , Armour Thyroid , Minocycline HCl

**Allergies:**

## Objective:

**Vitals:** Ht 69, Wt 160, BMI 23.63.

**Examination:**
Left foot:
Inspection: Severe pes planus no erythema, no ecchymosis, mild swelling, moderate diffuse tenderness. has grade 1 ulcer on the medial malleolus and 1st MTPJ - no exudate. Range of Motion: within normal limits. Stability: no gross instability. Strength: within normal limits. Sensation: sensation intact to light touch. Vascular: capillary refill within normal limits, no edema present.
X-Rays Studies::
X-Rays taken here: TODAY show: , KADOKO,ROBERT G 1/26/2011 5:10:15 PM > . Foot X-Rays: Left AP/LAT/Oblique views show: 2nd, 3rd midshaft MT fxs. Prolific callous formation, age unknown. <20% displacement on any view. Progression of healing.

## Therapeutic Interventions:

## Assessment:

**Assessment:**
1. Sprain and strain of cruciate ligament of knee - 844.2 (Primary)
2. Tear of medial cartilage or meniscus of knee, current - 836.0
3. Closed fracture of metatarsal bone(s) - 825.25, Left
52F 6 wk out from foot fx. She still has pain but now has ulcers, still benign. I have to DC the cast, she will use a walker boot. Will use boot till pain is gone, review in 3 wk.

## Plan:

**1. Sprain and strain of cruciate ligament of knee** Continue Norco Tablet, 10-325 MG, 1-2 tablet as needed for pain, Orally, every 4 hrs, 60, Refills 0 .

Removed the cast in the office today and took xrays. The patient has blistering of the skin, preventing me from putting on another one today. Continue with the walker boot for approximatly 3 weeks or until the pain is gone. Use bactroban/neosporin to treat the blistered areas. She states its impossible for her to be NWB for the next three weeks but will do the best she can.

**Immunizations:**

**Diagnostic Imaging:** X ray: Foot, left

**Labs:**
**Procedure Codes:** 73620 X-RAY FOOT - 2 VIEWS

**Preventive:**

**Follow Up:** 3 Weeks

**Provider:** Robert Kadoko, MD
**Patient:** LEVEE, CATHEY  **DOB:** 09/11/1958  **Date:** 01/26/2011

**Electronically signed by ROBERT KADOKO , MD on 01/24/2012 at 09:44 AM CST**
**Sign off status: Pending**

00031

**Progress Note**

**Patient:** LEVEE, CATHEY
**DOB:** 09/11/1958 **Age:** 52 Y **Sex:** Female
**Phone:** 817-994-3684
**Address:** 401 PARKVIEW COURT, HURST, TX-76053

**Provider:** Robert Kadoko, MD
**Date:** 12/29/2010

## Subjective:

**CC:**
1. 2 MONTHS.

**HPI:**
Orthopedic History:
The primary pain or problem is in the Left Knee and Left foot pain. They were referred here by: hospital ER. The pain level (1-10) is 8 patient states her knee fell much better but is complaining of deep aching pain in her left foot. The problem started with no known injury, patient has a history of foot and ankle fracture patient states about 2 weeks ago she began having pain. The following tests have been done Xray at today visit. The following treatments have been done none, patient came in wearing a post-op boot. The pain relief provided by these treatments is none.

**Medical History:** Hypothyroidism, Hypotension, Arthritis, Lung disease (Arthritis Node), Rheumatoid arthritis.

**Surgical History:** Hip Surgery (Septic Hip drainage) , Knee Surgery (Right Menisectomy) , Ankle Surgery (triple arthidosis) bilateral , Tonsillectomy .

**Family History:** 1daughter(s) - healthy.

**Social History:** Handedness: Right. no Smoking. no PCP. no Alcohol. Caffeine: yes, daily. no Recreational drug use. Occupation: Full-Time, , Full Duty.

**Medications:** Norco 10-325 MG Tablet 1-2 tablet as needed for pain every 4 hrs, Soma , Arava , Ibuprofen , Adderall , Progesterone , Cortef , Armour Thyroid , Minocycline HCl

**Allergies:** N.K.D.A.

## Objective:

**Vitals:** Ht 5'9, Wt 170, BMI 33.20.

**Examination:**
Left foot:
Inspection: Severe pes planus no erythema, no ecchymosis, mild swelling, moderate diffuse tenderness. Range of Motion: within normal limits. Stability: no gross instability. Strength: within normal limits. Sensation: sensation intact to light touch. Vascular: capillary refill within normal limits, no edema present.
X-Rays Studies::
X-Rays taken here: TODAY show: . Foot X-Rays: Left AP/LAT/Oblique views show: 2nd, 3rd midshaft MT fxs. Prolific callous formation, age unknown. <20% displacement on any view.

**Physical Examination:**
General:
General appearance: no apparent distress pleasant well nourished. General appearance: pleasant, well nourished.

## Therapeutic Interventions:

## Assessment:

**Assessment:**
1. Sprain and strain of cruciate ligament of knee - 844.2 (Primary)
2. Tear of medial cartilage or meniscus of knee, current - 836.0
3. Closed fracture of metatarsal bone(s) - 825.25, Left

52F 5mth sp ACL reconstruction has had a complex postop period. Last visit was quite unfavorable. She returns and says she complained of a painful foot to the MA. There is nothing in the record of this by the MA. I asked why she did not tell me, 'I was so upset, I forgot'. Xrays today show minimally displaced MT fxs, she is wearing a removable boot. Plan is SLC, NWB for 6 weeks. Off work 2 weeks, she cant function well, and refill pain meds.

## Plan:

### 1. Closed fracture of metatarsal bone(s)

The relation ship with this patient is strained, but we need to proceed and manage her acute problem. Her fxs are obviously old, she reports she told the MA about her foot, I spoke to the MA who saw her that day, NikkiP, she does not recall that. Finally there is no record at all that she mentioned this. It is not the first time the patients recollection is different, but we will do the best we can. If her fx was displaced, it would have been a difficult problem.

**2. Others**   Start Norco Tablet, 10-325 MG, 1-2 tablet as needed for pain, Orally, every 4 hrs, 80, Refills 0 .

Return in 4 weeks, cast removal and repeat x-rays.

**Immunizations:**

**Labs:**
**Preventive:**

**Follow Up:** 4 Weeks (Reason: follow up)

**Provider:** Robert Kadoko, MD
**Patient:** LEVEE, CATHEY  **DOB:** 09/11/1958  **Date:** 12/29/2010

**Electronically signed by ROBERT KADOKO , MD on 01/24/2012 at 09:43 AM CST**
**Sign off status: Pending**

**Progress Note**

Patient: LEVEE, CATHEY
DOB: 09/11/1958  **Age:** 52 Y  **Sex:** Female
Phone: 817-994-3684
Address: 401 PARKVIEW COURT, HURST, TX-76053

**Provider:** Robert Kadoko, MD
**Date:** 12/08/2010

## Subjective:

### CC:
1. Knee pain-right.

### HPI:
Orthopedic History:
The primary pain or problem is in the  Right, Knee. They were referred here by:  hospital ER. The pain level (1-10) is  8, Patient states she has not had a change in symptoms still having pain.. The problem started with  an altercation. The following tests have been done  Xray, MRI. The following treatments have been done  surgery, physical therapy, medications, casting/splinting. The pain relief provided by these treatments is  mild.
Index injury is April 2010, sufferd an ACL injury. Had ACL reconstruction 6/24/10. Had some trouble getting all the PT, missed some appointments. Today, patient reports she was in a car accident in October with a prolonged hospital stay at HEB. She was discharged October 30, 2010.

**Medical History:** Hypothyroidism, Hypotension, Arthritis, Lung disease (Arthritis Node), Rheumatoid arthritis.

**Surgical History:** Hip Surgery (Septic Hip drainage) , Knee Surgery (Right Menisectomy) , Ankle Surgery (triple arthidosis) bilateral , Tonsillectomy .

**Family History:** 1daughter(s) - healthy.

**Social History:** Handedness: Right. no Smoking. no PCP. no Alcohol. Caffeine: yes, daily. no Recreational drug use. Occupation: Full-Time, , Full Duty.

**Medications:** Soma , Arava , Ibuprofen , Adderall , Progesterone , Cortef , Armour Thyroid , Minocycline HCl , Norco

**Allergies:** N.K.D.A.

## Objective:

**Vitals:** Ht 5'9, Wt 170, BMI 33.20.

### Examination:
Right knee:
Inspection: arthroscopy portals, benign, no drainage, healed - no effusion. Palpation: diffuse tenderness with no focal point. Knee Range of Motion: full extension, flexion stops at 100 degrees, painful. Stability: negative, Lachman's, negative, pivot-shift, 1+ anterior drawer test.
Strength: 4/5, knee extension, quad atrophy is noted. Sensation: normal to light touch dorsum, plantar leg + foot. Vascular: 2+ palpable distal pulses, brisk capillary refill < 3 secs, dorsalis pedis and posterior tibialis pulses, popliteal pulse +:. Wounds: no prior surgical scars identified, no prior traumatic scars identified.

### Physical Examination:
General:
General appearance:  pleasant, well nourished.

## Therapeutic Interventions:

## Assessment:

### Assessment:
1. Sprain and strain of cruciate ligament of knee - 844.2 (Primary)
2. Tear of medial cartilage or meniscus of knee, current - 836.0

: 00025

52F sp ACL reconstruction has had a complex few months including dx with lung nodes - not biopsied yet; had an MVA admitted to hospital for 4 days. She called today asking for an appt. Reports she had severe swelling a few days ago, which went down with steroids dose pak after she went to see her PCP. I do not see sign of infection, ligament injury, recommend rest and increase activity as tolerated.

## Plan:

**1. Others**  Start Norco Tablet, 10-325 MG, 1-2 tablet as needed for pain, Orally, every 4 hrs, 80, Refills 0 .

**Immunizations:**

**Labs:**
**Preventive:**

After the meeting, she asked my MA for a note to stay off work for the past 3 days. I said I would give her today only, she reports she is better, and the PCP who gave her the steroids should give the note for the past 2 days. At this point her story and attitude changed, said she would like off the NEXT 3 days - she has NOT seen her PCP recently and the steroids were from an 'old' prescription. She also gave the reasoning that it is the hydrocodone, rather than the steroids as previously stated to the MA, that keep her from working. Her story is confusing, and I cannot justify more days off. I have had to work with her in the past regarding her situation. However, I have to stick what I can reasonably justify, and that is limited to off work today.

**Follow Up:** PRN (Reason: PRN)

**Provider:** Robert Kadoko, MD
**Patient:** LEVEE, CATHEY  **DOB:** 09/11/1958  **Date:** 12/08/2010

**Electronically signed by ROBERT KADOKO , MD on 01/24/2012 at 09:43 AM CST**
**Sign off status: Pending**

: 00026

**Progress Note**

**Patient:** LEVEE, CATHEY
**DOB:** 09/11/1958 **Age:** 52 Y **Sex:** Female
**Phone:** 817-994-3684
**Address:** 401 PARKVIEW COURT, HURST, TX-76053

**Provider:** Robert Kadoko, MD
**Date:** 11/08/2010

## Subjective:
**CC:**
1. Knee pain-right.

**HPI:**
Orthopedic History:

The primary pain or problem is in the Right, Knee. They were referred here by: hospital ER. The pain level (1-10) is 8, Patient states she has not had a change in symptoms still having pain.. The problem started with an altercation. The following tests have been done Xray, MRI. The following treatments have been done surgery, physical therapy, medications, casting/splinting. The pain relief provided by these treatments is mild.

Patient was in a Car accident back in October with a prolonged hospital stay at HEB, Patient was Discharge October 30, 2010.

**Medical History:** Hypothyroidism, Hypotension, Arthritis, Lung disease (Arthritis Node), Rheumatoid arthritis.

**Surgical History:** Hip Surgery (Septic Hip drainage) , Knee Surgery (Right Menisectomy) , Ankle Surgery (triple arthidosis) bilateral , Tonsillectomy .

**Family History:** 1daughter(s) - healthy.

**Social History:** Handedness: Right. no Smoking. no PCP. no Alcohol. Caffeine: yes, daily. no Recreational drug use. Occupation: Full-Time, , Full Duty.

**Medications:** Arava Tablet , Ibuprofen Tablet , Adderall Tablet , Progesterone Suppository , Cortef Tablet , Armour Thyroid Tablet , Minocycline HCl Capsule , Soma Tablet , Norco Tablet

**Allergies:** N.K.D.A.

## Objective:
**Vitals:** Ht 5'9, Wt 170, BMI 33.20.

**Examination:**
Right knee:

Inspection: arthroscopy portals, benign, no drainage, healed. Palpation: no pain to palpation. Knee Range of Motion: full extension, flexion stops at 130 degrees. Stability: negative, Lachman's, negative, pivot-shift, 1+ anterior drawer test. Strength: 4/5, knee extension, quad atrophy is noted. Sensation: normal to light touch dorsum, plantar leg + foot. Vascular: 2+ palpable distal pulses, brisk capillary refill < 3 secs, dorsalis pedis and posterior tibialis pulses, popliteal pulse +:. Wounds: no prior surgical scars identified, no prior traumatic scars identified.

**Physical Examination:**
General:

Build: average. General appearance: pleasant, well nourished.

## Therapeutic Interventions:

1. **Physical Therapy**
Exercise : strengthening Right Knee

## Assessment:
**Assessment:**

as follows: right quadriceps the muscle strength is 4/5.

**Outside Test Results:**
**X-Rays:** Test Results: No tests to report at this time.
**Impression:**  Anterior cruciate ligament (ACL), acute tear (844.2).  Medial meniscus, acute tear (836.0).  Post-Op, S/P Surgery (V67.00).  Doing well, better than last time, but slowed a bit. Improved strength ROM, still needs brace and pain meds.  Reassured her.  She has skipped a few PT sessions - reccomend she do everything she can to get there.
**Plan:**

1.  Her rehab and recovery can take up to apprx 8 months. She is doing great and I do not want her to get discouraged. She may reduce her therapy to once weekly with a home program.
2.  The patient was instructed to return to the office in 2 months for follow-up.


  **Procedures: Orders:**

**Prescriptions:**
Rx: Soma- 350 mg tablet , 1 tablet by mouth three times a day. Max daily dose: 3.  Dispense: 42 tablet. Refills: 0.  Allow Generic: Yes

**Patient Instructions:**
PT RX dispensed.

Signed by _____  Robert Kadoko, MD

**Texas Orthopedic & Spine Associates**
2008 L. Don Dodson Drive, Suite 110, Bedford, TX 76021 - Phone: 817-288-0084 - Fax: 817-445-1039

---------------------------------------------------------------------------------------------------------------------

**Visit Date: 8/6/2010**
Patient Name: LEVEE, CATHEY
DOB: 9/11/1958
Referred By: Robert Kadoko, MD
Primary Insurance: UNITED HEALTHCARE
Treating Physician: Robert Kadoko, MD

This 51 year old female presents today for followup orthopedic evaluation. She indicates the problem location is the right knee. She states her husband had surgery on Friday and was unable to sleep and very agitated. He did a military kick on her, knocking her right leg from underneath her. She heard a pop and was unable to stand or use the leg. She went to Harris HEB the same night, had xrays and pain medications, was placed in a leg immobilizer, and referred here. Pain is described as aching, deep, sharp and swelling. Severity of pain is 5-6 on a scale of 1-10 with 10 being the worst. She is still wearing brace for long distances due to pain/weakness. Date of Injury: 4/10/2010. Date of surgery is: 6/24/2010. ACL reconstruction - right. Global period ends 9/24/2010.

**Review of Systems:** No abnormal findings with the exception of the chief complaint.

**Allergies:** No known medical allergies.

**Medication History: Active: ibuprofen** -Pain & Pyrexia Meds- 800 mg tablet (active). **Norco** -Pain & Pyrexia Meds- 325 mg-10 mg tablet (1-2 every three hours as needed for pain.) (active); usage started on 7/9/2010 medication was prescribed by Myles, Robert M.D.. **Adderall** -Central Nervous System Meds- 30 mg tablet (One tablet in the morning.) (active), **Phenergan** -Gastrointestinal Tract Meds- 25 mg tablet (1 every four hours.) (active); usage started on 6/9/2010 medication was prescribed by Myles, Robert M.D., **progesterone** -Endocrine System Meds- 200 mg (active), **Cortef** -Endocrine System Meds- 20 mg tablet (active), **Prozac** -Central Nervous System Meds- 20 mg capsule (One by mouth every day.) (active), **armour thyroid tablets** -Imported- 2 gr tablet (active), **minocycline** -Infections & Infestation Meds- 100 mg capsule (Twice a day.) (active), **Adderall** -Nutrition Meds- 10 mg tablet (One tablet at lunch.) (active).

**Physical Exam:** Height: 5 ft. 9.000 in. Weight: 170 lbs. BMI: 25
Patient is a 51 year old female who appears his given age and in no apparent distress.
**Right Knee Examination:**
Inspection of the anterior aspect of right lower leg reveals incision 1 cm. Right lateral collaterals and right medial collaterals reveals no erythema and no ecchymosis. Arthroscopic portals are benign, without evidence of infection.
There is a mild effusion.
Right knee flexion is 135 degrees. Right knee extension is 0 degrees (full extension). Pain with knee flexion is mild.
Valgus laxity: none. Varus laxity: none. Lachman's test: +1. Pivot shift test: negative.
Right dorsalis pedial pulse and right posterior tibialis pulse 2/4.
SILT dorsum, plantar, 1st web space foot. Muscle strength is 5/5 for all groups tested, except

Page: 1

: 00021

explained that a completely torn ACL will not heal and surgical repair by suturing the ligament alone is rarely successful.

The various treatment options for a torn ACL were then considered. The first option is nonoperative treatment that emphasizes a good knee strengthening and rehabilitation program. Some patients are able to resume a fairly vigorous activity level with this treatment. Knee bracing may also be helpful to allow participation in higher risk and more vigorous recreational activities. The advantage of this approach is the avoidance of major knee reconstructive surgery. Instability symptoms and further injury to the knee, however, may occur. The patients who initially choose a non-operative treatment may later elect to proceed with surgical reconstruction of the ACL if instability symptoms are found unacceptable.

The second option is surgical repair and reconstruction of the ACL. This requires an extensive surgical procedure with a relatively long recovery. The resumption of vigorous athletic activities does not occur for nine to twelve months following the surgery. In most cases the reconstructive surgery involves reinforcing or augmenting the damaged ACL with a tendon graft. For the highly motivated and athletic person, surgical reconstruction of the ACL generally offers the best opportunity for a high level of athletic participation. Nearly 90% of patients who undergo surgical reconstruction are able to eventually resume athletic participation at a level very close to their preinjury level. The limitations or risks of surgical treatment include some loss of knee mobility, mild residual instability and discomfort, infection, and rarely blood clots.

With either treatment option, the knee has an increased risk of arthritis. Meniscus cartilage tears may also occur following injury to the ACL and this further increases the risk of knee arthritis. As a result, knee instability which may cause meniscus cartilage damage should be avoided if at all possible. Reconstruction of the anterior cruciate ligament restores knee stability and thus minimizes the risk of meniscus cartilage tears and arthritis.

Send letter to:

**Procedures:**

**Orders:**

**Patient Instructions:**
PT Knee RX dispensed.
PT Knee RX dispensed.

Signed by _____ Robert Kadoko, MD

Page: 3

full-time, hand dominance is. right, language preference. English, marital status. married.
Patient/Guardian denies alcohol use, tobacco exposure, illegal drug use.
**Review of Systems: Constitutional Symptoms:** (+) major trauma, **Hematologic / Lymphatic:**
(+) fever.

**Physical Exam:** Height: 5 ft. 9.000 in. Weight: 170 lbs. BMI: 25
General: Patient is a 51 year old female who appears her given age, well developed, well
nourished, distressed, with good attention to hygiene and body habitus, crying and depressed.
Oriented to person, place and time. Mood and affect appear stressed, tearful and crying.

Head & neck: Head is normocephalic, atraumatic, without any gross head or neck deformity.
Neck is supple and trachea is midline.
Cardiovascular: Peripheral pulses full to palpation, extremities warm with no edema.
Respiratory:Chest configuration non-hyperinflated and expansion symmetric.
Abdomen: Abdomen exam normal, no evidence of masses or tenderness.
Lymphatic: No neck, supraclavicular, or axillary lymphadenopathy noted.
Skin: Inspection of skin outside of affected area reveals no abnormalities.

**Right Knee Examination:**
Inspection of the anterior aspect of right lower leg and right gastrocnemius muscle reveals
extensive ecchymosis.
There is a severe effusion.
Right knee flexion is 30 degrees. Right knee extension is 0 degrees (full extension).
Pain with knee flexion is severe.
Patient very apprehensive, and ligamentous exam not conclusive.
Right dorsalis pedial pulse and right posterior tibialis pulse 2/4.
SILT dorsum, plantar, 1st web space foot.

**Test Results:**
**X-Ray Results: Test Results: MRI Right Knee films and report 4/10/2010 Impression: (+)**
**ACL tear complete. A lot of edema**
**Impression:** Anterior cruciate ligament (ACL), acute tear (844.2). Medial meniscus, acute tear
(836.0). She has at least a ACL and possibly meniscus tear. Recc PT for ROM then review for
ACL reconstruction has RA would reccomend allograft. .
Plan:
1. Discussion with the patient included: review and discussion of x-rays and MRI with
patient..
2. The patient has increased inflammation. I reccommend oral medications for pain control
and therapy to increase ROM. Once motion is achieved, then I recommend an ACL
reconstruction.
3. The patient was instructed to return to the office in 10 days for follow-up.
4. I explained the findings and diagnosis of a torn ACL to the patient. The considerable
significance of this particular knee injury was discussed. Injury to the ACL usually results in
knee looseness or instability which can greatly limit participation in recreational and athletic
activities. Knee instability or giving way is most likely to occur in sports which require
frequent cutting, stopping, or jumping. I also outlined the difficulties in treating a torn ACL. I

**Texas Orthopedic & Spine Associates**
2008 L. Don Dodson Drive, Suite 110, Bedford, TX 76021 - Phone: 817-288-0084 - Fax: 817-445-1039

-------------------------------------------------------------------------------------------------------

**Visit Date:** 4/12/2010
Referred By: Robert Kadoko, MD
Patient Name: LEVEE, CATHEY
DOB: 9/11/1958
Primary Insurance: UNITED HEALTHCARE
Treating Physician: Robert Kadoko, MD

This 51 year old female presents today for initial orthopedic evaluation. She indicates the problem location is the right knee. She states her husband had surgery on Friday and was unable to sleep and very agitated. He did a military kick on her, knocking her right leg from underneath her. She heard a pop and was unable to stand or use the leg. She went to Harris HEB the same night, had xrays and pain medications, was placed in a leg immobilizer, and referred here. Pain is described as aching and throbbing, constant and tender. Patient indicates activity worsens condition. Symptoms are associated with decreased range of motion, pain with and without movement, soreness, bruising and swelling. Severity of pain is 10 on a scale of 1-10 with 10 being the worst. Prior tests/treatments for this condition include seen in ER on 4/10/2010 refered here, x-ray of knee 4/10/2010 and MRI of knee 4/10/2010. Patient occupation not known. The patient's main occupation is a counselor at Dunbar High School. **Date of Injury: 4/10/2010.**

**Allergies:** No known medical allergies.
**Medication History:**
    **Active:**
        **ibuprofen** -Pain & Pyrexia Meds- 800 mg tablet (active)
        **Adderall** -Central Nervous System Meds- 30 mg tablet (One tablet in the morning.) (active)
        **progesterone** -Endocrine System Meds- 200 mg (active)
        **Cortef** -Endocrine System Meds- 20 mg tablet (active)
        **armour thyroid tablets** -Imported- 2 gr tablet (active)
        **minocycline** -Infections & Infestation Meds- 100 mg capsule (Twice a day.) (active)
        **Adderall** -Nutrition Meds- 10 mg tablet (One tablet at lunch.) (active)
**Past Medical History: Endocrine Hx:** (+) hypothyroidism, **Cardiovascular Hx:** (+) hypertension, **Musculoskeletal Hx:** (+) arthritis conditions,.
**Past Surgical History:** Patient/Guardian admits past surgical history of hip surgery (septic hip drainage), knee surgery (right) (menisectomy), ankle surgery (triple arthidosis) bilateral, tonsillectomy.
**Family History:** Patient/Guardian admits a family history of cancer, cerebral vascular accident, hypertension, kidney disease, rheumatoid arthritis.
**Social History:** Patient/Guardian admits caffeine use, employment status. Currently employed

No. 324-476966-10

| | | |
|---|---|---|
| In the Matter of the Marriage of | : | IN THE DISTRICT COURT |
| Cathy June Levee | : | |
| and | : | |
| Theodore Floyd Levee | : | TARRANT COUNTY, TEXAS |
| and | : | |
| in the Interest of | : | |
| Catherine Nicole Levee, a Minor Child | : | 324TH JUDICIAL DISTRICT |

## AFFIDAVIT

STATE OF __Texas__

COUNTY OF __Tarrant__

BEFORE ME, the undersigned authority, personally appeared (Custodian) __Phillip Klotz__ who being by me duly sworn, deposed as follows: (Please print your name)

I, the undersigned, am over eighteen (18) years of age, of sound mind, capable of making this Affidavit, and personally acquainted with the facts herein stated and do state that the facts in this Affidavit are true and correct.

I am the Custodian of Records for **Texas Ortho and Spine Associates/Dr. Robert G. Kadoko.** Attached hereto are __122__ pages of records concerning **Cathey June Levee**. These said records are kept in the regular course of business at 2008 L. Don Dodson Dr., Ste. 100, Bedford, TX 76021 and it was in the regular course of business at such address for an employee, or representative, or a doctor, with personal knowledge of the act, event, condition, opinion or diagnosis recorded to make the memorandum of record or to transmit information hereof to be included in such memorandum or record, and the memorandum or record was made at or near the time of the act, event, condition, opinion, or diagnosis, or reasonably soon thereafter. The records attached hereto are the originals or exact copies of the originals and **nothing has been removed** from the original file before making these true and correct copies.

_____
SIGNATURE OF CUSTODIAN

SUBSCRIBED AND SWORN TO before me, the undersigned authority, on this the __30th__ day of __January__, __2012__.

_____
NOTARY PUBLIC
In and for the State of __TX__
My Commission Expires: __05/03/13__

Order No. 9936.002

Cause No. 324-476966-10

| | | |
|---|---|---|
| IN THE MATTER OF | § | IN THE DISTRICT COURT |
| THE MARRIAGE OF | § | |
| | § | |
| **CATHEY JUNE LEVEE** | § | |
| **AND** | § | |
| **THEODORE FLOYD LEVEE** | § | 324th JUDICIAL DISTRICT |
| | § | |
| AND IN THE INTEREST OF | § | |
| **CATHERINE NICOLE LEVEE,** | § | |
| | § | |
| A MINOR CHILD | § | TARRANT COUNTY, TEXAS |

FILED
TARRANT COUNTY
THOMAS A. WILDER
DISTRICT CLERK
10 MAY 13 AM 3: 13

## BUSINESS RECORDS AFFIDAVIT

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TARRANT | § |

BEFORE ME, the undersigned authority, on this day personally appeared _Wendy Sloan_ and made the following statements under oath:

"My name is _Wendy Sloan_. I am competent to make this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct.

"I am the custodian of the records of *Dr. Robert Gonza Kadoko, M.D.* Attached to this affidavit are ___11___ pages of records from our offices. These pages of records are kept by our offices in the regular course of business, and it was the regular course of business of our offices for an employee or representative of our offices, with knowledge of the act, event, condition, opinion, or diagnosis recorded, to make the record or to transmit information thereof to be included in the record. The record was made at or near the time or reasonably soon thereafter. The records attached to this affidavit are the original or exact duplicates of the original."

_Wendy Sloan_
_____
Affiant

SWORN AND SUBSCRIBED TO before me on this _11th_ day of May, 2010, to certify which witness my hand and seal of office.

_Sharon D. Oliver_
_____
Notary Public, State of Texas

SHARON D. OLIVER
Notary Public, State of Texas
My Commission Expires
NOV. 10, 2010

**Texas Orthopedic & Spine Associates**
2008 L. Don Dodson Drive, Suite 110, Bedford, TX 76021 - Phone: 817-288-0084 - Fax: 817-445-1039

---

**Visit Date: 4/23/2010**
Patient Name: LEVEE, CATHEY
DOB: 9/11/1958
Referred By: Robert Kadoko, MD
Primary Insurance: UNITED HEALTHCARE
Treating Physician: Robert Kadoko, MD

This 51 year old female presents today for followup orthopedic evaluation. She indicates the problem location is the right knee. She states her husband had surgery on Friday and was unable to sleep and very agitated. He did a military kick on her, knocking her right leg from underneath her. She heard a pop and was unable to stand or use the leg. She went to Harris HEB the same night, had xrays and pain medications, was placed in a leg immobilizer, and referred here.Pain is described as aching and throbbing and constant. She also complains of tightness and muscle spasms.Patient indicates activity worsens condition. Symptoms are associated with bruising, swelling and Numbness. She states her toes are numb.Severity of pain is 8 on a scale of 1-10 with 10 being the worst. Prior tests/treatments for this condition include physical therapy 3 times per week for 2weeks, with mild relief from pain. Patient occupation not known. The patient's main occupation is a counselor at Dunbar High School. Date of Injury: 4/10/2010.

**Review of Systems:** No abnormal findings with the exception of the chief complaint.
**Allergies:** No known medical allergies.
**Physical Exam:** Temp: 96.2 Height: 5 ft. 9.000 in. Weight: 170 lbs. BMI: 25
Patient is a 51 year old female who appears his given age and in no apparent distress.
**Right Knee Examination:**
Inspection of the anterior aspect of right lower leg and right gastrocnemius muscle reveals extensive ecchymosis.
There is a severe effusion.
Right knee flexion is 75 degrees. Right knee extension is 0 degrees (full extension).
Pain with knee flexion is moderate.
Patient very apprehensive, and ligamentous exam not conclusive.

**Test Results:**
**X-Ray Results:** Test Results: No tests to report at this time.
**Impression:** Anterior cruciate ligament (ACL), acute tear (844.2). Medial meniscus, acute tear (836.0). We had a long discussion again. she wants the knee fixed, but she came in a motorized scooter. Given that she uses that, it suggests her functional level is limited; coupled with the RA, it is not clear that ACL reconstructiion is indicated. She really said the scooter was obtained on the reccomendation of her attorney. That she is otherwise 'very active'. In any case her ROM is still inadequate. I counseled her extensively about ACL surgery, limits, complications especially in RA patients. We will review in 2 weeks. .
**Plan:**

Cathey Levee's claim of 80% disabled is not supported anywhere in medical evidence. This page from the business records affidavit of the states shows a contradiction to the statement Yet Prosecutor Rodgers made it a major point in his closing to accuse Theodore Levee of being untruthful.
Prosecutor Rodgers is guilty of malfeasance

Claim to Hurst PD 80% disabled - 1st report of rib inj.
Saturday, December 03, 2011
5:50 PM
5/13/10 HPD Report 10-2679.2
- Victim services
- Cleared out bank account
- Unable to pay bills
- Crime Victims comp.
- Other photos o bruises taken several days later
- Broken rib overlooked
- Advised to call prosecutor
- Get med record and photo to prosecutor

5/14/10HPD Report 10-2679.3
- 80% Disabled
- Mostly wheelchair bound
- Advised DA Injury to a disabled person
Business Aff. obtained from
Tarrant  County Court House.

TX Ortho & Spine 4/12/10. Dr. Kadoko
- "We had a long discussion again. She wants knee fixed, but came a motorized scooter.
-  Given that she uses that, it is suggested that functional level is limited; coupled with RA it is not clear that ACL reconstruction is indicated.
- She really said the scooter was obtained on the recommendation of her attorney.
- That she is otherwise "very active'.
Theodore Levee observations.
 Cathey Levee is involved in a questionable auto accident lawsuit alleging a debilitating back injury 6/2009. Ted Levee started questioning the need and scope of injury in third quarter of 2009.
  Major source of contention based on Ms. Levee's ability to go dancing for hours wearing high heels, possibly exaggerating symptoms and comments concerning "ducking meetings" at work.
  Injury based on Mr. Levee's observations and the  Levee's could not show a correlation to the level of pain and evidence of injury.
  Ms. Levee climbed stairs, shopped and behaved as if nothing was wrong when she was away from work and not in the public eye.
This was the same time frame as Dr. Callaghen commenting Ms. Levee was creating illness in the children and Ms. Levee ordered Katy removed from mental health and drug treatment ADA.
<div align="center">Mid - October 2009.</div>
1.    Does Cathey Levee have a disability?

2. Does Cathey Levee have a impairment

3. What is the basis for Cathey Levee's claim to the Hurst Police Dept. of being 80% disabled at the time of the allegation of assault on 3/10/10?

4. Has Cathey Levee had a Functional Capacity Evaluation?

5. What is the original injury?

6. What is the original cause of the injury?

7. Did Cathey Levee make the number up?

APPENDIX THIRTEEN; PROSECUTORS FALSE

AFFIDAVIT TO FEDERAL COURT

TIMOTHY S. RODGERS
AFFIDAVIT

RA 273

**3-001**

AFFIDAVIT

STATE OF TEXAS

COUNTY OF TARRANT

BEFORE ME, the undersigned authority, on this day personally appeared Timothy S. Rodgers, known to me to be the person whose name is subscribed hereto, who, upon his oath deposed and said:

"My name is Timothy S. Rodgers. I am an Assistant Criminal District Attorney in Tarrant County Texas and am the prosecutor who tried the aggravated assault causing serious bodily injury case against Theodore Floyd Levee, cause number 1239907D. I am writing this affidavit in response to Theodore Levee's allegations of prosecutorial misconduct as related to the prosecution of the above case.

1.  Summary of Facts (as reported by Catherine Levee and the Hurst Police Department)

On Saturday April 10, 2010 at about 8:53 PM, Officer Jimenez with the Hurst Police Department was dispatched to Hurst-Euless-Bedford Hospital in reference to a domestic violence assault. Once there Jimenez spoke to Catherine Levee (Cathy) who reported that she had been assaulted by her husband, Theodore Levee. She stated that she and Theodore had gotten into an argument about inappropriate comments he had been making to their 16-year-old daughter Alexandra. When Cathy confronted Theodore about the inappropriate behavior he got angry with her. During the ensuing argument, Theodore kicked Cathy numerous times in the leg and then knocked her right leg out from under her causing her to fall down. When she fell she screamed in pain. Theodore continued to yell and scream at Cathy threatening to hurt her even more. He then told their daughter Katy, who was present during the assault, that Cathy was just faking injuries to get attention. Cathy went to the hospital where doctors confirmed that her right knee suffered extensive damage. Her anterior cruciate ligament, posterior cruciate ligament and medial meniscus were torn. Her fibula was fractured in two places and there were bone fragments underneath her knee cap. Officers saw extensive bruising and swelling of the leg and took photographs of the injuries. Several days after the assault, Cathy observed a large bruise to her chest and later learned that a rib had been broken during the assault. One of Cathy's daughters photographed the bruise to the chest.

Before the above offense, Cathy had suffered from rheumatoid arthritis for many years. She occasionally used a wheelchair to move about but was able to function with a cane on most days. After this assault, Cathy and Theodore began litigation of a divorce in Tarrant County Family Court. By all indications the divorce proceedings were very contentious. On July 23, 2010, Cathy's father Teddy Edmondson was arrested for assaulting Theodore outside the Family Court building after a divorce hearing. Edmondson was charged with the assault.

RA 274

**3-002**

2. Procedural History

The aggravated assault case against Theodore Levee was tried before Judge Ruben Gonzalez of the 432nd Judicial District Court of Tarrant County, Texas on October 13 and 14, 2011. Before trial, attorneys for the State and defense agreed to a motion in limine regarding any facts or circumstances of the pending divorce case between Cathy and Theodore Levee. During the trial, the following witnesses testified for the prosecution:   The State's witnesses testified, inter alia, that they had seen Theodore demonstrate what they all called a "whip kick" in the past. They described the move as a sweep of the leg of one person by another person and stated Theodore claimed it was a movement he learned while in the military. After the State rested its case, Steven Bell, attorney for Theodore Levee, called one witness. Levee testified and was cross-examined after which both the prosecution and defense rested their cases. After hearing arguments from both sides Judge Gonzalez found Levee guilty of aggravated assault. After the conviction, attorneys for the State and the defense had a discussion off of the record regarding how the trial was going to proceed. As a result, both parties agreed on a punishment for Levee. In exchange for his admission of guilt and waiver of right to appeal his conviction, Levee agreed to a sentence of ten years in prison which, by agreement, was probated over a period of ten years. In addition, Levee pleaded guilty to one pending violation of a protective order case and the State agreed to dismiss another.

3. Response to Allegations of Prosecutorial Misconduct

Levee has alleged thirteen claims of prosecutorial misconduct which are listed below exactly as written in Mr. Levee's filings. My responses follow immediately after each allegation.

A. Suppressing sworn notarized statement of Catherine Levee, eyewitness

In prosecuting this case, I did not suppress any sworn statements of Catherine Levee. I did not seek to suppress any statements and only moved the Court to prevent both sides from mentioning circumstances surrounding the pending divorce that were not relevant to the criminal trial.

B. Suppressing the origination of the term "whip kick" as used in direct testimony in closing.

At no time did I move to suppress any mention of the term "whip kick." The term was used frequently throughout the trial by both the State and defense without objection.

C. Suppressing the lack of authenticity of the claim of 80% disability.

I did not move to exclude or suppress any evidence of the disability of the victim or Defendant in this case. The Tarrant county District Attorney's Office maintains an open file policy. All records and reports that are not work product for the office are made available to the defense throughout the life of a criminal case. This is done on line

**RA 275**

**3-003**

through our electronic case filing system (ECFS) as well as manually through production of paper copies of records. All reports and records, including those detailing Catherine Levee's medical condition before and after the assault, were made available to the defense before the trial began. Records detailing Catherine Levee's treatment for rheumatoid arthritis were made available to Steven Bell, attorney for the Defendant, on or about April 12, 2011 (Riata Therapy Specialists) and April 27, 2011 (Arthritis Center of Texas). Medical records pertaining to Catherine Levee's initial treatment for injuries sustained during the assault were made available to the defense in May of 2010.

D. Suppressing the evidence of perjury of prosecution witnesses concerning statements of their observation of the petitioner on the afternoon of April 10, 2010.

I am not aware of any perjury committed by any witness for the State. Further, I do not believe based on the case and my investigation, that any of the State's witnesses committed perjury. Per my continuing ethical obligation of candor to the tribunal, had I become aware of or suspected a State's witness committed perjury, I would have reported it to the Court immediately.

E. Failing to give the medical or physical proof of the exact cause of the injury.

Through testimony, photographs and medical records, I provided evidence to the judge in this case of the serious bodily injury this victim suffered as a result of the offense. The judge as the sole fact finder ruled that the evidence admitted proved Mr. Levee's guilt beyond a reasonable doubt.

F. Evidence of the addition and acquisition of narcotics illegally obtained by the complainant and undeniably present in the Business Records Affidavit and other evidence presented by the State

I am not aware of any illegal acquisition of narcotics by the victim in this case. Nor am I aware of any reference to narcotics in any business records affidavits related to the case.

G. Making an oral motion in limine to suppress evidence

As stated above, I did move the court to prevent the State and defense from alluding to, an any way, evidence related to the pending divorce between Theodore and Catherine Levee. Over the course of the many months leading up to the trial of the case, Steve Bell and I discussed the pending divorce and agreed that specifics of the divorce litigation were irrelevant to the criminal case and would only confuse any issues in the assault. Per that agreement, Mr. Bell and I concluded a motion in limine regarding the specifics related to the divorce was appropriate. I made the motion orally which was agreed to by Mr. Bell and no objections were made. The motion was made pursuant to rules of procedure.

**RA 276**

**3-004**

H. Violating the contractual obligation in the plea agreement: (1) In altering terms by the statement "In addition..." after petitioners involuntary concurrence through Mr. Bell and adding additional conditions and terms; (2) Allowing the agreement after the implied belief and communication through Mr. Bell that the probation would be served in Florida.

The Defense and I agreed upon the final punishment in this case after Mr. Levee was found guilty of aggravated assault by the judge. Mr. Levee was admonished about the terms of the agreement and Judge Gonzalez repeatedly questioned him as to whether he understood the terms and agreed to them. Mr. Levee did so. During the judge's admonishments of Mr. Levee, my co-counsel Assistant District Attorney Lloyd Whelchel brought to the Court's attention that there may be issues with transferring any probation Mr. Levee was on to Florida. Mr. Levee had indicated he was going to live in Florida after the conclusion of the trial. Mr. Whelchel stated on the record that, per the interstate compact, any probation Mr. Levee received could not be transferred to Florida unless Florida consented to the transfer. After this discussion Mr. Levee persisted in his plea and was sentenced by the Court. No changes or alterations were made by the State.

I. Suppressing evidence of the perjury of the complainant's testimony concerning administration of her narcotic prescription to petitioner

I am not aware of any perjury committed by any witness for the State. Further, I do not believe based on the case and my investigation, that any of the State's witnesses committed perjury. Per my continuing ethical obligation of candor to the tribunal, had I become aware of or suspected a State's witness committed perjury, I would have reported it to the Court immediately.

J. Submission of altered and edited pictures into evidence of the chest injury alleged by complainant (1) In spite of the inconsistencies of the coloration and shapes of the bruises from all the photos received

I did not edit any photographs admitted in the trial of this case. Photos used in the prosecution of this case were received from two sources: the Hurst Police Department who investigated the offense, and the victim Catherine Levee. In preparing exhibits for trial, I placed pictures into files so that they could be printed for trial. Beyond increasing the size of some of the photographs so that the Court may be able to see the pictures' contents better, I did not modify any photographs admitted into evidence.

K. Mischaracterization of the petitioner in cross examination of the verbal abuse admitted by the petitioner in an isolated instance after learning of the sexual promiscuity of his adopted daughter, bringing different boyfriends into the home while absent and using petitioner bed, sneaking different boys in to the home while petitioner slept, her supplying alcohol and drugs to her sisters, her actions in the rape of her sister Andrea, her encouragement of promiscuous behavior in her siblings, the ongoing theft of money and property, the threat of "driving his car and killing us all if you tell on me" for stopping at different boys homes after

**RA 277**

**3-005**

school to indulge in sex and drugs, especially Trevor McDonald whom it was learned was supplying drugs, and the near fatal overdose of narcotics to her youngest sister. All of this information was presented to the petitioner by the complainant at the same time resulting in a heartbreaking disappointment and an overwhelming anger at the behavior.

After Mr. Levee testified during the defense's case in chief, I cross-examined him on many aspects and specifics related to the case. The cross-examination was conducted pursuant to rules of evidence and procedure. Most of the factual specifics Mr. Levee references in this claim were not part of the trial which forms the basis of this writ.

L. Influencing the court to dismiss the brutal attack in July 2010 in the court parking garage by two men while petitioner was still without use of his right arm from the April surgery and suffered facial lacerations, three broken ribs and petitioners' passenger was knocked down and had a cardiac incident forcing the transportation by ambulance to the cardiac ICU.

In this point, Mr. Levee references the assault case in which he was the listed victim. That assault case against Teddy Edmondson was filed on August 9, 2010. According to ECFS documents, Assistant District Attorney Jon O'Toole offered to dismiss Mr. Edmondson's case upon completion of an anger management class. In 2010, it was the common practice of prosecutors in Tarrant County to convey this offer to offenders with misdemeanor assault charges pending but who have little to no criminal record. Mr. Edmondson's case was dismissed on November 1, 2010. A certificate of completion of an anger management class is on ECFS in the case. I did not participate in the plea bargaining in that case in any way. Any agreements between Mr. Edmondson's attorney and Mr. O'Toole were made without my input or knowledge.

M. Failure to act as a representative of the people of the State of Texas (1) Placing the desire to prosecute and win over the demand that he operate in the interest of the truth and of justice.

I prosecuted this case per the rules of law and ethics. My goal was to ensure that justice was done and worked to the best of my ability to ensure that happened.

FURTHER AFFIANT SAYETH NOT.

Timothy S. Rodgers

**RA 278**

**3-006**

SWORN TO AND SUBSCRIBED before me the undersigned Notary Public by Timothy S. Rodgers on this 14th day of August, 2013.

Notary Public in and for the State
Of Texas

My Commission expires the 27th day of _____, 201 5 .

RA 279

**3-007**

AS STATED BY TIMOTHY RODGERS;

(Mr. Rodgers statements are in italics)

 *(1)* *Summary of Facts*

   *(As reported by Catherine Levee and the Hurst Police Department)*

      a.  A Federal Courts review is limited to the record that was before the

           state court that adjudicated the claim on the merits.[1]

On Saturday April 10, 2010 at about 8:53 PM, Officer Jimenez with the Hurst Police Department was dispatched to Hurst-Euless-Bedford Hospital in reference to a domestic violence assault. Once there Jimenez spoke to Catherine Levee (Cathy) who reported that she had been assaulted by her husband, Theodore Levee. She stated that she and Theodore had gotten into an argument about inappropriate comments he had been making to their-

---

[1]  As quoted in Magistrates Order , second page,  Document 37 Page 2 of 2 Page ID 464
Cullen v. Pinholster, 131 S.Ct. 1388,1398

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

THEODORE FLOYD LEVEE,       §
        Petitioner,            §
                             §
V.                                §      Civil Action No. 4:13-CV-211-Y
                             §
SHARI BRITTON, Chief of Probation    §
and Parole Field Services and Interstate    §
Compact, Florida Department of        §
Corrections, and                  §
LEIGHTON ILES, Director of         §
Community Supervision and Corrections   §
Department of Tarrant County, Texas,     §
        Respondents.           §

## AMENDED ORDER

The undersigned's order entered on July 10, 2013, is VACATED. This amended order issues to correct an error in the July 10 order.

Pending before the court are petitioner Theodore Floyd Levee's motion to expand time to file an amended brief (doc. no. 18), second motion to extend time to file an amended brief (doc. no. 23), motion to appoint counsel (doc. no. 34), and motion for discovery (doc. no. 35).

Petitioner's motions to expand time to file an amended brief in compliance with Local Rule 7.2(c) are GRANTED to the extent petitioner is allowed sixty (60) days to file an amended brief and/or reply brief in compliance with Local Rule 7.2, if he chooses to do so, after the date respondent's supplemental answer is filed.

Petitioner's motion for appointment of counsel is DENIED. There is no constitutional right to counsel for postconviction collateral attacks. The appointment of counsel is discretionary if the court determines that the interests of justice so require and is statutorily required if an evidentiary hearing is warranted. RULES GOVERNING SECTION 2254 CASES 8(c); 18 U.S.C. § 3006A(a)(2)(B);

**3-009**

*Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987). At this juncture, the interests of justice do not warrant appointment of counsel, and it is impossible to determine whether an evidentiary hearing will be necessary until the pleadings and documentary evidence are reviewed. *Id.* 8(a).

Finally, petitioner's motion for discovery is DENIED. Unlike an average civil litigant, a habeas corpus petitioner is not entitled to broad discovery as a matter of course. *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). A habeas petitioner is entitled to invoke all applicable federal rules of discovery, however, it is within the district judge's discretion and subject to the requirement of good cause shown as to whether to allow discovery. RULE GOVERNING SECTION 2254 CASES 6. Good cause exists where "specific allegations before the court show reason to believe that petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy*, 520 U.S. at 909; *Reed v. Quarterman*, 504 F.3d 465, 471-72 (5ᵗʰ Cir. 2007). In the absence of good cause, such showing not having been demonstrated by petitioner, it would be premature at this juncture in the proceedings to grant discovery.

Also pending before the court is respondent Leighton Isles' "request for an affidavit," wherein he asks the Court order "an affidavit be filed by the petitioner's trial counsel regarding his representation" and "explaining his conduct in representing the petitioner" during his state trial proceedings (doc. no. 32). The request is DENIED. A federal court's review under 28 U.S.C. § 2254 is limited to the record that was before the state court that adjudicated the claims on the merits. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

SIGNED July ____**11**____, 2013.

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE

2

**3-010**

*(2)* _16-year-old daughter Alexandra. –_

a. Incorrect.

Fact in the record that was before the state court - Alexandra Levee born September 2009 was 19 years of at the time as is also stated in 4 /10-/10 HPD Incident Report –

**Incident Report**         10-2679    Supplement No ORIG
**HURST POLICE DEPARTMENT**

**VICTIM (Person) 1: LEVEE, CATHEY EDMONDSON**

| Incident # | Ind No | Type | Name | MN |
|---|---|---|---|---|
| VICTIM (Person) | 1 | Individual | LEVEE, CATHEY EDMONDSON | 274687 |

| Race | Sex | DOB | Age | Ethnicity | Juvenile? | Height | Weight |
|---|---|---|---|---|---|---|---|
| WHITE | FEMALE | ██/██/████ | 51 | NOT OF HISPANIC ORIGIN | No | 5'09" | 160# |

| Hair Color | Eye Color | Skin | Means of Attack |
|---|---|---|---|
| BLONDE/STRAWBERRY | GREEN | LIGHT | HANDS, FEET AND FISTS (medical attention) |

| Extent of Injury | Dom Violence |
|---|---|
| BROKEN BONES | YES |

| Type | Address | City | State |
|---|---|---|---|
| HOME | 401 ██████ | HURST | TEXAS |

| ZIP Code |
|---|
| 76053 |

| Type | DL No | GLS |
|---|---|---|
| OPERATOR LICENSE | ████████ | TEXAS |

| Type |
|---|
| SOCIAL SECURITY NUMBER ████████ |

| Phone Type | Phone No |
|---|---|
| CELL | (214) 794-0094 |

| Employer/School | Phone Type | Phone No |
|---|---|---|
| FTW ISD | BUSINESS | ████████ |

**Modus Operandi**

| Premise Type | Crime Code(s) |
|---|---|
| RESIDENTIAL-HOUSE | ASSAULTS |

**Narrative**

On Saturday, April 10, 2010, at approximately 2053 hrs, I (Officer Jimenez #650), was dispatched to HEB Hospital, in reference to domestic violence.

Dispatch advised the reporting party, identified as Cathey Levee, W/F, ████, called and advised she had been assaulted by her husband, Theodore Levee, W/M, ████ Cathey advised she had a broken leg and possible torn ligaments in her right leg.

I arrived on scene and made contact with Cathey and she advised the following. Cathey got home around 1800 hrs today when Theodore began asking where their 19 year old daughter, identified as Alexandra Levee, W/F, ████-90, was and if she was coming over. Cathey stated they have been arguing about the inappropriate behavior and questions Theodore has been asking Alexandra.

Cathey stated Theodore has become really attached to Alexandra lately and wanting to spend more time with her. He has been asking questions about her dating life, sex life, and wanting to go to the tanning salon with her, along with wanting her to tell him where she is and when she is coming over constantly.

Cathey stated she tried to have a conversation with Theodore about the behavior and how it was making Alexandra uncomfortable last night (04-09-10). Theodore became upset with Cathey and began arguing with her over this issue. Theodore believes there is nothing wrong with his behavior and now has started doing the same thing with their 16 year old daughter, identified as Katy Levee, W/F, ████94.

Cathey stated at one point Theodore kicked her numerous times in her legs and bumped her with his shoulder. Theodore then knocked her right leg out from under her causing her to fall to the ground. Cathey screamed and was in extreme pain after falling. Theodore told her and daughter Katy that she was faking and she just wanted

| Report Officer | Printed At | |
|---|---|---|
| 650/JIMENEZ, MIGUEL | 04/12/2010 08:27 | Page 3 of 8 |

HDP -10-2679

**(3)** _Theodore kicked Cathy numerous times in the leg._

    a.  Incorrect.

        1.  Fact in the trial record that was before the state court

Defense Bell cross of Cathey Levee with objection by Mr. Rodgers

Q. Do you remember if you told them what had happened? Did you give them -- the -- the officers your version from the Hurst Police Department as to what happened?

A. Yes.

Q. Okay. Do you remember telling the police that he had kicked you numerous times in the legs?

A. No.

Q. So if the police report says that, would it be accurate or inaccurate?

MR. RODGERS: Objection, Your Honor. The police report is hearsay, and if he wanted to cross-examine about what an officer may say, I understand that, but he's cross-examining off of a document with nobody to impeach on that.

STATE VS. THEODORE FLOYD LEVEE

Q. So you don't remember if you said that or not?

A. No, I don't.

Q. Now, when you talked to the police for the first time -- do you remember talking to the -- the officers?

A. Yes, sir.

Q. Do you remember if you told them what had happened?  Did you give them -- the -- the officers your version from the Hurst Police Department as to what happened?

A. Yes.

Q. Okay.  Do you remember telling the police that he had kicked you numerous times in the legs?

A. No.

Q. So if the police report says that, would it be accurate or inaccurate?

MR. RODGERS:  Objection, Your Honor.  The police report is hearsay, and if he wanted to cross-examine about what an officer may say, I understand that, but he's cross-examining off of a document with nobody to impeach on that.

MR. BELL:  I'm merely asking her if she -- if the police report were to say that, whether or not it would be correct or incorrect.

THE COURT:  As phrased, I'm going to

3-013

**(4)** _Her anterior  cruciate ligament was torn_

    a.  Surgery in 1975 for right knee and was part of a prior injury

        1.  In fact the evidence in Business Record Affidavit Texas Health HEB 00022

            a.  Anterior  cruciate ligament disrupted

        2.  Allegation was part of an going complaint of pain from 1975 Preexisting right knee surgery Business Records Affidavit 06/26/2002 Arthritis Center of Texas (pg. 2 Medical History)

        3.  Examples – sampling of Past complaints of right knee injury

**3-014**

CONFIDENTIAL INFORMATION

TEXAS HEALTH HARRIS HEB
RADIOLOGIC INTERPRETATION

PATIENT:     LEVEE,CATHEY
PATIENT ID:   9060052031      PHYSICIAN: PECKENPAUGH, DANIEL E
                              COPY TO:
LOCATION:    61-01O      MRN:     E2051258

ADMITTING DIAGNOSIS:  POSS BROKEN KNEE
REASON FOR EXAM:     DERANGEMENT

| EXAM DESCRIPTION | EXAM DATE | EXAM TIME | ORDER # | EXAM CODE |
| --- | --- | --- | --- | --- |
| MRI EXT LWR RT JOINT WO CONT | 04/10/2010 | 2229 | EM1308-10 | 561609 |

Examination:  MRI right knee without contrast

Ordering Physician:  DANIEL E PECKENPAUGH

Date: 4/10/2010 10:29 PM

History: DERANGEMENT

technique: Multiplanar, multi-sequential and right right knee without contrast

Findings:

The anterior cruciate ligament is disrupted. Posterior cruciate ligament is intact. Contusions are seen in the postero-medial and posterior lateral tibia, anterior aspect of the tibia and anteromedial femoral condyles. Fat fluid level seen within a moderate joint effusion suggest articular disruption. Discrete cortical disruption on MRI is not appreciated. Consider thin section CT to identify the sites of likely nondisplaced fracture which is not clearly evident but likely in one of the area of contusions and likely in the posterior aspect of the tibial plateaus.

The medial meniscus is diffusely abnormal with no significant identifiable anterior horn or body and a truncated posterior horn. There is a displaced meniscal fragment seen within the posterior intercondylar notch, image 8 series 6. The lateral meniscus appears intact.

The quadriceps and patellar tendons are intact. The medial collateral ligament appears intact. Extensive soft tissue edema noted about the knee including edema superficial to the medial collateral ligament, likely reactive. The lateral collateral ligament complex is intact.

Small hypointense normality within patient's joint effusion measuring 3.6 mm on image 4 series 6 likely a loose osteocartilaginous body, possibly from either the postero-medial or posterior lateral tibial

CC0022

3-015



**ANDREW CHUBICK, M.D**
**RICHARD C. MERRIMAN, M.D.**
**ERIC HURD, M.D.**
**DIANNE L. PETRONE, M.D.**
**JOHN J. WILLIS, M.D.**
**ALEX LIMANNI, M.D.**
**MARIAN SACKLER, M.D.**

**Specialists in:**

| Arthritis | Bursitis |
| Carpal Tunnel | Connective Tissue |
| Syndrome | Disease |
| Fibromyalgia | Gout |
| Low Back Pain | Osteoporosis |
| Tendinitis | Vasculitis |

## CLINIC NOTE

**PATIENT NAME:** Mehl, Kathey
**DATE OF VISIT:** 06/26/02

**PRIMARY PHYSICIAN:** James Boyd, M.D.

**CHIEF COMPLAINT:** Fibromyalgia and possible lupus.

**HISTORY OF PRESENT ILLNESS:** This is a 43-year-old white woman who reports the onset of muscle and joint pain in 1980s. She feels that the joints are affected at least as much as the muscles. Sometime in the mid 80s, perhaps 1985, she was diagnosed with fibromyalgia. She reports antidepressants did not seem to help very much. She tried nonsteroidals, they did help somewhat. She tried other pain medicines. She was jogging at that time and didn't try any other specific exercise program.

She noted more fatigue and persistent pain into the early 1990s. During that time, she was child bearing and had this added stress.

She reports, earlier in 1996, an episode that initially was thought to be Parvovirus. She had more prominent pain in her hip and went on to have a hip draining because of concerns of a possible sepsis. She reports skin tests suggested yeast or TB, but the culture grew nothing. She was in the hospital for a week and was sent home with IV antibiotics for 10 days.

She points out at that time she was diagnosed with lupus, but had principally just arthritis. She was given prednisone that made her feel crazy, but may not have helped any. She was placed on Plaquenil that she took for about six months, but did not think this helped either. She has not tried other disease-modifying agents.

She continues to have pain in the joints with swelling especially in the hands. Right elbow is swelling as well. In the morning, she is stiff for quite sometime, but when she takes her pain medicine, it only lasts about 30 to 45 minutes. She has some jaw phenomenon. She notes her energy is up and down. She has had some sleep disturbance.

She notes over the last couple of years, she has been taking pain medicines and sleep medicines. She has been taking Vioxx for the last year, average is about three to five tablets per week. She currently is a single mom with two jobs and going to graduate school and is pressing her activity level.

She denies any trouble with her neck. The shoulders, elbows, and wrists have been affected. She has had trouble with the hands as mentioned, but not the lower back.

712 NORTH WASHINGTON • SUITE 200 • DALLAS, TEXAS 75246
4100 W. 15TH • SUITE 118 • PLANO, TEXAS 75093
(214) 823-6503

**3-016**

She also had trouble in the hips, but none since 1996. She had trouble in the right knee, the left ankle, and the feet. There has been known TMJ trouble.

She denies any rashes, photosensitivity, or psoriasis. There has been no alopecia, oral ulcers, dysphagia, colitis, or inflammatory bowel disease. She has had no pleurisy, inflammatory eye disease, or Raynaud's. She has had a little of dry mouth and eyes, but this is on and off and probably related to medicine.

**PAST MEDICAL HISTORY:** Significant for four pregnancies, three deliveries, each complicated by possible infection afterwards. She had an ectopic pregnancy in June 2000, with unilateral salpingectomy. She reports a septic hip as mentioned in 1996. She had childbirth in 1990, 1992, and 1994. She reports cosmetic oral surgery in 1983 and reparative surgery to fix this process in 1984 twice and once in 1985. She reports an appendectomy in 1981, laparotomy in 1981 related to PID. She reports wedge osteotomy of the right foot, two reparative surgeries in 1969. She had a meniscectomy in 1975 in the right knee. She reports wisdom teeth removed in 1975. She had tonsillectomy in 1963. She had bilateral triple arthrodesis of her feet in 1969. She also has history of migraines in the past and was treated with Imitrex, but only two headaches in the last one year related to this. She has other headache; probably it is more tension related. She has been taking Fiorinal #3 upto 10 per month, but does not take much during the summer because she has less stress with her teaching job. She reports a history of generalized seizures. In 1995, when she tried to get off her medications including Xanax, she had four total in 24 hours and was in the hospital overnight, but did not seek any followup for this.

**CURRENT MEDICATIONS:** Include Vioxx 25 mg about three to five per week, Lortab 10 mg two per day, Xanax 1 mg at night, Flexeril 10 mg at night, Fiorinal #3, she has not taken any in a while, but that can be updated 8 to 10 per month. Other treatments are over-the-counter including MSM, DHEA, FAME, DMAE, and 5-HTP for her joints, energy, mood, and sleep.

**ALLERGIES:** None.

**TRANSFUSIONS:** None.

**FAMILY HISTORY:** Positive for fibromyalgia in the mother and gout in the father. There is some rheumatoid in the father's side of family but no lupus.

**SOCIAL HISTORY:** The patient is single, lives with her three children 8,10, and 12. There is no other family close by, no caretaker responsibility. She lives in a two-story house and uses steps a lot. She currently works as an art teacher and is working on Bachelor's in Education. Her second job is in ceramics business with art shows several times a year. Tobacco none, alcohol only once a week.

3-017



**Arthritis Centers of Texas**

ANDREW CHUBICK, M.D
RICHARD C. MERRIMAN, M.D.
ERIC HURD, M.D.
DIANNE L. PETRONE, M.D.
JOHN J. WILLIS, M.D.
ALEX LIMANNI, M.D.
MARIAN SACKLER, M.D.

Specialists in:
Arthritis
Carpal Tunnel
Syndrome
Fibromyalgia
Low Back Pain
Tendinitis

Bursitis
Connective Tissue
Disease
Gout
Osteoporosis
Vasculitis

## CLINIC NOTE

**PATIENT NAME:** Levee, Cathey
**DATE OF VISIT:** 06/20/03

**PRIMARY PHYSICIAN:** R. K. Stahlman, M.D.

**SUBJECTIVE:** The patient returns after two months with a history of rheumatoid arthritis. Since her last visit she has continued eight tablets of Azulfidine per day. She feels that her hands have improved. She has less pain and stiffness there and they are more functional.

She notes her knees and elbows will give her more trouble when she has rainy weather. She notes the hurting and stiffness, but not much swelling. On those days she will take 2.5 mg of prednisone a day for two or three days and then is able to back off and stop.

She continues to have some stiffness in the morning, it may last up to an hour. Her energy is down. She has had no sleep disturbance.

There have been no rashes. She has had some mild constipation. There has been no bleeding. There have been no fevers or chills. She has had some migraine headaches lately.

**OBJECTIVE:**
Vital Signs: Weight 148 pounds. Blood pressure 102/70. Pulse 92. Respirations 18 and unlabored.
General: She is in no apparent distress.
Skin: Without rash.
Musculoskeletal: Joints show tenderness in the right elbow as well as the wrists, MCPs, and PIPs with slight swelling. There is tenderness in the MCPs 1 through 5 bilaterally with some deformity. Knees and ankles show no synovitis or effusion today.

**LABORATORY STUDIES:** Laboratory data has been stable.

**IMPRESSION:** Rheumatoid arthritis with fairly good control at the present.

**PLAN:**
1. Continue Azulfidine at same dose.
2. UA, hemogram, ESR, CRP, and SMAC.
3. Return for visit in eight weeks, sooner if necessary.

John J. Willis, M.D.
JWL/nrs

cc:    R. K. Stahlmann, D.O.
       9208 Elam Road, Suite 100
       Dallas, TX 75217-4171

712 NORTH WASHINGTON • SUITE 200 • DALLAS, TEXAS 75246
4100 W. 15TH • SUITE 118 • PLANO, TEXAS 75093
(214) 823-6503



**Arthritis Centers of Texas**

ANDREW CHUBICK, M.D
RICHARD C. MERRIMAN, M.D.
ERIC HURD, M.D.
DIANNE L. PETRONE, M.D.
JOHN J. WILLIS, M.D.
ALEX LIMANNI, M.D.
MARIAN SACKLER, M.D.
HIMANSHU PATEL, D.O.

Specialists i...
Arthritis
Carpal Tunnel
Syndrome
Fibromyalgia
Low Back Pain
Tendinitis

Bursitis
Connective Tissue
Disease
Gout
Osteoporosis
Vasculitis

## CLINIC NOTE

**PATIENT NAME:** Levee, Cathey
**DATE OF VISIT:** 04/25/06

**PRIMARY PHYSICIAN:** R.K. Stahlmann, D.O.

**SUBJECTIVE:** The patient returns after three months with a history of rheumatoid arthritis. At the time of her last visit, she had an area of focal irritation and pain in the left lateral ankle area. She was found to have a fracture of the distal fibula and was casted for several weeks and that got much better.

She notes doing fairly well with her joints until the last week or so when she has had a flare-up. She has had more trouble with the right elbow, right inner ear, as well as the hands and feet. She has had some swelling in the joints and they are stiff in the morning. Energy is down some. She has had no sleep disturbance.

She also notes more burning, numbness, and pain to feet as well. There has been no focal weakness. She has had no rashes, nausea, vomiting, epigastric pain, or mucocutaneous bleeding. She still has some low-grade fevers at times with no high-grade fever. She has had no headaches.

**OBJECTIVE:**
Vital Signs: Weight 173 pounds. Blood pressure 123/74. Pulse 102. Respirations 20 and unlabored. Temperature 98.3.
General: She is in no apparent distress.
Skin: Without rash in the upper and lower extremities, trunk, and back.
Lungs: Clear to auscultation and percussion.
Musculoskeletal: Joints showed tenderness with slight swelling of the MCPs and PIP, bilaterally as well as the MTPs bilaterally. There is trace synovitis of the right knee.

**IMPRESSION:** Rheumatoid arthritis with some flare.

**PLAN:**
1. Continue current medications.
2. Burst and taper of prednisone 20 mg a day for two days, 15 mg a day for two days, 10 mg a day for two days, 5 mg a day for two days, and then stop.
3. UA, hemogram, ESR, CRP, and SMAC.
4. Return to clinic in three months or sooner if necessary.

John J. Willis, M.D.
JWI/pla/nek/smo

cc: R.K Stahlmann, D.O.
9208 Elam Road, Suite #100
Dallas, TX 75217

712 NORTH WASHINGTON SUITE 300 DALLAS, TEXAS 75246
2929 N. CENTRAL EXPRESSWAY SUITE 225 RICHARDSON TEXAS 75080
(214) 823-6503



ANDREW CHUBICK, M.D
RICHARD C. MERRIMAN, M.D.
CHRISTOPHER TEHLIRIAN, M.D.
DIANNE L. PETRONE, M.D.
JOHN J. WILLIS, M.D.
ALEX LIMANNI, M.D.
MARIAN SACKLER, M.D.
HIMANSHU PATEL, D.O.
PRIYA K. NAIR, M.D.
LINDA TEAGUE, M.D.

Specialists in:
Arthritis          Bursitis
Carpal Tunnel      Connective Tissue
Syndrome           Disease
Fibromyalgia       Gout
Low Back Pain      Osteoporosis
Tendinitis         Vasculitis

## CLINIC NOTE

**PATIENT NAME:** Levee, Cathey
**DATE OF VISIT:** 12/30/10

**PRIMARY PHYSICIAN:** R.K. Stahlman, M.D.

**SUBJECTIVE:** The patient returns after one month with a history of severe rheumatoid arthritis. Since last visit, she has continued Arava 20 mg per day and has had about 2 months and a week or so on the medicine. She has not noted any difficulty taking the medicine.

She notes a flare up of arthritis in early December with the right knee swelling and hurting and the left foot swelling and hurting. She did a burst and taper of steroids and noticed that they both get better, but the knee especially got better. She finally got off the prednisone on 12/18/10. She is to continue her other medications.

She also has been seeing an orthopedic surgeon initially and he recommended treating the arthritis first and she had persistent pain in the left foot. She went back yesterday and got a cast because of a fracture in the left foot.

She denies any new rashes. She still has her eczema and takes treatment for it. She has had no nausea, vomiting, epigastric pain, or mucocutaneous bleeding. There have been no fevers, chills, or infections. She has had no headaches.

She notes stiffness in the morning that is currently around 10 to 15 minutes. She notes the other joints have been fine. Her energy is up and down some and her sleep is fine.

**OBJECTIVE:**
Vital Signs: Weight 181 pounds. Blood pressure 170/110, repeat 160/100. Pulse 100. Respirations 18 and unlabored. Temperature 98.6.
General: She is in no apparent distress.
Skin: Shows a mild eczematous rash.
Lungs: Clear to auscultation and percussion.
Heart: Regular rate and rhythm.
Musculoskeletal: Joints show mild tenderness and trace swelling of the right knee. There is some tenderness in the MTPs on the right. The left foot and lower legs are in a cast.

712 NORTH WASHINGTON SUITE 300 DALLAS, TEXAS 75246
2929 N. CENTRAL EXPRESSWAY SUITE 225 RICHARDSON TEXAS 75080
(214) 823-6503

**3-020**



ANDREW CHUBICK, M.D
RICHARD C. MERRIMAN, M.D.
CHRISTOPHER TEHLIRIAN, M.D.
DIANNE L. PETRONE, M.D.
JOHN J. WILLIS, M.D.
ALEX LIMANNI, M.D.
MARIAN SACKLER, M.D.
HIMANSHU PATEL, D.O.
PRIYA K. NAIR, M.D.
LINDA TEAGUE, M.D.

Specialist

Arthritis
Carpal Tunnel
Syndrome
Fibromyalgia
Low Back Pain
Tendinitis

Bursitis
Connective Tissue
Disease
Gout
Osteoporosis
Vasculitis

## CLINIC NOTE

**PATIENT NAME:** Levee, Cathey
**DATE OF VISIT:** 04/23/08

**PRIMARY PHYSICIAN:** R.K. Stahlman, D.O.

**SUBJECTIVE:** The patient returns after four months with a history of rheumatoid arthritis. Since last visit, she had one flare in last month. Her right knee was hurting and swollen. It seemed particularly bad for about 10 days and she actually had to use a walker for three days and got better after that and is not so bad now.

She notes continuing to have some pain especially in the hands and feet. She has not had a lot of swelling. She is stiff in the morning some. Her energy has been up and down some.

She has had no rashes. She notes stress-related GI troubles but no bleeding. There have been no fevers or chills recently. She does have migraine headaches off and on.

She notes in February having an abscess in the right fourth toe that had to be drained, and she had to take antibiotics for it. She has had strep throat four times in the last four months with antibiotics each time. She has had some atypical chest pain, not associated with exertion.

**OBJECTIVE:**
Vital Signs: Weight 152 pounds. Blood pressure 136/80. Pulse 100. Respirations 16 and unlabored. Temperature 99.0.
General: She is in no apparent distress.
Skin: Without rash in the upper and lower extremities, trunk and back.
Lungs: Clear to auscultation and percussion.
Musculoskeletal: Joints show tenderness in the PIP joints and MTP joints. There is some tenderness in the right wrist. There is evidence of previous infection and hyperpigmentation of the right fourth toe.

**IMPRESSION:**
1. Rheumatoid arthritis with some persistence.
2. Some secondary degenerative disease.

**3-021**

**(5)** *Posterior crucial ligament was torn*

    a. Completely false.

        1. The fact in the evidence in Affidavit Texas Health HEB 00022

            a. Posterior crucial ligament is intact –( 2nd sentence.)

MRN: 106210HEB  Visit: 8060052031  DocType: 9500          CONFIDENTIAL INFORMATION

TEXAS HEALTH HARRIS HEB
RADIOLOGIC INTERPRETATION

PATIENT:   LEVEE,CATHEY
PATIENT ID:   9060052031     PHYSICIAN: PECKENPAUGH, DANIEL E
BIRTHDATE:             COPY TO:
LOCATION:   61-01O      MRN:   E2051258

ADMITTING DIAGNOSIS: POSS BROKEN KNEE
REASON FOR EXAM:   DERANGEMENT

| EXAM DESCRIPTION | EXAM DATE | EXAM TIME | ORDER # | EXAM CODE |
|---|---|---|---|---|
| MRI EXT LWR RT JOINT WO CONT | 04/10/2010 | 2229 | EM1308-10 | 561609 |

Examination: MRI right knee without contrast

Ordering Physician: DANIEL E PECKENPAUGH

Date: 4/10/2010 10:29 PM

History: DERANGEMENT

Technique: Multiplanar, multi-sequential and right right knee without contrast

Findings:

The anterior cruciate ligament is disrupted. Posterior cruciate ligament is intact. Contusions are seen in the postero-medial and posterior lateral tibia, anterior aspect of the tibia and anteromedial femoral condyles. Fat fluid level seen within a moderate joint effusion suggest articular disruption. Discrete cortical disruption on MRI is not appreciated. Consider thin section CT to identify the sites of likely nondisplaced fracture which is not clearly evident but likely in one of the area of contusions and likely in the posterior aspect of the tibial plateaus.

The medial meniscus is diffusely abnormal with no significant identifiable anterior horn or body and a truncated posterior horn. There is a displaced meniscal fragment seen within the posterior intercondylar notch, image 8 series 6. The lateral meniscus appears intact.

The quadriceps and patellar tendons are intact. The medial collateral ligament appears intact. Extensive soft tissue edema noted about the knee including edema superficial to the medial collateral ligament, likely reactive. The lateral collateral ligament complex is intact.

Small hypointense normality within patient's joint effusion measuring 3.6 mm on image 4 series 6 likely a loose osteocartilaginous body, possibly from either the postero-medial or posterior lateral tibial

Printed by GANNC2          Page 5         CC0022     Job # 13340852 at 05/04/10 12:57:51

**(6)** *And medial meniscus torn*

    a. Partially incorrect

        1. The  fact in evidence in Affidavit Texas Health

        HEB 00022

            a. medial meniscus diffusely abnormal

                i. Prior surgery 1975

*(7)Fibula fractured in two places*

    a. Incorrect – medical evidence shows one slight subtle proximal fibular fracture (crack).

        1. Second fracture is untrue and nowhere in medical evidence.

        2. Based on history in evidence fractures as a chronic condition existed, occurring before and since April 10 2010.

            a. 4/25/06 Casting for fibular fracture

            b. 12/30/10 Casting for fibular fracture

            c. Acute on chronic for fractures (Dr. Kadoko)

        3. In fact the evidence in Affidavit Texas Health HEB 00024 indicates a single possible fracture barely evident

4/25/06 Casting for fibular fracture (Subjective)

**3-024**



ANDREW CHUBICK, M.D
RICHARD C. MERRIMAN, M.D.
ERIC HURD, M.D.
DIANNE L. PETRONE, M.D.
JOHN J. WILLIS, M.D.
ALEX LIMANNI, M.D.
MARIAN SACKLER, M.D.
HIMANSHU PATEL, D.O.

Specialists i...
Arthritis            Bursitis
Carpal Tunnel        Connective Tissue
Syndrome             Disease
Fibromyalgia         Gout
Low Back Pain        Osteoporosis
Tendinitis           Vasculitis

## CLINIC NOTE

**PATIENT NAME:** Levee, Cathey
**DATE OF VISIT:** 04/25/06

**PRIMARY PHYSICIAN:** R.K. Stahlmann, D.O.

**SUBJECTIVE:** The patient returns after three months with a history of rheumatoid arthritis. At the time of her last visit, she had an area of focal irritation and pain in the left lateral ankle area. She was found to have a fracture of the distal fibula and was casted for several weeks and that got much better.

She notes doing fairly well with her joints until the last week or so when she has had a flare-up. She has had more trouble with the right elbow, right inner ear, as well as the hands and feet. She has had some swelling in the joints and they are stiff in the morning. Energy is down some. She has had no sleep disturbance.

She also notes more burning, numbness, and pain to feet as well. There has been no focal weakness. She has had no rashes, nausea, vomiting, epigastric pain, or mucocutaneous bleeding. She still has some low-grade fevers at times with no high-grade fever. She has had no headaches.

**OBJECTIVE:**
Vital Signs: Weight 173 pounds. Blood pressure 123/74. Pulse 102. Respirations 20 and unlabored. Temperature 98.3.
General: She is in no apparent distress.
Skin: Without rash in the upper and lower extremities, trunk, and back.
Lungs: Clear to auscultation and percussion.
Musculoskeletal: Joints showed tenderness with slight swelling of the MCPs and PIP, bilaterally as well as the MTPs bilaterally. There is trace synovitis of the right knee.

**IMPRESSION:** Rheumatoid arthritis with some flare.

**PLAN:**
1. Continue current medications.
2. Burst and taper of prednisone 20 mg a day for two days, 15 mg a day for two days, 10 mg a day for two days, 5 mg a day for two days, and then stop.
3. UA, hemogram, ESR, CRP, and SMAC.
4. Return to clinic in three months or sooner if necessary.

John J. Willis, M.D.          cc:     R.K Stahlmann, D.O.
JWI/pla/nek/smo                        9208 Elam Road, Suite #100
                                       Dallas, TX 75217

712 NORTH WASHINGTON SUITE 300 DALLAS, TEXAS 75246
2929 N. CENTRAL EXPRESSWAY SUITE 225 RICHARDSON TEXAS 75080
(214) 823-6503

3-025



**ANDREW CHUBICK, M.D**
**RICHARD C. MERRIMAN, M.D.**
**CHRISTOPHER TEHLIRIAN, M.D.**
**DIANNE L. PETRONE, M.D.**
**JOHN J. WILLIS, M.D.**
**ALEX LIMANNI, M.D.**
**MARIAN SACKLER, M.D.**
**HIMANSHU PATEL, D.O.**
**PRIYA K. NAIR, M.D.**
**LINDA TEAGUE, M.D.**

Specialists in:
**Arthritis**          **Bursitis**
**Carpal Tunnel**   **Connective Tissue**
**Syndrome**         **Disease**
**Fibromyalgia**     **Gout**
**Low Back Pain**   **Osteoporosis**
**Tendinitis**        **Vasculitis**

## CLINIC NOTE

**PATIENT NAME:** Levee, Cathey
**DATE OF VISIT:** 12/30/10

**PRIMARY PHYSICIAN:** R.K. Stahlman, M.D.

**SUBJECTIVE:** The patient returns after one month with a history of severe rheumatoid arthritis. Since last visit, she has continued Arava 20 mg per day and has had about 2 months and a week or so on the medicine. She has not noted any difficulty taking the medicine.

She notes a flare up of arthritis in early December with the right knee swelling and hurting and the left foot swelling and hurting. She did a burst and taper of steroids and noticed that they both get better, but the knee especially got better. She finally got off the prednisone on 12/18/10. She is to continue her other medications.

She also has been seeing an orthopedic surgeon initially and he recommended treating the arthritis first and she had persistent pain in the left foot. She went back yesterday and got a cast because of a fracture in the left foot.

She denies any new rashes. She still has her eczema and takes treatment for it. She has had no nausea, vomiting, epigastric pain, or mucocutaneous bleeding. There have been no fevers, chills, or infections. She has had no headaches.

She notes stiffness in the morning that is currently around 10 to 15 minutes. She notes the other joints have been fine. Her energy is up and down some and her sleep is fine.

**OBJECTIVE:**
Vital Signs: Weight 181 pounds. Blood pressure 170/110, repeat 160/100. Pulse 100. Respirations 18 and unlabored. Temperature 98.6.
General: She is in no apparent distress.
Skin: Shows a mild eczematous rash.
Lungs: Clear to auscultation and percussion.
Heart: Regular rate and rhythm.
Musculoskeletal: Joints show mild tenderness and trace swelling of the right knee. There is some tenderness in the MTPs on the right. The left foot and lower legs are in a cast.

712 NORTH WASHINGTON SUITE 300 DALLAS, TEXAS 75246
2929 N. CENTRAL EXPRESSWAY SUITE 225 RICHARDSON TEXAS 75080
(214) 823-6503

Acute on Chronic for Fractures per Dr. Kadoko (Assessment)

**Progress Note**

Patient: LEVEE, CATHEY
DOB: █
Phone: █
Address: █

Provider: Robert Kadoko, MD
Date: 09/23/2011

## Subjective:

**CC:**
1. 4 WEEK F/U.

**HPI:**
Orthopedic History:
The primary pain or problem is in the Right Knee and Left foot/ankle pain. They were referred here by: hospital ER. The pain level (1-10) is 6/10 in the ankle, throbbing constantly - 7/10 in the knee, throbbing . The problem started with an altercation 4-12-2010 right knee and 3 days ago ankle pain began no known injury. The following tests have been done none since the last visit - she had septic hip surgery on the right on 9/7/2011. The following treatments have been done none - she states she does not feel the ankle is healing at all.

**Medical History:** Hypothyroidism, Hypotension, Arthritis, Lung disease (Arthritis Node), Rheumatoid arthritis.

**Surgical History:** Hip Surgery (Septic Hip drainage) , Knee Surgery (Right Menisectomy) , Ankle Surgery (triple arthidosis) bilateral , Tonsillectomy .

**Family History:** 1daughter(s) - healthy.

**Social History:** Handedness: Right. no PCP, no Alcohol. Caffeine: yes, daily. no Recreational drug use. Occupation: Full-Time, , Full Duty.

**Medications:** Arava , Ibuprofen , Adderall , Progesterone , Cortef , Armour Thyroid , Minocycline HCl , Soma 350 MG Tablet 1 tablet as needed Four times a day, Phenergan 50 MG tablet 1 tab(s) every 6 hours as needed, Norco 10-325 MG Tablet 1-2 tablet as needed for pain every 4 hrs, Soma

**Allergies:**

## Objective:

**Vitals:** Ht 69, Wt 160, BMI 23.63, BP 175/104, Temp 96.9, HR 116.

**Examination:**
X-Rays Studies::
X-Rays taken here: KADOKO,ROBERT G 8/19/2011 12:53:52 PM > . Ankle X-Rays: Left AP/LAT/Mortise views show: Distal third fibula fx, healing callus is visible. Severe, severe degenerative changes in the tibio-talar jt sp triple arthrodesis.

**Physical Examination:**
General:
General appearance: Alert and Oriented x 3 (Time, Place, Person). General appearance: pleasant, well nourished.

## Therapeutic Interventions:

## Assessment:

**Assessment:**
1. Sprain and strain of cruciate ligament of knee - 844.2 (Primary)
2. Tear of medial cartilage or meniscus of knee, current - 836.0
3. Closed fracture of metatarsal bone(s) - 825.25, Left
4. Closed fracture of lateral malleolus - 824.2

52F with new lateral malleolus fx. It is at least 2 months old maybe longer. Xrays today show acute-on-chronic fx. Considered placing in cast but last cast caused severe skin problems. She cannot use crutches because of severe upper extremity weakness. Secondly she is on 6 weeks of IV abx for hip infection. So I

00036

**3-027**

**Plan:**

**1. Sprain and strain of cruciate ligament of knee** Continue Norco Tablet, 10-325 MG, 1-2 tablet as needed for pain, Orally, every 4 hrs, 60, Refills 0 ;  Start Soma Tablet, 350 MG, 1 tablet as needed, Orally, Four times a day, 60, Refills 0 ;  Start Phenergan tablet, 50 MG, 1 tab(s), orally, every 6 hours as needed, 60, Refills 0

The patient states she has been hurting for about the past three days. She went to her arthritis doctor, but he told her if her pain is not in a joint its probably not arthritis. The xrays show a fracture that is about 8 weeks old and is healing. Regarding her foot, I will give her Dr. Ahuero's name if she would like further consult regarding her flat feet and previous ankle fusion. Continue with the walker boot. The one she has is not sufficient, I will provide her with a walker boot.

**Procedures:**
  DME SCRIPT:
    Orthosis ONE WALKER BOOT FOR THE LEFT LEG.

**Immunizations:**

**Diagnostic Imaging:** X ray: Ankle, left 2v Lofton,Schon 8/19/2011 12:57:54 PM

**Labs:**

**Procedure Codes:** 73600 X-RAY ANKLE - 2 VIEWS

**Preventive:**

**Follow Up:** 4 Weeks (Reason: F/U and xrays)

**Provider:** Robert Kadoko, MD
**Patient:** LEVEE, CATHEY  **DOB:** 09/11/1958  **Date:** 08/19/2011

**Electronically signed by ROBERT KADOKO , MD on 01/24/2012 at 09:44 AM CST**
**Sign off status:** Pending

**3-028**

## 00024 HEB

CONFIDENTIAL INFORMATION

TEXAS HEALTH HARRIS HEB
RADIOLOGIC INTERPRETATION

PATIENT:      LEVEE,CATHEY
PATIENT ID:   9060052031       PHYSICIAN: PECKENPAUGH, DANIEL E
BIRTHDATE:    ███████         COPY TO:
LOCATION:     61-01O          MRN:    E4943877

ADMITTING DIAGNOSIS:  POSS BROKEN KNEE
REASON FOR EXAM:     INJURY

| EXAM DESCRIPTION | EXAM DATE | EXAM TIME | ORDER # | EXAM CODE |
|---|---|---|---|---|
| TIBIA FIBULA 2 VIEWS RT | 04/10/2010 | 2040 | ED16541-10 | 501140 |

Examination: Tibia-fibula 2 views right side

Ordering Physician: Peckenpaugh, Daniel

Date: 4/10/2010 8:35 PM

History: Injury

Findings: Frontal and lateral radiographs of the right tibia and
fibula are submitted. Correlation is made with the patient in the
examination performed earlier. The oblique proximal fibular
diaphyseal fracture is very subtle on this examination and only
identified a correlating with the examination is a currently is
nondisplaced with only a subtle oblique lucency. The more distal
fibula appears intact. Question subtle cortical disruption in the
posterior proximal tibia along the plateau, seen on the lateral view.
A staple is seen in the talus.

Impression:

Subtle proximal fibular fracture barely evident, and better seen on
the examination as it is less displaced currently

Question subtle cortical regularity of the posterior tibia proximally
at the knee on the lateral view. Consider CT or MRI for further
evaluation.

Electronically Signed by: William Elkins, MD on 4/10/2010 8:39 PM
DICTATED BY:   ELKINS, WILLIAM NELSON
TRANSCRIBED BY/ON: TR  04/10/2010

Report Status:  Final

THIS REPORT IS VERIFIED AND FINALIZED ONLY IF SIGNED BY A RADIOLOGIST.

PECKENPAUGH, DANIEL E

1600 Hospital Parkway

000024

3-029

**(8)**_Later learned a rib had been broken during assault_

    a.  Untrue

        1.  HEB Business Affidavit 000013 –No other Injuries at this time. No other Complaints. Denys any other injury during this incident

        2.  No complaint made from 4/10/2010 to 5/09/2010 despite numerous doctor and therapy visits

        3.  Medical report 5/09/2010 cannot state any time of injury – only "Focal soft tissue adjacent to the left lateral fourth rib which has areas of cortical disruption. This could be a minimally displace fracture although malignant etiology is not excluded".

    b.  No medical evidence before the court of a rib injury

    c.  Photograph and testimony indicate injury to right side of chest.

**ED Physician Note (continued)**

knee, severely twisting her knee. Pt states when she tries to walk on knee, if feels wobbly and goes out on her. No other injuries at this time. No other complaints. Pt has hx of RA and mild right menisectomy as a teenager. Denies any other injury during this incident.

**FAMHX:** none

Past Medical History
Diagnosis                                                Date
  • Rheumatic Disease
  • Hypertension

Past Surgical History
Procedure                                                Date
  • Appendectomy
  • Tonsillectomy

**Tobacco Use History:** reports that she has never used tobacco.
**Alcohol Use History:** reports that she does not drink alcohol.
**Drug Use History:** reports that she does not use illicit drugs.

**Allergies: No Known Allergies**

Previous Medications
HYDROCORTISONE (CORTEF) 5 MG TABLET          take 5 mg by mouth three(3) times daily.
LEVOTHYROXINE SODIUM (SYNTHROID) 100 MCG TAB  take 100 mcg by mouth every day.
OTHER MED                                     atterol 30 mg po qam 50 po qpm

Review of Systems
Musculoskeletal: Positive for joint pain **(Right knee pain secondary to injury)**. Negative for falls.
Neurological: Negative for loss of consciousness.

| ED Triage Vitals | | |
|---|---|---|
| BP | 04/10/10 1919 | **171/90 mmHg** |
| Pulse | 04/10/10 1919 | **123** |
| Resp | 04/10/10 1919 | **20** |
| Temp | 04/10/10 1919 | 98 °F (36.7 °C) |
| Temp src | 04/10/10 1919 | Oral |
| SpO2 | 04/10/10 1919 | 98 % WNL on RA |
| Pain Scale | 04/10/10 1919 | **9** |
| Oxygen Flow Rate (L/min) | -- | |
| O2 Delivery Device | 04/10/10 1919 | **Room Air** |
| Trauma Level | -- | |

TEXAS HEALTH HEB          LEVEE,CATHEY
                          MRN: 000106210
                          Acct #: 9060052031      000013
                          Admit Date: 04/10/2010
Page 8                    Printed By GANNC at 5/4/10 12:58 PM

Medical Report 05/09/2010 – left lateral rib

**3-031**

TEXAS HEALTH HARRIS HEB
RADIOLOGIC INTERPRETATION

PATIENT:   LEVEE, CATHEY
PATIENT ID:  9060060856     PHYSICIAN: JACKSON, RICHARD A
BIRTHDATE: ▓▓▓▓▓▓      COPY TO:
LOCATION:   03-010      MRN:    E2051258

ADMITTING DIAGNOSIS: EMS/3
REASON FOR EXAM:    PAIN SHORTNESS OF BREATH

| EXAM DESCRIPTION | EXAM DATE | EXAM TIME | ORDER # | EXAM CODE |
|---|---|---|---|---|
| CTA THORAX ANGIO | 05/09/2010 | 0609 | EC10026-10 | 530446 |

Examination: CT angiogram of the chest with contrast

Ordering Physician: RICHARD A JACKSON

Date: 5/9/2010 6:09 AM

History: PAIN SHORTNESS OF BREATH

Technique: Computed tomographic examination of the chest was performed after the administration of nonionic intravenous contrast according to the chest CTA protocol. Coronal 3-D MIPs were generated.

Findings:

There is good opacification of the pulmonary arterial system and there is no pulmonary embolism. No evidence of thoracic aortic dissection or aneurysm. Heart and pericardium are unremarkable.

5.1 x 2.3 cm ovoid heterogeneous soft tissue mass in the right pectoralis minor muscle on image 171 series 2. Focal soft tissue adjacent to the left lateral fourth rib which has areas of cortical disruption. This could be a minimally displaced fracture although malignant etiology is not excluded.0100509061817.

No pathologically enlarged adenopathy noted.

No pleural effusion. No focal infiltrate. Areas of atelectasis in the lower lobes. 6.5-mm subpleural nodule in the left upper lobe posteriorly on image 189 series 2.

Limited images of the upper abdomen are grossly unremarkable.

Impression:

No evidence of pulmonary embolism

Heterogeneous soft tissue mass in the right pectoralis minus muscle could be a hematoma although malignant lesion such as a metastasis or

Printed by EERUBJS                           Page 1                    Job # 13404546 at 05/12/10 06:46:42

Testimony pertaining to injury on Right Side of Chest

A.   Yes.

Q.   These are photographs that were taken of your injuries a couple of days after the assault?

A.   Yes.

Q.   How long after the assault were these pictures taken?

A.   Either the 12th or the 13th.

Q.   So we're talking two or three days later?

A.   Yes.

Q.   And do State's Exhibits 4 and 8 accurately reflect the picture -- the injuries you had at that time?

A.   They're -- yes, they are accurate.

Q.   And I want to show you State's Exhibit No. 9. Are these the medical records -- your medical records from HEB hospital from that night?

A.   Yes.

MR. RODGERS:  Your Honor, we would offer State's Exhibits 4 through 9, inclusive, into evidence. For the record, State's Exhibit No. 9, we've had a business records affidavit and notice of intent to offer these business records on file for the required amount of time.

MR. BELL:  I have no objection to State's Exhibit 9.  However, State's Exhibit 4, 5, 6, 7 and 8, I

3-033

Copy of Pictures submitted into evidence indicate right side of body





10/06/2010 Radiology report indicating Left side injury of unknow time.

# RADIOLOGY  ASSOCIATES

### The Center for Cancer and Blood Disorders
800 W Magnolia
Fort Worth, TX 76104
Phone: (817) 759-7000    Fax:  (817) 759-7027
www.rstc.com

| | | |
|---|---|---|
| Patient Name: | LEVEE, CATHEY E | |
| DOB: | SEX: F    Phone: (817) 994-3684 | MRN: RA3634283 |
| Physician: | FRIESS, GREGORY G, DO | Date of Exam: 10/06/2010 |
| | | Accession: 3724554 |

Exam:  DIAGNOSTIC PET/CT THORAX WITH CONTRAST (71260)
Reason: PULMONARY NODULE

**Final Report**

CLINICAL HISTORY:

Pulmonary nodules.

TECHNIQUE:

After IV injection 100 cc Omnipaque-350 and oral administration of oral contrast, CT is performed from lung bases through proximal thighs with CT of chest, abdomen and pelvis reviewed here.

COMPARISON:

CT angiogram chest and CT chest performed at Harris HEB, performed on 5/09/10 and 8/12/10 respectively.

CT CHEST :

FINDINGS:

No mediastinal or hilar lymphadenopathy is seen.  There is no pericardial effusion. Thoracic esophagus appears unremarkable.  There is no axillary lymphadenopathy.

Right middle lobe nodule measures about 8-9 mm.  I measured this same nodule at about 8-9 mm on the CT from 8/12/10.   Nodule at the lung base in the right lower lobe just above the right hemidiaphragm measures up to about 10-11 mm in maximal diameter.  I measure that nodule at

This Facsimile may contain PRIVILEGED, CONFIDENTIAL AND/OR OTHERWISE PROTECTED INFORMATION intended only for the use of the addressee. Unauthorized distribution or use of the facsimile or its contents is strictly prohibited. If you are not the addressee, the person responsible for delivering this message to the addressee, or have received this facsimile in error, please immediately notify us by telephone at the number above and destroy this information. Thank you.

Patient Name:    LEVEE, C  JEY E                          MRN:         RA3634283
DOB:                      SEX: F    Phone: (817) 994-3684      Date of Exam:  10/06/2010
Physician:    FRIESS, GREGORY G, DO                       Accession:   3724554

Exam:    DIAGNOSTIC PET/CT THORAX WITH CONTRAST (71260)

10-11 mm on the previous exam. There is a new small nodule in the right lateral costophrenic sulcus measuring about 5 mm. No additional significant pulmonary nodules are seen in the right lung.

In the posterior left upper lobe, there is a 4 mm pulmonary nodule. It appears slightly smaller than on study 5/08/10 and is slightly smaller than it was on the study from 8/12/10. No new nodules are seen elsewhere in the left lung. No significant infiltrate is seen. Mild ground-glass changes in the lungs on the PET scan are probably atelectasis. No significant air-space disease is seen on the breath-hold CT images.

There is a healed lateral left fourth rib fracture and posterior fourth and fifth rib and seventh rib fractures.

**IMPRESSION:**

1.  Stable right middle lobe and right lower lobe nodules compared to August study. New 5 mm nodule right lateral costophrenic sulcus. No to minimal activity was seen in these nodules on PET scan. Benign process is suggested, but low-grade malignancy is not excluded and would continue to follow with chest CT to prove two years of stability or decrease in size.

2.  4-5 mm posterior left upper lobe nodule. It is actually slightly smaller than it was on the two previous exams.

3.  No other significant abnormalities in the chest.

**CT ABDOMEN:**

**FINDINGS:**

Mild perfusion variant is seen adjacent to the fissure for ligamentum of teres without other significant focal abnormality in the liver. Gallbladder is present and grossly unremarkable. Spleen appears unremarkable. Pancreas and adrenal glands appear unremarkable. There is no upper abdominal lymphadenopathy.

Bilateral kidneys demonstrate no evidence of hydronephrosis. There is a low-attenuation round lesion in the mid right kidney measuring about 7 mm which is probably a cyst. A tiny exophytic

This Facsimile may contain PRIVILEGED, CONFIDENTIAL AND/OR OTHERWISE PROTECTED INFORMATION intended only for the use of the addressee. Unauthorized distribution or use of the facsimile or its contents is strictly prohibited. If you are not the addressee, the person responsible for delivering this message to the addressee, or have received this facsimile in error, please immediately notify us by telephone at the number above and destroy this information. Thank you.

10/06/2010   There is a healed lateral left fourth rib fracture and posterior fourth and fifth rib and seventh rib fracture.

Frontal image of the rib cage. Ribs 1-12 demonstrate the variable shape of the upper 9

3-036



The location of specific rib fractures is an important indicator of related injury.

| | | |
|---|---|---|
| Healed Lateral | Left Fourth Rib Fracture | |
| Healed posterior | Left Fourth Rib Fracture | |
| Healed posterior | Left Fith Rib Fracture | |
| Healed posterior | Left Seventh Rib Fracture | |



Area referenced in pictures and testimony

POSTERIOR VIEW



**(9)** *Suffering from Rheumatoid arthritis form many years She occasionally used a wheel chair to move around*

a. False

1. The wheel chair is unrelated to the Rheumatoid Arthritis as stated in the record

2. Wheel chair was the result of an attempt at a civil lawsuit in a 2009 auto Accident(pg. ID 531)

3. Wheelchair was admitted to Dr. Kadoko as being "At the recommendation of my attorney" (Bus. Rec Aff. Dr. Kadoko 4/23/2010)

Wheelchair was result of claim of lower back injury in 2009 Auto Accident attempted lawsuit and additional source of Pain Medications.

**3-039**

Q. What was it?

A. We had gone to a Rangers game.

Q. Texas Rangers baseball game?

A. Yes.

Q. What time did you go?

A. Around 10:00 o'clock in the morning. We went early because Katy had won an art contest, and that's why we were going.

Q. Who all was going?

A. Alexandra, Andrea, Katy and myself.

Q. The Defendant wasn't going?

A. No.

Q. Do you remember what he was doing that day?

A. Staying home.

Q. At that time, going to the game, did you just go on foot, or did you have to take a wheelchair?

A. I had to take the wheelchair.

Q. Tell the Court why you were in a wheelchair at that time?

A. I had been in a -- a car accident that hurt my lower back in 2009, and had been in a wheelchair for several months, but was getting well and used the wheelchair only for long distances.

Q. Did you use the wheelchair at home at that time?

3-040

Business record Affidavit of Dr. Kadoko 4/23/2010 "recommendation of my attorney"

**Texas Orthopedic & Spine Associates**
2008 L. Don Dodson Drive, Suite 110, Bedford, TX 76021 - Phone: 817-288-0084 - Fax: 817-445-1039

**Visit Date:** 4/23/2010
**Patient Name:** LEVEE, CATHEY
**DOB:** ▉▉▉▉▉▉
**Referred By:** Robert Kadoko, MD
**Primary Insurance:** UNITED HEALTHCARE
**Treating Physician:** Robert Kadoko, MD

This 51 year old female presents today for followup orthopedic evaluation. She indicates the problem location is the right knee. She states her husband had surgery on Friday and was unable to sleep and very agitated. He did a military kick on her, knocking her right leg from underneath her. She heard a pop and was unable to stand or use the leg. She went to Harris HEB the same night, had xrays and pain medications, was placed in a leg immobilizer, and referred here. Pain is described as aching and throbbing and constant. She also complains of tightness and muscle spasms. Patient indicates activity worsens condition. Symptoms are associated with bruising, swelling and Numbness. She states her toes are numb. Severity of pain is 8 on a scale of 1-10 with 10 being the worst. Prior tests/treatments for this condition include physical therapy 3 times per week for 2weeks, with mild relief from pain. Patient occupation not known. The patient's main occupation is a counselor at Dunbar High School. Date of Injury: 4/10/2010.
**Review of Systems:** No abnormal findings with the exception of the chief complaint.
**Allergies:** No known medical allergies.
**Physical Exam:** Temp: 96.2 Height: 5 ft. 9.000 in. Weight: 170 lbs. BMI: 25
Patient is a 51 year old female who appears his given age and in no apparent distress.
**Right Knee Examination:**
Inspection of the anterior aspect of right lower leg and right gastrocnemius muscle reveals extensive ecchymosis.
There is a severe effusion.
Right knee flexion is 75 degrees. Right knee extension is 0 degrees (full extension).
Pain with knee flexion is moderate.
Patient very apprehensive, and ligamentous exam not conclusive.

**Test Results:**
**X-Ray Results:** Test Results: No tests to report at this time.
**Impression:** Anterior cruciate ligament (ACL), acute tear (844.2). Medial meniscus, acute tear (836.0). We had a long discussion again. she wants the knee fixed, but she came in a motorized scooter. Given that she uses that, it suggests her functional level is limited; coupled with the RA, it is not clear that ACL reconstructiion is indicated. She really said the scooter was obtained on the reccomendation of her attorney. That she is otherwise 'very active'. In any case her ROM is still inadequate. I counseled her extensively about ACL surgery, limits, complications especially in RA patients. We will review in 2 weeks. .
**Plan:**

Page: 1

3-041

*(10)* _But was able to function with a cane._

    a. Cathey Levee never ever used a cane – not in testimony nor in evidence

*(11)* _The State's witnesses testified, inter alia, that they had seen_

_Theodore demonstrate what they all called a "whip kick" in the past._

   a. False.

      1. Mr. Rodgers asserts "they", "inter alia".

      2. Alexandra is the only one of the children to claim in testimony anything about a "whip kick"

      3. Term whip kick was in April 2010 Divorce Affidavit in that the term was from Cathey Levee's father in the ER on April 10 2010 as sworn April 2010 by Cathey Levee (page 3)

Cause No._____

| | | |
|---|---|---|
| IN THE MATTER OF THE MARRIAGE OF | | IN THE DISTRICT COURT |
| **CATHEY JUNE LEVEE** AND **THEODORE FLOYD LEVEE** | | _____ JUDICIAL DISTRICT |
| AND IN THE INTEREST OF **CATHERINE NICOLE LEVEE** | | |
| A MINOR CHILD | | TARRANT COUNTY, TEXAS |

---

### Affidavit of Cathey Levee

---

STATE OF TEXAS

COUNTY OF TARRANT

BEFORE ME, the undersigned authority, on this day personally appeared **Cathey Levee**, and made the following statements and swore that they were true:

"My name is **Cathey Levee**. I am the Petitioner in the above referenced matter. I am over eighteen (18) years of age and have never been convicted of a felony. I am of sound mind and fully competent to make this affidavit. I am personally acquainted with the facts stated herein, which are true and correct to the best of my knowledge.

"I am requesting the Court to enter a *Temporary Restraining Order* against Respondent herein, my husband **Theodore (Ted) Levee**, as more fully set forth below.

"I am the wife of **Theodore (Ted) Levee**. We have one daughter who is still a minor (16) and still living at home, whose name is **Catherine (Katy) Levee**, and two older children who do not live at home anymore, **Alexandra Levee** and **Andrea Levee**. I have filed for divorce against **Ted** in this cause. I am asking for a *Temporary Restraining Order* against him for family violence. I already have a *Temporary Protective Order* that was granted to me through the Tarrant County District Attorney's Office, a copy of which is attached. My husband has been very violent towards me, violated the *Temporary Protective Order* and was arrested, but was released. He is still making threats towards me and my daughters, to kill me or us; he has broken into my house and feels like he can do so at any time; and my daughters and I are very scared of him. He broke my leg in the assault that resulted in the *Temporary Protective Order* and I can't walk as I am in a wheelchair or walker. If he comes over, I can't get away from him.

FIRST AMENDED ORIGINAL PETITION FOR DIVORCE, TRO'S AND TO'S          PAGE 1

**3-044**

My husband and I were married December 14, 2002. Shortly thereafter he legally adopted my three daughters from a previous marriage. During our entire relationship **Ted** has been very abusive: mentally, emotionally and physically to my daughters and to me. He is extremely controlling with my daughters and with me. **Ted** has always had an obsessive fixation with my oldest daughter **Alexandra**. She has told me for years that he made her feel "strange" but would not be specific. The abuse towards the children began in 2002. This abuse was almost always directed at **Alexandra** and **Katy**. He would "thump" them on their foreheads, pushing, shoving, screaming and calling them names, telling them that they had no rights and that they were his property. In the beginning of our marriage his abuse was confined to shoving me or bumping me around the house, but after a while he began having explosive temper outbursts and would even tell me to get out of the car miles from home and tell me to walk home after calling me stupid, fat and ugly and taking my phone away.

Ever since **Ted** was diagnosed with **Rapid Cycling Bipolar Disorder with Delusional Tendencies** I have been watchful and afraid. When he could not sleep I told him to take his medicine and rest. He would not do it. He got mad at me and tried to make me leave. He told me to pack my bags and I said no. On April 9th he karate kicked my neck and only missed me by a few inches. Later that night he tried to make me have sex and I said no. He got very angry and said if that's the way it is then get out of his house. He started pulling suitcases out of the closet and told me to pack my bags. It was the middle of the night and I told him no. Since he had just had surgery he could not move well but he was extremely verbally abusive. He finally went downstairs and tried to sleep in the easy chair. The next day when we got home I went upstairs to check on him and he was VERY ANGRY. He asked if **Alexandra** was going to stay and I said she had plans. Again he told me to *"shut the fuck up cunt,"* *"bitch,"* and *"whore,"* he wasn't talking to me and said that I had ruined his life for 8 years and how terrible a person I was. He went crazy and started telling me how much he hated me. I quietly told **Katy** to pack a bag that we were going somewhere else for the night but he caught us and shoved me and took my phone and threw it across the room. I told him I didn't want to stay with a violent person who had tried to kill me. I said to just let me and **Katy** go that I couldn't stay with a person who had tried to break my neck. He started shoving me as I tried to get my things, then said if he'd wanted to kill me he would have, then grabbed for my neck. **Katy** came in and said *"Stop, you're killing her!"* He took his bottle of Valium and ate the whole bottle, about 200 pills and started chewing them up. I became afraid that he would kill himself and I said that only girls kill themselves with pills so he spit them out all over **Katy** and me. This is not the first time he has spit in my face. When gets manically angry he spits at me, punches holes in walls or breaks things. He then went and got the shotgun and made that scary noise they make and started pacing in the upstairs hallway. This isn't the first time he has used the gun to threaten **Katy** and me. He did it last summer when he was mad at me for something, while **Katy** and I were in the bathroom. I told **Katy** on that summer occasion that if she heard the noise again to call 911. On Saturday, April 10, 2010, he was acting the same way, angry, abusive and scary. I became afraid and

I took my phone from my purse and he knocked me down and took it away from me. He threw it across the room and blocked my path and tried to put his hands around my neck. I got away and tried get my things but he wouldn't leave the bedroom. He kept calling me terrible names and said he was going to kill me. **Katy** screamed for him to leave me alone. I tried to get him out of the bedroom where **Katy** was. He just kept saying he was going to kill me and himself for ruining his life. I went into the hallway and he followed me. **Katy** came into the hallway with my phone just as he shoved me into the banister wall, severely bruising my right breast and then did a military-type kick to my right leg, flipping it out from under me at a 90° degree angle and I heard bone break. I screamed for **Katy** to call 911. She screamed at **Ted** *"Stop you're killing her!"* He told her to shut up, that I was just a drama queen. I crawled and dragged myself back to the bedroom and took the phone that **Katy** had found for me. I called my parents. **Ted** hadn't let me talk to them in two years, because he blamed all the children's and my problems on them. He said we were all crazy and he was the only sane person in the house. He called us *"white trash"*, *"whores,"* *"sluts"* and *"liars"* and wanted to *"kill us all."* He has threatened to kill my parents, **Georgie and Ted Edmondson**, and **Alexandra** on multiple occasions. He said that I was *"the devil"* and the children were *"spawns of Satan"*. Meanwhile he went outside and was trying to take my wheelchair out of my van and saying that he was taking it away from me. I have had to use it about 80° of the time since last summer's car wreck. My parents came and I had my dad take me to the hospital in the van so he wouldn't destroy my chair or steal the van from me. When I got to the hospital they gave me an X-ray and an MRI. The doctor said I had a sports injury; my dad called it a "whip kick" and said that it was an illegal move in the sports industry. The doctor told me I had suffered a ruptured ACL, torn meniscus, bone fragments under the kneecap, and my fibula was broken in two places. When they asked how it happened I said my husband did it. The next thing I knew the police were there and I was asked to file a report. **Ted** was arrested and I was told I'd be safe until Monday. He kept trying to call me from jail. I filed for some sort of a protective order that was supposed to prevent him from coming to the house or contacting me.

On Sunday, April 11th, **Alexandra** stayed at the house to take care of me. The police called about noon and said someone had bonded **Ted** out and that he would be released in 10 minutes; that he understood he wasn't to come to our house and to leave me, the kids and my parents alone. **Alexandra** and I panicked. In about 15 minutes **Ted** walked through the front door, with his keys the police gave him back saying *"Heeee's baaacck"*, like Jack Nicholson in that horror movie. He called for **Alexandra** to come downstairs and I wouldn't let her, so he came upstairs. I was trying to call 911 and he took my laptop downstairs into the driveway and smashed it. I finally got 911 on the phone. He kept running up and down the stairs taking and breaking things, screaming that he was going to kill me, ruin my life, get me fired and send **Alexandra** to hell. The police finally came and they had to draw a gun on him, he was so irrational. They arrested him again. I asked the police officer how he got out and they said everyone had a right to be bonded but that we would be safe because he had broken the protective order and the judge wouldn't like that. Well, he was bonded out and was **released again** on Monday, April 12, 2010. The police called again to let me know he

would be released in 20 minutes, but that he understood not to come over and to call 911 if he did. I had my dad come over with a gun and we waited. The police called and said **Ted** wanted his stuff. I was so scared I had **Dad**, **Alexandra**, **Andrea** and **Katy** pack the car he drives, with all his things so he would go away, and then **Andrea** took the car, which is registered in my name, to the hospital for him to pick up and leave it there and she brought my van home. He went straight to the bank and drained our account, checks are bouncing all over the place and my lights will be turned off on Tuesday if I can't find a way to pay them. I don't know what to do. Now I am two months behind on all my bills.

I am physically, spiritually and emotionally traumatized beyond belief and have to have surgery as soon as my leg stops swelling. I have not been released to work but must go and try and provide for the children and me. I will never walk normally again. I'll find out Friday, April 23, 2010 when I'll have surgery but will probably have to wait until school is out because I cannot afford to take time off. I am terrified of surgery as my health is very poor. He had his younger daughter, Sarah Levee, who is a lawyer in Chicago, call to tell me that he would cancel my insurance because I put the pictures of my leg on FaceBook for documentation. She has contacted me several times. The scariest thing is that he changed his relationship status on his FaceBook site to *"widowed"* and the last thing he said to me before he was arrested the second time was that he was *"going to kill me."* He is telling his friends at work that we are back together, he is giving me money and that my leg isn't broken and it's all okay. He said I just *"tripped"* and bruised easily because of rheumatoid arthritis. **Ted** is also telling them how much **Alexandra** loves her *"Papa"* and how great their relationship is. His friends believe him. He has not removed the *"widowed"* status and it is still there today.

I am truly in fear for my life and for my children's. I am terrified of **Ted** and have to have one of my daughters sleep with me at night. **Ted** had also stopped me from receiving the settlement money from the law firm of Modjarrad & Abusaad that we were awarded, for a claim that he initiated for **Andrea** when she was released from the mental health hospital to her grandparents. He filed a lawsuit, again, against my parents to try and prevent them from seeing **Andrea**, **myself** and the other **girls**. (I received the check on Saturday, April 24th after pleading with their secretary and telling them the situation; a representative came to my house and delivered it.) This is also the firm that is handling my car accident settlement and since **Ted** went to see them last week, they have not returned any of my calls to try and find out how to proceed with my auto claim. I am using my wheelchair almost 100 percent of the time now. I am not supposed to be walking, at work or driving a car with my severe leg injury and cannot have surgery until I get some money and am sure that I have insurance. **Ted** told **Andrea's** counselor in a previous manic episode that I was faking my back injury and was not hurt in the accident last summer, and that I was going out dancing and wearing high heels. Then he threatened to call the insurance company to take back my wheelchair. He is trying to control every aspect of mine and the children's lives. **Ted** has cut me off from all sources of funds and I cannot pay my bills. He has prevented me from reaching my attorney for my car accident and getting any money. Additionally, on April 19, 2010, I found the ladder he used to climb on top of

the roof which was propped up against the house; it was NOT there last week. I had **Alexandra** and a friend of hers move it to the garage so he could not enter the house from the roof. He has also threatened to burn the house down on multiple occasions and yesterday on April 28th; I noticed that all the batteries were gone from the fire alarms. I truly believe he has entered our home while I have been at work. Additionally, on April 29th, **Ted** came to the house and after watching my house sitter work in the yard drove up into the driveway and confronted her aggressively. She told him she knew who he was and he was not to be within 200 feet of the house because of the protective order, he was verbally aggressive and threatening to her and made her feel afraid. After she called me, I called the Hurst police department and filed a report.

All three girls have been able to reduce their psychiatric medications since he was arrested on Monday, April 12, 2010, and feel safer. I, however, am having severe anxiety attacks to the point that I feel like I am having a heart attack. I asked **Katy** why she didn't need all her antidepressants and other medicines and she said it was because **Ted** was gone. I asked **Alexandra** and **Andrea** the same question and they said that the only reason any of them put up with his horrible behavior was to protect *me*, because they knew I was sick and needed help paying bills and needed my insurance to go to the doctor. **Alexandra**, **Katy** and **Andrea** agreed that if they had had a choice, he would have been gone a long time ago, because having bipolar disorder wasn't an excuse for his awful behavior with me or them.

I am even more afraid of him now than ever because I have filed for this divorce against him. The children will not contact him. He left a message with our family therapist to tell me that he wants the children or me to call him. He also said he has an attorney. The therapist will not see **Ted** at all anymore but gave me the message. **Ted** is sneaky and a night stalker. I do not want him around me or my children. I fear that if he is around any of us, he will hurt me or the girls or steal **Katy** and "groom" her for sexual abuse, or rape **Alexandra** at her apartment. Last night I asked **Katy** if he had ever been inappropriate with her and she said yes. I asked her why she didn't tell me sooner, and she said it was because it started when she was twelve and she really didn't put the pieces together until this year when she turned 16. I asked her what he did and she said that he told her *"if I thought you were whore's, I'd be fucking all four of you"*. She said he made other comments like that, but that she couldn't remember them all at this time; but that she didn't like it when he forced her to hug him or lie down in the bed with him at night and "cuddle". I had already told **Ted** that this wasn't appropriate for a teenager and he, again, just told me I had a dirty mind. All the children are calling him **Ted**, not "Papa", and do not want to see him or speak to him. I feel guilty that they felt they needed to take abuse in order to protect me. I need protection from this man for me and all my children.

I need the Court to enter orders to protect me and my children from my husband. I ask for a Protective Order for family violence, for a Temporary Restraining Order, and anything else the Court can give me to protect us. I need this as soon as possible.

"Further affiant saith not."

---

AFFIDAVIT

PAGE 5

**3-048**

3-049

_Cathey Levee_
Cathey Levee, Affiant

SIGNED under oath before me on April 30, 2010.

_Beverly A.J. McGee_
Notary Public, State of Texas

BEVERLY A.J. McGEE
Notary Public, State of Texas
My Commission Expires
JULY 25, 2012

**(12)** _Theodore claimed it was a movement he learned while in the_

_military._

    a. Totally false.

    b. Not in testimony

        1. There was no testimony or statement in existence where the claim of any such statement by Theodore Levee- again Mr. Rodgers made this up.

**(13)** *After the conviction, attorneys for the State and the defense had a discussion off of the record regarding how the trial was going to proceed. As a result, both parties agreed on a punishment for Levee.In exchange for his admission of guilt and waiver of right to appeal his conviction, Levee agreed to a sentence of ten years in prison which, by agreement, was probated over a period of ten years.  In addition, Levee pleaded guilty to one pending violation of a protective order case and the State agreed to dismiss another.*

    a. Incorrect

        1. In 28 U.S.C. 2254 states reply in 11.072 is that Levee did not plead guilty

        2. The actual occurrence in the record of the trial was the Court ordered defense counsel to find COMPACT AGREEMENT authority to bond awaiting a presentencing Investigation.

        3. Mr. Bell never attempted to get information, instead making an agreement to prevent the review of the trial to suppress the ineffective assistance of counsel.

States reply to Petition for Writ of Habeas Corpus

Case 4:13-cv-00211-Y-BJ   Document 28-2   Filed 06/26/13   Page 20 of 23   PageID 413



NO. C-432-009597-1239907-AP

EX PARTE                              §        IN THE 432ND JUDICIAL
                                      §
                                      §        DISTRICT COURT OF
                                      §
THEODORE FLOYD LEVEE                   §        TARRANT COUNTY, TEXAS

STATE'S REPLY TO PETITION FOR WRIT OF HABEAS CORPUS

COMES NOW, the State of Texas, by and through the Criminal District Attorney of Tarrant County, Texas, and denies generally the allegations in the instant application for Writ of Habeas Corpus.

The Case in Brief:

The applicant was convicted of the offense of aggravated assault causing bodily injury in a trial before the Court. See Judgment. Following the applicant's conviction, the applicant entered into an agreement to waive his right to appeal in exchange for community supervision. See Motion for New Trial. The trial court sentenced the applicant to ten years' community supervision. See Judgment.

Ground for Relief:

The applicant contends that his guilty plea was involuntarily entered because:

- He was not fully advised by trial counsel regarding his legal options;
- Trial counsel unduly pressured him into accepting

 FILE COPY     038

**3-052**

his plea;
- Trial counsel did not explain the consequences of his plea;
- Trial counsel did not advise that he could not appeal once his plea was accepted; and
- He was taking a number of prescribed medications which affected his ability to understand the consequences of his plea.

Discussion:

A.   Jurisdiction

The Code of Criminal Procedure permits a defendant serving community supervision to file an application for writ of habeas corpus. See Tex. Code Crim. Proc. art. 11.072 §1. These applications, however, are limited to challenges to the legal validity of the conviction or order in which community supervision is imposed or to the conditions of community supervision, and must be made on constitutional grounds. See Tex. Code Crim. Proc. art. 11.072 §2(b) & §3(c). A voluntariness claim does fall within these grounds.

B.   Voluntariness of Plea

The applicant should be denied relief on his claim that his guilty plea was involuntarily entered because he did not enter a guilty plea. The judgment and the docket sheet both indicate that the applicant pled not guilty and was tried before the Court. See Judgment; Docket Sheet. There is no constitutional right to a "voluntary" not guilty plea. See Harris v. State, 2009 WL 2902696, page 6 (Tex. App. - Austin 2009, no pet.) (not designated for

039

**3-053**

publication). Likewise, since the applicant pled not guilty, his trial counsel clearly did not pressure him into pleading guilty.

The applicant also contends that he was taking a number of prescribed medications which affected his ability to understand the consequences of his plea. See Application, page 6. However, he does not set forth any specific evidence regarding his medications or their effect. See Application, page 6. Thus, the applicant has not met his burden of proof. See Ex parte Maldonado, 688 S.W.2d 114 (Tex. Crim. App. 1985) (applicant must present facts that, if true, would entitle him to the relief requested in order to prevail). An applicant's sworn allegations alone are not sufficient to prove his claims. Ex parte Empey, 757 S.W.2d 771, 775 (Tex. Crim. App. 1988).

The applicant's ground for relief should be denied.

WHEREFORE, PREMISES CONSIDERED, the State prays the Court deny this application for writ of habeas corpus.

Respectfully submitted,

JOE SHANNON, JR.
Criminal District Attorney
Tarrant County, Texas

STEVEN W. CONDER, Assistant
Criminal District Attorney
401 W. Belknap
Fort Worth, Texas  76196-0201
(817) 884-1687

040

**3-054**

Trial recess for COMPACT information

STATE VS. THEODORE FLOYD LEVEE 26

here. He -- he -- he does not live here anymore.

THE COURT: Mr. Whelchel?

MR. WHELCHEL: I don't understand -- under the interstate compact, I know that he's a convicted felon. He hasn't been sentenced yet. I don't -- I don't know what impact allowing him to go back to Florida as a convicted felon has on the interstate compact.

THE COURT: And -- and let me just explain. Mr. Bell, are you familiar with the interstate compact that we're discussing?

MR. BELL: Not as to -- no.

THE COURT: All right. There is a statute that is a compact among the several states that before a person that is convicted of a crime in another state, before they're received or allowed to reside within the destination that they wish to be, they must seek the approval of that entity there.

Otherwise, the jurisdiction that allows it to occur is going to be responsible as a result of that defendant being allowed to be -- reside in that other location without apprising the receiving state.

MR. BELL: I understand that.

THE COURT: Okay. There is an issue, however, that the case has not been completed as of yet

3-055

because we're pending sentencing.

Now, I am going to table this at this time point and allow you to find me some authority that allows me to continue on with the bond.

Now, first off that must -- first thing that needs to be satisfied, you must contact the bondsman. Number one, the bondsman must be agreeable to allow Mr. Levee to return to Florida to continue, and Mr. Levee is no longer going to be allowed -- well, we will set the dates of when he needs to appear, and he must make himself available as a condition of the bond for the presentence investigation report in the future.

So he needs to make the necessary arrangements. He would necessarily have -- you also have to provide the authority that -- or this -- the -- the -- you understanding what I'm asking --

MR. BELL: Well, I'm going to agree with the Court. Until he's punished, though, it's my belief -- because I have had those situations with probation until -- until he actually transfers, but he hasn't been sentenced yet.

THE COURT: I --

MR. BELL: The bonding company, I can take care of that issue. That's not a problem.

THE COURT: All right. Well, you're --

3-056

you're sure of that, but I'm not so sure. I have to have some written authorization -- or not authorization, but confirmation that they'll remain on the bond. That's essential.

MR. BELL: That's no problem. I can get that to you.

THE COURT: Okay. Then I also need the legal authority -- and we're going to confirm with the -- an authority in Miami, Dade County, to determine whether or not that we can and they would allow Mr. Levee to reside there pending sentencing.

Now, if they're of the opinion that he does not, that solves the -- that answers the question right then and there.

MR. BELL: Okay.

THE COURT: All right. I'm going -- we will be off the record.

(Recess from 2:48 p.m. to 4:21 p.m.)

(Open court, Defendant present)

THE COURT: Let's go on the record.

All right. Mr. Bell, you've had significant time to discuss with your client with regard to a potential plea-bargain agreement with regard to punishment, plea in bar in two other pending cases in County Criminal Court No. 5. Have you and your client

**(14)** *In prosecuting this case, I did not suppress any sworn statements of Catherine Levee. I did not seek to suppress any statements and only moved the Court to prevent both sides from mentioning circumstances surrounding the pending divorce that were not relevant to the criminal trial.*

  a. False

    1. A June 10 2010 letter to Mr. Rodgers stated there existed a sworn statement by reputed eye witness Catherine Levee.

      a. Mr. Rodgers hid this letter and the sworn statement.

      b. Theodore Levee submitted a request to authenticate the document to Tarrant County District Attorney's Office and was denied evidence – from a "Open File Discovery Rules" trial.

      c. The subsequent action on Mr. Rodgers part to keep the information of the sworn statement of Catherine Levee suppressed shows the

involvement of Texas Attorney General

suppressing the documents  in open file

discovery and request under  open records act.

d. The request was made in the 28 U.S.C.2254

action as well as in the attempt to appeal the

civil ruling of the Divorce Court depriving

Theodore Levee of all rights and property.

Ordinarily, a witness may not be impeached by a pending charge. However, a court may permit impeachment by pending charges to show the bias, prejudice, or interest of the witness in testifying. Nethery v. State, 692 S.W.2d 686, 699 (Tex. Crim. App. 1985) cert. denied, 474 U.S. 1110, 88 L. Ed. 2d 931, 106 S. Ct. 897 (1986). An issue regarding the general credibility of a witness in a criminal trial is not a material issue in the sense that it will justify the admission of inherently prejudicial evidence of details of an extraneous offense committed by the witness. Murphy v. State, 587 S.W.2d 718, 722 (Tex. Crim.App. [Panel Op.] 1979).

Letter June 10 2010 to ADA Rodgers stating "Katy has written a notarized statement of the events of 4/10 /10 and both of us are willing to testify."

Cathey.Levee@fwisd.org

To 'TSRodgers@TarrantCounty.com', 'Beverly Storey', 'Jeanne Insuaste', 'thelevees5@msn.com'

| | |
|---|---|
| From: | **Levee, Cathey** (Cathey.Levee@fwisd.org) |
| Sent: | Thu 6/10/10 7:23 PM |
| To: | 'TSRodgers@TarrantCounty.com'    (TSRodgers@TarrantCounty.com) |
| Cc: | 'Beverly Storey' (bevstorey@gmail.com); 'Jeanne Insuaste' (jeannecpl@sbcglobal.net); 'thelevees5@msn.com' (thelevees5@msn.com) |

Hotmail [Active View](#)

Tim,

Ted continues to contact and harass my family. He claims to have not been to my home on 4/28 because he was at Dr. Grant's office. Please see the attached map and how close it is to my home, 7 minutes (or less). Additionally he claims he wasn't at my home on 5/19 or 5/25 which is shown on the temporary computer file I sent you earlier. On June 3rd when I checked my computer again, the temporary file from CWA6215 had been deleted, so that would be the **third time** he has entered my home. The time to get to the court house from my home says 21 minutes on the attached map but I can assure you that it does not take that long without traffic. According to several sources the ankle monitor is not perfect and if it is a range, my home would not be off the path he was supposed to be on. Also, I have been told that you can wrap them with aluminum foil to prevent the signal from going through. It would only take 5 minutes for him to do these things. He also has letters from my three daughters they wrote their biological father in 2005 when we started the adoption process.

When he was arrested and Officer Disraeli came to pick up his belongings, I gave him ALL his clothes, jewelry and medication. NOTHING ELSE! If he has these letters, then he has gotten them from my file cabinets at the house. He also has taken tools and the original copy of the two year protective order, my daughter graduation announcements and other various items. He also has a signed note from the doctor in Ennis who performed the rotary cuff surgery stating that he gave Ted hydrocodone and "hi

**3-060**

wife" gave him something else that would make him crazy. I find it hard to believe that a doctor who has never met me or seen my medical records would write such a letter, but that is what he is using for his defense. Also, on the original form in February from Dr. Grant's office, he wrote that he was only allergic to iodine and Demerol. On the 4/28 form he added vicodin (hydrocodone, Norco) to the list. He has used this medication for pain multiple times and I have a prescription bottle that he was given for pain when he burned his hand a few years ago. This is the bottle I gave him his medicine from before the assault because it was too late and the pharmacy was closed when I got home to pick up the one from the Ennis doctor. He has also taken my hydrocodone on MULTIPLE occasions when his shoulder hurt before his surgery. He also has several copies of my medical claims for my car wreck and I do not know how he has gotten them without being in my house. He is trying to claim medical fraud from my car accident last year. I had all these records in my home by my bed. He IS entering my house! Why won't anyone with any authority believe me?

Also, when Ted first started going to Dr. Grant in February of 2010 he signed a HIPPA form that I could access his records. So I did. The doctor diagnosed him at that time as Bipolar II, ADD, with paranoid and narcissistic tendencies, in addition to rage and control issues. According to the medical records he is NOT taking any medication to control his Bipolar Disorder. He is only taking Adderall and Valium. I can tell you that Adderall exacerbates his delusional behavior. If you would like me to FAX you those documents I can. As a Licensed Professional Counselor I can tell you that this combination is dangerous and prone to stalking and unpredictable behavior. This is exactly the kind of behavior that he exhibited when he kicked my oldest daughter out of the house is 2009. He stalked her, remotely accessed her computer and called her work multiple times to get her fired. I also recently discovered that he had a key logger on our home computer and had cameras pointed at the girls bedrooms and bathroom. Alexandra has also confided in me that he tried to touche her inappropriately on a volley ball tournament in Houston in 2006. I have always thought he was sexually inappropriate with her but never really put the pieces together until all three girls told me comments that he has said to them. My family therapist has said that Ted is a sexual predator who is after Alexandra and Katy. The girls had not told me many things because they knew I was sick and need the income and insurance. **I do not feel safe, protected or that anyone is listening to how crazy this man is.** He has contacted Katy (my youngest daughter) three times on FaceBook, "pinged" my cell phone to locate me and changed the passwords on my ATT account so I cannot access the internet at home. I cannot close the account nor do anything with it because he is listed as the only authorized user. He repackages the bill, which is sent to his Kaufman address and then resends it to me the day before the utility is disconnected.

**Do I have to die or suffer more physical injuries in order to get this man to leave us alone?** I understand he is going to court on the 23rd of this month. I would like to be there. Katy has written a notarized statement of the events of 4/10 /10 and both of us are willing to testify. **Please help us.** If something happens to me or my girls, my family and attorney will hold your office accountable. I do not care if he is fired; this is not about money, I want to feel safe in our home. I should not have to enter the witness protection plan to live our lives. This is exactly what the Battered Women's Foundation has recommended. **We are NOT safe**.

Thank you, Cathey

## OPEN RECORD REQUEST FOR JUNE 10 2010 ADA RODGERS LETTER

Theodore Levee
925 Altara Ave
Coral Gables FL 33146

Ashely Forth
ADA
Tarrant County District Attorneys' Office
401 W Belknap
Ft Worth TX 76196

In the matter OR 2013-19273
According to the letter from the AG of Texas Office,   AAG Jennifer Burnett,
We are past deadline for the release of the requested documents referred to in this correspondence
#OR 2013 -19273
That would include June 10, 2010 and all other correspondence between the DA office and Cathay Levee, sent from
The levees5@msn.com
Cathey.Levee fwisd.org
And any other and all correspondence in the completed criminal case.
The deadline according to the AG was 10 days after the issuance of the letter dated November 5 2013.
This action is jeopardizing factual claims in another action and as such considerably jeopardized the conviction and integrity of the District Attorney's office of Tarrant County.

Please comply at once as a like correspondence has been forwarded with the AG.



 Theodore Levee
925 Altara Ave
Coral Gables FL

Jennifer Burnett
PO Box 12548
Austin TX 78711-2548
Assistant Attorney General
Open Records Division
OR 2013-19273

Email between DA and Cathy Levee

Per your correspondence and the opinion of the Attorney General I have not received the requested documents and ask the assistance of the State of Texas in enforcing and holding all accountable equally under the law.

I have contacted the ADA Ashely Fourt date same and it is imperative to have these records in an action before the United States District Court North Texas Fort Worth Civil Action No. 4;13-cv-211-y, The matter is time sensitive.

Sincerely

Theodore Levee



ATTORNEY GENERAL OF TEXAS

GREG ABBOTT

November 5, 2013

Ms. Ashley D. Fourt
Assistant District Attorney
Tarrant County District Attorney's Office
401 West Belknap
Fort Worth, Texas 76196-0201

OR2013-19273

Dear Ms. Fourt:

You ask whether certain information is subject to required public disclosure under the Public Information Act (the "Act"), chapter 552 of the Government Code. Your request was assigned ID# 504741.

The Tarrant County District Attorney's Office (the "district attorney's office") received a request for all correspondence between two named individuals concerning a specified case. You claim the submitted information is excepted from disclosure under section 552.103 of the Government Code.[1] We have considered the exception you claim and reviewed the submitted information.

Section 552.103 of the Government Code provides in part:

> (a) Information is excepted from [required public disclosure] if it is information relating to litigation of a civil or criminal nature to which the state or a political subdivision is or may be a party or to which an officer or employee of the state or a political subdivision, as a consequence of the person's office or employment, is or may be a party.

---

[1] Although you also raise section 552.108 of the Government Code, you make no arguments to support this exception. Accordingly, we find the district attorney's office has waived its claim under this exception. See Gov't Code § 552.301(e) (governmental body must provide comments stating why exceptions raised should apply to information requested).

**3-064**

. . .

> (c) Information relating to litigation involving a governmental body or an
> officer or employee of a governmental body is excepted from disclosure
> under Subsection (a) only if the litigation is pending or reasonably anticipated
> on the date that the requestor applies to the officer for public information for
> access to or duplication of the information.

Gov't Code § 552.103(a), (c). A governmental body that claims an exception to disclosure under section 552.103 has the burden of providing relevant facts and documentation sufficient to establish the applicability of this exception to the information at issue. To meet this burden, the governmental body must demonstrate that (1) litigation was pending or reasonably anticipated on the date of its receipt of the request for information and (2) the information at issue is related to the pending or anticipated litigation. *See Univ. of Tex. Law Sch. v. Tex. Legal Found.*, 958 S.W.2d 479 (Tex. App.—Austin 1997, orig. proceeding); *Heard v. Houston Post Co.*, 684 S.W.2d 210 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). Both elements of the test must be met in order for information to be excepted from disclosure under section 552.103. *See* Open Records Decision No. 551 at 4 (1990).

You state, and have provided documentation demonstrating, a lawsuit styled *Levee v. Florida Dep't of Corr., et al*, Civil Action No. 4:13-cv-00211-Y-BJ, in which the district attorney's office is representing an employee of the Tarrant County Community Supervision and Corrections Department in connection with her employment, was filed in the United States District Court for the Northern District of Texas, Fort Worth Division, prior to the district attorney's office's receipt of this request for information. You state the pending litigation and submitted information relate to the underlying criminal case prosecuted by the district attorney's office. Based on your representations and our review, we find the submitted information is related to the litigation that was pending when the request for information was received. We therefore conclude the district attorney's office may withhold the submitted information under section 552.103 of the Government Code.

However, once information has been obtained by all parties to the litigation though discovery or otherwise, no section 552.103(a) interest exists with respect to that information. *See* Open Records Decision Nos. 349 (1982), 320 (1982). Thus, information that has either been obtained from or provided to all parties to the pending litigation is not excepted from disclosure under section 552.103(a) and must be disclosed. Further, the applicability of section 552.103(a) ends once the litigation has been concluded. *See* Attorney General Opinion MW-575 (1982); *see also* Open Records Decision No. 350 (1982).

This letter ruling is limited to the particular information at issue in this request and limited to the facts as presented to us; therefore, this ruling must not be relied upon as a previous determination regarding any other information or any other circumstances.

This ruling triggers important deadlines regarding the rights and responsibilities of the governmental body and of the requestor. For more information concerning those rights and responsibilities, please visit our website at http://www.texasattorneygeneral.gov/open/ orl_ruling_info.shtml, or call the Office of the Attorney General's Open Government Hotline, toll free, at (877) 673-6839. Questions concerning the allowable charges for providing public information under the Act may be directed to the Office of the Attorney General, toll free, at (888) 672-6787.

Sincerely,

Jennifer Burnett
Assistant Attorney General
Open Records Division

JB/tch

Ref:    ID# 504741

Enc.    Submitted documents

c:      Requestor
        (w/o enclosures)

**From:** "Thelevee@yahoo.com" <Thelevee@yahoo.com>
**Date:** August 26, 2013, 3:53:47 AM EDT
**To:** "8178843333@metrofax.com" <8178843333@metrofax.com>
**Subject: Fwd: thelevee@yahoo.com has sent you a file**

Theodore Levee
925 Altara Ave
Coral Gables Florida
33146
972-835-6777
Fax 305-665-5597
Email thelevee@yahoo.com

August 23, 2013


Tarrant County District Attorney
Public Information Officer

Tim Curry Criminal Justice Center
401 West Belknap
Fort Worth, TX 76196
Fax 817-884-3333
Dear Officer for Public Records:

    This request is made under the Texas Public Information Act, Chapter 552, Texas
Government Code, which guarantees the public's access to information in the custody of
governmental agencies.  I respectfully request copies of the following information:

Email records concerning;

State v.Theodore Floyd Levee

Correspondence between assistant district attorney Tim Rodgers and Cathey Levee.
While request is for all correspondence, specifically included is the email sent to Mr.Rodgers by
Cathey Levee on the account of Mr.Levee's - thelevees5@msn.com and also the email address -
cathey.levee@fwisd.org.

The email of June 10, 2010 is specific to the actions and knowledge of the district attorneys
office in the prosecution of above case.

    In the interest of expediency, and to minimize the research and/or duplication burden on your
staff, I would be pleased to personally examine the relevant records if you would grant me
immediate access to the requested material.   Additionally, and since time is a factor, please
communicate with me by telephone or fax rather than by mail.  My telephone number is:
972-835-6777

Fax 305-665-5138

Disclosure of this information is in the public interest because providing a copy of the information primarily benefits the general public.  I therefore request a waiver of all fees and charges pursuant to Section 552.267 of the act.

I shall look forward to hearing from you promptly, as specified in the law. Thank you for your cooperation.

Sincerely,

Theodore Floyd Levee
Electronically signed 5690

**3-068**

**(15)** *At no time did I move to suppress any mention of the term "whip kick." The term was used frequently throughout the trial by both the State and defense without objection.*

    a. Untrue

        1. In cross examination of Theodore Levee Prosecutor Rodgers asked where the term came from and objected to answer.

Mr. Rodgers objection to answer of origination of the kick from divorce affidavit as stated by Cathey Levee's father April 10 2010.

STATE VS. THEODORE FLOYD LEVEE                    178

Alexandra --

A.    Alexandra.

Q.    -- about you being in the military.  Tell the Judge, were you in the military and for how long.

A.    I enlisted on my 17th birthday.  I went to Fort Knox, Kentucky, for basic training, and I was found to have a vision deficiency.  I have diplopia, amblyopia, and colorblindness, and I made it through at AAFES (phonetic), the original physical, but I was discharged after 4 months and 25 days with an honorable discharge for not meeting medical fitness standards at the time of enlistment.  But it qualified me for my GI benefits.

Q.    Did you ever receive any formal training in combat through the military?

A.    There was a basic combat course.  It involved marksmanship, they have training.  There was some physical PT, standard military.  Most of it involved pugil sticks, a -- a little boxing.

Q.    Okay.  With regard to the type incident and the type kick that they're referring to, have you ever received any kind of training like that before?

A.    No.  I'm not aware of a kick that would destroy you from the ankle all the way up to the hip.  I had no knowledge --

Q.    Do you know --

3-070

A.   -- of that.

Q.   Do you know where they might have learned it?

A.   In the original paperwork I saw from the hospital --

MR. RODGERS:   Objection.

THE COURT:   Just a moment.

MR. RODGERS:   Testifying to hearsay and speculation as to how they know.

THE COURT:   Sustained.

Q.   (BY MR. BELL)   There's also been some testimony about a shotgun.  Was there a shotgun in the house?

A.   In -- in the garage.

Q.   Okay.  Was that shotgun ever pulled out that day?

A.   No, sir.

Q.   Okay.  Would you have been capable of cocking that shotgun that day?

A.   No, sir.

Q.   You would -- you would not have been physically able to -- to pull the mechanism apart, correct?

A.   I -- I probably could pick it up with one hand, but as far as -- it was a Mossberg .12 gauge shotgun. And -- and it had a cable lock in it, and I removed the ammunition and put the gun in the garage because of a prior incident between Katy and her mother and to --

3-071

*(16)* _The Tarrant county District Attorney's Office maintains an open file policy.  All records and reports that are not work product for the office are made available to the defense throughout the life of a criminal case_

    a. Untrue

        1. See OPEN RECORD REQUEST FOR JUNE 10 2010 ADA RODGERS LETTER

**(17)** _All reports and records, including those detailing Catherine Levee's medical condition before and after the assault, were made available to the defense before the trial began._

    a. False

        1. Evidence was missing radiology files necessary to evaluating the evidence where not in record and make any medical evaluation to cause impossible.

        2.

Attorney Mitchell upon discovery the files in criminal case where incomplete and discovering the needed documents to evaluate how injury occurred. New evidence shows injury was inconstant with testimony and prior statements of Cathey Levee and Catherine Levee.



NAMAN HOWELL
SMITH & LEE PLLC
ATTORNEYS AT LAW

Charles B. Mitchell, Jr.
Direct Dial: (817) 509-2040
cmitchell@namanhowell.com
Licensed in Texas and Arkansas

Fort Worth Club Bldg.
306 West 7th Street
Suite 405
Fort Worth, Texas 76102
(817) 509-2025
Fax (817) 509-2060

Offices in:
- Austin
- Fort Worth
- San Antonio
- Waco

www.namanhowell.com

March 19, 2013

*Via E-mail (w/o encls.)*
*And Via CMRRR No. 7012 1640 0001 6953 4340 (w/encls.)*
Theodore Floyd Levee
925 Altara Ave.
Coral Gables, FL 33146

Re:     Cause No. 324-476966-10; In the Matter of the Marriage of Cathy June Levee and Theodore Floyd Levee and in the Interest of Catherine Nicole Levee, a Minor Child, In the 324th Judicial District Court of Tarrant County, Texas
Our File No.: 35250-1

Dear Mr. Levee:

Attached please find correspondence from Records Deposition Service enclosing the **two new CDs** containing films regarding Cathey Levee which have now been produced by Texas Health Harris Methodist Hurst Euless Bedford Hospital in response to our previous Deposition on Written Questions in the above-referenced case. I am also returning to you at this time the two original disks that were produced by Texas Health Harris Methodist Hurst Euless Bedford in 2012 in response to this Deposition on Written Questions. As referenced, please note that I am **sending these original records to you** and I have not retained copies of these documents or CDs.

Thank you for your assistance.

Sincerely yours,

Charles B. Mitchell, Jr.

CBM:pr:mm
Enclosures

cc:     *Via E-mail only*
        Joe Rivera (w/firm) (w/o encls.)

102207282.DOCX /1

**3-074**

**Records Deposition Service of Texas, Inc.**
2201 Main St., Ste. 1250, Dallas, TX 75201
Phone: 214-760-7600 Fax: 214-760-0222

**STATUS**

March 14, 2013

Naman Howell Smith & Lee, PLLC
Ms. Patty Rien
306 W. 7th St., Ste. 405
Fort Worth, TX 76102-4911

| | |
|---|---|
| CUSTODIAN: | Texas Health Harris Methodist Hurst Euless Bedford (Films) |
| PATIENT: | Cathey June Levee |
| RE: | ITMOTMO: Cathy June Levee and Theodore Floyd Levee |
| FILE NO.: | 35250-1 |

**Deponent furnished two (2) new cd's with all films. Please note: we are returning the old cd's as well (each envelope is specifically labeled).**

Should you have any questions, please feel free to call our office at 214-760-7600.

Order No.     9936.004

No. 324-476966-10

| | | |
|---|---|---|
| In the Matter of the Marriage of | : | IN THE DISTRICT COURT |
| Cathy June Levee | : | |
| and | : | |
| Theodore Floyd Levee | : | TARRANT COUNTY, TEXAS |
| and | : | |
| in the Interest of | : | |
| Catherine Nicole Levee, a Minor Child | : | 324TH JUDICIAL DISTRICT |

## NOTICE

TO: ALL PARTIES BY AND THROUGH THEIR ATTORNEY(S) OF RECORD AS PROVIDED IN THE ATTACHED SERVICE LIST.

PLEASE TAKE NOTICE THAT TWENTY (20) DAYS FROM THE RECEIPT OF THIS NOTICE, THE DEPOSITION OF: CUSTODIAN OF RECORDS FOR:

**Texas Health Harris Methodist Hurst Euless Bedford (Films)**
**1600 Hospital Pkwy.**
**Bedford, TX 76022**

will be taken before a Notary Public or other officer authorized to administer oaths designated by **Records Deposition Service of Texas, Inc., 2201 Main St., Ste. 1250, Dallas TX 75201, 214-760-7600, 214-760-0222,** at THE DEPONENT'S ADDRESS pursuant to provisions of Texas Rules of Civil Procedure Upon Written Questions, copies of which are attached. A subpoena duces tecum will be issued to require the witness to produce records, books, papers, documents, and tangible things designated in the Exhibit A, which is incorporated herein by reference. This notice is given on behalf of the Respondent at the instance and authorization of (his)(her)(its) counsel of record, Charles B. Mitchell, Esq. If you have any objections to the copying of the records and documents, please call (214) 760-7600.

If the deponent designated in the Notice is an organization, such as a corporation, partnership, association or governmental entity, the deponent organization, shall designate one or more officers, agents or other persons who can testify on behalf of the Deponent with respect to all matters set out in the attached Exhibit A, which is incorporated herein by reference.

NOTICE TO TAKE DEPOSITION BY WRITTEN QUESTION

Order No. 9936

**3-076**

THERE WILL BE NO INTERROGATION OF THE DEPONENT BY THE UNDERSIGNED COUNSEL.

STATE OF TEXAS )
COUNTY OF DALLAS )

Naman Howell Smith & Lee, PLLC
Charles B. Mitchell, Esq.
306 W. 7th St., Ste. 405
Fort Worth, TX 76102-4911

NOTICED BY: Charles B. Mitchell, Esq.
14207000

TONY AARON GLENN

## CERTIFICATE OF SERVICE

BEFORE ME, the undersigned authority, on this day personally appeared Tony Aaron Glenn being first duly sworn, on oath states that a copy of the above Notice was personally served by him this March 13, 2012 on the above-named attorneys to whom this Notice is addressed, at the address set out in such Notice, the same being the last known address of such attorney, (by depositing a copy thereof, postage paid, in a wrapper addressed to such attorneys at such address) or (by personal delivery of such Notice to the addressee above set forth).

SUBSCRIBED AND SWORN before me this March 13, 2012.

HOWARD R. FALLON
Notary Public of Texas
My Commission Expires 07/02/14

NOTICE TO TAKE DEPOSITION BY WRITTEN QUESTION

Order No. 9936

**3-077**

# Incomplete Records affidavit from HEB Texas Health Harris Hospital



**THE STATE OF TEXAS**

**SUBPOENA**
**DUCES TECUM**

Order No. 9936.004

To any Sheriff or Constable of the State of Texas or any person authorized to serve and execute subpoenas as provided by Rule 176 Texas Rules of Civil Procedures.

**YOU ARE HEREBY COMMANDED TO SUBPOENA AND SUMMON the following witness**
CUSTODIAN OF RECORDS FOR:

    Texas Health Harris Methodist Hurst Euless Bedford
    1600 Hospital Pkwy.
    Bedford, TX 76022
    Attn: Radiology Dept.

**Please Call If**
**Costs Exceed $35.00**

to be and appear before me, HOWARD FALLON, Notary Public for the State of Texas or other designated Notary Public, on 04/05/2012 at 10:00 o'clock a.m. at the deponent's address.
OR MAIL TO: Records Deposition Service of Texas, Inc. , 214-760-7600, 214-760-0222
           2201 Main St., Ste. 1250, Dallas, TX 75201

YOU ARE ALSO ORDERED TO BRING AND PRODUCE all books, papers, documents and tangible things within your care, custody or control **designated in the attached Exhibit A, II. Documents to be Produced**, which is incorporated herein by reference, and then and there to **answer certain written questions** now in the hands of the undersigned officer, in accordance with a notice of intent to take your written deposition heretofore served upon all parties at the instance of the Respondent/Charles B. Mitchell, Esq. the answers to which questions shall be used as evidence in that certain Cause No. 324-476966-10 pending on the docket of the District Court of the 324th Judicial District of Tarrant County, Texas, styled:

    **In the Matter of the Marriage of**
    **Cathy June Levee**
    **and**
    **Theodore Floyd Levee**
    **and**
    **in the Interest of**
    **Catherine Nicole Levee, a Minor Child**
and there remain from day to day and time to time until discharged according to the law.

If the Deponent designated in this Notice is an organization such as a corporation, partnership, association or governmental entity, you, the deponent-organization are ALSO ORDERED AND DIRECTED to designate the person or persons who will testify on your behalf concerning the care, custody, control and maintenance of the records subpoenaed and all matters set out in the **attached Exhibit A**, which is incorporated herein by reference.

Texas Rules of Civil Procedures, Rule 176.8, Enforcement of Subpoena. (a) Contempt. Failure by any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena is issued or a district court in the county in which the subpoena is served, and may be punished by fine or confinement, or both. (b) Proof of payment of fees required for fine or attachment. A fine may not be imposed, nor a person served with a subpoena attached, for failure to comply with a subpoena without proof by affidavit of the party requesting the subpoena or the party's attorney of record that all fees due the witness by law were paid or tendered.

The release of records is authorized by the Texas Rules of Civil Procedure.
WITNESS MY HAND this March 13, 2012.

                        HOWARD R. FALLON
                        Notary Public of Texas
                        My Commission Expires 07/02/14

**SEE AND COMPLETE THE ATTACHED EXHIBIT AND AFFIDAVIT.**
Cathey June Levee
***NOTE TO DEPONENT: THIS DEPOSITION WILL NOT TAKE PLACE UNTIL THE TIME PERIOD FOR OBJECTIONS HAS EXPIRED OR THE REPRESENTATIVE FOR THE NAME ON RECORD HAS WAIVED OBJECTIONS.***

No. 324-476966-10

| | | |
|---|---|---|
| In the Matter of the Marriage of | : | IN THE DISTRICT COURT |
| Cathy June Levee | : | |
| and | : | |
| Theodore Floyd Levee | : | TARRANT COUNTY, TEXAS |
| and | : | |
| in the Interest of | : | |
| Catherine Nicole Levee, a Minor Child | : | 324TH JUDICIAL DISTRICT |

**AFFIDAVIT**

STATE OF _Tr_

COUNTY OF _Tarrant_

BEFORE ME the undersigned authority, personally appeared (Custodian) DANA THORSELL _____ who being by me duly sworn, deposed as follows: (Please print your name)

I, the undersigned, am over eighteen (18) years of age, of sound mind, capable of making this Affidavit, and personally acquainted with the facts herein stated and do state that the facts in this Affidavit are true and correct.

I am the Custodian of Records for **Texas Health Harris Methodist Hurst Euless Bedford**. Attached hereto are _2 CDS_ pages of records concerning **Cathey June Levee**. These said records are kept in the regular course of business at 1600 Hospital Pkwy., Bedford, TX 76022 and it was in the regular course of business at such address for an employee, or representative, or a doctor, with personal knowledge of the act, event, condition, opinion or diagnosis recorded to make the memorandum of record or to transmit information hereof to be included in such memorandum or record, and the memorandum or record was made at or near the time of the act, event, condition, opinion, or diagnosis, or reasonably soon thereafter. The records attached hereto are the originals or exact copies of the originals and **nothing has been removed** from the original file before making these true and correct copies.

SIGNATURE OF CUSTODIAN

SUBSCRIBED AND SWORN TO before me, the undersigned authority, on this the _14_ day of _April_, _2012_.

NOTARY PUBLIC

In and for the State

My Commission Expires: _____

R. Shawn Fallon
Notary Public,
State of Texas
Comm. Expires 04-22-15

Order No. 9936.004

3-079

*(18)* *I am not aware of any perjury committed by any witness for the State.  Further, I do not believe based on the case and my investigation, that any of the State's witnesses committed perjury. Per my continuing ethical obligation of candor to the tribunal, had I become aware of or suspected a State's witness committed perjury, I would have reported it to the Court immediately.*

    a. False

        1. Shotgun

            a. Presence of a Shotgun in testimony of Catherine Levee contradicted Cathey Levee's Testimony

            b. Officer Jimenez stated under oath he asked if any weapon was involved and he replied he did and the response was no.

        2. Testimony stating witnesses saw Theodore Levee prior to the incident.

            a. Police report Cathey Levee stated

        3. Whip kick testimony was false and was known or should have been known to be in divorce affidavit by Mr. Rodgers.

**3-080**

4. Injuries do not match medical evidence and was known or should have been known by Mr. Rodgers

5. Prior statements in HEB Business Records Affidavit are contrary to testimony in trial and Mr. Rodgers knew or should have known.

## SHOTGUN ALLEGATION IN TESTIMONY

It is in direct contradiction in testimony concerning a shotgun. Cathey Levee stated she saw it and Mr. Levee was cocking it despite having a rotator cuff replaced in surgery less than 24 hours before. Catherine Levee stated she never saw the shotgun.

The officer taking the report testified in a separate civil trial that on April 10 2010 he ask if a weapon where involved and Cathey Levee told him no.

There is an obvious and compelling discrepancy in testimony.

STATE VS. THEODORE FLOYD LEVEE

when you're trying to get over to the stairs, what's the Defendant doing?

A.   Pacing back and forth, going downstairs, telling me he's going to destroy my wheelchair.  He went and got things to threaten us.

Q.   How did he threaten you?

A.   With a shotgun.

Q.   What did he do with the shotgun?

A.   He started making that noise -- I'm not -- cocking it, and making that scary noise and threatened to kill us and threatened to kill himself.

Q.   Did he stay in the -- the house the whole time you were in the house?

A.   He was very agitated and was running around the bedroom and the hallway and downstairs, and I don't know what he was doing downstairs.  And then he would go out to the car and try and get the wheelchair out --

MR. BELL:  Objection, Your Honor.  I'm going to object as to what he was doing outside.  If she wasn't out there, she can't -- she has no idea what he's doing.  It's outside of her view.  Speculation.

THE COURT:  I understand your point.  I'll allow you to cross-examine on that and draw those inferences out.

MR. BELL:  Thank you.

3-083

A.    After he broke my leg, Katy was there.    The other girls were tanning.

Q.    Okay.    Where was the shotgun?

A.    In his hands.

Q.    Where was it prior to that?

A.    I don't recall.

Q.    Where did you see -- where were you when you saw it?

A.    Sitting on the floor with Katy.    And he started -- then I saw him with the shotgun.    He was pacing manically up and down the stairs.    Then the shotgun appeared, and he started cocking it and threatening us and saying he would harm himself, too.

Q.    And you could see him -- you could see him physically --

A.    Yes.

Q.    -- cocking the gun?

A.    Yes.

Q.    Okay.

MR. BELL:    May I have just a moment?    I have quite a bit of documentation.

Judge, may I see the medical records --

THE COURT:    You may.

MR. BELL:    -- from the hospital?

MR. RODGERS:    May I approach again, Judge?

Q.   Okay.  And so he had it -- so he was fully capable of using this other arm now?

A.   Yes.

Q.   You claim you heard the shotgun noise.  Was it -- did -- did you see it?

A.   No.

Q.   Okay.  So you never saw the gun?

A.   Not at that moment.

Q.   Okay.  Where was the gun?  Do you know where the gun was in the house?

A.   I don't.

Q.   Okay.  So you heard the cocking of the gun, you're trying help your mom.

A.   Yes.

Q.   And does he reappear?

A.   Yes.

Q.   Okay.  What happened when he reappears?

A.   He goes outside to my mom's car and says he's going to tear up her wheelchair so she can't use it anymore and take the car.

Q.   Okay.  So he reappears and tells your mom that -- that he's going to tear up her wheelchair so she can't get away?

A.   Uh-huh.

Q.   Okay.  Let me ask about your mom.  Your mom has

STATE VS. THEODORE FLOYD LEVEE

correct?

A. Yes.

Q. And he never comes back upstairs again?

A. No.

Q. Okay. Is it at that point you claim that you heard the gun cocking?

A. No.

Q. Was it prior to that?

A. Yes.

Q. Where was he when you heard the gun cocking?

A. I believe he was downstairs, but I'm not quite sure.

Q. And that would have been after -- that would have been after he went down to tear the wheelchair up, allegedly, correct?

A. Yes -- no, not after he claimed to -- to rip up the wheelchair. It was before that.

Q. Okay. So he went downstairs and came back up and went back down again?

A. No, he stayed downstairs.

Q. Okay. So he never came upstairs again?

A. No.

Q. Okay. So it was at that time that you heard that clicking of what you thought was a shotgun?

A. Yes.

3-086

Q. So he never came back upstairs with a gun, correct?

A. Correct.

Q. So you never saw the gun?

A. Correct.

Q. Okay.

MR. BELL: Just a moment, Your Honor.

Just a few more questions, Your Honor.

Q. (BY MR. BELL) You do have pending charges filed against you for your mom, correct?

A. Yes.

Q. Are you and your mom on speaking terms, obviously?

A. Yes.

Q. Okay. So it's fair to say that maybe allegedly an incident occurred, but y'all are back on good terms --

A. Yes.

Q. -- and speaking?

Okay. Are you living in the home with her?

A. No.

Q. When did that event allegedly occur?

MR. RODGERS: Objection; relevance.

THE COURT: Well, Mr. Bell, what I'll allow you to ask -- well, let me ask it this way: Is there

# HURST POLICE OFFICER TESTIMONY IN CIVIL COURT

FILED
COURT OF APPEALS
SECOND DISTRICT OF TEXAS

April 10, 2013

DEBRA SPISAK, CLERK

CAUSE NO. 324-476966-10

COURT OF APPEALS NO. 02-12-00...

SUPPLEMENTAL REPORTER'S RECORD

VOL. 1 of 1

IN THE INTEREST        IN THE DISTRICT COURT

OF

CATHERINE NICOLE LEVEE,    TARRANT COUNTY, TEXAS

A MINOR CHILD        324TH JUDICIAL DISTRICT

---

FINAL TRIAL

---

On the 21ST day of MARCH, 2012 the following proceedings came on to be heard in the above-entitled and numbered cause before the HONORABLE Jerry Hennigan, Judge Presiding, held in Fort Worth, Tarrant County, Texas.

Proceedings reported by oral stenography.

---

MR. HOLMANS: I just don't want the daughter to get in trouble for not being in here and sworn in.

THE COURT: The daughter is here?

MR. HOLMANS: They're here in the court house. But like I said, I had filed a Motion to Quash and I think we've got that worked out.

MR. MITCHELL: If we have an agreement that they will not sit in on the trial, I have no problem.

THE COURT: Okay. Are they somewhere not outside our courtroom?

MR. HOLMANS: They're on this floor.

THE COURT: That's fine. Thank you.

MR. MITCHELL: Your Honor, prior to moving forward with the trial, I re urge my Motion For Continuance, Your Honor, based on the fact that there are documents that we were unable to obtain with sufficient time to file as business records affidavits in the Court and we would appreciate the opportunity to have those records available in this trial.

THE COURT: I'll deny that Motion again.

MR. MITCHELL: Yes, sir. Thank you.

THE COURT: Call your first witness.

MR. MITCHELL: Call Officer Jimenez.

THE COURT: If you will come forward and have a seat in this chair to my right.

---

MR. MITCHELL: Your Honor, with the Court's permission, may I have my legal assistant sit behind me?

THE COURT: Absolutely. She can sit with you or however you'd like for her to sit.

MR. MITCHELL: Thank you, Your Honor.

THE COURT: If you would, sir, just have a seat and adjust the microphone to where you can speak into it.

Just go ahead and state your name for the record and spell it for the court reporter.

THE WITNESS: My name is Miguel J. Jimenez. M-I-G-U-E-L, J-I-M-E-N-E-Z.

**MIGUEL JIMENEZ**

having been previously duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. MITCHELL:

Q. Officer Jimenez, are you employed by the Hurst Police Department?

A. I currently work in patrol.

Q. All right. And in--if I may approach the witness, Your Honor?

THE COURT: You may.

---

BY MR. MITCHELL:

Q. Let me show you some records, Mr. Jimenez that I have obtained from the Hurst Police Department starting with this particular tab one, pages one through eight.

And would you verify what I've marked as Defendant's exhibit one is part of your police report that you took on April 10th at the hospital when you interviewed Ms. Cathey Levee?

A. Yes, sir. It appears so.

Q. Those two pages are not the complete report, correct?

A. No.

Q. But you do have the complete report on the public documents that I do have. I just didn't want to clutter the Court's file or record.

You were the first officer that investigated the alleged physical assault of Ms. Levee; is that correct?

A. Yes, sir.

Q. You went to the hospital and talked to her; correct?

A. Yes, sir.

Q. Do you recognize her here today?

A. Yes, sir.

15

exhibit number.

THE COURT: If you'll change the exhibit. Other than that, Mr. Holmans, would you have any objections?

MR. HOLMANS: No, Your Honor.

THE COURT: All right. Respondent's exhibit number one will be admitted. That will be the entire eight pages of the report.

BY MR. MITCHELL:

Q. Officer, in questioning Ms. Levee, did you ask her if any weapons were involved?

A. Yes, sir.

Q. Did she ever tell you that a shot gun was used?

A. No, sir.

Q. Did you also talk to her about her injuries?

A. Yes.

Q. And do you recall what injuries she told you she had?

A. What I recall from that night was just that she did have injuries and she had been hit in the leg and the extent of the injuries she didn't tell me, we actually found out from the doctors.

Q. So you actually talked to the doctors?

A. Yes. I believe the doctor's name I mentioned in the report.

Q. In your report is there any mention of broken

16

ribs?

A. No, sir.

MR. MITCHELL: I have no further questions. Thank you, Officer.

THE COURT: Mr. Holmans, do you have any questions of Officer Jimenez?

MR. HOLMANS: No questions.

THE COURT: Mr. Mitchell, may Officer Jimenez be excused?

MR. MITCHELL: Yes, sir. I ask that take place.

THE COURT: Mr. Holmans?

MR. MITCHELL: No objection.

THE COURT: Officer Jimenez, you're excused. Thank you very much for coming in.

THE WITNESS: Thank you, sir.

THE COURT: Mr. Mitchell, call your next witness.

MR. MITCHELL: Call Cathey Levee.

THE COURT: Ms. Levee.

MR. MITCHELL: If you'd like her to testify from there--

THE COURT: No. I'd like for her not--

CATHEY LEVEE

having been previously duly sworn, testified as follows:

DIRECT EXAMINATION

# CONTRADICTION IN POLICE REPORT TO TESTIMONY OF SEEING THEODORE LEVEE PRIOR TO INCEDENT

The police report clearly indicates in the complainants own statement relator did not see Alexandra and asked where she was, indicating the testimony of wanting to go tanning was a lie

**Incident Report**
**HURST POLICE DEPARTMENT**

10-2679    Supplement No ORIG

## VICTIM (Person) 1: LEVEE, CATHEY EDMONDSON

| Involvement | Inv No | Type | Name | | | | | | MNI |
|---|---|---|---|---|---|---|---|---|---|
| VICTIM (Person) | 1 | Individual | LEVEE, CATHEY EDMONDSON | | | | | | 274857 |

| Race | Sex | DOB | | Age | Ethnicity | | | Juvenile? | Height | Weight |
|---|---|---|---|---|---|---|---|---|---|---|
| WHITE | FEMALE | ▓ | | 51 | NOT OF HISPANIC ORIGIN | | | No | 5'09" | 160# |

| Hair Color | | Eye Color | Skin | Means of Attack |
|---|---|---|---|---|
| BLONDE/STRAWBERRY | | GREEN | LIGHT | HANDS, FEET AND FISTS (medical attention) |

| Extent of Injury | Dom Violence |
|---|---|
| BROKEN BONES | YES |

| Type | Address | | City | State |
|---|---|---|---|---|
| HOME | 401 ▓ | | HURST | TEXAS |

| ZIP Code |
|---|
| 76053 |

| Type | Id No | | OLS |
|---|---|---|---|
| OPERATOR LICENSE | ▓ | | TEXAS |

| Type |
|---|
| SOCIAL SECURITY NUMBER ▓ |

| Phone Type | Phone No |
|---|---|
| CELL | (214) ▓ |

| Employer/School | Phone Type | Phone No |
|---|---|---|
| FTW ISD | BUSINESS | (817) 4▓ |

### Modus Operandi

| Premise Type | Crime Code(s) |
|---|---|
| RESIDENTIAL-HOUSE | ASSAULTS |

### Narrative

On Saturday, April 10, 2010, at approximately 2053 hrs, I (Officer Jimenez #650), was dispatched to HEB Hospital, in reference to domestic violence.

Dispatch advised the reporting party, identified as Cathey Levee, W/F, ▓, called and advised she had been assaulted by her husband, Theodore Levee, W/M, ▓. Cathey advised she had a broken leg and possible torn ligaments in her right leg.

I arrived on scene and made contact with Cathey and she advised the following. Cathey got home around 1800 hrs today when Theodore began asking where their 19 year old daughter, identified as Alexandra Levee, W/F, ▓ was and if she was coming over. Cathey stated they have been arguing about the inappropriate behavior and questions Theodore has been asking Alexandra.

Cathey stated Theodore has become really attached to Alexandra lately and wanting to spend more time with her. He has been asking questions about her dating life, sex life, and wanting to go to the tanning salon with her, along with wanting her to tell him where she is and when she is coming over constantly.

Cathey stated she tried to have a conversation with Theodore about the behavior and how it was making Alexandra uncomfortable last night (▓). Theodore became upset with Cathey and began arguing with her over this issue. Theodore believes there is nothing wrong with his behavior and now has started doing the same thing with their 16 year old daughter, identified as Katy Levee, W/F, ▓.

Cathey stated at one point Theodore kicked her numerous times in her legs and bumped her with his shoulder. Theodore then knocked her right leg out from under her causing her to fall to the ground. Cathey screamed and was in extreme pain after falling. Theodore told her and daughter Katy that she was faking and she just wanted

| Report Officer | Printed At | |
|---|---|---|
| 650/JIMENEZ, MIGUEL | 04/12/2010 08:37 | Page 3 of 8 |

**(19)** *Through testimony, photographs and medical records, I provided evidence to the judge in this case of the serious bodily injury this victim suffered as a result of the offense.*

    a. Incorrect

        1. In determining whether an injury constitutes serious bodily injury, the relevant inquiry is the extent of the injury as inflicted, not after its effects have been ameliorated by medical treatment. Tex Jur Criminal Law: Offenses against the Person § 282

        2. The facts of a preexisting ongoing complaint for several years in a knee injury, factual historical medical records supporting chronic hairline bone fractures of unknown origin, coupled with the plea of not guilty should have warranted some degree of integrity in verifying evidence. No verification exists

        3. Suppression and lack of diligence investigating caused a flawed prosecution and the misleading and completely untrue statements and substandard

performance of Mr. Welchell and Mr. Rodgers

predicated the necessity to suppress any form of

review.

**(20)** *During the Judge's admonishments of Mr. Levee, my co-counsel Assistant District Attorney Lloyd Whelchel brought to the Court's attention that there may be issues with transferring any probation Mr. Levee was on to Florida*

a. Untrue, misleading and erroneous.

1. It was after admonishments and the Court asked if the state had any further conditions.

2. The state then made the COMPACT statement and is complete contradiction to the law as contained in that agreement

3. The game of gotcha as played with malice and intent by the district attornety office is clearly evidence

4. The additional insult of failing to apply for COMPACT transfer is evident in the records.

   a. The Court and the District Attorney's Office are tr4ained by COMPACT AGREEMENT and knew or should have known the rules as they apply and instead used false and

**3-093**

misleading actions to violate the integrity of the Court.

5. The actions of the District Attorney's Office in the entire adjudication fails to conform to the statues of the state as it apply to the obligation of a prosecutor.

   a. CODE OF CRIMINAL PROCEDURE TITLE 1. CODE OF CRIMINAL PROCEDURE CHAPTER 2. GENERAL DUTIES OF OFFICERS

   Art. 2.01. DUTIES OF DISTRICT ATTORNEYS. It shall be the primary duty of all prosecuting attorneys, including any special prosecutors, not to convict, but to see that justice is done. They shall not suppress facts or secrete witnesses capable of establishing the innocence of the accused.

**(21)** *Mr. Whelchel stated on the record that, per the interstate compact, any probation Mr. Levee received could not be transferred to Florida unless Florida consented to the transfer*

    a. False, malfeasant, incorrect performance by District Attorney's office.

        1. The Court and the prosecutor knew or should have known COMPACT agreement. Courts officers have an obligation to be abreast of the law and procedures and incorrectly stating facts causing distortion, disruption, and incorrect information in process was egregious, irresponsible and unethical.

        2. This allegation is further enforced in that the 7 day requirement was not follow and in fact the transfer was not submitted for over 11 months after sentencing.

    ii. The TDCJ Interstate Compact Office provided training to Community Supervision and Parole Officers, the Judiciary, District Attorneys and the Board of Pardons

and Paroles to ensure compliance with compact laws, standards, policies, and procedures.

    1.  Tarrant County District Attorney's office misstated COMPACT Rule Rule 3.103 - Reporting instructions; offender living in the receiving state at the time of sentencing-

    (a)(1) A reporting instructions request for an offender who was living in the receiving state at the time of sentencing shall be submitted by the sending state within 7 business days of the sentencing date or release from incarceration to probation supervision. The sending state may grant a 7 day travel permit to an offender who was living in the receiving state at the time of sentencing. Prior to granting a travel permit to an offender, the sending state shall verify that the offender is living in the receiving state.

**(22)** *In this point, Mr. Levee references the assault where he was the listed victim.*

    a.  The Tarrant County District Attorney is ultimately responsible for all cases and passing the buck is not acceptable practice.

1. The DA not only failed to protect the rights under the law of Theodore Levee – the ensuing action actual made the DA an accessory after the fact to the crime in covering up the assault.

2. The failure to even bring the second assailant to justice is an insult.

3. The rights of Mr. Levee as a victim of family violence where abridged by The Tarrant County District Attorneys Office.

(23) *In 2010, it was the common practice of prosecutors in Tarrant County to convey this offer to offenders with misdemeanor assault charges pending but who have little to no criminal record. Mr. Edmondson's case was dismissed.*

    a. Mr. Rodgers statement is made in reference to an act of family violence. Mr. Edmondson was Mr. Levee's father – in-law at the time of the assault.

    b.

§ 71.004. FAMILY VIOLENCE.  "Family violence" means:

```
             (1)  an act by a member of a family or household against
another member of the family or household that is intended to result
in physical harm, bodily injury, assault, or sexual assault or that
is a threat that reasonably places the member in fear of imminent
physical harm, bodily injury, assault, or sexual assault, but does
not include defensive measures to protect oneself;
             (2)  abuse, as that term is defined by Sections
261.001(1)(C), (E), and (G), by a member of a family or household
toward a child of the family or household;  or
             (3)  dating violence, as that term is defined by
Section 71.0021.

Added by Acts 1997, 75th Leg., ch. 34, § 1, eff. May 5, 1997.
Amended by Acts 2001, 77th Leg., ch. 91, § 2, eff. Sept. 1, 2001.
```

c. Mr. Rodgers again offends the commons senses of the average person to state this was the "common practice" in family violence.

d. The second perpetrator, Cameron Mendez was cited and dismissed by Tarrant County District Attorney's office, despite eyewitness testimony Mr. Levee did not provoke the attack, Mr. Edmondson hit him several times and Mr. Mendez jumped in. Mr. Levee was still recuperating from shoulder surgery three months before, had limited use of his right arm and never threw a punch. He was attacked in front of his attorney at the time Dawn Roberts, who was never questioned in the investigation. Never adjudicated. Mr.

**3-098**

Mendez has prior arrest for assault. His accomplice who was also arrested was Mr. Levee's daughter Alexandra Levee.

i. From The Tarrant County Sheriffs Department security camera in the parking garage showing Mr. Edmondson holding Mr. Levee and Mr. Mendez punching him.



12:38:11 07/23/2010

ii. From The Tarrant County Sheriff's Department security camera in the parking garage Mr. Mendez kicked Mr. Levee after Mr. Edmondson pulled him to the ground.



12:38:32 07/23/2010

*iii.* The full sequence of the security camera is available.

**(24)** *Any agreement between Mr. Edmondson and Mr. O'Toole )(ADA Tarrant County) was made without my knowledge.*

a. It was in the knowledge of the District Attorney's Office of Tarrant County and this is a lame attempt at avoiding the D.A.'s responsibility.

i.

Summary

This information is a clear and concise record of and abridgment of the law.

```
CODE OF CRIMINAL PROCEDURE

TITLE 1. CODE OF CRIMINAL PROCEDURE

CHAPTER 2. GENERAL DUTIES OF OFFICERS Art. 2.01. DUTIES OF DISTRICT
ATTORNEYS.  Each district attorney shall represent the State in all criminal
cases in the district courts of his district and in appeals therefrom, except
in cases where he has been, before his election, employed adversely.  When
any criminal proceeding is had before an examining court in his district or
before a judge upon habeas corpus, and he is notified of the same, and is at
the time within his district, he shall represent the State therein, unless
prevented by other official duties.  It shall be the primary duty of all
prosecuting attorneys, including any special prosecutors, not to convict, but
to see that justice is done.  They shall not suppress facts or secrete
witnesses capable of establishing the innocence of the accused. Acts 1965,
59th Leg., vol. 2, p. 317, ch. 722.
```

It is a clear and concise record of the neglect of duty.

```
        Art. 2.03. NEGLECT OF DUTY.  (a)  It shall be the duty of the attorney
representing the State to present by information to the court having
jurisdiction, any officer for neglect or failure of any duty enjoined upon
such officer, when such neglect or failure can be presented by information,
whenever it shall come to the knowledge of said attorney that there has been
a neglect or failure of duty upon the part of said officer;  and he shall
bring to the notice of the grand jury any act of violation of law or neglect
or failure of duty upon the part of any officer, when such violation, neglect
or failure is not presented by information, and whenever the same may come to
his knowledge.

        (b) It is the duty of the trial court, the attorney representing the
accused, the attorney representing the state and all peace officers to so
conduct themselves as to insure a fair trial for both the state and the
defendant, not impair the presumption of innocence, and at the same time
afford the public the benefits of a free press.


Acts 1965, 59th Leg., vol. 2, p. 317, ch. 722.  Amended by Acts 1967, 60th
Leg., p. 1733, ch. 659, Sec. 3, eff. Aug. 28, 1967.
```

Perjury only happens under oath. Timothy Rodgers vowed to tell the truth to someone who is authorized to administer the oath.

And, the proceeding was "competent," that is, authorized by law.   Perjury requires a statement and Timothy Rodgers intent was to mislead. Timothy Rodgers knew that his testimony is false and with the intent to mislead the court

Inconsistent statements can lead to perjury. Timothy Rodgers testimony viewed as a whole is shameful.

Sworn, written statements submitted to courts or government agencies are statements made in a proceeding and subject to perjury laws.

Timothy Rodgers "material" statements can be perjury. The false statements influenced the proceedings.

Timothy Rodgers made some material statements that are superfluous to the outcome and may still be perjury. Even where the false sworn statements does not affect the outcome of a case, Timothy Rodgers may be prosecuted for perjury. Timothy Rodgers perverted the truth.

APPENDIX TWELVE; MOTION FOR NEW TRIAL





APPENDIX ELEVEN; STATES REPY AND HABES COURTS ORDER 11.072

G. EX PARTE LEVEE,
NO.C-432-009597-1239907-AP,
ORDER & STATE'S REPLY

036

FILED
THOMAS A WILDER, DIST. CLERK
TARRANT COUNTY, TEXAS

JUL 05 2012

TIME ___2:46___

_____ DEPUTY

NO. C-432-009597-1239907-AP

EX PARTE

THEODORE FLOYD LEVEE

§
§
§
§
§

IN THE 432ND JUDICIAL

DISTRICT COURT OF

TARRANT COUNTY, TEXAS

## ORDER

The Court orders that the applicant's requested relief in this application for writ of habeas corpus be denied.

SIGNED AND ENTERED this the 2ᴺᴰ day of July, 2012.

_____
JUDGE PRESIDING

SCANNED

037

NO. C-432-009597-1239907-AP

MAY 1 1 2012

EX PARTE           §        IN THE 432ND JUDICIAL
                               §
                               §        DISTRICT COURT OF
                               §
THEODORE FLOYD LEVEE    §        TARRANT COUNTY, TEXAS

### STATE'S REPLY TO PETITION FOR WRIT OF HABEAS CORPUS

COMES NOW, the State of Texas, by and through the Criminal District Attorney of Tarrant County, Texas, and denies generally the allegations in the instant application for Writ of Habeas Corpus.

#### The Case in Brief:

The applicant was convicted of the offense of aggravated assault causing bodily injury in a trial before the Court. See Judgment. Following the applicant's conviction, the applicant entered into an agreement to waive his right to appeal in exchange for community supervision. See Motion for New Trial. The trial court sentenced the applicant to ten years' community supervision. See Judgment.

#### Ground for Relief:

The applicant contends that his guilty plea was involuntarily entered because:

- He was not fully advised by trial counsel regarding his legal options;
- Trial counsel unduly pressured him into accepting

FILE COPY    038

- his plea;
- Trial counsel did not explain the consequences of his plea;
- Trial counsel did not advise that he could not appeal once his plea was accepted; and
- He was taking a number of prescribed medications which affected his ability to understand the consequences of his plea.

Discussion:

A.   Jurisdiction

The Code of Criminal Procedure permits a defendant serving community supervision to file an application for writ of habeas corpus. See Tex. Code Crim. Proc. art. 11.072 §1. These applications, however, are limited to challenges to the legal validity of the conviction or order in which community supervision is imposed or to the conditions of community supervision, and must be made on constitutional grounds. See Tex. Code Crim. Proc. art. 11.072 §2(b) & §3(c). A voluntariness claim does fall within these grounds.

B.   Voluntariness of Plea

The applicant should be denied relief on his claim that his guilty plea was involuntarily entered because he did not enter a guilty plea. The judgment and the docket sheet both indicate that the applicant pled not guilty and was tried before the Court. See Judgment; Docket Sheet. There is no constitutional right to a "voluntary" not guilty plea. See Harris v. State, 2009 WL 2902696, page 6 (Tex. App. - Austin 2009, no pet.) (not designated for

039

publication). Likewise, since the applicant pled not guilty, his trial counsel clearly did not pressure him into pleading guilty.

The applicant also contends that he was taking a number of prescribed medications which affected his ability to understand the consequences of his plea. See Application, page 6. However, he does not set forth any specific evidence regarding his medications or their effect. See Application, page 6. Thus, the applicant has not met his burden of proof. See Ex parte Maldonado, 688 S.W.2d 114 (Tex. Crim. App. 1985) (applicant must present facts that, if true, would entitle him to the relief requested in order to prevail). An applicant's sworn allegations alone are not sufficient to prove his claims. Ex parte Empey, 757 S.W.2d 771, 775 (Tex. Crim. App. 1988).

The applicant's ground for relief should be denied.

WHEREFORE, PREMISES CONSIDERED, the State prays the Court deny this application for writ of habeas corpus.

Respectfully submitted,

JOE SHANNON, JR.
Criminal District Attorney
Tarrant County, Texas

STEVEN W. CONDER, Assistant
Criminal District Attorney
401 W. Belknap
Fort Worth, Texas   76196-0201
(817) 884-1687

040

FAX (817) 884-1672
State Bar No. 04656510

CERTIFICATE OF SERVICE -

A true copy of the above reply has been mailed to the applicant's counsel, the Hon. David Richards, 204 West Central Avenue, Fort Worth, Texas 76164, on this, the 11th of May, 2011.

STEVEN W. CONDER

c18.levee theodore floyd.wr/cs

041

APPENDIX TEN;  INJURY OF THE KNEE IN THIS CASE

# APPENDIX 10. ARGUMENT; INJURY OF THE KNEE



A. The injury showing the lateral ligaments of the knee.

**The claim is the knee was injured by an outward motion to the side or 90 degree angle injuring the ACL.**

**The prior injury and lack of specificity make the records inconclusive and vague as to the cause.**

**A more logical explanation better fitting the injury is as pictured above. This type of injury is consistent with the description in the radiology report and the lack of involvement of the other ligaments.**

**The following pages show the claim and the explanation of the injury.**

# The lack of investigation and expert opinion leave the evidence questionable.



Front View of leg





39.19 was facing me exactly as you're facing me, And I took a

39.20 step, and he body-slammed me. And I went into the

39.21 banister and stood back up. t .. J screamed. Then my

39.22 daughter showed up at the door, and then he looked at me

39.23 and he wrapped his leg around me and rook it out from

39.24 under me arid it went at a right angle this way and t

39.25 heard it break.

B.

**The Injury of the Knee**



C. In an ACL disruption based on a rotary knee instability anteromedial instability - when medial platue of tibia rotates anteriorly and externally as joint opens on medial side ,this implies disruption of medial capsular ligament, medial collateral ligament, posterior oblique ligament and anterior cruciate ligament.



D. One plane anterior instability is present when the tibia moves forward on femur due to anterior pull of leg when foot is in neutral position. This include disruption of anterior cruciate ligament, lateral capsular ligament [partial or complete], medial capsular ligament [partial or complete].

E. Front View - Normal Ligaments

F. Strain and bruise – no ligament tear.

**The Injury of the Knee**



G. Medial Collateral Ligament is torn,  Anterior Crucial Ligament is torn , Medial Meniscus
Is damaged.
 Conclusion; In a sideways, moderate movement, the ACL, MCL and Meniscus are involved.

**The Injury of the Knee**



H. In a sever movement to the side, tears occur in the ACL, MCL and Meniscus.



I. The evidence in the MRI indicates an injury inconsistent with testimony.

1. The anterior cruciate ligament is disrupted

**The Injury of the Knee**

2.  Posterior cruciate ligament is intact.

3. The medial collateral ligament appears intact

4. The lateral meniscus appears  intact.

5. The quadriceps and patellar tendons are intact.

6. The medial meniscus is diffusely abnormal

7. Complex tear of the anterior horn, body and part of the posterior horn  of the medial meniscus

8. Prior history same injury treated previously .

J.

MRI EXT LWR RT JOINT WO 04/10/2010 2229 EM1308-10 561609
CONT

**The Injury of the Knee**

Examination: MRI right knee without contrast
Ordering Physician: DANIEL E PECKENPAUGH
Date: 4/10/2010 10:29 PM

History: DERANGEMENT

technique: Multiplanar, multi-sequential and right right knee without contrast

Findings:
The anterior cruciate ligament is disrupted. Posterior cruciate ligament is intact. Contusions are seen in the postero-medial and posterior lateral tibia, anterior aspect of the tibia and anteromedial femoral condyles. Fat fluid level seen within a moderate joint effusion suggest articular disruption. Discrete cortical disruption on MRI is not appreciated. Consider thin section CT to identify the sites of likely nondisplaced fracture which is not clearly evident but likely in one of the area of contusions and likely in the posterior aspect of the tibial plateaus.

The medial meniscus is diffusely abnormal with no significant identifiable anterior horn or body and a truncated posterior horn. There is a displaced meniscal fragment seen within the posterior intercondylar notch, image 8 series 6. The lateral meniscus appears intact.

The quadriceps and patellar tendons are intact. The medial collateral ligament appears intact. Extensive soft tissue edema noted about the knee including edema superficial to the medial collateral ligament, likely reactive. The lateral collateral ligament complex is intact.

Small hypointense normality within patient's joint effusion measuring 3.6 mm on image 4 series 6 likely a loose osteocartilaginous body, possibly from either the postero-medial or posterior lateral tibial plateau.

Impression:

Disrupted anterior cruciate ligament

Bone contusions in the posterior medial and lateral tibia and anterior tibia and anteromedial femur. Lipohemarthrosis indicates articular disruption although the discrete fracture line is not identified on this MRI. Consider thin section CT as clinically appropriate.

Complex tear of the anterior horn, body and part of the posterior horn of the medial meniscus with a displaced meniscal fragment in the intercondylar notch
Small osteocartilaginous body

ment is inevital



APPENDIX NINE;  COURT: DON'T – DO NOT SAY ANOTHER WORD

APPENDIX EIGHT; KNEE INJURIES AND HOW THEY OCCUR

COMMON MEDICAL KNOWLEDGE




# TYPES OF KNEE INJURIES
## & how they occur

This article is approved by the following for continuing education credit:

ACFEI provides this continuing education credit for **Diplomates** after June 2001 who are required to obtain 15 credits per year to maintain their status.

ACFEI is accredited by the **ACCME** to sponsor continuing medical education for physicians. ACFEI designates this educational activity for a maximum of 1 hour in category 1 credit towards the AMA Physicians Recognition Award.

ACFEI is **California Board of Registered Nursing** Provider 13133.

By **Matthew Donohoe,** MA, ATC; **Helen Aslanian,** BS; and **Kenneth Solomon,** PhD, PE, Post PhD

**Key Words:** knee injury, knee meniscal tears, knee ligament rupture, knee osteoarthritis, chondromalacia, knee bursitis

## Abstract
The purpose of this article is to distinguish the mechanism of knee injury (e.g., forward fall while foot is trapped, impact of knee on dashboard, chronic injury due to repetitive twisting, etc.) from the type of injury (e.g., torn meniscus, ruptured ACL, bursitis, etc). While there are no absolute rules for positively associating each mechanism of injury with a specific type of injury, this article will provide some guidance for those attempting to prove or disprove the relationship between mechanism and injury type.

## Scope of Paper
Before we are able to discuss types of injuries to the knee joint, we must first examine the anatomy of the knee joint and the kinematics that the structures of the knee generate. We will then discuss the relationship of mechanism of injury and the type of injury from both an anatomical point of view and by example.

## Anatomy of the Knee
The knee is the largest joint in the body.[9] The femur, tibia, and patella combine to create a complex joint (Figures 1 & 2). This complex joint is comprised of three articulations: two tibiofemoral articulations (joints between bones or cartilages that are immovable when the bones are directly united) and one patellofemoral articulation.[10] The two tibiofemoral joints are created by the condyles (articular prominences of bones) of the femur and plateaus of the tibia. The medial and lateral condyles of the femur roll

**Figure 1:** Bony anatomy of the knee (anterior view)



**Figure 2:** Bony anatomy of the knee (posterior view)



**Figure 3:** Ligaments & cartilage of the knee (anterior view)



and glide across the medial and lateral meniscus (fibrous cartilage within a joint) respectively. In the healthy knee, the roll and glide of the femur produce approximately 140 degrees of flexion and extension. Although flexion and extension are the dominant motions at the tibiofemoral articulations, internal rotation and external rotation are also produced at these articulations. The amount of internal and external rotation is a function of flexion and extension. Rotation is absent when the knee is in full extension, but there can be up to 30 degrees of internal rotation and 45 degrees of external rotation when the knee is in 90 degrees of flexion.[15]

The patellofemoral articulation is created by the patella and the femur. The posterior surface of the patella articulates with the trochlear groove of the femur. The trochlear groove is a U-shaped concavity located between the two condyles of the femur.[9] The patella is a sesamoid bone, which is bone that has developed within a tendon. In this case, the tendon that envelopes the patella is the quadriceps tendon. The patella's primary function is to act as a modified pulley mechanism that changes the direction of the force vector of the quadriceps. This change in the line of pull increases the momentum, and consequently the amount of torque, giving the quadriceps

a mechanical advantage. Another function of the patella is to protect the anterior knee.[15]

The knee joints contain two C-shaped fibrocartilage structures, medial and lateral menisci, that are attached to the medial and lateral tibial plateaus respectively (Figures 3 & 4). The two menisci help stabilize the joint by deepening the articular surface of the tibia. They also aid in the absorption of shock and the transmission of force by increasing the articular surface area, produce synovial fluid (a source of nutrients and lubrication to the joint), and help prevent the condyles of the femur from articulating directly on the tibial plateaus, which protects against friction wear of the femur and tibia.[15]

The condyles of the femur and the tibial plateaus are covered with a hyaline cartilage called articular cartilage (Figures 1 & 2). The primary function of articular cartilage is to absorb shock in the joint.[19] The articular cartilage does this by absorbing and discharging synovial fluid as pressure changes within the joint.[2]

The anterior and posterior cruciate ligaments are thick fibrous connective tissue structures that help guide the knee during motion (Figure 4). The anterior cruciate ligament attaches to the tibia at the anterior intercondylar portion of the

tibial plateau; it travels upward and backward and attaches to the femur at the intercondylar fossa (an anatomical pit, groove, or depression). The anterior cruciate ligament prevents excessive anterior translation of the tibia with respect to the femur. The posterior cruciate ligament attaches to the tibia at the posterior proximal tibial shaft and attaches to the femur at the posterior intercondylar fossa. The posterior cruciate ligament prevents excessive posterior translation of the tibia with respect to the femur.[2]

The medial and lateral collateral ligaments also help guide the knee during motion (Figures 3 & 4). The medial collateral ligament attaches to the tibia at the medial proximal tibial shaft and attaches to the femur at the medial epicondyle (any of several prominences on the outer part of a long bone). The medial collateral ligament helps protect against excessive valgus forces on the knee. The lateral collateral ligament attaches to the proximal head of the fibula and attaches to the femur on the lateral epicondyle. The lateral collateral ligament provides protection from excessive varus forces on the knee.[2]

The articular capsule of the knee is irregular in that it does not completely envelope the joint like most other synovial joints. It is covered with a synovial



**Figure 4:** Ligaments & cartilage of the knee (posterior view)

Posterior Cruciate Ligament
Anterior Cruciate Ligament
Medial Collateral Ligament
Lateral Collateral Ligament
Medial Meniscus
Lateral Meniscus



**Figure 5:** Anterior knee musculature

Rectus Femoris
Vastus Medialis
Vastus Lateralis



**Figure 6:** Tearing of the PCL as a result of falling on a flexed knee*

Fall
Force

membrane that produces synovial fluid to lubricate and provide nutrients for the joint structures.[15]

The knee joint is crossed by 12 muscles that stabilize the joint and produce the anatomical motions of the joint. These 12 muscles can be divided into three groups: the quadriceps femoris, the hamstring, and the unclassified group. The quadriceps femoris group is comprised of the rectus femoris, vastus intermedius, vastus lateralis, and the vastus medialis (Figure 5). This muscle group is responsible for knee extension.[15] The vastus medialis, however, has an important function in providing a medial force on the patella that counterbalances the lateral components of force generated by the remaining three quadriceps muscles. The dynamic medio-lateral equilibrium created by the vastus medialis helps to maintain patellar tracking.[15] The rectus femoris also assists in hip flexion because the proximal attachment is on the anterior inferior iliac spine.[16]

The hamstring group is made up of the biceps femoris, semimembranosus, and the semitendinosus. These muscles work together to produce knee flexion and hip extension. The muscles of the hamstring group produce hip extension because they also cross the hip joint and have a proximal attachment on the ischial tuberosity of the pelvis. Only the short head of the biceps femoris does not produce hip extension due to its proximal attachment on the posterior femur.[16]

The unclassified muscle group contains the sartorius, gracilis, popliteus, gastrocnemius, and plantar muscles.[15] These muscles have less influence on the knee than the other two muscle groups. They primarily act on another joint, such as the ankle or the hip, and only assist with flexion, extension, and internal and external rotation of the tibia. The popliteus is the one exception to that statement; its primary function is to initiate internal rotation of the knee and unlock the knee at the onset of knee flexion.[6]

There are 13 bursae in the knee joint. A bursa is a sac containing a viscid fluid that helps reduce friction between moving parts. Bursae are usually found over bony prominences and beneath tendons.[5] The knee bursae are grouped in three general areas: the anterior bursae, medial bursae, and lateral bursae. The anterior bursae consist of the deep infrapatellar bursa, subcutaneous prepatellar bursa, subcutaneous infrapatellar bursa, and suprapatellar bursa. The medial bursae consist of the bursa between the medial head of the gastrocnemius and the fibrous capsule, the bursa between tendons of the semimembranosus and semitendinosus, bursae deep to the tibial collateral ligament, the bursa superficial to the tibial collateral ligament, and the semimembranosus bursa. The lateral bursae consist of the bursa between the fibular collateral ligament and the tendon of the biceps femoris, the bursa

between the fibular collateral ligament and the tendon of popliteus, the bursa between the lateral head of the gastrocnemius and joint capsule, and the bursa between the tendon of the popliteus and the lateral femoral condyle.[14]

## Mechanisms of Knee Injuries

Due to the complex nature of the anatomy of the knee, injury to the joint is quite common as a result of both chronic stress and acute insult. This article examines the more common types of knee injuries that occur, describing the mechanisms required to cause these specific injuries. This article also explores how tears occur to the medial and lateral meniscus, anterior cruciate ligament, posterior cruciate ligament, medial cruciate ligament, and lateral cruciate ligament, as well as the causes of arthritic changes, chondromalacia, and bursitis.

## Meniscal Tears

A tear to the menisci is caused by a combination of compression of the knee joint (such as during weight bearing) in the presence of a rotary force and flexion or extension, or in the absence of synchronous rotation during flexion or extension.[2,17] When the knee joint is compressed, the condyles of the femur and the tibial plateaus are brought closer together, which reduces the ability of the menisci to move freely during rotation and flexion or extension. Essentially, a portion of the menisci becomes trapped





## Medial Collateral Ligament Rupture

Ruptures of the medial collateral ligament are caused by a direct valgus force applied to the knee, as well as by an external rotation of the knee joint (Figure 7).[2,4] A medial collateral ligament injury is usually more severe than a lateral collateral ligament injury because the medial collateral ligament is part of the joint capsule and is attached to the medial meniscus, while the lateral collateral ligament is not.[2,9]

## Lateral Collateral Ligament Rupture

Ruptures of the lateral collateral ligament are uncommon; however, when they do occur, they are caused by a varus force applied to the knee joint (often coupled with internal rotation of the tibia) (Figure 8) or during complete dislocation of the knee.[2,17] Injury to the lateral collateral ligament is rarely an isolated injury and often is concomitant with stretching or rupturing of the lateral popliteal nerve.[17]

## Knee Osteoarthritis

Osteoarthritis of the knee is a disease that is characterized by degeneration of the articular cartilage of the joint. Osteoarthritis is also referred to as osteoarthrosis and degenerative joint disease. The degeneration of articular cartilage leads to a loss of shock absorption, which in turn leads to trabecular micro-fractures. Subsequently, the subchondral bone begins to degenerate and osteophytes form at the joint margin.[19,18]

The cause of osteoarthritis is not well known; however, risk factors have been established and include age, gender, previous trauma to the joint, and possibly obesity. The prevalence of knee osteoarthritis increases with age because as cartilage ages, it undergoes changes that decrease its ability to withstand compression, putting more stress on the subchondral bone.[8,11]

Females seem to be more likely to get osteoarthritis than males, but males tend

and a tear results as a portion of the menisci moves while the trapped portion does not. It is important to note that rotation of the knee joint does not occur in full extension; therefore, a meniscal tear cannot occur in a position of full extension.[17] Also, it is very uncommon for both menisci to be torn in a single event. The second meniscal tear is usually the result of a joint that has had a history of internal derangement due to relaxation of either the joint capsule or ligaments and weakened quadriceps musculature.

## Anterior Cruciate Ligament Rupture

Ruptures of the anterior cruciate ligament can occur due to rotation, abduction, posterior translation of the femur with respect to the tibia, hyperextension, or dislocation of the knee joint. The anterior cruciate ligament is most commonly ruptured during internal rotation of the tibia while the knee is flexed.[4] In order to achieve rupture of the anterior cruciate ligament due to abduction, the medial collateral ligament must first be ruptured. When the medial collateral ligament is ruptured due to abduction, the rupture of the anterior cruciate ligament is inevitable.[17]

## Posterior Cruciate Ligament Rupture

Posterior cruciate ruptures are created when a posterior force is applied to the head of the tibia while the knee is in flexion.[17] Ruptures of the posterior cruciate ligament may also occur during both hyperflexion and hyperextension. Hyperflexion without coupled posterior translation of the tibia often results in an avulsion of the posterior cruciate ligament from the femur.[7] When ruptures of the posterior cruciate ligament occur as a result of hyperextension, first the anterior cruciate ligament is ruptured, followed by injury to the posterior capsule. Then, at 30 degrees of hyperextension, injury to the posterior cruciate ligament occurs; finally, injury to the popliteal artery occurs at 50 degrees of hyperextension.[7]

Injury to the posterior cruciate ligament most frequently occurs as a result of motor vehicle accidents and has been referred to as "the dashboard injury." During a frontal collision, the occupants of the front seat travel forward and strike their knees on the dashboard. This forces the head of the tibia to move posteriorly and causes the posterior cruciate ligament to rupture.[7] Another common means of rupturing the posterior cruciate ligament is falling onto a flexed knee, which also drives the tibia posteriorly, rupturing the posterior cruciate ligament (Figure 6).[2]

**Table 1: *Mechanisms & Types of Knee Injuries***

| Injury | Mechanism of Injury | How the Injury May Occur |
|---|---|---|
| Torn Meniscus | combination of compression, rotation and flexion\extension, or absence of synchronous rotation during flexion\extension | twisting knee while walking due to unknowingly stepping in a ground depression |
| Ruptured ACL | rotation, abduction, posterior translation of the femur, hyperextension or dislocation | twisting knee upon landing after jumping or falling |
| Ruptured PCL | posterior translation of the tibia, hyperflexion or hyperextension | striking knee on dashboard or falling onto a flexed knee |
| Ruptured MCL | valgus force applied to the knee or external rotation | lateral side of pedestrian's knee struck by the bumper of a moving vehicle |
| Ruptured LCL | varus force applied to the knee or complete dislocation | blow to medial aspect of the knee; often concomitant with other knee injuries |
| Osteoarthritis | unknown; however, risk factors include age, gender, previous trauma, and possibly obesity | increased age, female gender, and being overweight |
| Chondromalacia | unknown, however it has been postulated that abnormal patellar tracking is a major etiological factor | abnormal patellar tracking secondary to knee injury which disrupts function of the vastus medialis |
| Bursitis | contact trauma, prolonged kneeling and repeated flexion/extension | striking knee on rigid surface, such as dashboard or ground |

extension, trauma to the knee can occur in many different manners, some of which are summarized in Table 1. However, in order to damage one of the specific structures of the knee, the mechanism required to injure that structure must be present or injury cannot result. Meniscal tears require compression, rotation and flexion, or extension. Ruptures of the anterior cruciate ligament occur as a result of rotation, abduction, posterior translation of the femur with respect to the tibia, hyperextension, or dislocation of the knee joint. Ruptures of the posterior cruciate ligament occur as a result of posterior translation of the tibia while the knee is flexed from hyperextension or hyperflexion. The medial collateral ligament will rupture as a result of a valgus force or external rotation. The lateral collateral ligament will rupture as a result of a varus force or complete dislocation of the knee. Bursitis of the knee is often a result of direct impact, prolonged kneeling, or repeated flexion or extension of the knee. While the causes of osteoarthritis and chondromalacia are not known, we do know there are risk factors that increase the likelihood of developing these problems. The risk factors for osteoarthritis include age, gender, previous trauma, and obesity, while abnormal patellar tracking is the risk factor for chondromalacia.

As can be seen, there is no doubt about the true complexity of the knee joint, the major processes that occur as people walk, sit, stand, run, and jump, and the debilitating injuries that can occur when external and internal forces cause the structures of the knee to exceed their physical limits.

to get osteoarthritis at a younger age.[1,12] It has been suggested that males get osteoarthritis at a younger age due to the influence of trauma or occupation.[12]

Any damage to the joint cartilage, no matter how minimal, can lead to osteoarthritis. This is because cartilage has limited healing abilities due to poor vascularity. Once injured, the degeneration process of the joint cartilage begins and is difficult to halt or reverse.[19,11]

The increased body weight of obese individuals increases the stress placed on the cartilage in the joint and can become a contributing biomechanical factor for knee osteoarthritis.[12] Logically, increased loading stress will diminish the capacity for protection of the subchondral bone and injury to these structures is more likely, thus increasing the risk of osteoarthritis.

## Knee Chondromalacia

Chondromalacia is the softening and deterioration of the articular cartilage on the posterior surface of the patella. The exact cause of chondromalacia is unknown; however, it has been postulated that abnormal patellar tracking is a major etiological factor.[13] Three stages of chondromalacia have been identified. Stage 1 involves the swelling and softening of the articular cartilage. Stage 2 involves the fissuring of the softened articular cartilage, and stage 3 involves deformation of the surface of the articular cartilage caused by fragmentation.[3]

## Bursitis

Bursitis of the knee is the inflammation of one or more of the numerous bursae that surround the knee joint. Bursitis can be acute, chronic, or recurrent.[2] Most commonly, the bursae in the anterior group become inflamed. Common mechanisms of knee bursitis include contact trauma, prolonged kneeling, and repeated flexion or extension of the knee.

## Summary

Although the knee, at first glance, appears to be a relatively simple hinge joint that merely moves in flexion and

## References

1. Altman RD. The classification of osteoarthritis. *The Journal of Rheumatology.* 1995;Vol. 22;Suppl. 43:42-43.

2. Arnhein DD, Prentice WE. *Principles of Athletic Training.* 8th ed. St. Louis, MO: Mosby Year Book;1993.

3. Cailliet R. *Knee Pain and Disability.* 2nd ed. Philadelphia, PA: FA Davis; 1983.

4. Cross MJ, Chrichton, KJ. *Clinical Examination of the Injured Knee.* Baltimore, MD:

Williams & Wilkins; 1987.

5. Dox IG, Melloni BJ, Eisner GM. *The Harper Collins Illustrated Medical Dictionary*. New York, NY: HarperCollins; 1993.

6. Enerson OD. 2003. Retrieved from: www.whonamedit.com/synd.csm/2251.html.

7. Fanelli GC. *Posterior Cruciate Ligament Injuries: A Practical Guide to Management*. New York, NY: Springer-Verlag; 2001.

8. Felson DT, Niamark A, Anderson J, Kazis L, Castilli W, Meenan RF. The prevalence of knee osteoarthritis in the elderly. *Arthritis and Rheumatism*. 1987;Vol. 30;914-918.

9. Hoppenfeld S. *Physical Examination of the Spine and Extremities*. East Norwalk, CT: Appleton & Lange; 1976.

10. Kapit W, Elson LM. *The Anatomy Coloring Book*. 2nd ed. New York, NY: HarperCollins College Publishers; 1993.

11. Martin DF. Pathomechanics of knee osteoarthritis. *Medicine and Science in Sports and Exercise*. 1994; 26: 1429-1434.

12. Michet CJ. Osteoarthritis. *Primary Care*. 1993; 20: 815-826.

13. Nicholas J, Hershman E. *The Lower Extremity and Spine In Sports Medicine*. St. Louis, MO: Mosby-Year Book; 1986.

14. Physiome Project. 2003. Retrieved from: http://www.physiome.org.nz/sites/physiome/anatml/database/knee/ groups/group_12.html.

15. Rasch PJ. *Kinsiology and Applied Anatomy*. 7th ed. Philadelphia, PA: Lea & Fehiger.

16. Sieg KW, Adams AP. *Illustrated Essentials of Musculoskeletal Anatomy*. 2nd ed. Gainesville, FL: Megabooks; 1985.

17. Smilli IS. *Injuries of the Knee Joint*. UCLA BIOMED WE 870 S641i; 1951.

18. Whiting WC, Zernicke RF. *Biomechanics of Musculoskeletal Injury*. Champaign, IL; Human Kinetics; 1985.

19. Wilkerson G. Conservative Management of Osteoarthritis (FN: 97-158). Shirley, NY: Biodex Medical Systems; 1997.

*Figures 6, 7, and 8 are based on diagrams originally printed in Arnhein DD, Prentice WE. *Principles of Athletic Training*. 8th ed. St. Louis, MO: Mosby Year Book;1993.

## About the Authors

**Matthew Donohoe** holds a bachelor's  degree in kinesiology with an emphasis in athletic training, and a master's degree in physical education with an emphasis in biomechanics and athletic training. He has also been certified as an athletic trainer by the National Athletic Trainers Association. Donohoe's studies and professional experience have focused on accident reconstruction, biomechanics, athletic training, and injury rehabilitation. He has assisted in research projects at San Diego State University's Biomechanics Lab and has developed and carried out the protocol for research investigations on osteoarthritis knee bracing. Donohoe lectures on biomechanics as it relates to low-speed automobile accidents and daily life activities, and has carried out research on forces generated by sporting activities and activities of daily living. Currently Donohoe utilizes his knowledge of accident reconstruction, biomechanics, and the mechanics of injury at the Institute of Risk & Safety Analyses to determine the potential for injury in a given accident.

**Helen Aslanian** obtained a bachelor's  degree in physics from the University of California, Los Angeles (UCLA) in 2001 and is currently working on a master's degree in engineering at UCLA. Her experience includes an internship at Boeing's Electron Dynamics Division, and her professional responsibilities have included assessing and studying products and engineering laboratory processes to create a detailed, web-interface database.

As an undergraduate student at UCLA, Aslanian co-authored and presented papers based on her research on solid-state physics. Her research included laboratory work on, and analysis of, superconducting materials at the National High Magnetic Field Laboratory in Florida. Today Aslanian applies her understanding of a broad range of physics and her background in analysis and problem solving to the field of accident reconstruction at the Institute of Risk & Safety Analyses.

**Dr. Kenneth Solomon** obtained a bachelor's, master's, and doctorate degree in engineering and a postdoctorate degree in risk benefit assessment from UCLA. He also  holds a professional engineering license. Dr. Solomon's studies are limited primarily to accident reconstruction, biomechanics, and risk-benefit assessment, as demonstrated by his 29 years of independent research; his more than 200 internationally distributed publications, reports, and presentations; the three books he co-authored; and his journal guest editorships. In December of 1998 and after over 22 years of service, he retired as Senior Scientist with the RAND Corporation. He was on the faculty at the RAND Graduate School for 18 years and has taught as an adjunct faculty member at UCLA, the University of South Carolina, the Naval Post-Graduate School, and George Mason University. Dr. Solomon is a reserve deputy level IV with the Orange County Sheriff-Coroner's Department. He is also Commissioner of the Policing Commission for the City of Calabasas. He has published studies on transportation accidents (involving automobiles, trucks, motorcycles, and bicycles), industrial and recreational accidents (involving pressure vessels; rotating machinery; forklifts and cranes; exercise, gym, and recreational equipment; swimming pools; and manufacturing and punch presses), slip-and-fall and trip-and-fall accidents, and the adequacy of warnings.

**Earn CE Credit**

To earn CE credit, complete the exam for this article on page 63 or complete the exam online at www.acfei.com (select "Online CE").



**Arthritis Centers of Texas**

ANDREW CHUBICK, M.D
RICHARD C. MERRIMAN, M.D.
ERIC HURD, M.D.
DIANNE L. PETRONE, M.D.
JOHN J. WILLIS, M.D.
ALEX LIMANNI, M.D.
MARIAN SACKLER, M.D.
HIMANSHU PATEL, D.O.

Specialists i..
Arthritis
Carpal Tunnel
Syndrome
Fibromyalgia
Low Back Pain
Tendinitis

Bursitis
Connective Tissue
Disease
Gout
Osteoporosis
Vasculitis

## CLINIC NOTE

**PATIENT NAME:** Levee, Cathey
**DATE OF VISIT:** 04/25/06

**PRIMARY PHYSICIAN:** R.K. Stahlmann, D.O.

**SUBJECTIVE:** The patient returns after three months with a history of rheumatoid arthritis. At the time of her last visit, she had an area of focal irritation and pain in the left lateral ankle area. She was found to have a fracture of the distal fibula and was casted for several weeks and that got much better.

She notes doing fairly well with her joints until the last week or so when she has had a flare-up. She has had more trouble with the right elbow, right inner ear, as well as the hands and feet. She has had some swelling in the joints and they are stiff in the morning. Energy is down some. She has had no sleep disturbance.

She also notes more burning, numbness, and pain to feet as well. There has been no focal weakness. She has had no rashes, nausea, vomiting, epigastric pain, or mucocutaneous bleeding. She still has some low-grade fevers at times with no high-grade fever. She has had no headaches.

**OBJECTIVE:**
Vital Signs: Weight 173 pounds. Blood pressure 123/74. Pulse 102. Respirations 20 and unlabored. Temperature 98.3.
General: She is in no apparent distress.
Skin: Without rash in the upper and lower extremities, trunk, and back.
Lungs: Clear to auscultation and percussion.
Musculoskeletal: Joints showed tenderness with slight swelling of the MCPs and PIP, bilaterally as well as the MTPs bilaterally. There is trace synovitis of the right knee.

**IMPRESSION:** Rheumatoid arthritis with some flare.

**PLAN:**
1. Continue current medications.
2. Burst and taper of prednisone 20 mg a day for two days, 15 mg a day for two days, 10 mg a day for two days, 5 mg a day for two days, and then stop.
3. UA, hemogram, ESR, CRP, and SMAC.
4. Return to clinic in three months or sooner if necessary.

John J. Willis, M.D.
JWI/pla/nek/smo

cc:   R.K Stahlmann, D.O.
       9208 Elam Road, Suite #100
       Dallas, TX 75217

712 NORTH WASHINGTON SUITE 300 DALLAS, TEXAS 75246
2929 N. CENTRAL EXPRESSWAY SUITE 225 RICHARDSON TEXAS 75080
(214) 823-6503

APPENDIX SIX; DEFENSE CLOSING STATEMENT FAILED TO PROVIDE PREDICATE FOUNDATION OR TESTIMONY FOR CONFLICTING PRIOR STATEMENTS

Trl Rcd.II

Pg 12.25 If you look at the record again

Pg. 13.1 There is several versions from the complaint

25

24

# APPENDIX FIVE;   FAILURE OF DEFENSE OPENING STATEMENT TO SHOW PROMISED VARING STATEMENTS

20   Comp

APPENDIX 4; COMPLAINT OF RIB INJURY

Statement and pictures entered into evidence of the allegation of rib injury in assault in criminal trial are in conflict with medical evidence.

1. Medical records in evidence clearly show the radiology report as a past fracture and appearing on the left side of the body.

    a. Pictures and testimony claim an injury to the RIGHT side of the body.

2. Cathey Levee's medical record indicate a continuous use of steroids.

    a. Ecchymosis existed and has been a persistent presentation throughout treatment.

        i. Ecchymosis during prolonged steroid therapy is most likely due to the fragmentation of elastic staining fibers, the elastotic degeneration of the collagen fibers, and their absence in the pericapillary spaces as a result of

3. Cathey Levee convinced court ribs were part of injury

    a. however, the bruising she claimed on her right

       side is the opposite side of the rib injury discovered a month

       later.

RADIOLOGY REPORT AND ILLISTRATION These appear to be bruises however they are

An ecchymosis is the medical term for a subcutaneous purpura larger than 1 centimeter or a hematoma, commonly, but erroneously, called a bruise.[1] That is, bruises are caused by trauma whereas ecchymoses, a type of purpura, are not caused by trauma.[2]

A broader definition of ecchymosis[3][4] (noun) \e-ki-ˈmō-səs\ is as: the escape of blood into the tissues from ruptured blood vessels. The term also applies to the sub-cutaneous discoloration resulting from seepage of blood within the contused tissue.

TRIAL RECORD

before, correct?

A. Yes.

Q. These are photographs that were taken of your injuries a couple of days after the assault?

A. Yes.

Q. How long after the assault were these pictures taken?

A. Either the 12th or the 13th.

Q. So we're talking two or three days later?

A. Yes.

Q. And do State's Exhibits 4 and 8 accurately reflect the picture -- the injuries you had at that time?

A. They're -- yes, they are accurate.

Q. And I want to show you State's Exhibit No.9. Are these the medical records-- your medical records from HEB hospital from that night?

A. Yes.

MR. RODGERS: Your Honor, we would offer State's Exhibits 4 through 9, inclusive, into evidence.

For the record, State's Exhibit No. 9, we've had a business records affidavit and notice of intent to offer these business records on file for the required amount of time.

MR. BELL: I have no objection to State's Exhibit 9. However, State's Exhibit 4, 5, 6, 7 and 8, I

PICTURE ( COPY ) SUBMITTED INTO EVIDENCE



R10/06/2010   Radiology Associates  There is a healed lateral left fourth rib fracture and posterior fourth and fifth rib and seventh rib fracture

1. The location of specific rib fractures is an important indicator of related injury.

    a. Healed lateral left fourth rib fracture

    b. Healed posterior fourth rib fracture

2. Healed posterior left fifth rib fracture

3. Healed posterior left fifth rib fracture

4. Area photographs in evidence indicate

    a. Area on the RIGHT side of body.

5. Frontal image of the rib cage. Ribs 1-12 demonstrate the variable shape of the upper 9 ribs. The 12th rib does not articulate anteriorly. The sternum consists of the manubrium (M), the body (S), and the

xiphoid (X). The ribs articulate with the sternum via the costochondral (CC) junction. C = clavicle. Posterior image of the thorax. The ribs are numbered 1-12. The clavicle (C) and scapula (S) are often involved in injuries that include rib fractures.

RADIOLOGY REPORT AND ILLISTRATION

10/06/2010   There is a healed lateral left fourth rib fracture and posterior fourth and fifth rib and seventh rib fracture.

Frontal image of the rib cage. Ribs 1-12 demonstrate the variable shape of the upper 9



The location of specific rib fractures is an important indicator of related injury.



Healed Lateral        Left Fourth Rib Fracture

Healed posterior      Left Fourth Rib Fracture

Healed posterior      Left Fith Rib Fracture

Healed posterior       Left Seventh Rib Fracture



Area referenced in pictures and testimony

POSTERIOR VIEW

# APPENDIX THREE; PRIOR STATEMENTS OF COMPLAINANT

# IN EVIDENCE -BUSINESS RECORDS AFFIDAVIT TEXAS HEALTH HARRIS HEB ER RECORDS 4/10/2010

| CL PRIOR STATEMENTS 4/10/10 HEB EMERGENCY ROOM AFFIDAVIT IN EVIDENCE | | | | |
|---|---|---|---|---|
| 4/10/2010 | 19:28 | (7:28) | Domestic dispute with husband kicked in knee fell now cannot stand on leg<br><br>PD not notified 51 y.o. DOB: 911111958<br><br>Visit Date: 411012010<br><br>Account Number9:0 60052031 MRN:0 70013282<br><br>Room #: 61<br><br>Chief Complaint: Knee Injury (Major)<br><br>HPI<br><br>7:28 PM Cath██████ 51 ████ ▓ale presents to the ER complaining of right knee injury onset pta.<br><br>Pt. states her husband allegedly kicked her right knee.<br><br>Pt. reports her husband did a type of maneuver where he grabbed her ankle and kicked her knee, severely twisting her knee.<br><br>Pt. states when she tries to walk on knee it feels wobbly and goes out on her.<br><br>No other injuries at this time.<br><br>No other complaints.<br><br>Pt. has RA and mild right knee menisectomy as a teenager.<br><br>Denies any other injury during this incedent. | ER pg 11-13 |
| 4/10/2010 | 19:33 | (7:33) | Admiting Diag. Possible broken knee Injury: kicked in knee,pain. | ER pg 24 |
| 4/10/2010 | 19:45 | (7:45) | kicked right knee | ER pg 11 |

| | | | | |
|---|---|---|---|---|
| 4/10/2010 | 20:13 | (8:13) | Comment Dr. Peckepaugh PTA Domestic dispute with husband Kicked in knee. | ER pg 10 |
| | | | | |
| 4/10/2010 | 20:27 | (8:27) | Husband tripped her | ER pg 9 |
| 4/10/2010 | 20:32 | (8:32) | Patient stated a below-DF,  My husband tripped me.-DF | ER Pg 8 |
| 4/10/2010 | 23:01 | (11:00) | he purposely bumped me into the wall , I stumbled  & he did a "military take down" kick to my right knee. | Vic Vol Statement Pg1 |

APPENDIX TWO; HEB EMERGENCY ROOM RECORDS



Imaging
Request

1196303

Theodore Levee

Tim Rodgers

S# 01/05/10/10 E#KV

Harris HEB

(Cathy Levee)

# Grand Jury Subpoena
## Duces Tecum

The State of Texas}
County of Tarrant}

To the Sheriff or Other Proper Officer of Tarrant County, Greetings :

You are Hereby Commanded to Summon -

REBECCA J. KULASEVIG, CUSTODIAN OF THE MEDICAL RECORDS FOR TEXAS HEALTH HARRIS METHODIST HURST-EULESS-BEDFORD HOSPITAL, 1600 HOSPITAL PKWY., BEDFORD, TEXAS, 76022, (817) 848-4099, FAX 817-848-4862, **TO APPEAR IN PERSON** BEFORE THE GRAND JURY OF SAID COUNTY ON **FRIDAY, MAY 28TH, 2010, AT 10:00 A.M.,** THEN AND THERE TO TESTIFY BEFORE THE GRAND JURY AND TO BRING THE FOLLOWING RECORDS:

Provide any and all medical records pertaining to **CATHY LEVEE, W/F, DOB: 9/11/58,** for any and all treatment beginning on or about the **10TH DAY OF APRIL, 2010.** Include a business records affidavit.

**"You are authorized to release said records under EXCEPTIONS FOR LAW ENFORCEMENT ACCESS - (45 C.F.R. 164.512(f)) # 3 Grand Jury Subpoena (164.512(f)(1)(ii)(B))"**

IF COPIES, OF THE ABOVE REQUESTED RECORDS ARE DELIVERED TO THE TARRANT COUNTY GRAND JURY **ON FRIDAY, MAY 21ST, 2010,** YOU WILL **NOT** BE REQUIRED TO APPEAR IN PERSON ON FRIDAY, MAY 28TH, 2010 AT 10:00 A.M.

Herein Fail Not, but of this writ make due return, to show you have executed the same. Witness my hand this day of May 4, 2010.

GRAND JURY ATTORNEY (TR)

The Grand Jury meets in the Grand Jury Room
Tarrant County Justice Center
2nd Floor
401 West Belknap
Fort Worth, Texas 76196
(817) 884-1608 Fax (817) 884-1189

"A disobedience of this subpoena is punishable by fine not exceeding five hundred dollars, to be collected as fines and costs in other criminal cases." Article 24.22 Texas Code of Criminal Procedure.

# Grand Jury Subpoena



## Duces Tecum

# The State of Texas

# Tarrant County

## *****

Tarrant County Grand Jury
Tarrant County Justice Center
Second Floor
401 West Belknap
Fort Worth, Texas 76196-0201
(817) 884-1608

# Grand Jury Subpoena
# Return of Service

Came to hand this the _4_ day of _May_, 20_10_, and

**SERVED**        Executed on the _4_ day of _May_, 20 _10_, by handing the within subpoena to the within named witness;

**OR**

**UNSERVED**        I was unable to serve the named

witness because:

_____

_____

_____

Returned on this the _6_ day of _May_, 20_10_.

_____
Official Signature of Officer

# AFFIDAVIT

Re: Cathey Levee                    DOB: 09/11/1958

BEFORE ME, the undersigned authority, personally appeared
*Rebecca Kulasevig, RHIA ,* who, being by me duly sworn, deposed as
follows:

"My name is *Rebecca Kulasevig RHIA ,* and I am over twenty-one years of
age, of sound mind, capable of making this affidavit, and personally
acquainted with the facts herein stated:

I am a custodian of the medical records of Texas Health Harris Methodist
Hospital Hurst-Euless-Bedford. Attached, hereto are 27 pages of records of
the hospital. These said 27 pages of records are kept in this hospital in the
regular course of business, and it is in the regular course of business of
Texas Health Harris Methodist Hospital Hurst-Euless-Bedford for an
employee or representative of Texas Health Harris Methodist Hospital
Hurst-Euless-Bedford, with knowledge of the act, event, condition, opinion
or diagnosis, recorded to make the record or to transmit information thereof
to be included in such record; and the record was made at or near the time or
reasonably soon thereafter. The records attached hereto are the original or
exact duplicates of the original."

Affiant *Rebecca J. Kulasevig, RHIA*

SWORN TO AND SUBSCRIBED BEFORE ME on the
4 day of May , 2010.

Notary Public in and for
The State of Texas
Commission expires:

NOTARY PUBLIC
STATE OF TEXAS

CARRIE L. GANN
My Commission Expires
June 26, 2013

## Admission Information

| Attending Provider | Admitting Provider | Admission Type | Admission Date/Time |
|---|---|---|---|
| Peckenpaugh, Daniel E, MD | Peckenpaugh, Daniel E, MD | Emergency | 04/10/10 1904 |

| Discharge Date/Time | Hospital Service | Auth/Cert Status | Service Area |
|---|---|---|---|
| 04/11/10 0024 | Emergency Room | Incomplete | SA-TEXAS HEALTH RESOURCES |

| Unit | Room/Bed | Admission Status |
|---|---|---|
| HEBM1ER | DCHB/DCHB01 | Discharged (Confirmed) |

**Diagnosis**

## Discharge Disposition

| Discharge Provider | Date/Time | Disposition | Destination |
|---|---|---|---|
| (none) | 04/11/10 0024 | AHR Routine Discharge | (none) |

## Patient Demographics

| Name | Patient ID | SSN | Sex | Birthdate |
|---|---|---|---|---|
| Levee, Cathey | 000106210 | xxx-xx-1454 | Female | 09/11/58 (51 yrs) |

| Address | Phone | EMail | Employer |
|---|---|---|---|
| 401 PARKVIEW COURT HURST, TX 76053 | 214-794-0094 (H) | | FORT WORTH ISD |

**Race**
WHITE

| Reg Status | PCP | Date Last Verified | Next Review Date |
|---|---|---|---|
| | | | |

| Emergency Contact 1 | Emergency Contact 2 | Marital Status | Religion |
|---|---|---|---|
| LEVEE,ALEXANDRA (Natural Child) 401 PARKVIEW CT HURST, TX 76053-7151 817-266-3741 (H) | | Single | None Given |

## Emergency Contact

| Name | Home |
|---|---|
| LEVEE,ALEXANDRA | 817-266-3741 |

## Hospital Account

| Name | Acct ID | Class | Status | Primary Coverage |
|---|---|---|---|---|
| LEVEE,CATHEY | 9060052031 | Emergency | Discharged/Not Billed | UHC - U HLTHCR PPO |

## Guarantor Account (for Hospital Account #9060052031)

| Name | Relation to Pt | Service Area | Active? | Acct Type |
|---|---|---|---|---|
| LEVEE,CATHEY | Self | TH | Yes | Gar is a Person |

| Address | Phone |
|---|---|
| 401 PARKVIEW COURTHURST, TX 76053 | 214-794-0094(H) |

TEXAS HEALTH HEB

LEVEE,CATHEY
MRN: 000106210
Acct #: 9060052031
Admit Date: 04/10/2010

000001

Page 1

Printed at 4/11/10 12:31 AM

## Coverage Information (for Hospital Account #9060052031)

| F/O Payor/Plan | | Precert # |
|---|---|---|
| 1. UHC/U HLTHCR PPO | | |

| Subscriber | Relation to Pt | Subscriber # |
|---|---|---|
| LEVEE,CATHEY | Self | 813504562 |

**Grp #**

**Group Name**
FW ISD

**Address**
P O BOX 30557ATTN: CLAIMSSALT LAKE CITY, UT 84130-0557

**Phone**

**Policy Number**
-

**Auth/Cert**

---

TEXAS HEALTH HEB        LEVEE,CATHEY
MRN: 000106210
Acct #: 9060052031      000002
Admit Date: 04/10/2010

Page 2           Printed at 4/11/10 12:31 AM

## ED Patient Information

| Patient Name | Sex | DOB | SSN |
|---|---|---|---|
| Levee, Cathey (000106210) | Female | 9/11/1958 | 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 |

| Room | Bed | Code Status |
|---|---|---|
| DCHB | DCHB01 | Not On File |

## Active Historical Medications

| Medication | Sig | Last Dose | Dispense | Start Date | End Date | Doc. Provider |
|---|---|---|---|---|---|---|
| hydrocodone-acetaminophen (NORCO) 7.5-325 mg tablet | take 1-2 Tabs by mouth every six(6) hours as needed. for pain for 10 days. | | 20 Tab | 4/10/2010 | 4/20/2010 | Peckenpaugh, Daniel E, MD |
| hydrocortisone (CORTEF) 5 mg tablet | take 5 mg by mouth three(3) times daily. | | | | | Provider, External |
| LEVOTHYROXINE SODIUM (SYNTHROID) 100 mcg Tab | take 100 mcg by mouth every day. | | | | | Provider, External |
| Other Med | atterol 30 mg po qam 50 po qpm | | | | | Provider, External |

Medications not reviewed this encounter

## Allergies

No Known Allergies

## Patient History

| Medical History as of 4/11/2010 | Past Medical History | Date | Comments | Source |
|---|---|---|---|---|
| | RHEUMATIC DISEASE [716.80L] | | | Provider |
| | HYPERTENSION [401.9AL] | | | Provider |

**Audit Trail through 4/11/2010**

### HYPERTENSION [401.9AL]

| Medical History | Action | Updated | User | Source | Date | Comments |
|---|---|---|---|---|---|---|
| HYPERTENSION [401.9AL] | Created | 4/10/10 07:24 PM | Carr, Jenifer Dawn, RN | Provider | | |

### RHEUMATIC DISEASE [716.80L]

| Medical History | Action | Updated | User | Source | Date | Comments |
|---|---|---|---|---|---|---|
| RHEUMATIC DISEASE [716.80L] | Created | 4/10/10 07:24 PM | Carr, Jenifer Dawn, RN | Provider | | |

| Surgical History as of 4/11/2010 | Past Surgical History | Date | Comments | Source |
|---|---|---|---|---|
| | APPENDECTOMY [SNO80146002] | | | Provider |
| | TONSILLECTOMY [SNO173422009] | | | Provider |

**Audit Trail through 4/11/2010**

### TONSILLECTOMY [SNO173422009]

| Surgical History | Action | Updated | User | Source | Date | Comments |
|---|---|---|---|---|---|---|
| TONSILLECTOMY [SNO173422009] | Created | 4/10/10 07:24 PM | Carr, Jenifer Dawn, RN | Provider | | |

### APPENDECTOMY [SNO80146002]

| Surgical History | Action | Updated | User | Source | Date | Comments |
|---|---|---|---|---|---|---|
| APPENDECTOMY [SNO80146002] | Created | 4/10/10 07:24 PM | Carr, Jenifer Dawn, RN | Provider | | |

**Family History as of 4/11/2010**  **None**

**Audit Trail**

TEXAS HEALTH HEB

LEVEE,CATHEY
MRN: 000106210
Acct #: 9060052031
Admit Date: 04/10/2010

000003

Page 3

Printed at 4/11/10 12:31 AM

through 4/11/2010

**Family Status** **None**
as of 4/11/2010

**Audit Trail**
through 4/11/2010

| Tobacco History | Tobacco Use | | | Source | Types | Packs/day | Years Used | Comments | Date Quit |
|---|---|---|---|---|---|---|---|---|---|
| as of 4/11/2010 | Never | | | Provider | | 0.00 | 0.00 | | |

| Audit Trail | Tobacco Use | Updated | User | Source | Types | Packs/day | Years Used | Comments | Date Quit |
|---|---|---|---|---|---|---|---|---|---|
| through 4/11/2010 | Never | 4/10/10 07:24 PM | Carr, Jenifer Dawn, RN | Provider | | 0.00 | 0.00 | | |

| Alcohol History | Alcohol Use | | Source | Drinks/Week | | Alcohol/Wk | Comments |
|---|---|---|---|---|---|---|---|
| as of 4/11/2010 | No | | Provider | | | | |

| Audit Trail through 4/11/2010 | Alcohol Use | Updated | User | Source | Drinks/week | | Alcohol/wk | Comments |
|---|---|---|---|---|---|---|---|---|
| | No | 4/10/10 07:24 PM | Carr, Jenifer Dawn, RN | Provider | | | | |

| Drug History as of 4/11/2010 | Drug Use | | | Source | Types | | Frequency | Comments |
|---|---|---|---|---|---|---|---|---|
| | No | | | Provider | | | 0.00 | |

| Audit Trail through 4/11/2010 | Drug Use | Updated | User | Source | Types | | Frequency | Comments |
|---|---|---|---|---|---|---|---|---|
| | No | 4/10/10 07:24 PM | Carr, Jenifer Dawn, RN | Provider | | | 0.00 | |

| Sex History as of 4/11/2010 | Sexually Active | | | Source | Birth Control | | Partners | Comments |
|---|---|---|---|---|---|---|---|---|

| Audit Trail through 4/11/2010 | Sexually Active | Updated | User | Source | Birth Control | | Partners | Comments |
|---|---|---|---|---|---|---|---|---|

| ADL History as of 4/11/2010 | ADL Question | Response | Comments | Source |
|---|---|---|---|---|
| | **None** | | | |

**Audit Trail**
through 4/11/2010

**Occupational** **None**
as of 4/11/2010

**Audit Trail**
through 4/11/2010

| Socioeconomic as of 4/11/2010 | Marital Status | Spouse Name | Num of Children | Years Education | Source |
|---|---|---|---|---|---|
| | Single | | | | |

| Audit Trail | Marital Status | Spouse Name | Num of Children | Years Education | Source | Updated | User |
|---|---|---|---|---|---|---|---|

| OB History as of 4/11/2010 | Grav | Para | Term | Prem | Abrt | TAB | SAB | Ect | Mult | Lvng | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

| Audit Trail through 4/11/2010 | Grav | Para | Term | Prem | Abrt | TAB | SAB | Ect | Mult | Lvng | Updated | User |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

TEXAS HEALTH HEB     LEVEE,CATHEY
MRN: 000106210
Acct #: 9060052031    000004
Admit Date: 04/10/2010

Page 4      Printed at 4/11/10 12:31 AM

**OB History**     **\*\*None\*\***
 as of 4/11/2010

**Audit Trail**
through 4/11/2010

| Medical History | Q | A | Comments | User | Updated |
|---|---|---|---|---|---|
| | Any Medical History? | Yes | | Carr, Jenifer Dawn, RN | 4/10/10 07:24 PM |

| Surgical History | Q | A | Comments | User | Updated |
|---|---|---|---|---|---|
| | Any Surgical History? | Yes | ankle and knee surgery etopic preg | Carr, Jenifer Dawn, RN | 4/10/10 07:24 PM |

---

**Historical Medications Entered This Encounter**

| | Refills | Start | End |
|---|---|---|---|

**Other Med**
Sig: atterol 30 mg po qam 50 po qpm
Class: Historical Med
Ordered By: Jenifer Carr, RN

**hydrocortisone (CORTEF) 5 mg tablet**
Sig: take 5 mg by mouth three(3) times daily.
Class: Historical Med
Route: ORAL
Ordered By: Jenifer Carr, RN

**LEVOTHYROXINE SODIUM (SYNTHROID) 100 mcg Tab**
Sig: take 100 mcg by mouth every day.
Class: Historical Med
Route: ORAL
Ordered By: Jenifer Carr, RN

---

TEXAS HEALTH HEB

LEVEE,CATHEY
MRN: 000106210
Acct #: 9060052031
Admit Date: 04/10/2010

000005

Page 5     Printed at 4/11/10 12:31 AM

**Arrival Section**

| Expected | Arrival | Acuity | Means of Arrival | Escorted By | Service | Admission Type | Arrival Complaint |
|---|---|---|---|---|---|---|---|
| - | 4/10/10 7:04 PM | 4-Non-Urgent | Car/Ambulatory | - | Emergency Room | Emergency | - |

| | Arrived in ED | Date | 04/10/2010 | Time | 7:04 PM |
|---|---|---|---|---|---|

**ED Chief Complaint**

| Knee Injury (Major) | PTA domestic dispute with husband kicked in knee fell now can not stand on leg PD not notified yet happened in Hurst |
|---|---|

## All Flowsheet Data (04/10/10 0000--04/11/10 2359)

### ED Triage Info

| Row Name | 04/10/10 1917 | 04/10/10 1920 | 04/10/10 1924 |
|---|---|---|---|
| **ADDITIONAL INFO** | | | |
| Primary Care Physician | -- | -- | Stallman -JC |
| Last Menstrual Period | -- | 03/14/10 -JC | -- |
| Info Provided By | -- | -- | Patient -JC |
| Primary Language | -- | -- | English -JC |
| Acuity | -- | 4-Non-Urgent -JC | -- |
| Armband Applied? | -- | Yes -JC | -- |
| Allergy Band Applied | -- | No -JC | -- |
| Additional Triage Finished? | -- | -- | Yes -JC |
| Rapid Triage Finished? | -- | YES -JC | -- |
| Means of Arrival | Car/Ambulatory -JC | -- | -- |
| Accompanied by | Parent -JC | -- | -- |

### ED Consults

| Row Name | 04/10/10 2021 | 04/10/10 2024 |
|---|---|---|
| **OTHER** | | |
| ED Ortho Consult | 1st Call -SS Dr. Kadoko | Call Returned -SS |

### Transport

| Row Name | 04/10/10 1938 | 04/10/10 2030 | 04/10/10 2138 |
|---|---|---|---|
| **TRANSPORT** | | | |
| Location | X-ray -DF | X-ray -DF Pt returned from second XR. | MRI -DF |
| Transportation Method | Stretcher -DF | Stretcher -DF | Stretcher -DF |
| Transported By | Radiology Tech -DF | Radiology Tech -DF | Radiology Tech -DF |
| Ticket to Ride Received | -- | -- | -- -DF given |

### ED Screening

| Row Name | 04/10/10 1924 |
|---|---|
| **SUICIDE RISK** | |
| Suicide risk assessment needed | No -JC |
| **DOMESTIC VIOLENCE** | |
| Domestic Abuse | Admits -JC |

### ED Ice/Elevate

| Row Name | 04/10/10 1938 |
|---|---|
| **OTHER** | |
| Location Of Ice Application | right knee -DF |
| Extremity Elevated | right leg -DF |

### ED Nurse D/C Documentation

| Row Name | 04/10/10 1919 | 04/10/10 2327 | 04/11/10 0019 |
|---|---|---|---|

TEXAS HEALTH HEB

LEVEE,CATHEY
MRN: 000106210
Acct #: 9060052031
Admit Date: 04/10/2010
Printed By GANNC at 5/4/10 12:58 PM

000006

Page 1

| Row Name | 04/10/10 1919 | 04/10/10 2327 | 04/11/10 0019 |
|---|---|---|---|
| **OTHER** | | | |
| Pt. or responsible party verbalizes understanding of AVS | -- | -- | Yes -DF |
| Discharge Destination | -- | -- | Home -DF Pt A/O upon discharge home with daughter. |
| Patient has ride home? | -- | -- | Yes -DF |
| Transport Method | -- | -- | **Wheelchair** -DF |
| BP | **! 171/90 mmHg** -JC | **! 183/95 mmHg** -DF pt states her doctor has been monitoring her bp | -- |
| Pulse | **! 123** -JC | **! 120** -DF | -- |
| Resp | 20 -JC | 20 -DF | -- |
| SpO2 | 98 % -JC | 97 % -DF | -- |
| Temp | 98 °F (36.7 °C) -JC | 99.2 °F (37.3 °C) -DF | -- |
| Temp src | Oral -JC | Oral -DF | -- |
| Pain Scale | 9 -JC | 10 -DF | -- |

## Rounding Document

| Row Name | 04/10/10 2049 | 04/10/10 2248 |
|---|---|---|
| **ROUNDING DOCUMENTATION** | | |
| Needs Addressed | Yes;Assist to Bathroom -DF | Yes -DF Hurst PD still at bedside. |
| Pt/Family Updated on Plan of Care | Yes -DF | -- |

## Prehospital

| Row Name | 04/10/10 1917 |
|---|---|
| **PREHOSPITAL** | |
| Means of Arrival | **Car/Ambulatory** -JC |
| Accompanied by | **Parent** -JC |
| Prehospital | **Home** -JC |

## Ortho

| Row Name | 04/11/10 0017 |
|---|---|
| **IMMOBILIZATION** | |
| What type of Immobilization? | **Crutches; Knee Immobilizer** -DF |
| Distal Circulation | **Cap refill <3 sec;Distal pulses intact** -DF |
| Crutch Fitting | **Crutches fit to patient;Crutch instructions given to patient;Patient demonstrated good use of crutches** -DF |

## Triage Start

| Row Name | 04/10/10 1917 |
|---|---|
| **TRIAGE START** | |
| Start Triage | **1917** -JC |

## LOS Charges

| Row Name | 04/10/10 1915 |
|---|---|
| **LOS CHARGES** | |
| Nursing Note Charges | **2 Notes** -LR |
| Disposition Charges | **Discharge** -LR |

## Vitals

| Row Name | 04/10/10 1919 | 04/10/10 2327 |
|---|---|---|
| **VITALS** | | |
| BP | **! 171/90 mmHg** -JC | **! 183/95 mmHg** -DF pt states her doctor has been monitoring her bp |
| Pulse | **! 123** -JC | **! 120** -DF |

TEXAS HEALTH HEB

LEVEE,CATHEY
MRN: 000106210
Acct #: 9060052031
Admit Date: 04/10/2010
Printed By GANNC at 5/4/10 12:58 PM

000007

Page 2

| Row Name | 04/10/10 1919 | 04/10/10 2327 |
|---|---|---|
| Resp | 20 -JC | 20 -DF |
| SpO2 | 98 % -JC | 97 % -DF |
| O2 Delivery Device | Room Air -JC | -- |
| Temp | 98 °F (36.7 °C) -JC | 99.2 °F (37.3 °C) -DF |
| Temp src | Oral -JC | Oral -DF |
| Pain Scale | 9 -JC | 10 -DF |
| Wt - Scale | 77.111 kg (170 lb) -JC | -- |
| Method of weight | Stated -JC | -- |
| Height | 1.753 m (5' 9") -JC | -- |

## Additional Information

| Row Name | 04/10/10 1920 |
|---|---|
| **ADDITIONAL INFO** | |
| Acuity | 4-Non-Urgent -JC |
| Armband Applied? | Yes -JC |
| Allergy Band Applied | No -JC |
| Last Menstrual Period | 03/14/10 -JC |
| Rapid Triage Finished? | YES -JC |

## Domestic Violence

| Row Name | 04/10/10 1924 | 04/10/10 2341 | 04/11/10 0022 |
|---|---|---|---|
| **SCREENING** | | | |
| Screening | -- | Domestic violence positive -DF | -- |
| **EXPLANATION OF INJURIES/FINDINGS** | | | |
| Pt Explanation | -- | See medical record;Patient stated as below -DF | -- |
| Stated By Pt | -- | My husband tripped me. -DF | -- |
| **SUSPECTED ABUSER INFO** | | | |
| Relationship | -- | Husband -DF | -- |
| Observed Behavior | -- | Not present -DF | -- |
| **PT OBSERVATION** | | | |
| Pt affect/mood | -- | Appropriate to content;Tearful;Anxious -DF | -- |
| Pt behavior | -- | Guarded/Evasive -DF | -- |
| **PRESENT ABUSE HISTORY** | | | |
| Date of Abuse | -- | 04/10/10 -DF | -- |
| Time of Abuse | -- | -- -DF PTA | -- |
| **REPORTING** | | | |
| Photos Taken? | -- | No -DF | -- |
| Reported with Permission | -- | Reported to police/law enforcement -DF | -- |
| Primary Care Physician | Stallman -JC | -- | -- |
| **SAFETY** | | | |
| Suspected Abuser Present? | -- | No -DF | -- |
| Patient afraid to go home? | -- | -- | No -DF Pt discharged home with daughter. |
| Pt Disposition | -- | -- | Home -DF to stay with daughter |
| **REFERRALS** | | | |
| Referrals Given | -- | Information card given ---DF | -- |
| Response to Referrals | -- | Accepted -DF | -- |
| **OTHER** | | | |
| Ethnicity | -- | WHITE -DF | -- |

## Coping/ Behavior

| Row Name | 04/10/10 2032 |
|---|---|
| **COPING/BEHAVIORAL** | |

## Coping/ Behavior (continued)

| Row Name | 04/10/10 2032 |
|---|---|
| Coping/Behavior | **Exception/WDL Except -DF** |

**COPING/BEHAVIOR**

| Patient Emotional State | **Anxious -DF** |
|---|---|

## Safety Group

| Row Name | 04/10/10 2033 |
|---|---|

**SAFETY**

| Safety | -- -DF SR up x2, daughter at bedside. |
|---|---|

## Respiratory

| Row Name | 04/10/10 2032 |
|---|---|

**RESPIRATORY**

| Respiratory | **Brief Within Defined Limits -DF** |
|---|---|

## Peripheral Vascular

| Row Name | 04/10/10 2032 |
|---|---|

**PERIPHERAL VASCULAR**

| Peripheral Vascular | **Brief Within Defined Limits -DF** |
|---|---|

## Neuro

| Row Name | 04/10/10 2032 |
|---|---|

**NEUROLOGICAL**

| Neurological | **Brief Within Defined Limits -DF** |
|---|---|

## Skin Mucous Membranes

| Row Name | 04/10/10 2032 | 04/10/10 2052 |
|---|---|---|

**SKIN/MUCOUS MEMBRANE**

| Skin/Mucous Membrane | **Brief Within Defined Limits -DF** | -- |
|---|---|---|

**LACS/ABRASIONS/ECHYMOSIS/BURNS/INCISIONS/RASHES**

| Ecchymosis Location/Description | -- | multiple bruises noted to bilateral extremities. -DF |
|---|---|---|

## Musculo/ Ortho

| Row Name | 04/10/10 2032 |
|---|---|

**MUSCULAR/ORTHO**

| Muscular/Ortho | **Exception/WDL Except -DF** |
|---|---|

**OTHER**

| RLE | **Pain;Swelling;Limited movement;Injury/Trauma -DF** |
|---|---|

**MUSCULAR/ORTHO COMMENTS**

| Muscular/Ortho Comments | **Pt states husband tripped her. -DF** |
|---|---|

## User Key

(r) = User Recd, (t) = User Taken

| Initials | Name |
|---|---|
| JC | Carr, Jenifer Dawn, RN |
| DF | Freeman, Deborah Lynn, RN |
| LR | Russell, Linda J, RN |
| SS | Schiellerd, Samantha Leigh |

---

**Active IV Cath / Hemodynamics Cath / Dialysis Cath / Neuro Cath/Drain / Resp Airway/Trache/Chest Tube / GI Cath / Ostomy / GU Cath / Wound Drains / Interventional cath / Non-IV Med Delivery Device**

**\*\*None\*\***

---

**Inactive IV Cath / Hemodynamics Cath / Dialysis Cath / Neuro Cath/Drain / Resp Airway/Trache/Chest Tube / GI Cath / Ostomy / GU Cath / Wound Drains / Interventional cath / Non-IV Med Delivery Device**

TEXAS HEALTH HEB

LEVEE,CATHEY
MRN: 000106210
Acct #: 9060052031
Admit Date: 04/10/2010
Printed By GANNC at 5/4/10 12:58 PM

000009

Page 4

**None**

TEXAS HEALTH HEB

LEVEE,CATHEY
MRN: 000106210
Acct #: 9060052031
Admit Date: 04/10/2010

000010

Page 5

Printed By GANNC at 5/4/10 12:58 PM

## Orders

**Other Med [140058642]** — Signed

| | | | |
|---|---|---|---|
| Entered by: | Carr, Jenifer Dawn, RN 04/10/10 1922 | Ordered by: | N/A |
| Authorized by: | Provider, External | Frequency: | - Until Discontinued |
| Signed by: | Carr, Jenifer Dawn, RN 04/10/10 1922 | | |

**hydrocortisone (CORTEF) 5 mg tablet [140058643]** — Signed

| | | | |
|---|---|---|---|
| Entered by: | Carr, Jenifer Dawn, RN 04/10/10 1922 | Ordered by: | N/A |
| Authorized by: | Provider, External | Frequency: | THREE TIMES DAILY - Until Discontinued |
| Signed by: | Carr, Jenifer Dawn, RN 04/10/10 1922 | | |

**LEVOTHYROXINE SODIUM (SYNTHROID) 100 mcg Tab [140058644]** — Signed

| | | | |
|---|---|---|---|
| Entered by: | Carr, Jenifer Dawn, RN 04/10/10 1922 | Ordered by: | N/A |
| Authorized by: | Provider, External | Frequency: | DAILY - Until Discontinued |
| Signed by: | Carr, Jenifer Dawn, RN 04/10/10 1922 | | |

**XRAY Knee, Right 2 Views (KNEE 2 VIEWS RT) [140058645]** — Signed

| | | | |
|---|---|---|---|
| Entered by: | Peckenpaugh, Daniel E, MD 04/10/10 1932 | Ordered by: | Peckenpaugh, Daniel E, MD |
| Authorized by: | Peckenpaugh, Daniel E, MD | Frequency: | ONCE 04/10/10 1933 - 1 Occurrences |
| Signed by: | Peckenpaugh, Daniel E, MD 04/10/10 1932 | | |
| Question: | Is the patient pregnant? | Response: | UNKNOWN -SHIELD ABDOMEN |
| | How will the patient be transported? | | Stretcher |
| | Reason? | | INJURY |
| Comments: | Patient presents with: | | |

Knee Injury (Major) - PTA domestic dispute with husband kicked in knee fell now can not stand on leg PD not notified yet happened in Hurst

**XRAY Tibia/Fibula, Right 2 Views (TIBIA / FIBULA 2 VIEWS RT) [140058647]** — Signed

| | | | |
|---|---|---|---|
| Entered by: | Peckenpaugh, Daniel E, MD 04/10/10 2013 | Ordered by: | Peckenpaugh, Daniel E, MD |
| Authorized by: | Peckenpaugh, Daniel E, MD | Frequency: | ONCE 04/10/10 2015 - 1 Occurrences |
| Signed by: | Peckenpaugh, Daniel E, MD 04/10/10 2013 | | |
| Question: | Is the patient pregnant? | Response: | UNKNOWN -SHIELD ABDOMEN |
| | How will the patient be transported? | | Stretcher |
| | Reason? | | INJURY |
| Comments: | Patient presents with: | | |

Knee Injury (Major) - PTA domestic dispute with husband kicked in knee fell now can not stand on leg PD not notified yet happened in Hurst

**CONSULT ORTHOPEDIC SURGERY [140058649]** — Signed

| | | | |
|---|---|---|---|
| Entered by: | Peckenpaugh, Daniel E, MD 04/10/10 2014 | Ordered by: | Peckenpaugh, Daniel E, MD |
| Authorized by: | Peckenpaugh, Daniel E, MD | Frequency: | ONCE 04/10/10 2016 - 1 Occurrences |
| Signed by: | Peckenpaugh, Daniel E, MD 04/10/10 2014 | | |

**MRI Lower Extremity Joint, Right, WO Contrast (MRI EXT LOWER JOINT WO CONT RT) [140058651]** — Signed

| | | | |
|---|---|---|---|
| Entered by: | Peckenpaugh, Daniel E, MD 04/10/10 2027 | Ordered by: | Peckenpaugh, Daniel E, MD |
| Authorized by: | Peckenpaugh, Daniel E, MD | Frequency: | ONCE 04/10/10 2028 - 1 Occurrences |
| Signed by: | Peckenpaugh, Daniel E, MD 04/10/10 2027 | | |
| Question: | Is the patient pregnant? | Response: | UNKNOWN -SHIELD ABDOMEN |
| | How will the patient be transported? | | Stretcher |
| | Reason? | | DERANGEMENT |
| Comments: | Patient presents with: | | |

Knee Injury (Major) - PTA domestic dispute with husband kicked in knee fell now can not stand on leg PD not notified yet happened in Hurst

MRI R knee without contrast.

**hydrocodone-acetaminophen (NORCO) 7.5-325 mg tablet [140076951]** — Signed

| | | | |
|---|---|---|---|
| Entered by: | Peckenpaugh, Daniel E, MD 04/10/10 2300 | Ordered by: | N/A |
| Authorized by: | Peckenpaugh, Daniel E, MD | Frequency: | EVERY 6 HOURS PRN 04/10/10 - 10 Days |
| Signed by: | Peckenpaugh, Daniel E, MD 04/10/10 2300 | | |

**APPLY KNEE IMMOBILIZER [140076952]** — Canceled

| | | | |
|---|---|---|---|
| Entered by: | Peckenpaugh, Daniel E, MD 04/10/10 2301 | Ordered by: | Peckenpaugh, Daniel E, MD |
| Authorized by: | Peckenpaugh, Daniel E, MD | Frequency: | ONCE 04/10/10 2302 - 1 Occurrences |
| Signed by: | Peckenpaugh, Daniel E, MD 04/10/10 2301 | | |
| Canceled: | Interface, Adtinv 04/11/10 0328 [Pt Discharge] | | |

**CRUTCHES [140076953]** — Canceled

| | | | |
|---|---|---|---|
| Entered by: | Peckenpaugh, Daniel E, MD 04/10/10 2301 | Ordered by: | Peckenpaugh, Daniel E, MD |
| Authorized by: | Peckenpaugh, Daniel E, MD | Frequency: | ONCE 04/10/10 2303 - 1 Occurrences |
| Signed by: | Peckenpaugh, Daniel E, MD 04/10/10 2301 | | |
| Canceled: | Interface, Adtinv 04/11/10 0328 [Pt Discharge] | | |

## All Meds and Administrations

(There are no med orders for this encounter)

## Medication Details

(As of 04/10/2010)

## Outpatient Medications

TEXAS HEALTH HEB

LEVEE,CATHEY
MRN: 000106210
Acct #: 9060052031
Admit Date: 04/10/2010

000011

Page 6

Printed By GANNC at 5/4/10 12:58 PM

## Outpatient Medications (continued)

|  | Quantity | Refills | Start | End |
|---|---|---|---|---|
| **hydrocodone-acetaminophen (NORCO) 7.5-325 mg tablet** | 20 Tab | 0 | 4/10/2010 | 4/20/2010 |

Sig : take 1-2 Tabs by mouth every six(6) hours as needed. for pain for 10 days.
Route: ORAL
PRN Comment: for pain
Class: Print Script
Order #: 140076951

**hydrocortisone (CORTEF) 5 mg tablet**
Sig : take 5 mg by mouth three(3) times daily.
Route: ORAL
Class: Historical Med
Order #: 140058643

**LEVOTHYROXINE SODIUM (SYNTHROID) 100 mcg Tab**
Sig : take 100 mcg by mouth every day.
Route: ORAL
Class: Historical Med
Order #: 140058644

**Other Med**
Sig : atterol 30 mg po qam 50 po qpm
Route: (none)
Class: Historical Med
Order #: 140058642

## ED Note

**ED Notes signed by Freeman, Deborah Lynn, RN at 04/10/10 2055**

| Author: | Freeman, Deborah Lynn, RN | Service: | (none) | Author Type: | Registered Nurse |
|---|---|---|---|---|---|
| Filed: | 04/10/10 2055 | Note Time: | 04/10/10 2054 | | |

Hurst Police department called upon pt request.

Freeman, Deborah Lynn, RN

**ED Notes signed by Freeman, Deborah Lynn, RN at 04/10/10 2156**

| Author: | Freeman, Deborah Lynn, RN | Service: | (none) | Author Type: | Registered Nurse |
|---|---|---|---|---|---|
| Filed: | 04/10/10 2156 | Note Time: | 04/10/10 2155 | | |

2115 - Hurst PD officer at bedside.

Freeman, Deborah Lynn, RN

## ED Physician Note

**ED Provider Notes signed by Peckenpaugh, Daniel E, MD at 04/10/10 2319**

| Author: | Peckenpaugh, Daniel E, MD | Service: | Emergency Room | Author Type: | Physician |
|---|---|---|---|---|---|
| Filed: | 04/10/10 2319 | Note Time: | 04/10/10 1926 | | |

### Cathey Levee
Age: 51 y.o. DOB: 9/11/1958

Visit Date: 4/10/2010
Account Number: 9060052031   MRN: 070013282

**Room #: 61**

**Chief Complaint:**   Knee Injury (Major)

**HPI**

7:28 PM Cathey Levee 51 y.o. female presents to the ER complaining of right knee injury onset pta. Pt states her husband allegedly kicked her right knee. Pt reports her husband did a type of maneuver where he grabbed her ankle and kicked her

LEVEE,CATHEY
MRN: 000106210
Acct #: 9060052031
Admit Date: 04/10/2010
Printed By GANNC at 5/4/10 12:58 PM

000012

knee, severely twisting her knee. Pt states when she tries to walk on knee, if feels wobbly and goes out on her. No other injuries at this time. No other complaints. Pt has hx of RA and mild right menisectomy as a teenager. Denies any other injury during this incident.

**FAMHX:** none

Past Medical History
Diagnosis                                                           Date
- Rheumatic Disease
- Hypertension

Past Surgical History
Procedure                                                           Date
- Appendectomy
- Tonsillectomy

**Tobacco Use History:   reports that she has never used tobacco.**
**Alcohol Use History:   reports that she does not drink alcohol.**
**Drug Use History:   reports that she does not use illicit drugs.**

**Allergies:  No Known Allergies**

**Previous Medications**

HYDROCORTISONE (CORTEF) 5 MG TABLET            take 5 mg by mouth three(3) times daily.
LEVOTHYROXINE SODIUM (SYNTHROID) 100 MCG TAB   take 100 mcg by mouth every day.
OTHER MED                                       atterol 30 mg po qam 50 po qpm

Review of Systems
Musculoskeletal: Positive for joint pain **(Right knee pain secondary to injury)**. Negative for falls.
Neurological: Negative for loss of consciousness.

| ED Triage Vitals | | |
|---|---|---|
| BP | 04/10/10 1919 | **171/90 mmHg** |
| Pulse | 04/10/10 1919 | **123** |
| Resp | 04/10/10 1919 | **20** |
| Temp | 04/10/10 1919 | **98 °F (36.7 °C)** |
| Temp src | 04/10/10 1919 | **Oral** |
| SpO2 | 04/10/10 1919 | **98 % WNL on RA** |
| Pain Scale | 04/10/10 1919 | **9** |
| Oxygen Flow Rate (L/min) | -- | |
| O2 Delivery Device | 04/10/10 1919 | **Room Air** |
| Trauma Level | -- | |

TEXAS HEALTH HEB

LEVEE,CATHEY
MRN: 000106210
Acct #: 9060052031        000013
Admit Date: 04/10/2010

Page 8
Printed By GANNC at 5/4/10 12:58 PM

Physical Exam
Constitutional: She appears well-developed and well-nourished.
Neck: Normal range of motion. Neck supple.
Cardiovascular: Normal rate.
Pulmonary/Chest: Effort normal.
Abdominal: Soft.
Musculoskeletal:
    Right knee: She exhibits effusion **(Mild)**.
    **R knee with mild effusion. Diffusely tender, although most prominent medially. Difficult to perform full evaluation due to pain, but appears to have a grossly unstable right knee. Distally has intact NV status.**
**Also tender prox fibula.**
**No other obvious trauma.**
:

## Medical Decision Making

**Radiology:**
**Right Knee XR:** Impression: Mildly displaced proximal fibular diaphyseal fracture Small moderate suprapatellar effusion. No other fractures evident however consider MRI for follow-up if symptoms of knee pain - separate from the fibular fracture - persist, to exclude underlying soft tissue or occult osseous injury. Chondrocalcinosis Electronically Signed by: William Elkins, MD on 4/10/2010 7:51 PM

**Right Tibia/Fibula:**Impression: Subtle proximal fibular fracture barely evident, and better seen on the examination as it is less displaced currently Question subtle cortical regularity of the posterior tibia proximally at the knee on the lateral view. Consider CT or MRI for further evaluation. Electronically Signed by: William Elkins, MD on 4/10/2010 8:39 PM

**MRI Right Knee:** Impression: Disrupted anterior cruciate ligament Bone contusions in the posterior medial and lateral tibia and anterior tibia and anteromedial femur. Lipohemarthrosis indicates articular disruption although the discrete fracture line is not identified on this MRI. Consider thin section CT as clinically appropriate. Complex tear of the anterior horn, body and part of the posterior horn of the medial meniscus with a displaced meniscal fragment in the intercondylar notch Small osteocartilaginous body Electronically Signed by: William Elkins, MD on 4/10/2010 10:44 PM

**Rechecks / ED Course:**
**10:43 PM** - Recheck pt. Pt stable. No acute distress.

Disc with pt / family - findings of xrays and MRI. Will need no-wt bearing and FU Dr. Kadoko. Significant chance of needing surgical intervention. Understands.

Hurst PD here taking statement.

**Consults:**
**8:25 PM** - D/w Dr. Kadoko, who will consult pt. Suggests MRI.

**10:52 PM** - D/w Dr.Kadoko, suggests UKI, crutches, analgesics, non-wt bearing and follow up with pt in the office Monday.

11:01 PM: Reevaluated patient at the time of discharge. Informed patient of findings, results of any tests performed and clinical impression. Explained to patient instructions regarding their diagnosis, expectations, follow-up and reasons to return for reevaluation. Warnings given regarding emergent conditions that may arise and reasons to return for reevaluation for any new, persistent or worsening conditions. Explained that it is important to follow-up with their existing

---

TEXAS HEALTH HEB

LEVEE,CATHEY
MRN: 000106210
Acct #: 9060052031          000014
Admit Date: 04/10/2010

Page 9                                          Printed By GANNC at 5/4/10 12:58 PM

or referred physician. Instructed to take all medication as directed.

Diagnosis:
**Fibula fracture**
**Acl (anterior cruciate ligament) rupture**
**Medial meniscus tear**

New Medications:
**New Prescriptions**

HYDROCODONE-ACETAMINOPHEN (NORCO) 7.5-325    take 1-2 Tabs by mouth every six(6) hours as needed. for
MG TABLET                                    pain for 10 days.

I have advised the patient to follow-up with:
Kadoko, Robert Gonza, MD
Suite 110
2008 L Don Dodson Drive
Bedford Texas 76021
817-288-0084
Make an appointment in 2 days

Disposition: **Discharged**

**Dr. Daniel Peckenpaugh, MD**
**Emergency Medicine**

PRA: RaShonda Asenime

**Clinical Impression**

| Diagnosis | Comment | Added By | Time Added |
|---|---|---|---|
| Fibula Fracture | | Rashonda Asenime | 4/10/10 10:48 PM |
| ACL (Anterior Cruciate Ligament) Rupture | | Rashonda Asenime | 4/10/10 10:56 PM |
| Medial Meniscus Tear | | Rashonda Asenime | 4/10/10 10:56 PM |

**ED Disposition**

| | | |
|---|---|---|
| Discharge Home | The condition of the patient at this time is stable. | Asenime, Rashonda |

**ED Discharge Medications**

| Medication | Sig | Dispense | Start Date | End Date | Auth. Provider |
|---|---|---|---|---|---|
| hydrocodone-acetaminophen (NORCO) 7.5-325 mg tablet | take 1-2 Tabs by mouth every six(6) hours as needed. for pain for 10 days. | 20 Tab | 4/10/2010 | 4/20/2010 | Peckenpaugh, Daniel E, MD |

**ED Follow-up Information**

| Follow up With | Details | Comments | Contact Info |
|---|---|---|---|
| Kadoko, Robert Gonza, MD | Make an appointment in 2 days | | Suite 110 2008 L Don Dodson Drive Bedford Texas 76021 817-288-0084 |

TEXAS HEALTH HEB

# TAKE MEDICATION AS DIRECTED. FOLLOW UP WITH DR.KADOKO FOR FURTHER EVALUATIONS. RETURN TO ER FOR ANY NEW OR WORSENING SYMPTOMS.

**Fibular Shaft Fracture, Undisplaced (Adult)**
**Treated with or without Immobilization**

You have a *fracture* (break) of your fibula. This is the bone in your lower leg located on the outside of the leg. These fractures are easily diagnosed with x-rays.

TREATMENT
You have a **simple fracture** of the part of the fibula which is located between the knee and ankle. This bone usually will heal without problems and can often be treated without casting or splinting. This means the fracture will heal well during normal use and daily activities without being held in place. Sometimes a cast or splint is placed on these fractures if it is needed for comfort or if the bones are badly out of place.

HOME CARE INSTRUCTIONS
Ø Apply ice to the injury for 15 to 20 minutes, four times per day while awake, for 2 days. Put the ice in a plastic bag and place a thin towel between the bag of ice and your leg. This helps keep swelling down.
Ø Use crutches as directed. Resume walking without crutches as directed by your caregiver or when comfortable doing so.
Ø Only take over-the-counter or prescription medicines for pain, discomfort, or fever as directed by your caregiver.
Ø Keep appointments for follow up x-rays if these are required.
Ø If you have a removable splint or boot, do not remove the boot unless directed by your caregiver.
Ø **Warning:** Do not drive a car or operate a motor vehicle until your caregiver specifically tells you it is safe to do so.

**SEEK MEDICAL CARE IF:**
Ø You have continued severe pain or more swelling
Ø The medications do not control the pain.
Ø Your skin or nails below the injury turn blue or grey or feel cold or numb.
Ø You develop severe pain in the leg or foot.

Document Released: 01/06/2009  Document Re-Released: 09/26/2009
ExitCare® Patient Information ©2010 ExitCare, LLC.

**Medications:**
The list of home medications that you or someone you know provided us is only as accurate as the information that was provided. If your list of medications is different than what is listed here, you should contact your physician for further instructions on how to take your medications.

**Radiology Procedures:**

If you had an X-Ray, Cat Scan, Sonogram, Ultrasound, or an MRI during your stay, you can review these results with your primary

TEXAS HEALTH HEB

LEVEE,CATHEY
MRN: 000106210
Acct #: 9060052031            000016
Admit Date: 04/10/2010

Page 11                                Printed By GANNC at 5/4/10 12:58 PM

care physician. Other findings, that were not necessarily related to your treatment, may be present.

If you had a test that included IV dye (contrast containing iodine), you will need to drink plenty of water to help your body flush out the dye. Some medications should be stopped for 48 hours after your test. These medications are listed below:

**For instructions on restarting any of these medications after your test, call or visit your doctor:**

- Glucophage XR
- Glucophage
- Glucovance
- Glumetza
- Metaglip
- Metformin

- Riomet
- Actoplus Met
- Avandamet
- Fortamet
- Or _____

**QUITTING SMOKING IS ONE OF THE MOST IMPORTANT THINGS YOU WILL EVER DO:**
- Quitting will lower your chance of having a heart attack, stroke, or cancer.
- If you are pregnant, quitting smoking will improve your chances of having a healthy baby.
- By quitting, you protect your children and adolescents from illnesses caused by second-hand smoke.

**Resources**
You may want to contact these organizations for further information on smoking and how to quit.

American Heart Association
7272 Greenville Avenue
Dallas, TX 75231
(800) AHA-USA1 (242-8721)

American Cancer Society
1599 Clifton Road, NE
Atlanta, GA 30329
(404) 320-3333

American Lung Association
1740 Broadway, 14th Floor
New York, NY 10019
(212) 315-8700

National Cancer Institute
Bethesda, MD 20892
(800) 4-CANCER (422-6237)

Numeric Diagnostic Codes [ICD9-CM codes] found in this record are computer generated and are not intended to be used for billing purposes or as a representation of the physician's [coding] judgment.

Levee, Cathey (MR # 000106210)        Encounter Date: 04/10/2010

**Emergency Department Discharge Instructions**



## Texas Health
### Harris Methodist Hospital
#### HURST-EULESS-BEDFORD

*1600 HOSPITAL PARKWAY, BEDFORD, TX 76033........ PHONE 817-685-4000*

Levee, Cathey #000106210 (Acct: 9060052031) (51 y.o. F)   PCP: NO REFERRING       6101

**ED Treatment Team**

| Provider | Role | From | To |
|---|---|---|---|
| Peckenpaugh, Daniel E, MD | Attending Provider | 04/10/10 1931 | -- |

**Diagnoses**
Fibula Fracture
ACL (Anterior Cruciate Ligament) Rupture
Medial Meniscus Tear

**Discharge References/Attachments**
None

**Discharge Instructions**

# TAKE MEDICATION AS DIRECTED. FOLLOW UP WITH DR.KADOKO FOR FURTHER EVALUATIONS. RETURN TO ER FOR ANY NEW OR WORSENING SYMPTOMS.

**Fibular Shaft Fracture, Undisplaced (Adult)**
**Treated with or without Immobilization**

You have a *fracture* (break) of your fibula. This is the bone in your lower leg located on the outside of the leg. These fractures are easily diagnosed with x-rays.

TREATMENT
You have a **simple fracture** of the part of the fibula which is located between the knee and ankle. This bone usually will heal without problems and can often be treated without casting or splinting. This means the fracture will heal well during normal use and daily activities without being held in place. Sometimes a cast or splint is placed on these fractures if it is needed for comfort or if the bones are badly out of place.

HOME CARE INSTRUCTIONS
Ø Apply ice to the injury for 15 to 20 minutes, four times per day while awake, for 2 days. Put the ice in a plastic bag and place a thin towel between the bag of ice and your leg. This helps keep swelling down.
Ø Use crutches as directed. Resume walking without crutches as directed by your caregiver or when comfortable doing so.
Ø Only take over-the-counter or prescription medicines for pain, discomfort, or fever as directed by your caregiver.
Ø Keep appointments for follow up x-rays if these are required.
Ø If you have a removable splint or boot, do not remove the boot unless directed by your caregiver.
Ø Warning: Do not drive a car or operate a motor vehicle until your caregiver specifically tells you it is safe to do so.

SEEK MEDICAL CARE IF:
Ø You have continued severe pain or more swelling
Ø The medications do not control the pain.
Ø Your skin or nails below the injury turn blue or grey or feel cold or numb.
Ø You develop severe pain in the leg or foot.

Document Released: 01/06/2009  Document Re-Released: 09/26/2009
ExitCare® Patient Information ©2010 ExitCare, LLC.

**ED Disposition**
Discharge    The condition of the patient at this time is stable.
Home

**Follow-up Information**



Printed by ASENIME, RASHONDA [ASENIMR] at 4/10/2010 11:01:21 PM

000018

Levee, Cathey (MR # 000106210)                              Encounter Date: 04/10/2010

| Follow up With | Details | Comments | Contact Info |
|---|---|---|---|
| Kadoko, Robert Gonza, MD | Make an appointment in 2 days | | Suite 110<br>2008 L Don Dodson Drive<br>Bedford Texas 76021<br>817-288-0084 |

## Your Medications

**Start Taking**

**HYDROCODONE-ACETAMINOPHEN (NORCO) 7.5-325 MG TABLET**            take 1-2 Tabs by mouth every six(6) hours as
                                                                  needed. for pain for 10 days.

Authorizing Provider: Peckenpaugh, Daniel E, MD
Notes: --

**Continue Taking**

**HYDROCORTISONE (CORTEF) 5 MG TABLET**                           take 5 mg by mouth three(3) times daily.
Authorizing Provider: Provider, External
Notes: --

**LEVOTHYROXINE SODIUM (SYNTHROID) 100 MCG TAB**                  take 100 mcg by mouth every day.
Authorizing Provider: Provider, External
Notes: --

**OTHER MED**                                                     *atterol 30 mg po qam 50 po qpm*
Authorizing Provider: Provider, External
Notes: --

**Medications:**
The list of home medications that you or someone you know provided us is only as accurate as the information that was provided. If your list of medications is different than what is listed here, you should contact your physician for further instructions on how to take your medications.

**Radiology Procedures:**

If you had an X-Ray, Cat Scan, Sonogram, Ultrasound, or an MRI during your stay, you can review these results with your primary care physician. Other findings, that were not necessarily related to your treatment, may be present.

If you had a test that included IV dye (contrast containing iodine), you will need to drink plenty of water to help your body flush out the dye. Some *medications should be stopped for 48 hours after your test. These medications are listed below:*

**For instructions on restarting any of these medications after your test, call or visit your doctor:**

- Glucophage XR
- Glucophage
- Glucovance
- Glumetza
- Metaglip
- Metformin

- Riomet
- Actoplus Met
- Avandamet
- Fortamet
- Or _____

**QUITTING SMOKING IS ONE OF THE MOST IMPORTANT THINGS YOU WILL EVER DO:**

- Quitting will lower your chance of having a heart attack, stroke, or cancer.
- If you are pregnant, quitting smoking will improve your chances of having a healthy baby.
- By quitting, you protect your children and adolescents from illnesses caused by second-hand smoke.

**Resources**
You may want to contact these organizations for further information on smoking and how to quit.

American Heart Association
7272 Greenville Avenue
Dallas, TX 75231
(800) AHA-USA1 (242-8721)

American Lung Association
1740 Broadway, 14th Floor
New York, NY 10019
(212) 315-8700

American Cancer Society
1599 Clifton Road, NE
Atlanta, GA 30329
(404) 320-3333

National Cancer Institute
Bethesda, MD 20892
(800) 4-CANCER (422-6237)

**SUTURE REMOVAL NOTICE:**     There is a Facility Fee for Suture Removal.

We value Your opinion.  Please complete the satisfaction survey you may receive in the mail.  Thank You.



*9600*

Printed by ASENIME, RASHONDA [ASENIMR] at 4/10/2010 11:01:21 PM

000019

CONFIDENTIAL INFORMATION

Levee, Cathey (MR # 000106210)  Encounter Date: 04/10/2010

**Signature Denotes Understanding**

| Signature | Date | Time |
|---|---|---|
| *Cathy Le* | 04/10/2010 | 2320 |

Printed: 4/10/10 at 2301  Page of

( 009060052031 )( 070013282 )
LEVEE ,CATHEY
09/11/1958    51 / F    ET
04/10/10    EMER    EMR
10000   ED PHYSICIAN

*9600*

Printed by ASENIME, RASHONDA [ASENIMR] at 4/10/2010 11:01:21 PM

000020

CONFIDENTIAL INFORMATION

TEXAS HEALTH HARRIS HEB
RADIOLOGIC INTERPRETATION

PATIENT:     LEVEE,CATHEY
PATIENT ID:  9060052031      PHYSICIAN: PECKENPAUGH, DANIEL E
BIRTHDATE:   09/11/1958      COPY TO:
LOCATION:    61-01O          MRN:     E4943877

ADMITTING DIAGNOSIS:  POSS BROKEN KNEE
REASON FOR EXAM:     INJURY

| EXAM DESCRIPTION | EXAM DATE | EXAM TIME | ORDER # | EXAM CODE |
| --- | --- | --- | --- | --- |
| KNEE 2 VIEWS RT | 04/10/2010 | 1945 | ED16537-10 | 501120 |

Examination: Knee two views right side

Ordering Physician: DANIEL E PECKENPAUGH

Date: 4/10/2010 7:45 PM

History: INJURY, kicked in knee, pain

Findings: Frontal and lateral radiographs of the right knee are
submitted. There is a mildly displaced proximal fibular diaphyseal
fracture with one cortical width of lateral displacement of the distal
fracture fragment. Small moderate suprapatellar effusion appears to
be present. No other fractures. No dislocation. Chondrocalcinosis,
greatest in the lateral compartment of the knee.

Impression:

Mildly displaced proximal fibular diaphyseal fracture

Small moderate suprapatellar effusion. No other fractures evident
however consider MRI for follow-up if symptoms of knee pain - separate
from the fibular fracture - persist, to exclude underlying soft tissue
or occult osseous injury.

Chondrocalcinosis

Electronically Signed by: William Elkins, MD on 4/10/2010 7:51 PM
DICTATED BY:  ELKINS, WILLIAM NELSON
TRANSCRIBED BY/ON:  TR  04/10/2010

Report Status:  Final

THIS REPORT IS VERIFIED AND FINALIZED ONLY IF SIGNED BY A RADIOLOGIST.

PECKENPAUGH, DANIEL E

1600 Hospital Parkway

000021

TEXAS HEALTH HARRIS HEB
RADIOLOGIC INTERPRETATION

PATIENT:     LEVEE,CATHEY
PATIENT ID:   9060052031      PHYSICIAN: PECKENPAUGH, DANIEL E
BIRTHDATE:   09/11/1958      COPY TO:
LOCATION:    61-01O      MRN:     E2051258

ADMITTING DIAGNOSIS:  POSS BROKEN KNEE
REASON FOR EXAM:    DERANGEMENT

| EXAM DESCRIPTION | EXAM DATE | EXAM TIME | ORDER # | EXAM CODE |
|---|---|---|---|---|
| MRI EXT LWR RT JOINT WO CONT | 04/10/2010 | 2229 | EM1308-10 | 561609 |

Examination:  MRI right knee without contrast

Ordering Physician:  DANIEL E PECKENPAUGH

Date: 4/10/2010 10:29 PM

History: DERANGEMENT

technique: Multiplanar, multi-sequential and right right knee without
contrast

Findings:

The anterior cruciate ligament is disrupted.  Posterior cruciate
ligament is intact. Contusions are seen in the postero-medial and
posterior lateral tibia, anterior aspect of the tibia and anteromedial
femoral condyles. Fat fluid level seen within a moderate joint
effusion suggest articular disruption. Discrete cortical disruption
on MRI is not appreciated. Consider thin section CT to identify the
sites of likely nondisplaced fracture which is not clearly evident but
likely in one of the area of contusions and likely in the posterior
aspect of the tibial plateaus.

The medial meniscus is diffusely abnormal with no significant
identifiable anterior horn or body and a truncated posterior horn.
There is a displaced meniscal fragment seen within the posterior
intercondylar notch, image 8 series 6. The lateral meniscus appears
intact.

The quadriceps and patellar tendons are intact. The medial collateral
ligament appears intact. Extensive soft tissue edema noted about the
knee including edema superficial to the medial collateral ligament,
likely reactive. The lateral collateral ligament complex is intact.

Small hypointense normality within patient's joint effusion measuring
3.6 mm on image 4 series 6 likely a loose osteocartilaginous body,
possibly from either the postero-medial or posterior lateral tibial

000022

CONFIDENTIAL INFORMATION

TEXAS HEALTH HARRIS HEB
RADIOLOGIC INTERPRETATION

PATIENT:     LEVEE,CATHEY
PATIENT ID:  9060052031     PHYSICIAN: PECKENPAUGH, DANIEL E
BIRTHDATE:   09/11/1958     COPY TO:
LOCATION:    61-01O        MRN:     E2051258

ADMITTING DIAGNOSIS:  POSS BROKEN KNEE
REASON FOR EXAM:     DERANGEMENT

| EXAM DESCRIPTION | EXAM DATE | EXAM TIME | ORDER # | EXAM CODE |
|---|---|---|---|---|
| MRI EXT LWR RT JOINT WO CONT | 04/10/2010 | 2229 | EM1308-10 | 561609 |

Examination:  MRI right knee without contrast

Ordering Physician:  DANIEL E PECKENPAUGH

Date: 4/10/2010 10:29 PM

History: DERANGEMENT

technique: Multiplanar, multi-sequential and right right knee without
contrast

Findings:

The anterior cruciate ligament is disrupted.  Posterior cruciate
ligament is intact. Contusions are seen in the postero-medial and
posterior lateral tibia, anterior aspect of the tibia and anteromedial
femoral condyles.  Fat fluid level seen within a moderate joint
effusion suggest articular disruption.  Discrete cortical disruption
on MRI is not appreciated.  Consider thin section CT to identify the
sites of likely nondisplaced fracture which is not clearly evident but
likely in one of the area of contusions and likely in the posterior
aspect of the tibial plateaus.

The medial meniscus is diffusely abnormal with no significant
identifiable anterior horn or body and a truncated posterior horn.
There is a displaced meniscal fragment seen within the posterior
intercondylar notch, image 8 series 6.  The lateral meniscus appears
intact.

The quadriceps and patellar tendons are intact.  The medial collateral
ligament appears intact.  Extensive soft tissue edema noted about the
knee including edema superficial to the medial collateral ligament,
likely reactive.  The lateral collateral ligament complex is intact.

Small hypointense normality within patient's joint effusion measuring
3.6 mm on image 4 series 6 likely a loose osteocartilaginous body,
possibly from either the postero-medial or posterior lateral tibial

000022

TEXAS HEALTH HARRIS HEB
RADIOLOGIC INTERPRETATION

PATIENT:     LEVEE,CATHEY
PATIENT ID:  9060052031      PHYSICIAN: PECKENPAUGH, DANIEL E
BIRTHDATE:   09/11/1958      COPY TO:
LOCATION:    61-01O          MRN:      E2051258

ADMITTING DIAGNOSIS:  POSS BROKEN KNEE
REASON FOR EXAM:      DERANGEMENT

| EXAM DESCRIPTION | EXAM DATE | EXAM TIME | ORDER # | EXAM CODE |
|---|---|---|---|---|
| MRI EXT LWR RT JOINT WO CONT | 04/10/2010 | 2229 | EM1308-10 | 561609 |

Examination:  MRI right knee without contrast

Ordering Physician:  DANIEL E PECKENPAUGH

Date: 4/10/2010 10:29 PM

History: DERANGEMENT

technique: Multiplanar, multi-sequential and right right knee without contrast

Findings:

The anterior cruciate ligament is disrupted. Posterior cruciate ligament is intact. Contusions are seen in the postero-medial and posterior lateral tibia, anterior aspect of the tibia and anteromedial femoral condyles. Fat fluid level seen within a moderate joint effusion suggest articular disruption. Discrete cortical disruption on MRI is not appreciated. Consider thin section CT to identify the sites of likely nondisplaced fracture which is not clearly evident but likely in one of the area of contusions and likely in the posterior aspect of the tibial plateaus.

The medial meniscus is diffusely abnormal with no significant identifiable anterior horn or body and a truncated posterior horn. There is a displaced meniscal fragment seen within the posterior intercondylar notch, image 8 series 6. The lateral meniscus appears intact.

The quadriceps and patellar tendons are intact. The medial collateral ligament appears intact. Extensive soft tissue edema noted about the knee including edema superficial to the medial collateral ligament, likely reactive. The lateral collateral ligament complex is intact.

Small hypointense normality within patient's joint effusion measuring 3.6 mm on image 4 series 6 likely a loose osteocartilaginous body, possibly from either the postero-medial or posterior lateral tibial

000022

CONFIDENTIAL INFORMATION

plateau.

Impression:

Disrupted anterior cruciate ligament

Bone contusions in the posterior medial and lateral tibia and anterior tibia and anteromedial femur. Lipohemarthrosis indicates articular disruption although the discrete fracture line is not identified on this MRI. Consider thin section CT as clinically appropriate.

Complex tear of the anterior horn, body and part of the posterior horn of the medial meniscus with a displaced meniscal fragment in the intercondylar notch

Small osteocartilaginous body

Electronically Signed by: William Elkins, MD on 4/10/2010 10:44 PM
DICTATED BY:    ELKINS, WILLIAM NELSON
TRANSCRIBED BY/ON: TR   04/10/2010

Report Status:  Final

THIS REPORT IS VERIFIED AND FINALIZED ONLY IF SIGNED BY A RADIOLOGIST.

PECKENPAUGH, DANIEL E

1600 Hospital Parkway

CC0023

CONFIDENTIAL INFORMATION

TEXAS HEALTH HARRIS HEB
RADIOLOGIC INTERPRETATION

PATIENT:     LEVEE,CATHEY
PATIENT ID:  9060052031      PHYSICIAN: PECKENPAUGH, DANIEL E
BIRTHDATE:   09/11/1958      COPY TO:
LOCATION:    61-01O          MRN:    E4943877

ADMITTING DIAGNOSIS:  POSS BROKEN KNEE
REASON FOR EXAM:    INJURY

| EXAM DESCRIPTION | EXAM DATE | EXAM TIME | ORDER # | EXAM CODE |
|---|---|---|---|---|
| TIBIA FIBULA 2 VIEWS RT | 04/10/2010 | 2040 | ED16541-10 | 501140 |

Examination: Tibia-fibula 2 views right side

Ordering Physician: Peckenpaugh, Daniel

Date: 4/10/2010 8:35 PM

History: Injury

Findings: Frontal and lateral radiographs of the right tibia and
fibula are submitted.  Correlation is made with the patient in the
examination performed earlier.  The oblique proximal fibular
diaphyseal fracture is very subtle on this examination and only
identified a correlating with the examination is a currently is
nondisplaced with only a subtle oblique lucency.  The more distal
fibula appears intact.  Question subtle cortical disruption in the
posterior proximal tibia along the plateau, seen on the lateral view.
A staple is seen in the talus.

Impression:

Subtle proximal fibular fracture barely evident, and better seen on
the examination as it is less displaced currently

Question subtle cortical regularity of the posterior tibia proximally
at the knee on the lateral view.  Consider CT or MRI for further
evaluation.

Electronically Signed by: William Elkins, MD on 4/10/2010 8:39 PM
DICTATED BY:   ELKINS, WILLIAM NELSON
TRANSCRIBED BY/ON: TR  04/10/2010

Report Status:  Final

THIS REPORT IS VERIFIED AND FINALIZED ONLY IF SIGNED BY A RADIOLOGIST.

PECKENPAUGH, DANIEL E

1600 Hospital Parkway                                        000024

## ADMISSION ACKNOWLEDGEMENTS

**Notice of privacy practices:** I acknowledge receipt of the Texas Health Resources Notice of Privacy Practices. _____
*Initials*

**Release of information:** I authorize the Hospital to release any information or records contained in hospital patient records related to alcohol or substance abuse diagnosis or treatment, mental health treatment, or any communicable disease, including HIV/AIDS to (a) any of my treating practitioners, (b) my insurance company or health plan, (c) any other person or entity that is responsible for paying or processing for payment my hospital bill, (d) any other health care provider to which I am transferred for care, (e) entities using this information for quality management and peer review, and (f) any other person or entity as authorized by law. This release shall remain valid until I notify the Hospital, in writing, of my desire to revoke it. I hereby consent to receiving auto-dialed and/or pre-recorded message calls to my cellular telephone and to any telephone number provided by me either pre-admission or during admission from the facility or its affiliates and their agents including without limitation, any third-party debt collectors.

**Advance directives:**
**a. To be completed for Hospital outpatients and emergency room patients only:**
   Are you presenting an out-of-hospital DNR order or bracelet?  ☐ Yes ☑ No  Copy provided?  ☐ Yes ☐ No
**b. To be completed for Hospital inpatients and outpatients undergoing invasive procedures only:**
   1. Who is answering the following questions?  Patient?  ☑ Yes ☐ No  Person with patient?  ☐ Yes ☐ No
   2. Was printed information about advance directives offered to you?  ☑ Yes ☐ No  Information received?  ☐ Yes ☐ No
   3. Do you have a directive to physician (living will)?  ☐ Yes ☑ No  Copy provided?  ☐ Yes ☑ No
   4. Do you have a medical power of attorney?  ☐ Yes ☑ No  Copy provided?  ☐ Yes ☑ No
   5. Do you have a mental health directive?  ☐ Yes ☑ No  Copy provided?  ☐ Yes ☑ No
   6. Are you presenting an out-of-hospital DNR order or bracelet?  ☐ Yes ☑ No  Copy provided?  ☐ Yes ☑ No
   7. Would you like to discuss advance directives with a Hospital staff member?  ☐ Yes ☑ No  Referred to: _____
   I understand it is my responsibility to provide a copy of my advance directives to the Hospital.
   (*Hospital Staff Note: Shaded area indicates that advance directive follow-up documentation is required.)

**Patient rights and responsibilities:** I have received written information regarding my rights and responsibilities as a patient. This information tells me how to register complaints I might have.

**My valuables:** I understand that the Hospital does not assume responsibility for personal property I may keep with me during my treatment / hospitalization. I understand that unnecessary items should be sent home, and that a safe is available for my valuables.

**Financial agreement / assignment of benefits:** I hereby irrevocably assign to the Hospital, and any practitioner providing care and treatment to me, any and all benefits and all interest and rights (including causes of action and the right to enforce payment) under any insurance policies or any reimbursement or prepaid health care plan for services rendered during this admission. Under this assignment, Hospital shall have the right to appeal any denied or delayed claims on behalf of the insured or beneficiary. I hereby promise to pay for all services rendered to me to the extent I am legally responsible for such payment; I understand I am responsible for all health insurance co-payments and deductibles. Charity care may be available if Hospital eligibility criteria are met.

**Physicians providing services:** I understand that physicians, including my admitting physician as well as others, such as pathologists, radiologists or anesthesiologists, who may provide diagnosis, care or supervision of tests while I am in the hospital, will bill me separately from the hospital, and that some or all of these may not be covered by the same health plans as the hospital, and that I will be responsible for paying these physicians, subject to the terms of whatever health plan or insurance I may have.

**Medicaid patients only:** I understand that the services or items that I request to be provided to me may not be covered under the Texas Medical Assistance Program as being reasonable and medically necessary for my care. I understand that the Texas Department of Human Services or its health insuring agent determines the medical necessity of the services or items that I request and receive. I also understand that I am responsible for payment of the services or items I request and receive if these services or items are determined not to be reasonable and medically necessary for my care. If I am a Medicaid Star patient, these provisions may not apply.

**Medicare patients only:** I acknowledge receipt of the written material entitled, "Important message from Medicare."

**Obstetric patients only:** This admission acknowledgement and financial agreement/assignment of benefits is also given for any child(ren) born to me during this hospitalization.

**If the person signing this form is not the patient, please give full name, phone number and address:** _____

I have read and understand the information above.

| Signature of patient or of the authorized representative* of an incapacitated patient | Relationship to patient | Date of signature 4·10·10 |
| --- | --- | --- |
| Witness | Title  ER | Date of signature 4·10·10 |

\* For purposes of this form only, an "authorized representative" is: 1) a legal guardian, 2) an agent authorized in a medical power of attorney or directive to physicians, 3) an attorney appointed by a court, 4) an attorney retained by the patient or the patient's legally authorized representative, 5) a parent or legal guardian of a minor, or 6) a person authorized under the Texas Consent to Medical Treatment Act: the patient's spouse, adult child, a parent of the adult patient, a person clearly identified in advance of incapacity to act for the patient, the nearest living relative or a member of the clergy.

### HOSPITAL BOX MUST BE CHECKED

**Texas Health Resources**

**ADMISSION ACKNOWLEDGEMENTS**
Form THR-61 / 998540682 (12/08)

☐ Texas Health Arlington Memorial Hospital
☐ Texas Health Harris Methodist Hospital Azle
☐ Texas Health Harris Methodist Hospital Cleburne
☐ Texas Health Harris Methodist Hospital Fort Worth
☑ Texas Health Harris Methodist Hospital Hurst-Euless-Bedford
☐ Texas Health Harris Methodist Hospital Southwest Fort Worth
☐ Texas Health Harris Methodist Hospital Stephenville
☐ Texas Health Presbyterian Hospital Allen
☐ Texas Health Presbyterian Hospital Dallas
☐ Texas Health Presbyterian Hospital Denton
☐ Texas Health Presbyterian Hospital Keufman
☐ Texas Health Presbyterian Hospital Plano
☐ Texas Health Presbyterian Hospital Winnsboro
☐ Other _____

**PATIENT IDENTIFICATION**

( 009060052031 )( 070013282 )
LEVEE ,CATHEY
09/11/1958    51 / F    ET
04/10/10      EMER      EMR
10000    ED PHYSICIAN



*9051*

MEDICAL RECORDS

# UNIVERSAL CONSENT FOR TREATMENT

**General consent.** I understand that my health condition requires inpatient or outpatient admission. I consent to and authorize testing, treatment and hospital care by Hospital nurses, employees and others as ordered by my doctor and his/her consultants, associates and assistants, or as directed pursuant to standing medical orders or protocols. I understand that it may be necessary for representatives of outside health care companies to assist in my care. I also understand that persons in professional training programs may be among the individuals who provide care to me. I understand that in connection with my treatment, photos or videos may be taken. Any tissue or body parts removed from my body may be retained or disposed of by the Hospital at its sole discretion.

**Communicable disease testing.** I acknowledge that Texas law provides if any health care worker is exposed to my blood or other bodily fluid, the Hospital may perform tests, without my consent, on my blood or other bodily fluid to determine the presence of hepatitis B and C and HIV. I understand that such testing is necessary to protect those who will be caring for me while I am a patient at the Hospital. I understand that the results of tests taken under these circumstances are confidential and do not become a part of my hospital patient record.

**Independent physicians.** I acknowledge that the doctors taking part in my care do not work for the Hospital. They are engaged in the private practice of medicine, and are not employees, servants or agents of the Hospital. In addition to my attending doctor, other doctors who may take part in my care may include radiologists, pathologists, anesthesiologists, neonatologists, cardiologists, emergency physicians and other specialists. I acknowledge that the Hospital is not responsible for the judgment or conduct of doctors who treat or provide a professional service to me. The exception to this is that some medical residents – doctors taking part in a program of post-graduate medical education under the supervision of more experienced physicians – are employees of the Hospital.

**No guarantee.** I acknowledge that no guarantees or warranties have been made to me with respect to treatment to be provided at this Hospital. I understand that all supplies, medical devices and other goods sold or furnished to me by the Hospital are sold or furnished by the Hospital on an "AS IS" basis, and Hospital and Texas Health Resources disclaim any expressed or implied warranties with respect to them. With respect to specific supplies and devices, manufacturers' warranties may apply, and I may request manufacturer's warranty information concerning such supplies and/or devices.

**Newborn child(ren).** If any children are born to me during this admission, my signature below is on behalf of myself and such child(ren) as the legally authorized representative of such child(ren), and the paragraphs regarding "General consent", "Communicable disease testing", "Independent physicians" and "No guarantee" shall apply regarding any treatment provided to such child(ren).

**If the person signing this form is not the patient, please give full name, phone number and address:**

I have read and understand this information.

| | | |
|---|---|---|
| Signature of patient or legally authorized representative* | Relationship to patient | Reason patient unable to sign |
|  Witness | Title | 4/10/10 Date of signature |

\* For purposes of this form only, a "legally authorized representative" is: 1) a legal guardian, 2) an agent authorized in a medical power of attorney or directive to physicians, 3) an attorney appointed by a court, 4) an attorney retained by the patient or the patient's legally authorized representative, 5) a parent or legal guardian of a minor, or 6) a person authorized under the Texas Consent to Medical Treatment Act: the patient's spouse, adult child, a parent of the adult patient, a person clearly identified in advance of incapacity to act for the patient, the nearest living relative or a member of the clergy.

## HOSPITAL BOX MUST BE CHECKED

 **Texas Health Resources**

**UNIVERSAL CONSENT FOR TREATMENT**
Form 998541055 (Rev. 12/08)

☐ Texas Health Arlington Memorial Hospital
☐ Texas Health Harris Methodist Hospital Azle
☐ Texas Health Harris Methodist Hospital Cleburne
☐ Texas Health Harris Methodist Hospital Fort Worth
☑ Texas Health Harris Methodist Hospital Hurst-Euless-Bedford
☐ Texas Health Harris Methodist Hospital Southwest Fort Worth
☐ Texas Health Harris Methodist Hospital Stephenville
☐ Texas Health Presbyterian Hospital Allen
☐ Texas Health Presbyterian Hospital Dallas
☐ Texas Health Presbyterian Hospital Denton
☐ Texas Health Presbyterian Hospital Kaufman
☐ Texas Health Presbyterian Hospital Plano
☐ Texas Health Presbyterian Hospital Winnsboro
☐ Other _____

( 009060052031 )( 070013282 )
LEVEE ,CATHEY
09/11/1958   51 / F   ET
04/10/10      EMER       EMR
10000   ED PHYSICIAN

BA10434 12/08 522,000

9080

# AUTHORIZATION FOR VERBAL RELEASE OF PROTECTED HEALTH CARE INFORMATION

**1."DIRECTORY INFORMATION."** I understand that "Directory Information", such as my presence in the hospital and room number, as described in the Texas Health Resources Notice of Privacy Practices, may be released to all who ask for me by name, unless I object by specifically requesting to be a "No Information" patient as described below.

☐ **No Information** - I do not authorize release of any information, including Directory Information, concerning my admission or treatment. I choose to be a "No Information" patient and I realize that mail, flowers, telephone calls, and visitors will be refused on my behalf. (The hospital staff will not be able to acknowledge my presence.) I also understand that if I make phone calls from the hospital, caller identification systems may result in my location being disclosed to persons who receive the calls.

**2. MEDICAL INFORMATION AND DISCLOSURE.** I understand that medical information about my condition and treatment, may not be released, except in situations as described in the Texas Health Resources Notice of Privacy Practices, **unless I give my permission as provided below:**

☑ **I authorize** this hospital and medical staff members to discuss my medical history, diagnosis, treatment and prognosis with those listed below. I understand this may include information regarding testing, examination and treatment for HIV, AIDS related illness, mental health and drug, alcohol or chemical abuse.

☐ spouse_____

☐ children ___Alexandra Levee_____

☐ parent(s) _____

☐ other _____

*Note: I understand my medical information will not be discussed via telephone with the person(s) named above if I choose to be No Information since telephone calls will be refused on my behalf.*

This authorization will expire at the end of my hospitalization or outpatient service, unless I revoke the consent prior to that time.



| | | |
|---|---|---|
| X _____Cathey_____ | ___self___ | _4-10-10_ |
| Signature of Patient or Legally Authorized Representative* | Relationship | Date |
| _____Short_____ | | _4-10-10_ |
| Witness | | Date |

*A"legally authorized representative" is: 1) a legal guardian, 2) an agent authorized in a medical power of attorney or directive to physicians, 3) an attorney appointed by a court, 4) an attorney retained by the patient or the patient's legally authorized representative, 5) a parent or legal guardian of a minor, or 6) a person authorized under the Texas Consent to Medical Treatment Act: the patient's spouse, adult child, a parent of the adult patient, a person clearly identified in advance of incapacity to act for the patient, the nearest living relative, or a member of the clergy.

**HOSPITAL BOX MUST BE CHECKED**

**⊕ Texas Health**
Resources™
**Authorization for Verbal Release of**
**Protected Health Care Information**

Form 998540228 (Rev. 6/09)



*9100*

☐ Texas Health Arlington Memorial Hospital
☐ Texas Health Harris Methodist Hospital Azle
☐ Texas Health Harris Methodist Hospital Cleburne
☐ Texas Health Harris Methodist Hospital Fort Worth
☑ Texas Health Harris Methodist Hospital Hurst-Euless-Bedford
☐ Texas Health Harris Methodist Hospital Southwest Fort Worth

☐ Texas Health Harris Methodist Hospital Stephenville
☐ Texas Health Presbyterian Hospital Allen
☐ Texas Health Presbyterian Hospital Dallas
☐ Texas Health Presbyterian Hospital Denton
☐ Texas Health Presbyterian Hospital Kaufman
☐ Texas Health Presbyterian Hospital Plano
☐ Texas Health Presbyterian Hospital Winnsboro
☐ Other _____

( 009060052031 )( 070013282 )ION
LEVEE ,CATHEY
09/11/1958    S1 / F    ET
04/10/10      EMER      EMR
10000    ED PHYSICIAN

FG 32971

000027

APPENDIX ONE ;Constitutionally ineffective trial counsel.

Index of Authorities

Abney v. United States, 431 U.S. 651, 656, 97 S.Ct. 2034, 2038, 52 L.Ed.2d 651 (1977).                                                                                          1

Anderson v. Johnson, 338 F.3d 382, 392 (5th Cir. 2003)                          6

Arnold v. State, 685 P.2d 1261, 1265, 1267 (Alaska Ct. App. 1984)              5

Beans v. Black, 757 F.2d 933 (8th Cir.) , cert. denied, 474 U.S. 979 (1985) ;   7

Beans v. Black, 757 F.2d 933, 936 (8th Cir.) , cert. denied, 474 U.S. 979 (1985)
.                                                                               6

McCoy v. Wainwright, 804 F.2d 1196, 1198 (11th Cir. 1986)                       6

Rogers v. Maggio, 714 F.2d 35, 37 (5th Cir. 1983)                              5

Scott v. Wainwright, 698 F.2d 427, 429 (11th Cir. 1983)                       5, 7

See United States v. Wilkes, 20 F.3d 651, 653 (5th Cir.1994)                   1

State v. Osborne, 684 P.2d 683, 691 (Wash. 1984) .                             5

Strickland v. Washington, 466 U.S. 668, 690-91, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) .                                                                           6

Thomas v. Lockhart, 738 F.2d 304 (8th Cir. 1984)                              7

Thomas v. Lockhart, 738 F.2d 304, 308 (8th Cir. 1984)                         6

Thomas v. Lockhart, 738 F.2d 304, 308-09 (8th Cir. 1984)                      7

United States v. Melancon, 972 F.2d 566, 567 (5th Cir.1992).                  1

United States v. Pruitt, 32 F.3d 431, 433 (9th Cir.1994)                      1

United States v. Henderson, 72 F.3d 463, 465

Henderson argues that the district court erred when it denied his motion to withdraw the guilty plea.

The motion, Henderson asserts, should have been granted because he was denied adequate assistance of counsel.

We must first determine whether Henderson has waived the right to raise such a claim on direct appeal. The right to appeal a criminal conviction is a statutory right, not a constitutional right. Abney v. United States, **431 U.S. 651**, 656, 97 S.Ct. 2034, 2038, 52 L.Ed.2d 651 (1977).

A defendant may waive statutory rights, including the right to appeal, as part of a plea bargaining agreement. United States v. Melancon, **972 F.2d 566**, 567 (5th Cir.1992).

However, we have previously noted, without deciding the issue that waivers of rights to appeal may not apply to ineffective assistance of counsel claims. See United States v. Wilkes, **20 F.3d 651**, 653 (5th Cir.1994) (noting that waiver of postconviction relief in plea agreement may not apply to collateral attacks based on ineffective assistance of counsel).

Without deciding the issue, the Ninth Circuit has expressed similar sentiments. See United States v. Pruitt, **32 F.3d 431**, 433 (9th Cir.1994) ("We doubt that a plea agreement could waive a claim of ineffective assistance of counsel based on counsel's erroneously unprofessional inducement of the defendant to plead guilty or accept a particular plea bargain.").

**I.       Defense counselor Steven Bell admitted in court record he did not investigate the eye witness or have any knowledge of what the witness testimony would be.**

6:22    THE COURT:  Okay.   Now, with regard to the

respective witnesses that will be testifying, if either side has an issue with regard to whether or not that That witness should be heard by the Court, I expect you to make a timely objection

she is a witness in the case. He understands that we are not going to go into any matters related to that assault above and beyond the fact that it is pending. And that-- I just want to make the Court aware that we have made Defense Counsel aware of that fact through Brady Notice, it's in existence, and we have talked to Defense Counsel for Katy Levee about it.

THE COURT: All right. Mr. Bell, are you going to limit your cross-examination of this particular witness, or do –

MR. BELL: Iwill-- Iwill—

THE COURT: I need to have the defense attorney on standby.

MR. BELL: I will limit it only to the extent that obviously she would take the Fifth with regard to that offense.

THE COURT: Okay. Does she need to have her attorney present in your opinion?

MR. BELL: I would not anticipate so, but again.

THE COURT: Well --

MR. BELL: Yeah. Yeah. I'm not-- she's not my client, so I can't-- I mean, obviously, I don't know--

THE COURT: No, but what I'm asking is that

Page 9

do you anticipate to go into any matters to try -- attempt to impeach her And if you are, that's fine. just need to have her attorney present.

Now, I don't want to limit your cross-examination. She's not your client. However, in good faith and as an officer of the Court, can you tell me whether or not that would be a prudent step? The State's telling me that they don't anticipate the need of the -- of the attorney to -- to be present that's representing that particular witness.

MR. BELL: At this response -- at -- at this juncture, it's difficult for me to tell you that because she hasn't given any type of statement that I have seen –

THE COURT: All right.

MR. BELL: --so, I mean, she-- if-- from what I can tell, unless Tim can tell me wrong, she didn't talk to the police. She's never testified apparently in the divorce hearing. She didn't testify in the protective order. So I don't know exact -- exactly what she's going to say. So it's difficult to make that determination.

Now, what I can tell you is if I get to that point, we can stop it at that point and have her lawyer present.

Page 11

MR. BELL: Now, what I can tell you that I have learned -- and I work to determine whether or not this is going to become a factor-- that there were some: prior issues with regard to your complainant and this individual that if-- you know, depending on how she testifies, we -- we might very well get into that they were assaultive in nature and some prior violence between the two.

So that -- and quite honestly, that's why I said it's difficult for me to determine what the Court -- what I might got -- get into prior to hearing her testify. She's never said anything.

THE COURT: I understand that, Mr. Bell --

MR. BELL: But I do understand the Court's reservation with that, and honestly, probably, she should have somebody present, but...

THE COURT: I understand that.

1. "Effective assistance of counsel" requires defense counsel to assist his client in deciding whether to stand trial or enter a plea of guilty or

*nolo contendere.*

    i.  Rogers v. Maggio, 714 F.2d 35, 37 (5th Cir. 1983) ; Scott v. Wainwright, 698 F.2d 427, 429 (11th Cir. 1983) ; Arnold v. State, 685 P.2d 1261, 1265, 1267 (Alaska Ct. App. 1984) ; People v. Hunt, 219 Cal. Rptr. 731, 737 (Ct. App. 1985) ; State v. Osborne, 684 P.2d 683, 691 (Wash. 1984) .

2. To be able to advise his client adequately of the available options, defense counsel must be familiar with the facts of the case and the applicable law.

    i.  Rogers v. Maggio, 714 F.2d 35, 37 (5th Cir. 1983) ; Scott v. Wainwright, 698 F.2d 427, 429 (11th Cir. 1983) ; Arnold v. State, 685 P.2d 1261, 1265, 1267 (Alaska Ct. App. 1984) ; People v. Brown, 223 Cal. Rptr. 66, 70-71 (Ct. App. 1986) .

Thus, for example, in Scott v. Wainwright, 698 F.2d 427 (11th Cir. 1983) , where defense counsel conducted only limited legal research, procured no witnesses, took no depositions, and interviewed neither the prosecution's witnesses nor the

witnesses the defendant wanted to call, the court concluded that the defendant received ineffective assistance and that consequently his guilty plea was not knowing and voluntary.

    ii. See also Arnold v. State, 685 P.2d 1261 (Alaska Ct. App. 1984) (holding that defense counsel's assistance was ineffective where he did not understand the applicable law, did not review police and medical reports, did not examine any of the testimony before the grand jury, and did not interview any witnesses).

3. The amount of investigation required of the attorney to familiarize himself with the relevant facts and law depends upon the nature of the particular case.

    i. Strickland v. Washington, 466 U.S. 668, 690-91, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) .

4. Including the strength of the prosecution's case.

    i. Rhoades v. Henry, 611 F.3d 1133, 1142 (9th Cir. 2010)

5. As a general rule, defense counsel should attempt "to secure information in the possession of the prosecution and law enforcement authorities,"

i. Standards Relating to the Defense Function § 4-4.1 (3d ed. 1993), available at http://www.americanbar.org/publications/criminal_justice_section_archive/crimjust_standards_dfunc_toc.html (last visited Dec. 24, 2012). interview witnesses, Foster v. Wolfenbarger, 2012 FED App. 0224P, 687 F.3d 702, 708 (6th Cir.) ; Beans v. Black, 757 F.2d 933, 936 (8th Cir.) , cert. denied, 474 U.S. 979 (1985) .

ii. For example, in Thomas v. Lockhart, 738 F.2d 304, 308 (8th Cir. 1984) , the court held that the defendant received ineffective assistance of counsel where his attorney merely reviewed the file of the prosecutor and did not follow up on the names of three alibi witnesses given to him by the defendant or interview either the victim of the crime or any of the police officers who obtained a statement from the defendant or who were involved in his pretrial identification. The court distinguished the situation in which the defendant did not supply his attorney with information casting doubt on the events as portrayed in the prosecutor's file.

iii. See also Anderson v. Johnson, 338 F.3d 382, 392 (5th Cir. 2003) (concluding that the defense attorney's failure to interview eyewitness rose to the level of constitutionally deficient performance); Hawkman v. Parratt, 661 F.2d 1161 (8th Cir. 1981) (the defendant received ineffective assistance of counsel where his attorney did not interview the three eyewitnesses to the crime).

6. and investigate potential defenses, both factual and legal..

   i. McCoy v. Wainwright, 804 F.2d 1196, 1198 (11th Cir. 1986) (remanding the cause for an evidentiary hearing to determine whether defense counsel's failure to investigate a possible insanity defense constituted ineffective assistance of counsel);

   ii. Thomas v. Lockhart, 738 F.2d 304, 308-09 (8th Cir. 1984) (faulting defense counsel for not investigating the seriousness of the defendant's mental problems);

7. However, counsel need not investigate every conceivable defense.

   i. Scott v. Wainwright, 698 F.2d 427, 429 (11th Cir. 1983)

8. Nor must he always independently interview witnesses. For

instance, defense counsel is not required to interview witnesses where, after discussing the case with the defendant and reviewing the police reports and the statements of witnesses, he reasonably concludes that further investigation would not lead to unknown facts.

9. The duty to investigate applies in all cases, even when the defendant insists throughout that he wants to plead guilty -.

    i. Smith v. Mahoney, 611 F.3d 978, 986 (9th Cir. 2010) ; Beans v. Black, 757 F.2d 933 (8th Cir.) , cert. denied, 474 U.S. 979 (1985) ; Thomas v. Lockhart, 738 F.2d 304 (8th Cir. 1984) ; Arnold v. State, 685 P.2d 1261 (Alaska Ct. App. 1984) ; People v. Hunt, 219 Cal. Rptr. 731, 737 (Ct. App. 1985) .

    ii. See also Standards Relating to the Defense Function § 4-4.1 (3d ed. 1993), available at http://www.americanbar.org/publications/criminal_justice_section_archive/crimjust_standards_dfunc_toc.html (last visited Dec. 24, 2012).

**II.** **Defense counselor Steven Bell admitted in court record he did not investigate or examine the Brady statement concerning the arrest of the eye witness for Assault- Deadly weapon and the Attorney General investigation concerning the attempt to obtain funds from Victims Assistance that were paid by relators medical insurance Court interfered with admission of ineffective defense counsel.**

    A.    Bell did not review Brady Report

        Pace Pg. ID 639 Ln. 136.10

    Mr. BELL: The report was not a part of it.

B.     Court attempted to cover ineffective counsel admission and took discussion off the record.

Pace Pg. ID 639 Ln. 136.10

THE COURT: Are we off the record?

STATE VS. THEODORE FLOYD LEVEE

136

any other way that you could verify the information based upon -- other than asking the witness that date, because that is one of the elements that must be established for proof.

MR. RODGERS: If it please the Defense, I'd be happen to show them all the information the State has about the Indictment, the mainframe page showing the date of the offense, the allegations, and, in fact, I included a report.

MR. BELL: The report wasn't part of it. There was not a report. I got the -- I got the Brady motion --

THE COURT: Are we on the record or not?

MR. BELL: We're off the record.

THE COURT: Off the record.

(Off the record)

MR. BELL: Your Honor, at this time we'd would ask that you take judicial notice of the Information that has been filed with regard to an alleged offense that occurred between this individual and the complainant in this case.

THE COURT: And, State, do you have the cause number for me to review?

MR. RODGERS: Yes, Your Honor. It's -- actually, I believe the Information is listed on the

RA 138

**III.** Mr. Bell failed to vigorously cross examine witness complainant with the prior knowledgeas stated in opening and closing, of the witnesses several "varing" statements.

**IV.** Mr. Bell failed to cite 10 June 2010 letter to prosecutor he had possession of concerning the witnesses credibility, administering drug known to her to be "harmfull" (Victims Statement – "he reacts badley to" and – in an open file discovery case prosecution refused to produce records.

    A.     Reference to notarized statement of eye witness Catherine Levee Suppressed in trial and in post-trial actions

# cathey levee

Cathey.Levee@fwisd.org

- 
- [Send e-mail](#)
- [Find e-mail](#)
- 

To 'TSRodgers@TarrantCounty.com', 'Beverly Storey', 'Jeanne Insuaste', 'thelevees5@msn.com'

| | |
|---|---|
| From: | **Levee, Cathey** (Cathey.Levee@fwisd.org) |
| Sent: | Thu 6/10/10 7:23 PM |
| To: | 'TSRodgers@TarrantCounty.com'     (TSRodgers@TarrantCounty.com) |
| Cc: | 'Beverly Storey' (bevstorey@gmail.com); 'Jeanne Insuaste' (jeannecpl@sbcglobal.net); 'thelevees5@msn.com' (thelevees5@msn.com) |

Hotmail [Active View](#)

2 attachments (total 728.4 KB)



[Route fro...docx](#) [Download](#)(303.7 KB)



[Route fro...docx](#) [Download](#)(424.7 KB) [Download all](#)

Tim,

Ted continues to contact and harass my family. He claims to have not been to my home on 4/28 because he was at Dr. Grant's office. Please see the attached map and how close it is to my home, 7 minutes (or less). Additionally he claims he wasn't at my home on 5/19 or 5/25 which is shown on the temporary computer file I sent you earlier. On June 3rd when I checked my computer again, the temporary file from CWA6215 had been deleted, so that would be the **third time** he has entered my home. The time to get to the court house from my home says 21 minutes on the attached map but I can assure you that it does not take that long without traffic. According to several sources the ankle monitor is not perfect and if it is a range, my home would not be off the path he was supposed to be on. Also, I have been told that you can wrap them with aluminum foil to prevent the signal from going through. It would only take 5 minutes for him to do these things. He also has letters from my three daughters they wrote their biological father in 2005 when we started the adoption process.

When he was arrested and Officer Disraeli came to pick up his belongings, I gave him ALL his clothes, jewelry and medication. NOTHING ELSE! If he has these letters, then he has gotten them from my file cabinets at the house. He also has taken tools and the original copy of the two year protective order, my daughter graduation announcements and other various items. He also has a signed note from the doctor in Ennis who performed the rotary cuff surgery stating that he gave Ted hydrocodone and "his

wife" gave him something else that would make him crazy. I find it hard to believe that a doctor who has never met me or seen my medical records would write such a letter, but that is what he is using for his defense. Also, on the original form in February from Dr. Grant's office, he wrote that he was only allergic to iodine and Demerol. On the 4/28 form he added vicodin (hydrocodone, Norco) to the list. He has used this medication for pain multiple times and I have a prescription bottle that he was given for pain when he burned his hand a few years ago. This is the bottle I gave him his medicine from before the assault because it was too late and the pharmacy was closed when I got home to pick up the one from the Ennis doctor. He has also taken my hydrocodone on MULTIPLE occasions when his shoulder hurt before his surgery. He also has several copies of my medical claims for my car wreck and I do not know how he has gotten them without being in my house. He is trying to claim medical fraud from my car accident last year. I had all these records in my home by my bed. He IS entering my house! Why won't anyone with any authority believe me?

Also, when Ted first started going to Dr. Grant in February of 2010 he signed a HIPPA form that I could access his records. So I did. The doctor diagnosed him at that time as Bipolar II, ADD, with paranoid and narcissistic tendencies, in addition to rage and control issues. According to the medical records he is NOT taking any medication to control his Bipolar Disorder. He is only taking Adderall and Valium. I can tell you that Adderall exacerbates his delusional behavior. If you would like me to FAX you those documents I can. As a Licensed Professional Counselor I can tell you that this combination is dangerous and prone to stalking and unpredictable behavior. This is exactly the kind of behavior that he exhibited when he kicked my oldest daughter out of the house is 2009. He stalked her, remotely accessed her computer and called her work multiple times to get her fired. I also recently discovered that he had a key logger on our home computer and had cameras pointed at the girls bedrooms and bathroom. Alexandra has also confided in me that he tried to touche her inappropriately on a volley ball tournament in Houston in 2006. I have always thought he was sexually inappropriate with her but never really put the pieces together until all three girls told me comments that he has said to them. My family therapist has said that Ted is a sexual predator who is after Alexandra and Katy. The girls had not told me many things because they knew I was sick and need the income and insurance. **I do not feel safe, protected or that anyone is listening to how crazy this man is.** He has contacted Katy (my youngest daughter) three times on FaceBook, "pinged" my cell phone to locate me and changed the passwords on my ATT account so I cannot access the internet at home. I cannot close the account nor do anything with it because he is listed as the only authorized user. He repackages the bill, which is sent to his Kaufman address and then resends it to me the day before the utility is disconnected.

**Do I have to die or suffer more physical injuries in order to get this man to leave us alone?** I understand he is going to court on the 23rd of this month. I would like to be there. Katy has written a notarized statement of the events of 4/10 /10 and both of us are willing to testify. **Please help us.** If something happens to me or my girls, my family and attorney will hold your office accountable. I do not care if he is fired; this is not about money, I want to feel safe in our home. I should not have to enter the witness protection plan to live our lives. This is exactly what the Battered Women's Foundation has recommended. **We are NOT safe**.

Thank you, Cathey

 

      B.      Request for record to authenticate letter

# OPEN RECORD REQUEST FOR JUNE 10 2010 ADA RODGERS LETTER

**From:** "Thelevee@yahoo.com" <Thelevee@yahoo.com>
**Date:** August 26, 2013, 3:53:47 AM EDT
**To:** "8178843333@metrofax.com" <8178843333@metrofax.com>
**Subject: Fwd: thelevee@yahoo.com has sent you a file**

Theodore Levee
925 Altara Ave
Coral Gables Florida
33146
972-835-6777
Fax 305-665-5597
Email thelevee@yahoo.com

August 23, 2013


Tarrant County District Attorney
Public Information Officer

Tim Curry Criminal Justice Center
401 West Belknap
Fort Worth, TX 76196
Fax 817-884-3333
Dear Officer for Public Records:

This request is made under the Texas Public Information Act, Chapter 552, Texas Government Code, which guarantees the public's access to information in the custody of governmental agencies. I respectfully request copies of the following information:

Email records concerning;

State v.Theodore Floyd Levee

Correspondence between assistant district attorney Tim Rodgers and Cathey Levee. While request is for all correspondence, specifically included is the email sent to Mr. Rodgers by Cathey Levee on the account of Mr. Levee's - thelevees5@msn.com and also the email address - cathey.levee@fwisd.org.

The email of June 10, 2010 is specific to the actions and knowledge of the district attorney's office in the prosecution of above case.

In the interest of expediency, and to minimize the research and/or duplication burden on your staff, I would be pleased to personally examine the relevant records if you would grant me

immediate access to the requested material.   Additionally, and since time is a factor, please communicate with me by telephone or fax rather than by mail.  My telephone number is:
972-835-6777
Fax 305-665-5138

Disclosure of this information is in the public interest because providing a copy of the information primarily benefits the general public.  I therefore request a waiver of all fees and charges pursuant to Section 552.267 of the act.

I shall look forward to hearing from you promptly, as specified in the law. Thank you for your cooperation.

Sincerely,

Theodore Floyd Levee
Electronically signed 5690

From;
Theodore Levee
925 Altara Ave
Coral Gables FL 33146

To;
Ashely Forth
ADA
Tarrant County District Attorneys' Office
401 W Belknap
Ft Worth TX 76196

In the matter   2013-19273

According to the letter from the AG of Texas Office,   AAG Jennifer Burnett, we are past deadline for the release of the requested documents referred to in this correspondence #OR 2013 -19273

That would include June 10, 2010 and all other correspondence between the DA office and Cathey Levee, sent from thelevees5@msn.com, and Cathey.Levee fwisd.org.

And any other and all correspondence in the completed criminal case.

The deadline according to the AG was 10 days after the issuance of the letter dated November 5 2013.

This action is jeopardizing factual claims in another action and as such considerably jeopardized the conviction and integrity of the District Attorney's office of Tarrant County.

Please comply at once as a like correspondence has been forwarded with the AG.

Theodore Levee
925 Altara Ave
Coral Gables FL

Jennifer Burnett
PO Box 12548
Austin TX 78711-2548
Assistant Attorney General
Open Records Division


OR 2013-19273
Email between DA and Cathy Levee
Per your correspondence and the opinion of the Attorney General I have not received the requested documents and ask the assistance of the State of Texas in enforcing and holding all accountable equally under the law.

I have contacted the ADA Ashely Fourt date same and it is imperative to have these records in an action before the United States District Court North Texas Fort Worth Civil Action No. 4;13-cv-211-y, The matter is time sensitive.

Sincerely

Theodore Levee



## ATTORNEY GENERAL OF TEXAS
### GREG ABBOTT

November 5, 2013

Ms. Ashley D. Fourt
Assistant District Attorney
Tarrant County District Attorney's Office
401 West Belknap
Fort Worth, Texas 76196-0201

OR2013-19273

Dear Ms. Fourt:

You ask whether certain information is subject to required public disclosure under the Public Information Act (the "Act"), chapter 552 of the Government Code. Your request was assigned ID# 504741.

The Tarrant County District Attorney's Office (the "district attorney's office") received a request for all correspondence between two named individuals concerning a specified case. You claim the submitted information is excepted from disclosure under section 552.103 of the Government Code.[1] We have considered the exception you claim and reviewed the submitted information.

Section 552.103 of the Government Code provides in part:

> (a) Information is excepted from [required public disclosure] if it is information relating to litigation of a civil or criminal nature to which the state or a political subdivision is or may be a party or to which an officer or employee of the state or a political subdivision, as a consequence of the person's office or employment, is or may be a party.

---

[1] Although you also raise section 552.108 of the Government Code, you make no arguments to support this exception. Accordingly, we find the district attorney's office has waived its claim under this exception. *See* Gov't Code § 552.301(e) (governmental body must provide comments stating why exceptions raised should apply to information requested).

. . .

> (c) Information relating to litigation involving a governmental body or an officer or employee of a governmental body is excepted from disclosure under Subsection (a) only if the litigation is pending or reasonably anticipated on the date that the requestor applies to the officer for public information for access to or duplication of the information.

Gov't Code § 552.103(a), (c). A governmental body that claims an exception to disclosure under section 552.103 has the burden of providing relevant facts and documentation sufficient to establish the applicability of this exception to the information at issue. To meet this burden, the governmental body must demonstrate that (1) litigation was pending or reasonably anticipated on the date of its receipt of the request for information and (2) the information at issue is related to the pending or anticipated litigation. *See Univ. of Tex. Law Sch. v. Tex. Legal Found.*, 958 S.W.2d 479 (Tex. App.—Austin 1997, orig. proceeding); *Heard v. Houston Post Co.*, 684 S.W.2d 210 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). Both elements of the test must be met in order for information to be excepted from disclosure under section 552.103. *See* Open Records Decision No. 551 at 4 (1990).

You state, and have provided documentation demonstrating, a lawsuit styled *Levee v. Florida Dep't of Corr., et al*, Civil Action No. 4:13-cv-00211-Y-BJ, in which the district attorney's office is representing an employee of the Tarrant County Community Supervision and Corrections Department in connection with her employment, was filed in the United States District Court for the Northern District of Texas, Fort Worth Division, prior to the district attorney's office's receipt of this request for information. You state the pending litigation and submitted information relate to the underlying criminal case prosecuted by the district attorney's office. Based on your representations and our review, we find the submitted information is related to the litigation that was pending when the request for information was received. We therefore conclude the district attorney's office may withhold the submitted information under section 552.103 of the Government Code.

However, once information has been obtained by all parties to the litigation though discovery or otherwise, no section 552.103(a) interest exists with respect to that information. *See* Open Records Decision Nos. 349 (1982), 320 (1982). Thus, information that has either been obtained from or provided to all parties to the pending litigation is not excepted from disclosure under section 552.103(a) and must be disclosed. Further, the applicability of section 552.103(a) ends once the litigation has been concluded. *See* Attorney General Opinion MW-575 (1982); *see also* Open Records Decision No. 350 (1982).

This letter ruling is limited to the particular information at issue in this request and limited to the facts as presented to us; therefore, this ruling must not be relied upon as a previous determination regarding any other information or any other circumstances.

Ms. Ashley D. Fourt - Page 3

This ruling triggers important deadlines regarding the rights and responsibilities of the governmental body and of the requestor. For more information concerning those rights and responsibilities, please visit our website at http://www.texasattorneygeneral.gov/open/orl_ruling_info.shtml, or call the Office of the Attorney General's Open Government Hotline, toll free, at (877) 673-6839. Questions concerning the allowable charges for providing public information under the Act may be directed to the Office of the Attorney General, toll free, at (888) 672-6787.

Sincerely,

Jennifer Burnett
Assistant Attorney General
Open Records Division

JB/tch

Ref:   ID# 504741

Enc.   Submitted documents

c:     Requestor
       (w/o enclosures)

**V.     Counsel failed to impeach witness based on conflicted statements in testimony concerning a shot gun**

     A.     Witness testimony conflicted

     B.     Hurst Police Officer Juminez stated under oath that he ask if a weapon where involved and Cathey Levee said "No". But in testimony he was cocking a shot gun and running upo and down stairs and she saw it in his hand. But Catherine – who is in testimony as to never leaving her side never saw a gun.

**VI.     Defense counselor Steven Bell admitted in court record he failed to impeach witness complainant based on conflicted statements in medical records affidavit in closing argument**

**VII.     Counsel failed to impeach witness Alexandra Levee based on conflicted statements concerning whip kick and held proof in  affidavit of April Divorce sworn and in conflict**

**VIII. Defense counselor Steven Bell refused to investigate claim of injury in medical records**

     A.     Several rendition to not equate  to trial testimony

B.      Medical fact refutes testimony and claim of ACL rupture in that





the rupture

ment is inev

17. Smilli IS.
BIOMED WE &

According to all radiology reports no collateral ligament damage occurred.

**IX.    Defense counselor Steven Bell failed to properly advise relator of appeal right in front of two witnesses.**

(see Affidavits Skye Levee and Risa Ruso)

**X.      Defense counselor Steven Bell abandoned  relator**

Admission by defense counsel of failure to investigate witness.

Eyewitness Catherine Levee

Appendix Defense failed to examine Brady Statement in eye witness account

Appendix June 10 2010 Letter Cathey Levee Tim Rodgers cc'd to relators email account.

## Other Authorities

See United States v. Wilkes, **20 F.3d 651**, 653 (5th Cir.1994) ...................................................... 1